Rebekah Schultheiss
OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **RODERICK E. THEIS, II**, | Case No. _____ |
| Plaintiff, | |
| v. | |
| **INTERMOUNTAIN EDUCATION SERVICE DISTRICT BOARD OF DIRECTORS**, **MARK S. MULVIHILL**, Superintendent, and **AIMEE VANNICE**, Assistant Superintendent and Director of Human Resources, all in their official capacities, | **VERIFIED COMPLAINT** |
| | Violation of First Amendment Rights (42 U.S.C. § 1983) |
| | **Jury Trial Demanded** |
| Defendants. | |

## Introduction

The InterMountain Education Service District ("IMESD") allows its employees to decorate their offices with personal items conveying a multitude of messages concerning numerous topics. These decorations include paintings, personal photos, lights, plants, posters, inspirational quotes, books, and other items. Some decorations even portray political messages, such as posters or statements in support of Oregon public educators' unions. But when Rod Theis, an IMESD Education Specialist, chose to decorate his office with two children's books, IMESD ordered him to remove them and threatened him with discipline simply because it disagreed with the books' content.

*He is He* and *She is She* (the "Books") are books designed for kids ages 2-8. The Books convey a simple message: "He is he" and "She is she." The Books explain how every child should embrace and love herself exactly as God made her to be.

When Mr. Theis heard one of the Books' authors speak at an event in Pendleton, Oregon, he was inspired by the author's message of hope for children regarding their God-designed purpose and thought the Books were edifying and encouraging. So Mr. Theis purchased the Books and placed them behind his office desk, displaying only their covers as decoration:

Verified Complaint

 

However, an employee at one of Mr. Theis' schools saw the covers of the Books and complained that they were "transphobic." IMESD labeled the display as "a hostile expression of animus toward another person relating to their actual or perceived gender identity" and ordered Mr. Theis to remove them. IMESD then warned him that "further conduct of this nature" may result in discipline, including termination of his employment. But Mr. Theis' display of the Books caused no disruption. Indeed, not one student or school staff member had even commented about the Books to Mr. Theis since he began displaying them. The school principal even told Mr. Theis that he did not consider the Books to be offensive or inappropriate.

IMESD has created and implemented a Speech Policy that forbids employees from expressing a biological view of sex but permits employees to express viewpoints that a person's subjective identity determines whether a person is male or female, not a person's sex. IMESD's censorship of Mr. Theis' message, and the Speech Policy on which that censorship was based, violate the First and Fourteenth Amendments to the United States Constitution. Preliminary injunctive relief is necessary because Mr. Theis desires to immediately display the Books and books

Verified Complaint

with similar messages in his office but is self-censoring his speech because IMESD has enforced and will continue to enforce its Speech Policy against him, which will subject him to escalating discipline up to and including termination of his employment.

## Parties

1.    Plaintiff Roderick Theis, II, is a Licensed Clinical Social Worker employed by IMESD as an Education Specialist and, at all times relevant to this Complaint, a resident of Umatilla County, Oregon.

2.    Plaintiff is also a professing Christian who bases his beliefs on the Bible and strives to live out his Christian faith at work and in the community.

3.    Plaintiff's sincerely held religious beliefs govern his views about all aspects of life, including human nature, sex, and gender.

4.    Plaintiff is motivated by his sincerely held religious beliefs to speak on many topics from a Christian worldview.

5.    Plaintiff believes that all people should be treated with dignity and respect, that God created every person male or female, and that people should accept their God-given sex and not seek to reject or change it.

6.    IMESD is a body corporate. Or. Rev. Stat. § 334.125(1).

7.    The IMESD Board of Directors (the "Board") is the governing board with final policymaking authority over IMESD and may sue and be sued. *Id.* § 334.125(2).

8.    The Board is charged, *inter alia*, with the power to select and terminate the superintendent and to establish policies for IMESD consistent with the requirements of law and statewide goals and standards established by the State Board of Education. *Id.* § 334.225.

9.    The Board is responsible for the enactment and existence of policies and practices related to employee expression, including the Speech Policy challenged herein. IMESD Board Policy BBA, BFC. True and correct copies of IMESD Board Policies BBA and BFC are attached as Exhibits A and B, respectively.

10.    IMESD is "governed" by policies promulgated by the Board. Thus, the Board maintains full management and control of IMESD through its policies. IMESD Board Policy BF. A true and correct copy of IMESD Board Policy BF is attached as Exhibit C.

11.    The Board is required to appoint and employ a superintendent to manage IMESD in a fashion consistent with state law and the policy determinations of the Board. Ex. A.

12.    The superintendent "is responsible for implementing Board policy and decisions in the management of [IMESD]." IMESD Board Policy BCD. A true and correct copy of IMESD Board Policy BCD is attached as Exhibit D.

13.    The Board has designated Defendant and Superintendent Mark S. Mulvihill as the individual "responsible for carrying out its policies" in the daily operations of IMESD. Ex. D.

Verified Complaint

14.    The Board retains broad supervisory authority over Defendant Superintendent, the assistant superintendents, and all other IMESD staff.

15.    The Board has ratified and implemented the Speech Policy adopted and enforced by Defendants at IMESD. The Board is ultimately responsible for its implementation and enforcement by IMESD employees.

16.    IMESD officials were acting pursuant to Board policy in promulgating and enforcing the Speech Policy against Plaintiff.

17.    The Board enforced the Speech Policy against Plaintiff when it affirmed Superintendent Mulvihill's decision to prohibit Plaintiff from displaying the Books in his office.

18.    Defendant Mulvihill, as a policymaker, is responsible for the implementation and enforcement of IMESD policies and their application to employee speech.

19.    Defendant Mulvihill is responsible for the administration, interpretation, and oversight of certain IMESD policies, including the Speech Policy, and their application to employee speech.

20.    Defendant Mulvihill enforced the Speech Policy against Plaintiff when he approved Defendant VanNice's decision to forbid Plaintiff from displaying the Books in his office and threatened further punishment for future violations.

21.    Defendant Mulvihill is sued in his official capacity.

Verified Complaint

22.   Defendant Aimee VanNice is, and was at all times relevant to this Complaint, the Assistant Superintendent and Director of Human Resources at IMESD.

23.   Defendant VanNice is responsible for the enforcement of certain District policies, including the Speech Policy, and their application to employee speech.

24.   Defendant VanNice enforced the Speech Policy against Plaintiff when she prohibited Plaintiff from displaying the Books in his office and threatened further punishment for future violations.

25.   Defendant VanNice is sued in her official capacity.

26.   All Defendants prohibited Plaintiff from displaying the Books in his office pursuant to the Speech Policy and practice challenged herein.

27.   All Defendants are responsible for the implementation and application of the Speech Policy and practices by IMESD employees.

## **Jurisdiction and Venue**

28.   This civil rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

29.   This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

30.   This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; the requested injunctive relief

Verified Complaint

under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; damages under 28 U.S.C. § 1343; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

31.    Venue is proper in this District Court and Division under 28 U.S.C. §§ 1391(b)(1), (c)(2) because all the events and omissions giving rise to the claims occurred in this District and because the Defendants reside in this District.

32.    Those same facts grant this Court personal jurisdiction over IMESD.

## Factual Background

### I.    Defendants' Speech Policy

33.    IMESD is an Education Service District that provides services to 17 component school districts in four counties—Morrow, Umatilla, Union, and Baker.

34.    IMESD is under the direction and control of the Defendants.

35.    Defendants are the official policymakers for IMESD and have enacted and are responsible for the Speech Policy challenged herein and its enforcement against Plaintiff.

36.    Defendants approved IMESD Board Policy ACB, "Every Student Belongs" ("Policy ACB"). A true and correct copy of Policy ACB is attached as Exhibit E.

37.    Defendants approved IMESD Board Policy ACB-AR ("Policy ACB-AR"). A true and correct copy of Policy ACB-AR is attached as Exhibit F.

38.    Policies ACB and ACB-AR constitute Defendants' Speech Policy.

39.    The Speech Policy includes a section entitled "Bias Incident." Ex. E at 1.

Verified Complaint

40.    The Speech Policy defines "Bias incident" as a "person's hostile expression of animus toward" another "person's perceived ... gender identity[.]" *Id.*

41.    In response to a bias incident, the Speech Policy requires IMESD personnel to: (1) "[a]ddress the history and impact of bias and hate"; (2) "[a]dvance the safety and healing of those impacted by bias and hate"; (3) "[p]romote accountability and transformation for people who cause harm"; and (4) "[p]romote transformation of the conditions that perpetuated the harm." Ex. F at 1.

42.    The Speech Policy defines broadly "[p]ersons impacted by a bias incident" as "to include persons directly targeted by an act, as well as the community of students as a whole who are likely to be impacted by the act." *Id.*

43.    The Speech Policy does not require IMESD to identify a specific individual "impacted" to determine that conduct constitutes a "bias incident."

44.    The Speech Policy does not require IMESD to determine whether a specific individual or groups of individuals were actually "impacted" to conclude that conduct constitutes a "bias incident."

45.    Violations of the Speech Policy "may result in discipline up to and including termination of [] employment." *See* Letter of Directive at 2; Superintendent's Appeal Response Letter at 4. True and correct copies of the Letter of Directive and the Superintendent's Appeal Response Letter are attached as Exhibits G and H, respectively.

46.    Under the Speech Policy, IMESD officials can censor expression that they deem inappropriate or that they subjectively determine targets a certain group,

even if this expression does not materially disrupt IMESD's ability to provide efficient services to students or its component school districts.

## II.    Plaintiff's Desired Expression

### A. Employee Office Spaces

47.    Plaintiff is a Licensed Clinical Social Worker employed by IMESD as an Education Specialist. He has been employed by IMESD since 2008.

48.    In this role, Plaintiff travels to schools within IMESD's jurisdiction to meet with students and assess their educational support needs.

49.    Plaintiff's duties involve meeting with students one-on-one to conduct individual standardized tests to evaluate the student's intellectual or academic level or behavioral assessments to determine their social or emotional needs.

50.    Plaintiff then writes comprehensive reports about his observations of a student, the assessment results, and his recommendations for school district personnel on how to best meet the student's needs.

51.    Itinerant IMESD employees are often given office spaces in their assigned schools.

52.    Employees commonly decorate their offices with paintings, personal photos, lights, plants, posters, inspirational quotes, books, and other items.

53.    For example, the IMESD Speech Pathologist assigned to the Elgin School District decorates her office by displaying children's books such as *What Should Danny Do?* and *What Should Darla Do?* by Ganit and Adir Levy, stuffed

Verified Complaint

animals, toys, games, the American flag, and an inspirational quote: "In a world where YOU can be anything Be Yourself."

54.    Another IMESD employee fills her office bookshelf with artwork, children's toys, arts and crafts materials, and various books on counseling students, including a large collection of books for adolescent girls going through puberty.

55.    Another fills her bookshelf with children's books and board games. She decorates her office wall with artwork, family photos, and personal notes from coworkers and students.

56.    Some employees display items or political messages in support of the Oregon Education Association ("OEA")—the union that represents K-12 public school educators—which pushes the use of gender-neutral pronouns when referring to students and warns members against "misgendering." *See* http://bit.ly/3H6zGCo.

57.    For example, one employee displays, next to personal and family photos on her office wall, a picture of workers standing in a picket line and holding rainbow-colored signs that spell the word "UNIONS."

58.    OEA even encourages members to engage in "Activism through Art," recognizing that "[a]rt is a powerful tool for change," and provides several posters for members to "use[] for creative and social media content, visuals, public messages, calls to action, spokesperson materials, and more." *Id.*

Verified Complaint

59.    The posters available on OEA's website promote LGBTQ+, Black Lives Matter, and other political issues.

  

60.    Plaintiff has an office located at La Grande Middle School ("LGMS") in the La Grande School District ("LGSD").

61.    LGMS teachers also commonly decorate their offices with paintings, personal photos, lights, plants, posters, inspirational quotes, books, and other items, including items promoting political messages.

62.    For example, an LGMS Social Studies teacher displays in the classroom an illustration of President Barack Obama saying "Yes, we can."

63.    An LGMS Special Education teacher displays a Pride flag with the words "YOU ARE LOVED" written on it.

64.    And an LGMS Counselor displays a poster that says, "Black students, Black dreams, Black futures, Black lives MATTER!"

65.    The same counselor also displays a rainbow-colored sticker promoting the Oregon School Counselors Association, an entity which has publicly criticized

Verified Complaint

President Donald Trump's executive orders for causing "heightened fear and anxiety" among the "historically marginalized community including our immigrant and refugee students and our LGBTQ2SIA+ students[,]" https://bit.ly/4jLORQ5, directs counselors to resources instructing them to use the chosen names and pronouns of transgender students, rather than biological or given names, and suggests that counselors should not disclose a student's gender identity to parents without the student's permission. *See* https://bit.ly/44FpgUp.

66.     Plaintiff spends roughly two to three days in his LGMS office per week.

67.     Plaintiff also has an office located in the Elgin School District.

68.     During the 2022-2023 and 2023-2024 school years, Plaintiff had an office located in the Union School District.

69.     Plaintiff uses his offices for writing reports, responding to emails, consulting with teachers regarding student needs, and testing and evaluating students.

70.     A sign on Plaintiff's LGMS office door reads "Staff Only."

71.     As such, students and parents may not and do not enter Plaintiff's LGMS office, except when students visit under his direct supervision during evaluations or testing.

72.     Plaintiff evaluated only four students in his LGMS office during the time he displayed the Books in his office.

Verified Complaint

### B. *He is He* and *She is She*

73.    On October 2, 2024, Plaintiff began displaying two books on the windowsill behind his desk in his LGMS office: *He is He* and *She is She* by Ryan and Bethany Bomberger.

74.    Only the covers of each book were visible:



75.    *He is He*'s cover depicts an illustration of a smiling boy and contains the phrases "He is He" and "a book about your identity."

76.    *She is She*'s cover depicts an illustration of a smiling girl and contains the phrases "She is She" and "a book about your identity."

77.    Plaintiff purchased the Books using his personal funds.

78.    Plaintiff did not use either book as part of his work with students.

79.    Plaintiff displayed the covers of the Books as his expression.

80.     Four students visited Plaintiff's office for evaluation between the time when Plaintiff began displaying the Books and when he was asked to remove them, but no student or staff member made a comment to Plaintiff or inquired about either of the Books.

81.     Upon information and belief, between the time when Plaintiff began displaying the Books and when he was asked to remove them from his office, no student became visibly upset or distracted by the Books.

82.     Upon information and belief, between the time when Plaintiff began displaying the Books and when he was asked to remove them from his office, no student, parent, or staff member entered Plaintiff's office to handle or read either of the Books.

### C. *Johnny the Walrus*

83.     Plaintiff also displayed a book on his desk in his Elgin and Union School District offices: *Johnny the Walrus* by Matt Walsh.

84.     *Johnny the Walrus* is a children's book about the creativity of children and imagination.

85.     These are images of the front and back covers:



Verified Complaint

86.    The description of the book is as follows: "Johnny is a little boy with a big imagination. One day he pretends to be a big scary dinosaur, the next day he's a knight in shining armor or a playful puppy. But when the internet people find out Johnny likes to make-believe, he's forced to make a decision between the little boy he is and the things he pretends to be — and he's not allowed to change his mind." https://bit.ly/4jOesI1.

87.    Plaintiff purchased the book using his personal funds.

88.    Plaintiff displayed the book as his expression in his Union office during the 2022-2023 and 2023-2024 school years and in his Elgin office during the 2024-2025 school year.

89.    In Plaintiff's Elgin office, only the front and back covers were visible to visitors:



Verified Complaint

### III.    Censorship of Plaintiff's Expression

90.    Defendants have applied the Speech Policy against Plaintiff based on his religious speech.

### A. Plaintiff meets with LGMS Principal to discuss the Books

91.    On October 21, 2024, LGMS Principal Chris Wagner emailed Plaintiff to request a meeting to discuss "some concerns brought to [Principal Wagner] about a couple of books on display in [Plaintiff's] office." October 21–23, 2024 Emails between Principal Wagner and Plaintiff Theis at 2. A true and correct copy of the email chain is attached as Exhibit I.

92.    In the same email chain, Principal Wagner instructed Plaintiff to "place the books out of sight." Ex. I at 1.

93.    On October 23, 2024, Plaintiff met with Principal Wagner.

94.    During that meeting, Principal Wagner discussed a complaint he had received from an LGSD staff member about the Books.

95.    According to Principal Wagner, the staff member was concerned about messages that could be considered offensive to transgender students.

96.    When Plaintiff asked why this staff person thought this, Principal Wagner responded that the staff member had looked up the Books online and then determined that they were offensive.

97.    After Principal Wagner and Plaintiff reviewed the Books together to determine whether they contained anything inappropriate, Principal Wagner said that he did not find anything offensive or inappropriate in them.

Verified Complaint

98.    However, Principal Wagner noted that each book contained several Bible verses, which he said could be considered pushing a certain point of view on a student.

99.    Plaintiff explained that no student or staff member had ever inquired about the Books to him during the month since he began displaying them.

100.    Principal Wagner responded that his job was to maintain a neutral environment where no particular views are pushed on students.

101.    While Principal Wagner clarified that he did not believe that Plaintiff had done anything inappropriate, he again requested that Plaintiff remove the Books from his office to maintain the neutrality at school.

102.    In a follow-up email to Plaintiff, Principal Wagner repeated his instruction to Plaintiff to "remove the two books from the school and keep them for personal use only." Ex. I at 1.

103.    Plaintiff complied with the directive and removed the Books from his office.

**B. IMESD notifies Plaintiff of complaint and bias incident investigation into the Books**

104.    On October 22, 2024, Plaintiff received an email from Defendant VanNice notifying him that an LGSD employee had filed a bias incident complaint against him with IMESD "regarding the following materials displayed in your office at LaGrande Middle School: *He is He* and *She is She*." October 22, 2024 Email from Aimee VanNice to Plaintiff Theis. A true and correct copy of the email is attached as Exhibit J.

Verified Complaint

105.    Defendant VanNice informed Plaintiff that IMESD would conduct an investigation of the display of the Books' covers as "a potential bias incident relating to another person's gender identity" pursuant to Policies ACB and ACB-AR. Ex. J at 3.

106.    Defendant VanNice scheduled a meeting for October 29, 2024. *Id.*

**C. Plaintiff meets with IMESD personnel about the complaint**

107.    On October 29, 2024, Plaintiff met with Defendant VanNice; Assistant Superintendent and Director of Special Education Corrina Robinson; Director of Special Education Administration and Director of School Psychology & Behavioral Services Gretchen McKay; HR Specialist Kim Youncs; and Autism Consultant Margaret Anderson, whom Plaintiff invited as an employee representative, at IMESD's Pendleton, Oregon office.

108.    Both Ms. Youncs and Ms. Anderson took notes during the meeting. True and accurate copies of Kim Youncs' and Margaret Anderson's notes from the October 29, 2024 meeting are attached as Exhibits K and L, respectively.

109.    Defendant VanNice began the meeting by explaining that she had been informed that the Books were displayed in Plaintiff's office in an area where no other books were located or displayed and that IMESD was investigating the display of the Books as a potential bias incident under Board Policy ACB. Ex. K at 1.

110.    She then questioned Plaintiff about his reason for displaying them. Ex. K at 1-2; Ex. L at 1-2.

Verified Complaint

111.    Plaintiff responded that the Books were for decoration to make his office more kid friendly. Ex. K at 2; Ex. L at 1.

112.    Plaintiff further explained the message that, in his view, the Books' covers communicated.

113.    He described how the phrase "She is She" sends a positive message that girls can do anything and that it's great to be a girl. Similarly, Plaintiff explained that "He is He" sends a message that boys can do great things, that it's great to be a boy, and great to be a man. Ex. K at 2; Ex. L at 1.

114.    This is all Plaintiff intended to convey by displaying the Books' covers.

115.    When asked whether the Books are part of the materials Plaintiff uses in working with children or carrying out his job responsibilities, Plaintiff responded "No." Ex. K at 1; Ex. L at 1.

116.    Even though the only messages displayed in Plaintiff's office were "He is He" and "She is She," Defendant VanNice interrogated Plaintiff about many passages and viewpoints contained in the Books. Ex. K at 1-2; Ex. L at 1-2.

117.    Defendant VanNice questioned Plaintiff about "the science" and the use of pronouns in the Books. *Id.*

118.    Defendant VanNice turned to a page in *She is She* that contained several Bible verses. *Id.* at 3.

119.    The page begins: "What does the Bible say?"

120.    It contains the following verses:

Verified Complaint

a. "So God created mankind in His own image, in the image of God He created them: male and female he created them." Genesis 1:27 (NLT).

b. "For You made the parts inside me. You put me together inside my mother." Psalms 139:13 (NLV).

c. "For we are God's masterpiece. He has created us anew in Christ Jesus, so we can do the good things [H]e planned for us long ago." Ephesians 2:10 (NLT).

d. "Don't copy the behavior and customs of this world, but let God transform you into a new person by changing the way you think..." Romans 12:2 (NLT).

e. "For this is how God loved the world: He gave His one and only Son, so that everyone who believes in Him will not perish but have eternal life." John 3:16 (NLT).

121.    Defendant VanNice asked Plaintiff whether the Bible supports "they/them." Ex. K at 3.

122.    Plaintiff responded that he believed that the Bible supports the Books. *Id.*

123.    Defendant VanNice turned to the next page, which begins, "What does science say?" and had Plaintiff read it. Ex. L at 2;

124.    The page contains several scientific facts about how boys and girls are different in important ways:

a. "As soon as we exist, something special inside each of us (called DNA) determines whether we will be girls or boys. That DNA never changes, no matter **how** we feel."

b. "Doctors know **long** before we're born whether we are females or males. They use a special machine to see inside a mother's womb. The image is called an **ultrasound**."

c. "There are **thousands** of physical differences between girls and boys. From our brains to our faces to our lungs and other body parts, we are wonderfully created equal but not the same."

d. "From running to swimming to soccer and volleyball, it's important to have separate girls' & boys' sports teams to give us **all** a chance to **shine**. It's fun to compete when it's fair."

e. "Only females can get pregnant, carry babies inside of them and give birth. How neat! No guy can ever do that. Even so, moms and dads are equally valuable."

125.    When Defendant VanNice questioned Plaintiff about the meaning of the page, Plaintiff responded that DNA determines what we are and never changes, that females have two "X" chromosomes and males have "XY" chromosomes, and read from the book: "She is she naturally." Ex. K at 3; Ex. L at 2.

126.    Defendant VanNice then demanded to know how the book could be used to support a transgender student. *Id.*

Verified Complaint

127.    Plaintiff reiterated that he doesn't use any of the Books as part of his work with students. *Id.*

128.    He further explained that he intentionally placed the Books behind his desk to ensure that he could supervise access to them. *Id.*

129.    Plaintiff then recounted the one occasion when a Union School District student that Plaintiff was evaluating asked about *Johnny the Walrus* and how Plaintiff summarized the book and shared parts of it with the student, all under Plaintiff's supervision. *Id.*

130.    Defendant VanNice then asked, "when an appropriate time would be to use that book?" and "Why can't Johnny be a walrus?" *Id.*

131.    Plaintiff only responded to the student's question and Plaintiff repeated that he doesn't use the Books; he displayed them as art. *Id.*

132.    Plaintiff also noted that it is very common for school staff to have books in their room, purchased by themselves, as well as lighting, music, and other decorations to create a good environment for students. *Id.*

133.    When asked specifically whether Plaintiff knows if other teachers have books on display in their classrooms, he explained that some classrooms, including the two flanking his office, contain walls of books. *Id.*

134.    Many books contained in LGMS classrooms feature violence, suicide, explicit language, domestic abuse, drug and alcohol use, and sexual content.

135.    To name but a few, these books include *The Twilight Saga*, *The Hunger Games* series, The *Divergent* series, *The Blackthorn Key* by Kevin Sands, *I am*

*Number Four* by Pittacus Lore, *The Darkest Path* by Jeff Hirsch, *Immortal Beloved* by Cate Tiernan, *What Happened to Goodbye* by Sarah Dessen, and *Queen of Shadows* by Sarah J. Maas.

136.    Other books on display and available for students to read reference same-sex relationships or feature non-binary characters.

137.    For example, one 6th-grade classroom contains *Cinder and Glass* by Melissa de la Cruz, which features a same-sex relationship.

138.    Another 6th-grade classroom contains *The Wicked Fate* and *This Poison Heart* by Kalynn Bayron, which include non-binary characters and depict a same-sex relationship between the main character and another female character.

139.    The LGMS library also includes *Heartstopper* and *Heartstopper, Volume 2* by Alice Oseman—books about a same-sex male relationship. The back of *Heartstopper* depicts two boys kissing.

140.    Returning to *She is She*, Defendant VanNice asked "Does this book support transgender?" Ex. K at 4; Ex. L at 3.

141.    Plaintiff responded that the book is not about being transgender. Ex. K at 3.

142.    Defendant VanNice then asked, "Does this book support a she wanting to be a he?" *Id.* at 3; Ex. K at 4 ("[A] he wanting to be a she?").

143.    Plaintiff responded "No." *Id.*

Verified Complaint

144.    Defendant VanNice asked whether Plaintiff believed displaying the Books in school, where serving students takes place, constituted a hostile expression of animus towards others. *Id.*

145.    Plaintiff responded that he has no ill will towards anyone, that he wished no harm to anybody, and that the Books do not contain messages of ill will or hostility. *Id.*

146.    But Defendant VanNice kept pressing, asking Plaintiff if he understood the possibility that a student may have thoughts about being transgender and may see the Books. Ex. K at 5.

147.    Plaintiff responded that that was possible. *Id.*

148.    Plaintiff then pointed out that some of the books in the classrooms next to his office are labeled for young adults, contain sexually inappropriate material (including a book where a boy masturbates), and that several parents had complained about those books, but they remained on display. *Id.*

149.    One of the classrooms contains *It Starts with Us* by Colleen Hoover, *Three Dark Crowns*, *One Dark Throne,* and *Queens of Fennbirn* by Kendare Blake, and *Before I Fall* by Lauren Oliver, all of which portray violence and sexual scenes or references.

150.    The classroom also contains *City of Bones* and *City of Ashes* by Lauren Oliver, wherein a gay character's romantic interests are a main plot point.

151.    The other classroom contains *Graceling* by Kristin Cashore, which features violence, gore, references to birth control, and depicts characters having sex.

Verified Complaint

152.    But Defendant VanNice expressed no concern about those books. She would not even consider Plaintiff's offer to send pictures of the books as context for the investigation. *Id.*; Ex. L at 4.

153.    The meeting concluded after Defendant VanNice informed Plaintiff that the Books would not be appropriate in any of his office spaces within any school district. *Id.*

154.    She explained that Plaintiff may not display books that contain a view that might be contrary to someone else's beliefs or views. *Id.* at 4; Ex. K at 6. According to her, IMESD employees were not allowed to express views and opinions on specific subjects (in this instance, gender) while at work. *Id.*

155.    Defendants, however, allow many books that contain views that might be and are contrary to someone else's beliefs or views, and allow other employees to express views and opinions on specific subjects, including gender.

### D. IMESD determines that the display of all three books violates the Speech Policy

156.    On November 22, 2024, Defendant VanNice issued a Letter of Directive to Plaintiff ("the Letter"). *See* Ex. G.

157.    The Letter detailed IMESD's "findings and final determination" following its investigation. *Id.* at 1.

158.    It explained that IMESD had received a complaint regarding the display of "transphobic books" in "clear view of where students sit when they visit [Plaintiff's] office for purposes of evaluations." *Id.*

Verified Complaint

159.    The Letter listed the "transphobic" books as *He is He*, *She is She*, and *Johnny the Walrus*. *Id*.

160.    The Letter concluded that Plaintiff's "display of He is He, She is She, and Johnny the Walrus for students visiting [Plaintiff's] office for purposes of evaluations and student services, amounts to a bias incident under Policy ACB, Every Student Belongs" because their display constituted "a hostile expression of animus toward another person relating to their actual or perceived gender identity." *Id*. at 2.

161.    The Letter warned that "further conduct of this nature may result in discipline up to and including termination of [] employment." *Id*.

162.    The Letter also directed Plaintiff to complete "Making Schools Safe and Inclusive for Transgender Students" training. *Id*. at 3.

**E. Superintendent Mulvihill rejects Plaintiff's appeal**

163.    Policy ACB-AR permits a respondent to a bias incident complaint to appeal the initial determination to the superintendent. *See* Ex. F at 1 (Providing that a respondent "may submit a written appeal to the superintendent within five school days[.]")

164.    On December 2, 2024, Plaintiff filed his appeal of Defendant VanNice's determination with Defendant Superintendent Mulvihill. A true and accurate copy of Plaintiff's December 2, 2024 Appeal is attached as Exhibit M.

165.    Plaintiff's Appeal began by observing how IMESD and school district personnel commonly decorate their offices or classrooms. Ex. M at 3.

Verified Complaint

166. The Appeal explained that Plaintiff has decorated his offices by displaying pieces of art, children's books, personal pictures, and inspirational sayings. *Id.*

167. The Appeal stated that the Books were "edifying and encouraging books" and had "positive kid-friendly artwork" to display. *Id.*

168. The Appeal reiterated that Plaintiff does not have "prejudiced, spiteful or malevolent ill-will toward anyone," that Plaintiff has not made a hostile expression of animus toward anyone, and that the Books "do not convey any sort of animus anywhere within them toward anyone." *Id.* at 6.

169. The Appeal also described how Plaintiff's office—which is marked "Staff Only"—is generally off-limits to students, that students only enter his office when he brings them in for evaluations, that students may only access either book if they asked for and received permission from Plaintiff, and that no student ever asked or commented about the Books. *Id.* at 7.

170. The Appeal noted that "there is no evidence provided of anyone being targeted or impacted" by Plaintiff's display of the Books. *Id.* at 11.

171. Indeed, the Appeal recounted how the LGMS Principal did not think the Books were inappropriate or offensive, *id.*, and how the building administrator of Plaintiff's Elgin office *approved* of Plaintiff's display of *Johnny the Walrus. Id.* at 13.

172. Instead, the Appeal states, the "only suggested evidence of impact" in the Letter of Directive is that "a staff person was offended by the display of the two

Verified Complaint

books in [Plaintiff's] office and this staff person considers them to be 'transphobic.'" *Id.* at 11.

173.    Rather, the Letter "hypothesize[s] possible targeting and possible impact" by concluding that someone may see the Books and take offense. *Id.*

174.    Turning to Defendant VanNice's warning that "further conduct of this nature" could result in termination of employment, the Appeal expressed Plaintiff's concern that he did not understand what "further conduct of this nature" meant. *Id.* at 12.

175.    The Appeal asked whether "further conduct" meant if someone "who disagrees with [Plaintiff] about what is true, positive, or harmful decides to take offense at something in [Plaintiff's] office space in the future." *Id.*

176.    The Appeal concluded by reaffirming Plaintiff's commitment to his job and requesting that Defendant Mulvihill overturn Defendant VanNice's decision that Plaintiff's display of the Books amounted to a bias incident. *Id.* at 13.

177.    On January 15, 2025, Defendant Mulvihill sent Plaintiff a letter denying his appeal. Ex. H at 1.

178.    Defendant Mulvihill concluded that Defendant VanNice's determination that Plaintiff's display of the Books in his office "amounted to a bias incident" was "[s]ubstantiated," because the Books "promote a binary view of gender, which excludes and invalidates an understanding of gender diversity," and their display "communicates a message of exclusion and diminishes the validity of non-binary and

transgender experiences" and "contributes to an unwelcoming environment, which directly contradicts IMESD's commitment to inclusivity and diversity." *Id.*

179.    But LGMS English and Science class lessons also teach "a binary view of gender."

180.    For example, one LGMS science lesson on genetics teaches students that females have two "X" chromosomes and males have "XY" chromosomes. In other words, students learn that DNA dictates an individual's sex and other characteristics. *See* LGMS Sesame Street Genetics Lesson. A true and accurate copy of the LGMS Sesame Street Genetics Lesson is attached as Exhibit N.

181.    An LGMS English class teaches students to use traditional "he/him" or "she/her" pronouns when referring to a single, gendered individual.

182.    The English grammar lessons do not teach students to use non-binary "they/them/their" pronouns when referring to a single, gendered individual.

183.    Defendant Mulvihill also found Defendant VanNice's determination that Plaintiff's "conduct" had "conflicted with the District's policy and responsibilities under Oregon law to ensure an inclusive educational environment" to be "[s]ubstantiated." Ex. H at 1.

184.    Defendant Mulvihill explained that this was because Plaintiff "introduced materials into the public school environment" that "communicate[] a message that is excluding on the basis of gender identity" and thus "undermine[] the inclusive environment" at LGSD and IMESD. *Id.* at 2.

Verified Complaint

185.    Thus, IMESD's determination that Plaintiff's display of the Books violated IMESD policies was because of the message IMESD officials interpreted the Books to convey.

186.    Indeed, Defendant Mulvihill goes on to note that the Books "present a point of view that not everyone is going to agree with," and that "such a point of view undermines the Board Policy ACB[.]" *Id.* at 2-3.

187.    Defendant Mulvihill admitted that the display of the Books did not disrupt IMESD's ability to provide efficient services.

188.    The Letter confirmed that IMESD "did not find that any one person was directly targeted" by Plaintiff's display. *Id.* at 3.

189.    Defendant Mulvihill also admitted that IMESD "d[id] not require evidence of direct targeting" for it to find a violation of the Speech Policy. *Id.*

190.    Rather, Defendant Mulvihill explained that IMESD's determination was based on the hypothetical and subjective "potential impact" of the display on students and staff who "may interpret that the books send a message of bias and exclusion" at some point in the future. *Id.* at 3.

191.    Finally, Defendant Mulvihill informed Plaintiff that he would "uphold[]" Defendant VanNice's Letter of Directive and instructed Plaintiff to "comply with [IMESD] Board Policy ACB[.]" *Id.* at 4.

192.    Defendant Mulvihill then warned Plaintiff that "failure to comply with [IMESD] Board Policies and directives may result in discipline up to and including termination of [Plaintiff's] employment." *Id.*

Verified Complaint

**F. The Board rejects Plaintiff's appeal of Superintendent Mulvihill's decision**

193.    Policy ACB-AR permits a respondent to a bias incident complaint to request an appeal of the Superintendent's determination to the Board. *See* Ex. F at 2 (Providing that a respondent may file a written appeal "with the Board within five school days of receipt of the superintendent or designee's response[.]").

194.    The Board "may decide to hear or deny the request for appeal[.]" *Id.*

195.    The Board's decision regarding an appeal is final. *Id.*

196.    On January 22, 2025, Plaintiff emailed the Board his request for an appeal. A true and accurate copy of Plaintiff's January 22, 2025 Appeal is attached as Exhibit O.

197.    In his email, Plaintiff explained that "the matter seems to be a fairly clear example of viewpoint discrimination against [him]." Ex. O.

198.    On February 24, 2025, the Board sent Plaintiff a letter responding to his request for appeal. A true and accurate copy of the Board's February 24, 2025 Response Letter is attached as Exhibit P.

199.    The Board informed Plaintiff that it had voted to deny his request for appeal, relying on the findings of the Superintendent. Ex. P.

**IV.    Continuing Impact of Defendants' Policies on Plaintiff**

200.    Defendants' Speech Policy challenged herein, and which IMESD officials enforced in censoring Plaintiff, remain in place and serve to chill and deter Plaintiff's (and other employees') expression.

Verified Complaint

201.    Immediately and in the future, Plaintiff desires to display *He is He*, *She is She*, *Johnny the Walrus*, and books with similar messages.

202.    Plaintiff is refraining from displaying his Books or books conveying similar messages, however, out of fear that he will again be found to have violated the Defendants' Speech Policy challenged herein, and thus be subject to punishment, including termination of his employment.

203.    Plaintiff's fear of punishment severely limits his constitutionally-protected expression at IMESD and in its component school districts.

204.    Plaintiff has suffered great personal cost due to Defendants' actions made pursuant to their Speech Policy and the Speech Policy itself.

205.    Defendants' investigation consistently disrupted Plaintiff's work and often consumed his personal time.

206.    Plaintiff spent hundreds of hours traveling to and from meetings with IMESD personnel, attending those meetings, gathering evidence, preparing and writing his responses to Defendants' allegations and investigation, and preparing and writing appeals.

207.    Plaintiff also experienced distress associated with the entire investigation and appeal process and from the threat of losing his job.

Verified Complaint

**Causes of Action**

FIRST CAUSE OF ACTION
Violation of Plaintiff's First Amendment Right to Freedom of Speech
Content & Viewpoint Discrimination
(42 U.S.C. § 1983)

208.    Plaintiff re-alleges and incorporates herein, as though fully set forth, Paragraphs 1 through 207 of this Complaint.

209.    The First Amendment's Freedom of Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits censorship of protected expression.

210.    Non-disruptive expression by an employee on a matter of public concern is protected by the First Amendment.

211.    Plaintiff's speech is protected under the First Amendment.

212.    Plaintiff's expression—displaying the books *He is He*, *She is She*, and *Johnny the Walrus* in his office—did not and does not materially and substantially interfere with IMESD's ability to provide efficient services to the public or any of its component school districts.

213.    The messages Plaintiff expressed with the display of the Books are exclusively Plaintiff's private expression and are not school-sponsored speech.

214.    But pursuant to their Speech Policy and practice, Defendants have singled out Plaintiff's expression and prevented him from displaying his messages in his offices at school.

215.    Viewpoint-based restrictions, whether in a public or nonpublic forum, are unconstitutional and subject to strict scrutiny.

216.    Time, place, and manner restrictions on speech must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

217.    Defendants' censorship of Plaintiff's display of the Books while permitting books and other decorations with different messages on related topics is content and viewpoint discrimination, which is unconstitutional in any type of forum.

218.    Defendants expressly interpret their Speech Policy in a viewpoint-discriminatory manner, permitting employees to decorate their offices with a wide variety of expressive messages, including messages with the viewpoint that gender is fluid, gender is on a spectrum, or there are more than two genders, while prohibiting any expression of a contrary view.

219.    Defendants expressly interpret their Speech Policy to prohibit the expression of certain viewpoints without regard to whether the expression materially or substantially disrupts IMESD's ability to provide efficient services.

220.    Defendants' Speech Policy and practice also impose an unconstitutional heckler's veto because they permit the restriction of protected employee expression merely because school officials deem an employee's expression "offensive" to others.

221.    Prior restraints on speech may not delegate overly broad discretion to government decision-makers, may not allow for content-based restrictions, must further a compelling government interest, must be narrowly tailored, and must be the least restrictive means available.

Verified Complaint

222.    Defendants' Speech Policy and practice impose an unconstitutional prior restraint because they vest school officials with unbridled discretion to permit or deny employee expression subject to no standards or guidelines, thereby permitting content- and viewpoint-based enforcement of the policies.

223.    Defendants' Speech Policy and practice give unbridled discretion to school officials by permitting them to forbid the display of messages they deem to be "hostile expression[s] of animus toward another person" based on "gender identity," or otherwise "contribute[] to an unwelcoming environment."

224.    Defendants' Speech Policy and practice are overbroad because they sweep within their ambit protected First Amendment expression.

225.    Defendants' Speech Policy and practice are overbroad because they restrict employee speech that does not and will not materially and substantially disrupt IMESD's ability to provide efficient services.

226.    The overbreadth of the Defendants' Speech Policy and practice chill the speech of employees who might seek to engage in private expression through the display of messages in their offices.

227.    Defendants have no compelling or legitimate reason that would justify their censorship of the message that Plaintiff seeks to express.

228.    Defendants' Speech Policy and practice are not the least restrictive means of achieving any compelling interest they may allege.

229.    Defendants' Speech Policy and practice are not reasonably related to any legitimate governmental or pedagogical concerns.

Verified Complaint

230.   Censoring employees' private and protected speech that does not materially disrupt IMESD's ability to provide efficient services is not and cannot be a legitimate governmental or pedagogical concern.

231.   Defendants' Speech Policy prohibiting "bias incident[s]" or "hostile" messages in employees' offices, both facially and as-applied, violates the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

SECOND CAUSE OF ACTION
Violation of Plaintiff's First Amendment Right to Freedom of Speech
Retaliation
(42 U.S.C. § 1983)

232.   Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1–207 of this Complaint.

233.   The First Amendment's Free Speech Clause protects Plaintiff's ability to speak and to associate with messages of his choosing.

234.   The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

235.   In addition to providing a valuable service to his community, Plaintiff receives a valuable government benefit from holding his Education Specialist position.

236.   Plaintiff speaks as a private citizen when he decorates his office.

237.   Plaintiff's interest as a citizen commenting on matters of public concern outweighs IMESD's interest in efficient provision of services.

Verified Complaint

238.   Plaintiff's speech on matters of public concern never prevented Defendants from efficiently providing services to the public.

239.   Defendants' retaliatory and unconstitutional actions taken against Plaintiff would deter a person of ordinary firmness from exercising his right to free speech in the future.

240.   Defendants took these retaliatory and unconstitutional actions against Plaintiff at least in part because of the views he had expressed on matters of public concern.

241.   The decisions taken by Defendants via the final policymaker and based on IMESD policy were the moving force of the violation of Plaintiff's rights.

242.   Defendants' retaliatory and unconstitutional actions taken against Plaintiff violate his clearly established rights of the freedom of speech and the freedom of the press as guaranteed by the First Amendment to the United States Constitution.

### THIRD CAUSE OF ACTION
Violation of Plaintiff's First Amendment Right to Free Exercise of Religion
(42 U.S.C. § 1983)

243.   Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1–207 of this Complaint.

244.   The First Amendment's Free Exercise Clause guarantees religious believers—at a bare minimum—equal treatment.

245.   The First Amendment's Free Exercise Clause protects Plaintiff's right to decorate his office, to create or not create expression, to participate or not

participate in religious exercises, to speak or not speak, and to associate or not associate with messages in accordance with his religious beliefs.

246. The First Amendment also protects Plaintiff from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to policies and practices that lack neutrality and general application, being targeted for his religious beliefs, and being punished for exercising his religious beliefs.

247. The First Amendment doubly protects religious speech under the hybrid rights doctrine—the free exercise of religion in conjunction with other rights, namely the right to free speech.

248. Plaintiff exercises his religion under the First Amendment when he follows God's calling on his life, professes his faith, and decorates his office with items expressing messages consistent with his religious beliefs.

249. Plaintiff's sincerely held religious beliefs motivated him to display the Books in his office.

250. Defendants substantially burdened Plaintiff's religious exercise when they forced Plaintiff to choose between exercising his religious beliefs and being dismissed or violating his conscience.

251. Defendants' censorship also infringed on the hybrid of Plaintiff's Free Exercise of Religion and Free Speech rights.

252. IMESD's censorship of Plaintiff was an official expression of hostility toward Plaintiff's religious viewpoints.

Verified Complaint

253.    Defendants censored Plaintiff to suppress the religious exercise of Plaintiff and similarly situated employees.

254.    Defendant's censorship of Plaintiff was not neutral or generally applicable because IMESD openly promotes viewpoints contrary to Plaintiff's, decides on an ad hoc basis what may cause offense, and because the decision was based on religious animus.

255.    A government policy that burdens religious exercise and is not both neutral and generally applicable must satisfy strict scrutiny.

256.    And a government policy that targets religious beliefs is never permissible.

257.    Defendants' application of the Speech Policy burdens religious exercise because Defendants apply this Policy to exclude certain religious viewpoints.

258.    The Speech Policy, facially and as-applied, is not neutral or generally applicable.

259.    Rather, Defendants have specifically targeted Plaintiff's speech on sex and gender because of the religious views Plaintiff expressed by his display of the Books in his office.

260.    The Speech Policy also creates a system of individualized governmental assessments of the reasons for the relevant "bias incident."

261.    Defendants cannot offer a compelling or even valid interest in a narrowly tailored way for infringing Plaintiff's right to freely exercise his religion.

Verified Complaint

262.    Accordingly, Defendants violated Plaintiff's clearly established First Amendment right to freely exercise religion.

## FOURTH CAUSE OF ACTION
Violation of Plaintiff's Right to be Free from Unconstitutional Conditions
(42 U.S.C. § 1983)

263.    Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1–207 of this Complaint.

264.    By conditioning Plaintiff's employment at IMESD on his willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on him in violation of his First Amendment rights.

265.    Defendants' Speech Policy and their enforcement of those policies impose an unconstitutional condition upon employees' right to free speech and their receipt of state benefits (e.g., avoiding disciplinary actions up to and including termination, remaining an employee).

266.    Defendants' Speech Policy and their enforcement of those policies require employees to surrender their constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection to avoid disciplinary actions up to and including termination.

267.    Defendants enforced their Speech Policy against Plaintiff, making it clear that he can only avoid further disciplinary action if he surrenders his constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection.

Verified Complaint

268.    Defendants' Speech Policy and their enforcement of those policies violate Plaintiff's right to be free from unconstitutional conditions.

FIFTH CAUSE OF ACTION
Violation of Plaintiff's Fourteenth Amendment Right to Due Process of Law
(42 U.S.C. § 1983)

269.    Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1–207 of this Complaint.

270.    The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech pursuant to vague standards that grant enforcement officials unbridled discretion.

271.    The arbitrary determination by school officials of what is and is not a "bias incident," what speech constitutes a "hostile expression of animus toward another person" based on "gender identity," or what speech "contributes to an unwelcoming environment" violates this norm.

272.    Employees of common intelligence must guess as to whether their expression will be deemed a "bias incident," a "hostile expression of animus toward another person" based on "gender identity," or otherwise "contributes to an unwelcoming environment" and thus subject to censorship and punishment.

273.    Defendants' Speech Policy and practice of prohibiting "bias incident[s]," or speech that targets a specific group, or "unwelcoming" messages in the workplace are vague and allow for unbridled discretion in determining which employee speech is permissible.

274.    Defendants' Speech Policy and practice allow IMESD officials to act with unbridled discretion when deciding whether employee expression is a "hostile expression of animus toward another person" based on "gender identity," or otherwise "contributes to an unwelcoming environment."

275.    The discretion given to IMESD officials in Defendants' Speech Policy and practice leaves censorship of employee speech to the whim of IMESD officials.

276.    Defendants' Speech Policy prohibiting the display of messages that are "bias incident[s]," "hostile expression[s] of animus toward another person" based on "gender identity," or otherwise "contribute[] to an unwelcoming environment" both facially and as-applied, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

SIXTH CAUSE OF ACTION
Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law
(42 U.S.C. § 1983)

277.    Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1–207 of this Complaint.

278.    By threatening to punish Plaintiff for expressing his views regarding gender identity when they do not punish employees who express opposite views on the same subject, Defendants have violated and are violating Plaintiff's right to equal protection of the law under the Fourteenth Amendment.

279.    Plaintiff was similarly situated to other IMESD employees. Defendants take no disciplinary action against employees who support and endorse the viewpoint that gender is fluid, gender is on a spectrum, or there are more than two genders, but

they take disciplinary action against employees, like Plaintiff, who express a contrary view.

280.    Defendants' Speech Policy and related practices have also been applied to discriminate intentionally against Plaintiff's rights to freedom of speech and free exercise of religion, his right to be free from unconstitutional conditions, and his right to due process of law. Thus, discriminatory intent is presumed.

281.    Defendants' Speech Policy and related practices burden Plaintiff's fundamental rights, target a suspect class (i.e., religion), and have no rational basis.

282.    Defendants' Speech Policy and related practices are underinclusive, prohibiting some expression while allowing other expression equally harmful to IMESD's asserted interests.

283.    Defendants applied their Speech Policy and related practices to Plaintiff in a discriminatory and unequal manner, granting other employees the right to express their views on issues related to gender identity, while denying that right to Plaintiff, in violation of his right to equal protection of the law under the Fourteenth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests that this Court enter judgment against Defendants and provide the following relief:

i)    That this Court issue a Preliminary and Permanent Injunction enjoining Defendants, their officials, agents, employees, and all persons in active concert or participation with them, from enforcing

Defendants' Speech Policy challenged herein both facially and as-applied so as to prohibit Plaintiff from displaying the Books or similar messages in the workplace;

ii)    That this Court render a Declaratory Judgment, declaring Defendants' Speech Policy prohibiting messages that are deemed to be "bias incidents," "hostile expression[s] of animus toward another person" based on "gender identity," or otherwise "contribute[] to an unwelcoming environment" unconstitutional, facially and as-applied to Plaintiff's speech;

iii)   That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy in order that such declarations shall have the force and effect of final judgment;

iv)    That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

v)     That this Court grant an award of actual and nominal damages against the Board to Plaintiff in an amount this Court deems appropriate;

vi)    That this Court grant to Plaintiff reasonable costs and expenses of this action, including attorneys' fees in accordance with 42 U.S.C. § 1988;

vii)   That this Court grant the requested injunctive relief without a condition of bond or other security being required of Plaintiff; and

viii)   That this Court grant such other and further relief as this Court deems

just and proper.

Respectfully submitted this 21st day of May, 2025.

_s/Rebekah Schultheiss_____

Rebekah Schultheiss                     Tyson C. Langhofer*
OR Bar No. 121199                       VA Bar No. 95204
LAW OFFICES OF REBEKAH MILLARD, LLC     Matthew C. Ray*
P.O. Box 7582                           GA Bar No. 347985
Springfield, Oregon 97475               ALLIANCE DEFENDING FREEDOM
(707) 227-2401                          44180 Riverside Parkway
rebekah@millardoffices.com              Lansdowne, Virginia 20176
                                        (571) 707-4655
*Counsel for Plaintiff*                 tlanghofer@ADFlegal.org
                                        mray@ADFlegal.org

                                        David A. Cortman*
                                        GA Bar No. 188810
                                        ALLIANCE DEFENDING FREEDOM
                                        1000 Hurricane Shoals Road N.E.,
                                        Suite D1100
                                        Lawrenceville, Georgia 30043
                                        (770) 339-0774
                                        dcortman@ADFlegal.org

                                        *Counsel for Plaintiff*
                                        *\*Pro Hac Vice Application*
                                        *Forthcoming*

## DECLARATION UNDER PENALTY OF PERJURY

I, RODERICK E. THEIS, II, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this _20_ day of May, 2025, at ___Elgin___, Oregon.

Roderick E. Theis, II

Verified Complaint