IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| RODERICK E. THEIS, II, ) | |
| ) | |
| Plaintiff, ) | No. 2:25-cv-00865-HL |
| ) | |
| v. ) | July 18, 2025 |
| ) | |
| INTERMOUNTAIN EDUCATION SERVICE ) | Pendleton, Oregon |
| DISTRICT BOARD OF DIRECTORS; MARK ) | |
| S. MULVIHILL, Superintendent; and ) | |
| AIMEE VANNICE, Assistant ) | |
| Superintendent and Director of ) | |
| Human Resources, all in their ) | |
| official capacities, ) | |
| ) | |
| Defendants. ) | |

**TRANSCRIPT OF PROCEEDINGS**

(Oral Argument)

BEFORE THE HONORABLE ANDREW D. HALLMAN

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

ALLIANCE DEFENDING FREEDOM
By:  David A. Cortman
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30042


FOR THE PLAINTIFF:

ALLIANCE DEFENDING FREEDOM
By:  Tyson Charles Langhofer
44180 Riverside Parkway
Lansdowne, VA 20176


FOR THE PLAINTIFF:

ALLIANCE DEFENDING FREEDOM
By:  Matthew Ray
44180 Riverside Parkway
Lansdowne, VA 20176

FOR THE PLAINTIFF:

Rebekah Schultheiss (Millard)
P.O. Box 7582
Springfield, OR 97475


FOR THE DEFENDANTS:

HARRANG LONG
By:  Julian W. Marrs
800 Willamette Street
Suite 770
Eugene, OR 97401

(July 18, 2025, 1:03 p.m.)

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  United States District Court for the District of Oregon is now in session, the Honorable Andrew Hallman presiding.

THE COURT:  Be seated.  This is the time set for oral argument in, is it These (phonetic) or Thise (phonetic).

MR. LANGHOFER:  Tice (phonetic).

THE COURT:  Theis.  All right.  Theis vs. the IMESD. If you give me one second, I'm going to get logged on to my computer out here.

I did mention this to the parties, but you can remove your coats, given our temperature, but I see no one's taken me up at this time.

MR. LANGHOFER:  Thank you, Your Honor.

THE COURT:  It's a standing invitation.  I do -- we did have a trial out here last week that was very hot.

All right.  Thank you for your patience.  Let me assure you I've read the parties' briefing.  I spent a considerable amount of time going through the issues in this case.  I have certainly not made any decisions in this case, but I do have quite a few questions.  I don't want my questions to get in the way of your particular arguments, particularly if you have additional issues you haven't covered in your brief that you want

to address.  So we'll open it up.  It's plaintiff's motion, and we'll start with plaintiff.

I suppose first we're going to have counsel state your appearances for the record, which I also forgot.  I'm a little hot in my office, too.

But I will be interjecting with questions.  And, please, if there are additional issues you would like to raise with me, you will be able to put them on the record at the conclusion of your argument.

All right.  So counsel for plaintiff, can you first introduce yourselves for the record?

MR. CORTMAN:  David Cortman for the plaintiff.

MR. LANGHOFER:  Tyson Langhofer for plaintiff.

THE COURT:  And before you keep going, our court reporter was not able to make it out here today, so it's very important that everyone speak into the microphone at all times, and I would ask that you just remain sitting, given the setup.

MR. RAY:  Matthew Ray for the plaintiff, Your Honor.

MS. SCHULTHEISS:  And Rebekah Schultheiss for the plaintiff, Your Honor.

THE COURT:  All right.

MR. MARRS:  Good afternoon, Your Honor.  Julian Marrs for the defendants.

THE COURT:  All right.  Who is arguing for plaintiff or who is -- how is argument being split up?

MR. LANGHOFER:  I am arguing, Your Honor.

THE COURT:  Okay.  You may proceed.

MR. LANGHOFER:  And I'll -- and given the Court's remarks, I'll give a brief introduction to -- it doesn't address any new issues, but it'll summarize our arguments, and if Your Honor has any questions about that, I'll be happy to expand on those, and then I just plan to kind of run through, but happy to answer the Court's questions.

So good afternoon.  May it please the Court.  My name is Tyson Langhofer and I represent the plaintiff, Rod Theis. We're here today because defendants have taken two broad legal positions.  First, defendants assert that everything their employees say and do while at school is government speech, including decorating their desk with personal photos and messages.  So if defendants can ban Mr. Theis from displaying these books, then a different school district could ban a gay teacher from displaying her wedding photo by claiming that it's government speech, and it could ban that same teacher from displaying a book addressing LGBTQ issues next to that photo for the same reason.

This can't be the case.  More than 50 years ago in *Tinker*, the Supreme Court ruled that neither students nor teachers shed their constitutional rights for freedom of speech or expression at the schoolhouse gate, but defendants' position flies in the face of that longstanding principle.  And it's also

contrary to the Supreme Court's recent decision in *Kennedy*, which held that not everything a public school employee says while at work is government speech.

Now, the second broad legal position that defendants take is that they can ban any district employee from expressing any message that promotes a binary view of gender while at school, even though they allow other employees to express opposite views on gender.

Now, defendants contend that promoting a binary view of gender violates Oregon state law, but this can't be true. We know this because La Grande Middle School, where Mr. Theis displayed these books, is bound by the same state law and actually teaches a binary view of gender in biology and English curriculum. So if defendants were correct, then every public school in Oregon that teaches a binary view of gender in any class would be violating state law, and this just can't be the case.

So if the statement -- continuing along the same line, if the statement "he is he" is a hostile expression of animus towards those who believe gender is fluid, then the statement "he is she" potentially would be a hostile expression of animus towards those who believe gender is fluid, fixed, and binary, but the statement "he is she" is no more a hostile statement than saying "he is he."

This fact alone demonstrates the unconstitutional

vagueness of this policy.  How could any employee understand expressing a binary view of gender was banned by the policy when the biology teacher down the hall is teaching the same thing on a daily basis.

So the undisputed facts before this Court show that Mr. Theis -- that the defendants punished and banned Mr. Theis from showing these books simply because one co-worker disagreed with his viewpoint on gender.  Disagreement is not disruption.

When you combine this with the fact that the speech policies of prior restraint against all promotion of a binary view on gender and the fact that defendants showed hostility towards Mr. Theis's religious beliefs, we believe that this shows that this standard is strict scrutiny, because of the Free Exercise claims and the prior restraint claims.

THE COURT:  All right.  I waited as long as I could.

MR. LANGHOFER:  Thank you.

THE COURT:  Let's start with *Pickering*.

MR. LANGHOFER:  Yes.

THE COURT:  I looked at *Damiano*, and *Damiano* says that both the First Amendment retaliation and the as-applied content and viewpoint-based discrimination claims are subject to the *Pickering* analysis.

I understand you may want to preserve that issue for further review, but can we at least agree I am bound by *Pickering* for all forms of First Amendment claims?

MR. LANGHOFER:  So, Your Honor, they -- I agree with -- I agree that the -- *Damiano* ruled that the retaliation and the viewpoint-based claims were *Pickering.*  It did have another statement that prior restraint claims are under another standard, and I can get the case on that, but here's the point that we're raising on this, and we can move on to *Pickering*, and the main thing we're trying to argue here, why we're arguing this, and we don't argue this in almost any other cases, but we're arguing here because of this:  the school district has taken the position that they don't have to show any disruption at all, and they've said that, "We are doing this because of your point of view."

So under *Pickering*, all of the claims, you look at *Dodge*, you look at *Damiano*, they say that if it's only viewpoint, that viewpoint is not allowed.  So if you're saying the only reason you're doing it is viewpoint, then it does move to a strict scrutiny-type analysis.  That -- and because they're not alleging any disruption, whereas in *Damiano*, they did argue -- they said, "Look, we have substantial disruption."  So that's the -- that's the reason that we believe that, but we're happy to argue on the *Pickering* -- you know, to address the *Pickering* claims.

THE COURT:  Yeah.  I -- if I look at *Damiano*, though, I can't -- even if it's viewpoint discrimination, I have to apply *Pickering* and then --

MR. LANGHOFER:  Totally understand.

THE COURT:  Just -- just to get the framework for today's argument, I want to go through the rest of the claims. Also under *Damiano*, equal protection is subject to *Pickering*.

MR. LANGHOFER:  Agreed, Your Honor.

THE COURT:  All right.  And then *Kennedy* left open the Free Exercise issue, but I'm still bound by the Ninth Circuit cases unless they're clearly irreconcilable with the -- with *Kennedy,* and the Ninth Circuit has said even Free Exercise is *Pickering*.

So is any -- again, you've preserved all your opinions -- positions about why *Pickering* should not be the test in certain cases, but is anything not *Pickering*?  I'm just not understanding why we're even talking about strict scrutiny.

MR. LANGHOFER:  Sure, Your Honor.  So I think that if we look at, you know, that in *Kennedy*, Justice Thomas in his concurrence said that the Supreme Court has never applied *Pickering* to a Free Exercise claim.  And I think -- and you're right.  There are some cases in the Ninth Circuit which have indicated that, but I think that -- you know, I do think that -- I'm not sure what all the ones that Your Honor's referring to, but I think there is some distinction.

I think that most -- when you look at the Free Exercise claims, if they're -- if they're not neutral or generally applicable, which we don't think they are here, then we do think that strict scrutiny would apply in that situation, but, again,

Your Honor, we're happy to address *Pickering*, because we think that we win under *Pickering* at the -- as well. So if -- if we want -- do you want me to address the *Pickering* and why we believe we win on that, I'm happy to -- I'm happy to address that.

THE COURT: Yeah. I mean, we'll probably come back. I have the most problem in the Free Exercise context of applying *Pickering*, because then it seems like a school district could ban wearing a cross or a school district could ban a Star of David. It seems like there would be no limits if -- if -- you know, if defendants' arguments are successful. And I'm not saying that that's the same situation here, but in the Free Exercise context, I -- I have questions about whether the *Pickering* test should apply, but given the Ninth Circuit case law, I don't have -- I don't have any ability to say it wouldn't apply.

MR. LANGHOFER: I understand, Your Honor. I'll -- let me try and make the case under *Kennedy*. So in *Kennedy*, it did say that the First Amendment doubly protects religious speech, and in the -- and that's at 597 -- 523. And then it went on to say that the Free Exercise clause protects not only the right to harbor religious beliefs inwardly and secretly, it does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faith in daily life, which would include, you know, obviously expressive activity. And so I think that's why the court has made it clear

that in those contexts, you know, it -- there is a higher standard that would not be *Pickering*.

And the -- and I think the reason why is because the -- in the school context, Your Honor, the school can still show -- if they can show a compelling interest and they're neutral, then they'll be able to overcome that, but here, we don't have that. Their compelling interest, they say, is to stop the promotion of a binary view of gender, which is actually taught in the schools.

THE COURT:  But my point isn't to argue whether strict scrutiny or *Pickering* should apply to Free Exercise.  It's the Ninth Circuit has said, and especially in *Berry vs. Department of Social Services* from 2006, 447 F.3d 642, they applied *Pickering* even in a case where a public employee just had a Bible in their office.

So until the Supreme Court or the Ninth Circuit speaks differently, I am applying *Pickering*, and that's going to go for every single claim in this case.

MR. LANGHOFER:  Okay.  And just I'll make one last comment on that.  I understand your position.  I think that most of those cases, I understand -- I'm not sure the year of that one, but I don't know that hostility aspect from *Masterpiece* has been applied by the Ninth Circuit in a -- in a -- under *Pickering* in the Free Exercise analysis.  So that could be, you know, a new -- you know, a way in which the courts are addressing Free Exercise, and so (pause) --

THE COURT:  Respectfully, I'm not looking for new ways to blaze (pause) --

MR. LANGHOFER:  I totally understand, Your Honor.

THE COURT:  Ways to blaze new legal ground.  I'm looking to apply the Ninth Circuit case law.

MR. LANGHOFER:  Sure.

THE COURT:  And if somebody wants to take this to the Ninth Circuit, then they can do the legal trailblazing.

MR. LANGHOFER:  I understand.

THE COURT:  So let's get to *Pickering*, then.  Plaintiff agrees that the display of the books is a matter of public concern, correct?

MR. LANGHOFER:  Correct.  And defendants agree with that as well.

THE COURT:  I'm just trying to square plaintiff's at times assertions that these books were just decorative or your comments earlier that "he is he," "she is she," it doesn't really convey any message that -- with the idea that this is undisputedly now speech on a matter of public concern.

MR. LANGHOFER:  Correct, Your Honor.  Well, and I apologize if we -- if we attempted to -- you know, if we conveyed in any way that it wasn't supposed to be expressive.  It is both. I think defendants' testimony both during the investigation and in its complaint is that he chose these books because he does believe they share a positive message.  They have a happy kid on

the front, they're cartoon pictures.  He thought it brightened up the room, but he also said specifically that he did this pursuant to his religious beliefs.  And so it has both a decorative, you know, cheery -- promoting a cheery attitude, but also conveying a message that he thinks is important, which is it's great to celebrate a boy being a boy and it's great to celebrate a girl being a girl.

THE COURT:  Right.  But otherwise, the district could -- I mean, the district could say you don't get to put any blue books up on your shelf.  Completely irrational, no basis for any of it.  And if it's just decorative, we're not here today. We're here because of the message conveyed by the books, which is undisputedly a matter of public concern, correct?

MR. LANGHOFER:  We agree with that.

THE COURT:  All right.  The biggest area I struggle with here is the presence of students.  Again, now I'm turning to public versus private speech, which I think if we're all -- if we're under *Pickering*, that's, frankly, the entire case is, is this public versus private speech.  And I struggle with the fact that there were children present.

I don't think there's any question that if the exact same books were displayed or read, like, in a faculty lounge or were read after school, that doesn't -- that would be private speech on a matter of public concern, but because they were displayed in the presence of students, to me that gets now into

what I think we can safely call a gray area in the Ninth Circuit case law.

In particular, I'm struggling with -- I mean, under *Johnson v. Poway*, I mean, I think the defendants -- the plaintiff would not prevail in this case, period.  I think that's clear.

So then the question I have is how much did *Kennedy* take away from -- from *Johnson*?  And there's clear parts of *Johnson* that are -- sorry.  There's at least dicta in *Johnson* that is not reconcilable with *Kennedy*, but the holding itself remains, and a key part of that holding was that the speech was conveyed to children.

So help me understand this distinction, because even in *Kennedy*, it was after the football game.  I mean, if he'd been praying before the game, it seems like he loses.  Praying after the game is different.  So help me understand the role of the kids in this office.

MR. LANGHOFER:  Sure, Your Honor.  So a couple things.  One, I think an important distinction here is that defendants are taking a position that they can ban the promotion of a binary view of gender anywhere, including hallways, teachers lounges, everything, that -- that in and of itself is a violation.  And so I think that is a much broader scope than what Your Honor is bringing up.

Secondly, when it comes to *Poway* and the distinction with the classroom and what Mr. Theis did, Mr. Theis does have

his own office, obviously, he's only in that district two days a week, he saw four students during the three-week period there, there is a staff only, you know -- and students don't come in, and it's undisputed that he does not use this in any way in his job duties.  He didn't -- no student asked about it, he didn't use them, he doesn't convey that message to them when they're there.  And so that is very different than *Poway* where you have a classroom which is open to all students all the time, essentially, walking by, in and out.  Even if they're not in the class, they can go by and see it, you know, they can --

THE COURT:  Slow down, Mr. --

MR. LANGHOFER:  I'm sorry.  I apologize.

THE COURT:  I'm a little worried about the court reporter.

MR. LANGHOFER:  You're right.  I apologize.

So the distinction here between *Poway* with the classrooms and the banners and the interaction and Mr. Theis is different.  And I think it's also different even if it was a classroom, what we have, the situation is that IMESD and the school district both allow school employees, including teachers and, you know, office employees to decorate their office space.  And their desks, they get to decorate.  And we have a lot of evidence in the record of what that looked like.  There are political messages, you know, there are family photos and so forth.  And what -- and the position that the district, the

IMESD, is taking is all of that is government speech.  And because it owes -- because no citizen -- under *Poway*, essentially they're saying, look, if a citizen couldn't come in and do it, then it's government speech, and I think that's where *Kennedy* diverges.

THE COURT:  Well, I agree with you there and I'll have questions about that, because the whole if a citizen could come and do it, that part's gone, because -- after *Kennedy*, but, again, what I'm focused on, and I think you -- you picked up on a key piece of it, is so if it's in front of students, and does it also have to be somehow in the course and scope of their -- of their job?  Because I think you would agree that if Mr. Theis was a teacher, he couldn't read this -- the district could ban him from reading these books to his students, correct?

MR. LANGHOFER:  I would agree with that, yes.

THE COURT:  All right.  And so he's not -- these books were not used in the course and scope of his employment, but they did communicate a message on a matter of public concern to children who were in his office.  And so what do we do with that?

MR. LANGHOFER:  Sure.  So I think a couple things. One, Your Honor, is that the district, the IMESD, admits that it allows its employees, even employees that are in front of students, to decorate their offices, and that includes political messages and it includes -- there's evidence that one of them had a union poster, rainbow-colored union poster.  And, again, that

would mean -- if that's government speech, it would mean that the school is saying that they support the unions, which we know is not always the case, right, so it can't be government speech.

And, again, I think also the desk, when we're talking about a desk, this is the decorations on a desk, that everything that's on a teacher's desk cannot be government speech.  It just doesn't make sense.  And I think even young students recognize that.  We know that a teacher can have a Bible on their desk and that -- and they can read it at, you know, lunchtime and obviously they -- you know, not used in the course of duties, but I think there's a lot of cases --

THE COURT:  Do we know that?

MR. LANGHOFER:  I think that that's pretty clear that there are --

THE COURT:  I mean, that was one question I had, which was -- and it's, oh, that 2006 case says a public employee can't have a Bible.  It's only when they're interacting with the public.

MR. LANGHOFER:  Well, I think it depends on the distinction we're talking about here.  Again, if -- my understanding of IMESD's policy and also the school's is they allow teachers to have books on their desks which are personal books that they would read during their personal time and so forth.  If they allow that from a secular perspective, they couldn't prohibit that from a religious perspective.  That's what

all of the, you know, recent Free Exercise cases are about, that the government can't treat secular speech better than religious speech. That's what *Kennedy* was about. The school was targeting his religious speech, and they were concerned that students were watching that.

And I think that shows that just because students and parents were watching -- that was in front of everybody. He had his -- he had his school shirt on. They knew he was still, you know, essentially on the clock, he was -- he still had duties, other coaches had duties, too, but since they were allowed to engage in secular speech like getting on social media and texting their friends, talking to their family, they couldn't treat the religious speech differently.

THE COURT: But I just don't -- I mean, if we're still in *Pickering* balancing, this kind of viewpoint discrimination seems permissible where it's public speech. I haven't seen a case, at least from the Ninth Circuit, that says it's not, because there's always going to be some measure of viewpoint discrimination in, like, just having the school teach -- you know, requiring a science teacher to teach evolution, it doesn't -- you can go on and on and on and on about -- and the key is the first inquiry is is this publish speech.

MR. LANGHOFER: Right. And I think under *Kennedy*, the new test, as I understand it, is does that speech owe its existence to his role as a government employee. And nobody

disputes that that was not used as part of his duties. It was unnecessary. And, in fact, the school said, "We don't want you to do it," right? So it's clearly not part -- it did not owe its existence to that. Just like Kennedy's prayers, Coach Kennedy's prayers didn't owe its existence to his role as a coach, these books do not as well.

And there's a lot of examples of other teachers who engaged in speech which are outside of what their official duties were. The school allowed that to happen. And there's even -- you know, the allegation is that they allowed them to speak on gender identity from a different viewpoint. So if they're allowing that, they can't -- they can't say that -- that this is all government speech.

And, again, you need to go back to the -- you go back to the, you know, example of a teacher's desk, certain people are allowed to show certain wedding photos and vacation photos and things like that, and others are not because they have the right to tell them not because that's not government speech? I don't think anybody really understands that what -- the decorations on a teacher's desk are government speech. And I think that's consistent with the *Kennedy* new standard, which is that would owe its existence to, you know, his role as a government employee, and it doesn't.

THE COURT: Well, then let's turn to -- we have *Poway v. Johnson*, and then I think there's an interesting juxtaposition

with the case that I just identified for the parties, *Wood v. Florida*, which surprisingly relies heavily on -- on *Poway.* And then it gets to when is a public -- an employee of the public schools acting or speaking to the public versus engaging in private speech, which has nothing to do with really the content. I mean, where *Florida* decided you can't even announce your pronouns to your class, and here you have something on the opposite end of the spectrum, which is you can't even discuss a binary gender view, but in both cases, the result was a matter of is it public speech, not viewpoint discrimination.

MR. LANGHOFER: Right. That's right. And so in *Wood* -- I would say *Wood* is very different, and here's why. On page 7, it set forth the standard, here's the three things why we say that it is government speech. One, it is limited to when the teacher is, one, interacting with students, two, in the classroom, and three, within the scope of her employment duties.

We think none of those things are present here, and here's why: that it -- yes, the books are -- are present when he's interacting with students, but they are not literally part of the conversation as her pronouns would be. They're part of her teaching. She, in fact, says to the students, "You must address me in this way." So it's part of the teaching process, whereas the books are merely decorative at that point. Yes, they're expressive, but they're not part of the teaching portion, and so that's not -- it doesn't meet number one, because it's not

used, the message is not used, the speech is not in use when interacting.

Secondly, it's not in the classroom.  Again, it is with -- you know, it is -- he does interact with students in his office, but it's much, much more limited.  We have -- you know, it's a very controlled environment.  It's not all students all the time.  It is a limited environment where they're invited in, and not everybody is seeing that.

And then third, clearly the teacher is teaching at that point and using that communication, the challenged communication, within her employment duties, whereas, again, there's no dispute that he wasn't using that here.

So I think those three elements are not present.  And it demonstrates why this is very different, because what -- think about why did IMESD allow employees to decorate their offices? Because they want to show their personality, show who they are. They're very different.  Everybody's very different.  It communicates a bit about the teacher as a person and how they want to -- you know, the mood they want to set, which is a personal choice, not a curricular choice.  And this is very curricular.

I think there's two other points on *Wood* that's really important.  One, when you think about -- even though I haven't read -- you know, I just got the opinion, I haven't read the entire thing, but I don't think compelled speech was a

discussion, but I think it's a really important thing to think about and why they ruled the way they did.

When Ms. *Wood* required the students to use the pronouns that she was asking for, it automatically implicated the First Amendment Free Speech and Free Exercise rights of those students and parents, who might object to expressing that message.  And they were able to avoid that issue by saying, you know, "This -- we're -- this is how we're going to run our school."

Secondly, it's important to note that Florida has adopted a binary view of gender, and that's what they teach in their curriculum.  Here, we actually -- and so the message would be different and disruptive in that aspect, whereas here, we -- the message that Mr. Theis is trying to express is actually consistent with the biology and English curriculum.

And so in -- all of those factors are not present in *Wood* and they are present here, and that's why we believe that the decoration of your office, the bookshelf, that type of speech, which is clearly a personal kind of expression not used in interacting with students, would not be government speech.

THE COURT:  So whether it's Florida or Oregon, if you have a non-teacher who wanted to put, say, an LGBT flag on -- behind their desk just as a matter of free speech, that -- and they were not actively teaching -- they weren't using it in front of students, it was just -- say, it's another ESD worker somewhere else, that's permissible.  So there's a constitutional

right to hang an LGBT flag in your office if you're not talking about it with students?

MR. LANGHOFER:  Provided that they are allowing all -- all teachers to decorate their office space with other flags communicating other messages, then I think that would be accurate, Your Honor.  And the school does have the right to control its classrooms and its office decorations if it's doing it in a way that's not targeting certain speech and if, you know -- and so that's the -- that's the nature here.  They're saying decorate your office, even use -- you can promote a fluid view of gender, but not non -- you know, not a binary.  That's not permissible.

THE COURT:  I shouldn't speak so broadly, because it still would be subject to the second prong of *Pickering*.  I mean, if hanging an LGBT flag was so disruptive, then perhaps it wouldn't get past the second prong, but at least your view is that that's private speech under the hypothetical I gave?

MR. LANGHOFER:  That's exactly right, Your Honor.

THE COURT:  All right.

MR. LANGHOFER:  Your Honor, one other thing on that topic before you move on is just that I think what *Kennedy* makes clear, and I tried to make this point, but I'm not sure whether I did, is that -- that a picture or some message in the class doesn't become government speech simply because a student views it.  And I don't think any -- any -- and I think that's where,

you know, the distinction between *Poway* and *Kennedy* comes in. You know, *Poway* and the *Kennedy* Ninth Circuit was trying to say, "Hey, students and parents saw it, therefore, it's government speech," and *Kennedy*'s saying, "No.  We can't do it that broadly."

THE COURT:  Well, I'm still struggling with what the test is.  So it clearly has to be conveyed -- well, to me, it has to be conveyed to students to be public speech.  And I think we would all agree at least in the public employee context -- public teacher context, it has to be conveyed to students.  And then you're adding to that test essentially within the course and scope of their duties as opposed to, well, not in the course and scope of their duties.

MR. LANGHOFER:  Correct, Your Honor.  I think it doesn't owe its existence to its role as a government employee. And I think when -- when a teacher is addressing a student directly and doing that curriculum and requiring that interchange on a curricular matter, then I think, yes, that would be the government speech, but when we're talking about this passive speech, which is decorating the desk and not used in her role, into her role, then that would not be government speech.  And I think that -- that's what *Kennedy*'s trying to explain with the does it owe its existence to her role as an employee.

THE COURT:  But that's hard for school districts, though, because the instance here, at least there was one example

where a student asked about the book and then it was used and then plaintiff discussed it. So even though it was -- I mean, it seems pretty clearly outside his course and scope, then all of a sudden you're having this discussion with a student.

MR. LANGHOFER: Sure. So I -- I agree. I think it -- the way that it -- I don't know if it's fully explained in here, but the way that went was essentially he was evaluating, the student asked about it. He said, "If we get through the evaluation, after we're done with all this, then, you know, we can read it if you want," and that's what they did after his role in evaluation. Now, his only role -- he has no role in teaching, right? He's just got a role in evaluating. He completed the evaluation and then read it.

And I think that -- that would -- that speech there did not owe its existence to, you know, his role, because it wasn't -- he was not actually carrying that role out. And I think that -- that's where the -- you know, the *Tinker* standard and the "as it developed" (indiscernible) is -- is it's recognizing that teachers do things outside their role as teachers while they're on the clock on the campus, and there's got to be some play there, and we can't have the school telling certain teachers that they get to do certain things and then targeting others, especially if it's based on their religious beliefs. And that's what we think is present here, which makes it, you know, more difficult for the school.

THE COURT:  Well, but the school could, I mean, if -- I think what you're saying, though, is once we get -- once we get to the second standard of *Pickering* with substantial disruption, if there is a substantial disruption based on promoting -- I mean, let's just call these the binary -- if we had plaintiff doing this a hundred times with a hundred kids and we got a hundred complaints from parents and zero complaints about pro-LGBT messaging, it seems like that under the second standard of *Pickering*, there could be a legitimate limitation on that speech.

MR. LANGHOFER:  That is -- that is correct.  You're definitely -- Your Honor's right that we have those two different steps.  And what defendants are trying to do is cut that off before you even get to the balancing, and the reason is because there is no disruption.  I mean, they admit that.  There is one complaint, and so they're not going to meet that.  They don't even -- they don't even try to argue that.  They're trying to cut it off at the pass.

And I think it -- again, it makes it more egregious.  When you think about why the standard -- why the Supreme Court set the standard the way they do, I think this case demonstrates, because if it -- if the school could convert every speech, every word, everything uttered on the school campus to government speech, then there are no teachers rights on campus and *Tinker* wouldn't mean anything at that point in time.  And so I think

there has to be that two-tiered analysis, which that -- I think that the standard in *Kennedy* sets forth, does it owe its existence to his role as an employee, was he engaged in that. And here, that's just not the case.  There's -- it's clear that there was no use of that in this case.

And, again, the problem here also is that they're trying to prohibit everywhere else.  They're saying this prohibits the entire thing and they're saying Oregon law prohibits it, which, again, just -- it can't be the case given that schools are actually, you know, teaching that same message over and over and over again, which really undermines the whole substantial disruption, because there's no disruption going on when they're teaching it, you know, in biology class.

THE COURT:  I mean, you keep coming back to that, and (pause) -- let's move on to this general theme, because right now what we're talking about is just *Pickering*.  And what I -- what the Court is focused on is the adverse employment action allegedly in retaliation for displaying the books, but you're broadening it, and I want to talk about -- the claims are broader than that, is how I should phrase it.  I'm not clear how, though.

We have this policy.  It is -- to me, it's facially neutral.  And plaintiff has only attempted to display the books either right behind his desk or on the bookshelf, and that's what he was specifically disciplined for.  So why are we talking about the broader implication of this?

MR. LANGHOFER: Sure. So, for a couple reasons. One, you know the policy, while it -- you know, if Your Honor, you know, understands it to be facially neutral, the way that they've interpreted it is it does discriminate on viewpoint and does target a specific thing, because what defendants have said is that it only prohibits promoting a binary view of gender. It doesn't do the opposite. It allows the opposite.

And so then the question becomes, okay, what -- what does that mean? Like, what -- you know, if -- and the reason why they were a broader thing is because my client's still obviously employed there, and so if they're saying it applies everywhere at all times, he could be punished, because the letter does say -- there is no actual punishment right now other than they're telling him he can't speak, which we think is harm, is adverse action under the First Amendment, but they've told him, "You will be fired if you engage -- if you promote a binary view of gender." And so then the question is, what does that mean? I mean, that -- that's the letter from, you know, Ms. Van -- Vannice is that there is threatened punishment if he does this again. And -- and so I think -- and so the end of --

THE COURT: What it says is (pause) --

MR. LANGHOFER: So it's Exhibit G, Your Honor.

THE COURT: It says conduct of this nature may result in discipline up and to including termination, but the conduct specified is displaying these books.

MR. LANGHOFER:  Correct, but then if you -- if you look -- that's Mrs. Vannice's letter.  Then if you look at the next -- the next letter from Mr. Mulvihill, in the paragraph 1, which is Exhibit H there, Your Honor, it says the investigation found that the books promote a binary view of gender, which excludes and invalidates an understanding of gender diversity and transgender students.  And it goes on to basically say that the reason that -- the actual wrong was the promotion of that binary view of gender.  And I think that's -- that's the concern.

And I think it's also clear, Your Honor, they -- Mr. Theis at the end of the meeting with -- at the end of the meeting with Ms. Vannice asked whether -- if he put it somewhere else, like in a bookshelf, and they said, "No.  You can't even do that."  And so, again, it -- the scope of this, how they have defined what is prohibited, is broader than just the display of the books.

And I think that's -- that's why we're here, is because we think, one, that's, you know, unconstitutionally vague and broad, but that's why we're talking about the broader issue.

THE COURT:  Well, it seems that in looking at this, it's not clear whether he's being told to not display these for students specifically or staff.  I mean, to me that's a bigger problem than the point you're raising.  Based on the conversation we just had, and, again, I'm not saying that that's -- would be the Court's ruling, but based on your position, wouldn't the

bigger problem being that he's restricted from displaying these at any point as opposed to just when students are in his classroom?

MR. LANGHOFER:  That -- that is correct, Your Honor. We do believe that that is a bigger problem, a more -- you know -- and, again, as we understand it from their position, and I think their briefs reinforce this, the briefs repeat over and over the problem with the promotion of a binary view of gender. And they don't say in front of students.  They just say the promotion of a binary view of gender.  And I think that it demonstrates how broadly they're indicating that this goes.

And I do -- there is some discussion in the exhibits, and I can -- I'll try to find it and point it out to Your Honor, about, you know, this broader scope of could he ever, you know, do that, but, again, I think that when we're looking at the policy --

THE COURT:  Well, we're -- at the end of the day, the Court has to grant or deny an injunction.  And the simpler -- as far as a remedy, if -- if you were to prevail, allowing him to put the books in his classroom is straightforward, but somehow ordering IMESD to not prohibit a binary view of gender is not straightforward, and that would be an incredibly broad mandatory injunction to issue.

MR. LANGHOFER:  I think, Your Honor, what we're -- I -- I agree with Your Honor on the -- on the limited scope.  And what

we're asking for under this injunction is just to allow him to display those books and to remove the letter that shows that he engaged in a bias incident, and I think that's what we're asking for.

THE COURT:  Oh, so that's it.

MR. LANGHOFER:  That's correct.

THE COURT:  When we talk about these broader principles, it's --

MR. LANGHOFER:  I apologize.

THE COURT:  -- conflating what you're requesting versus the general argument.

MR. LANGHOFER:  I apologize.  The specific request for the injunction is to be able to show -- display the books in his office and -- and then -- and remove that letter that he -- you know, that found that it was a bias incident.  That's the specific request for this preliminary injunction, that we do have a broader challenge, because that's how we understand that, but we can deal with that another day.  Your Honor does not have to deal with that today.

THE COURT:  All right.  So it seems like, at least for purposes of the preliminary injunction, what we're focused on is as-applied retaliation.

MR. LANGHOFER:  Absolutely.

THE COURT:  All right.

MR. LANGHOFER:  That's exactly right.  And I apologize

that I didn't make that clear in our -- in our briefing, Your Honor.

THE COURT:  No.  I -- first of all, I commend both parties on the briefing in this case.  These are complicated issues and cases are coming out in the middle of your briefing and, I'm sure, creating more work for everybody.  So -- all right.  Continue, Counsel.

MR. LANGHOFER:  Okay.  So Your Honor asked about adverse action, and I'll address the adverse action issue.  Have we addressed that, Your Honor?

THE COURT:  Is that a dispute?

MR. LANGHOFER:  What's that?

THE COURT:  Is adverse action a dispute?

MR. LANGHOFER:  No.  I thought you -- I thought you said you were focused on that, so I'm sorry.  Were you talking about the scope of the injunction?

THE COURT:  Well, I think if there's grounds for an injunction, it would be after you get through *Pickering* and then looking at it as a First Amendment retaliation claim.  I mean, if there's no dispute about matter of public concern, there's no dispute about disruption, or none that I could see, and that would address the specific issues of the letter and the books.

MR. LANGHOFER:  Correct.

THE COURT:  And so I'm -- I'm not just trying to create less work for myself, but I'd like to focus on those issues

unless you think there's other claims that must be addressed.  I mean, we could talk about Free Exercise, things like that, but --

MR. LANGHOFER:  No.  I think -- I think Your Honor's right.  We -- we've addressed those.  To the extent that we -- you know, we believe we win under *Pickering*, because it's not government speech for the reasons we talked about, and -- and the -- and it's, you know, conceded that it's a matter of public concern, therefore, you do the balancing, and there's no evidence of any disruption, they've admitted that, and so we would win under the *Pickering* standard from that standpoint.  And so I think that is -- you know, I think -- unless Your Honor has additional questions on that.

THE COURT:  I don't.  I want to turn to counsel for defense at this time.

MR. LANGHOFER:  Okay.

THE COURT:  Thank you.

MR. MARRS:  Good afternoon, Your Honor.  I want to start by clarifying a few things.  I think, as all good lawyers do, counsel for plaintiff have put a certain gloss on the facts and our legal positions, and I just want to clarify exactly the stances we've taken and what we think the record actually shows.

The first is the IMESD -- I'll refer to it as the ESD as we go forward just for verbal simplicity.  The position here isn't that anything that an employee of the ESD does as soon as they set foot in their workspace is government speech.  That's

not the position that we're taking.  For example, we're not saying that if plaintiff wanted to pray before he eats his lunch, that we could somehow regulate that speech.  We're not saying that's government speech.  That's slightly different than what's happening here.

On plaintiff's own allegations, his own pleadings, he says, "I put these books up in my office so that the children I work with would see them.  I wanted to make my workspace more kid friendly.  This is a message that I want the children that I interact with to see."  He also says that the only time he interacts with children is while he's evaluating them, while he's performing his duties.

So those two things together make it pretty clear that the plaintiff is intending to communicate a message by the display of the books behind him in his workspace where students will see them if he's evaluating them.  He's intending to convey that message to them.

Where that conflicts with the Ninth Circuit precedent on the issue is -- is exactly in line with *Johnson*.  When there's a giant banner behind a public employee and they're performing their duties, folks might impute the message of the giant banner behind them to the -- to the public employer.  That's one of the cornerstones that *Poway* and *Pickering* stand on, the other being things like limiting disruption.

Essentially what those cases say is just because you

are a person with First Amendment rights, when you work for the government, you don't get to make your own viewpoints the viewpoints of the government by communicating them outwardly.  So it's a narrower view of things.

We're not saying that plaintiff couldn't look at the books on his own, in his own break time, in his car, something like that, but when he displays them in the way that he did, which is the only thing at issue really here, that's speech that -- when he's interacting with students particularly, that's speech that is public speech, speech as an employee, not speech as a private citizen.

I think one of the things that hasn't really come out in the briefing so far but might be useful to highlight as an example is that the ESD policy that's mandated by the State of Oregon also prevents the display of symbols of hate, and it outlines a few specific examples.

At the risk of being absurd, their position means that if a -- if an employee of the ESD wanted to hang a swastika behind their desk and say this is -- somehow create a rationale for why it is their viewpoint, that would be private speech under their rationale regardless of who that employee worked with. Now --

THE COURT:  Well, why is that different?

MR. MARRS:  I'm not saying that it is.  I'm saying that it's problematic in the sense that the State of Oregon has

decided that its view is not that hanging a swastika is appropriate in a classroom, in the same way it's determined that allowing employees to make statements that are bias incidents is not appropriate. And so allowing --

THE COURT: I mean, but under your view, putting a Bible on your bookshelf as a teacher, not in front of you, is public speech and would not be permitted.

MR. MARRS: That's not necessarily true under the *Berry* case that Your Honor cited. That's cited as well in *Damiano*.

Here, the nature of the display itself highlights the message that plaintiff was intending to convey. This wasn't two books on a bookshelf amongst many others. It was two books directly behind him in a demonstrative way.

THE COURT: But he later on offered to put the books on a bookshelf, and he was told he couldn't do that.

MR. MARRS: And the statements that were made in that context were at the initial investigation level before any decision had been made. So he was told that during the pendency of the investigation, he should not be putting the books up on any bookshelf.

THE COURT: So plaintiff can put his books on the bookshelf, not in front of the kids?

MR. MARRS: Well, it will depend on the context, Your Honor. I think generally speaking, if those were the only two books up, I think there would be less of an issue here of him

supplanting government speech.

THE COURT:  What about just taking the books down when kids are in the room?

MR. MARRS:  And that leads to another issue here, which is I don't think that *Poway* or *Pickering* are necessarily limited to only when students are present.  I think that any time that the plaintiff is interacting in the course of his duties with, for example, another ESD employee or staff members from the school, any time he's demonstrating his books in that way while interacting with those folks, he's conveying a certain viewpoint to them, and that's the viewpoint that's at issue here.

THE COURT:  Well, what if he had a MAGA hat on?

MR. MARRS:  Well, that's slightly different in the sense that I don't think that this particular policy would apply to it.

THE COURT:  Well, but that's not -- I'm talking about the First Amendment.  I'm not talking about your policies.  I mean, because the Ninth Circuit has said you can go to a staff meeting with a MAGA hat on, but also I think we all agree that, you know, a math teacher can't get up there with a MAGA hat on and -- and teach math.

MR. MARRS:  I absolutely agree with that.

THE COURT:  So why is it different?  Why can this teacher not display his books outside of the presence of students?

MR. MARRS:  Because when he's interacting with other members of the community in his official capacity in his office, he's speaking as the government speaks, he's essentially putting his viewpoint within the -- he's putting his words in the mouth of his employer.

THE COURT:  But when he goes to a teacher conference (pause) --

MR. MARRS:  And so --

THE COURT:  And he can -- the Ninth -- this is not a hypothetical.  The Ninth Circuit just ruled on this.

MR. MARRS:  Yes.  I understand, Your Honor, the *Dodge* case.  The *Dodge* case is slightly different from this in the sense that it wasn't applying any sort of neutral policy like the one that we have here, and it was clearly a case of animus by a particular administrator against the viewpoints of that employee.  There was no discussion about whether or not -- if I remember correctly, about whether or not the teacher when he came to the school was speaking as an individual or as a public employee.

THE COURT:  No.  I mean, the -- the question in *Dodge* was can it reasonably be said that plaintiff was taking advantage of his position to press his particular views upon the impressionable and captive minds before him.  That's a quote from *Dodge*.  And they said, "No."  So the MAGA hat is fine.

And, I mean, your strongest argument is clearly that these books were displayed for children and used with one child.

I just don't see how you can continue to argue that he couldn't display these books outside the presence of children with just other staff members.

MR. MARRS:  Right, Your Honor.  Well, I'll come back to the presence of children point.

One of the elements of the *Pickering* analysis after you go through a matter of public concern, is it employee versus public speech, and then you go to the balancing factor, one of the factors there is whether or not there's a countervailing interest of the employer in preventing this speech.  And here, the State of Oregon has identified a countervailing interest for all of the educational providers in the state of eliminating bias incidents.

THE COURT:  But, I mean, that -- if you look at the *Damiano* case -- and I don't know how that argument squares now, because we're looking at a number of factors.  And here, you can't just say, "Well, we disagree with some speech and we're considering it bias."

Under the same rationale, some people, and the Court is not expressing any opinion, some people would think that a MAGA hat could be a display of bias because they disagree with the principles of the Trump administration.  Under your rationale, the ESD can ban the MAGA hat.

MR. MARRS:  Your Honor, I'll cabin our argument to the more narrow issue here:  even in front of students.  That doesn't

quite square with the relief that they're seeking in this preliminary injunction. What they're asking for is that the Court order that the ESD stop enforcing the speech policy challenged here in both facially and as-applied so as to prohibit plaintiff from displaying the books or similar messages to the workplace and to remove the reference from the letter of -- the letter of directive from his file. That's a little bit broader. They're essentially saying to the Court, "Please strike this policy from the books."

If Your Honor is correct that a display to staff is different than a display to students -- and I understand that there is language in the cases applying this in the Ninth Circuit, particularly *Poway*. One of the key factors in that court's decision was the impressionable minds of students who are required to go to the classroom in order to learn. That's the same here for students.

And so I recognize Your Honor's point, but they're asking for something broader than that in their relief.

THE COURT: Well, let's -- let's just stick with what counsel said they're requesting, because, again, I -- I think the request for relief in the complaint and then the request for relief in the preliminary injunction has merged into the -- a little too broad, perhaps, so -- but let's just stick with what counsel said, an order allowing the display of the books without limitation and then removing the letter of discipline.

I mean, I still struggle with allowing those books to be displayed to children. And counsel's point was that if it's not within the, I'm calling it course and scope, that's not the language used in *Kennedy*, but essentially that if the books are used as part of your duties are merely incidental is the deciding factor.

MR. MARRS: Well, I don't think that's exactly what *Kennedy* says, Your Honor. And I'll talk about *Kennedy* now. The clearest statement of the rationale of *Kennedy*, I believe, is actually reflected in Justice Alito's concurrence, and I'll just read that for the Court: Petitioner's expression occurred while at work but during a time when a brief slow in his duties apparently gave him a few free moments to engage in private activities. When he engaged in this expression, he acted in a purely private capacity.

That's not necessarily a it must -- the speech must be a part of the course and scope of their duties. It's something slightly different than that. It's are you making this expression, having this expressive conduct, while you were on the clock doing the things that you have been hired to do.

Here in *Kennedy*, the coach wasn't. He was given a moment for -- a private moment, just as the other coaches were, so bowing his head and silently praying on the football field isn't something that could have been imputed to his employer.

That's slightly different than the case here, where

plaintiff is saying, "I have this expressive conduct that I want to make. I want the kids to see these books and this message, and they're only going to come in here while I'm performing my job duties." That's a slightly different factual circumstance and a slightly different standard.

Beyond that, I think that the *Kennedy* case actually supports a denial of an injunction here. The facts in *Kennedy* are -- admittedly, I think by everyone, are much more of a gray area. In that case, it initially went up to the Ninth Circuit on a motion for preliminary injunction. The Ninth Circuit agreed with the district court that the injunction should be denied, and the Supreme Court declined to review that decision. Where the case -- the facts of that case are a little bit less clear than the facts of this case, I think all of that weighs in favor of denying an injunction here.

THE COURT: I mean, I still struggle with the -- with the fact that this was treated as a broad -- that the district swept up the speech as for both in front of the students and generally and treated it all as a bias incident, but your position, though, is still that the district could prohibit the display of the books even privately in his -- his office?

MR. MARRS: If plaintiff were displaying the books privately in his office when he is not interacting with other students or other staff members, then it is his own private speech. It's not something that could be imputed to his

employer, which is one of the -- one of the rationales underlying *Pickering* and *Poway*.

THE COURT: And I appreciate that. It's -- then how is -- how was the broad -- how was the breadth of this bias incident treatment and the order from the district appropriate if that's the standard?

MR. MARRS: I believe that it was appropriate. The letter of directive here simply asked him to take down the display of the books. It doesn't say anything beyond that. And so it doesn't say that he can't, for example, possess the books in his bookbag on campus or anything like that.

THE COURT: I mean, it says, "The office space you use is used for working with, testing and evaluating students, and consulting with other teachers, and parents also access your office." And they were on display in his office as art. And then he's told, "You can't display the books. This is a bias incident." So --

MR. MARRS: That's correct, Your Honor. And each of those instances that you just outlined are the scope of the plaintiff's duties while he's working as a state employee.

THE COURT: So you're still maintaining that these books could not have been discussed with teachers?

MR. MARRS: That's correct, Your Honor, if the discussion of the books with the teachers was something that the plaintiff was required to do as part of his job duties, which I

believe the record is unclear on that point.

THE COURT:  Well, I am struggling with whether or not he had any kind of right to -- or, excuse me, whether his display of these books to children was or was not public speech.  I don't know under *Dodge* how any other display of these books could be anything other than private speech, because if that's the case, then, again, you know, displaying a Bible would be -- without using it, without in the course and scope, would be out of bounds.  Wearing a cross, wearing a Star of David, wearing a keffiyeh would (pause) -- and, again, that's -- Free Exercise is different.  I'm talking specifically about free speech now, but those -- those actions could be restricted.

MR. MARRS:  I don't believe that that's the position of the district as it relates to this policy.  I understand Your Honor's broader argument.  I think there is some tension between the *Dodge* case and *Poway* and the *Downs* case that *Poway* cites that -- and *Berry*, the case that the Court has cited.  There is some inherent tension there.

You know, it may be that the right outcome is that any interaction with students in line with the discussion in *Poway* is certainly going to be imputed speech that is not going to be public speech.  It may be that there is a more fine dividing line here between what the district did and what the Court thinks is appropriate under the applicable precedent, but certainly when the plaintiff was performing his duties, talking to students, the

display of the books was certainly not private speech, especially given his statement of, "I want the students to see this while I'm evaluating them."

THE COURT:  Yeah.  And, again, that's -- for me, that's the crux of the case.  And then it comes down to -- I mean, obviously the display of these books had -- was not part of his job description, and is that relevant.  And I understand your position is at least that part of *Poway* remains good law, that, yes, that -- it doesn't matter if it's a math teacher talking about Christianity.  If you are imparting the message to students in any manner, it is public speech.

MR. MARRS:  That's right, while you're on the clock, Your Honor, you know, in the --

THE COURT:  Correct.

MR. MARRS:  -- doing your duties.  Right.

There's another issue that I want to clarify a little bit, and that's the state of the record as it relates to what has been described as the promotion of a binary view of gender by others in the school environment.

I think if the Court looks at the exhibit that has been provided here, I believe it's Exhibit O -- or maybe it's N.  In any event --

THE COURT:  The Sesame Street exhibit?

MR. MARRS:  Yes, the Sesame Street exhibit, Your Honor.  That exhibit is a lesson about the impact of DNA on biological

sex.  It's different than a discussion of gender identity, which I believe is an unrelated sort of idea, it's an unrelated area. And certainly this Sesame Street exhibit doesn't say, "There are only two gender identities.  One is male and one is female."  It simply isn't talking about the same thing as the books being displayed does.

Beyond that, the reference to an English lesson that teaches grammatical use of pronouns, the same sort of thing: it's a lesson about a traditional view of addressing folks in grammar; it's not a statement about what gender identities are appropriate one way or the other.

THE COURT:  Well, I think for First Amendment purposes, if it's public speech, the district can have any kind of idiosyncratic or incorrect view, and it's not the Court's business to tell the district what the -- whether their speech is inconsistent.  So there, I -- not that I agree or disagree with you.  I don't know that it's relevant that plaintiff argues that this speech is inconsistent for First Amendment -- excuse me, for speech purposes.

MR. MARRS:  I believe that's right.  So that the *Pickering* analysis is sequential.  It is if you get to question two, public speech versus private speech, if the answer is public speech, the speech is not protected.  That is the blanket rule.

Where it may matter is for certain of their claims, the idea of allowing one viewpoint versus another does factor in to

the merits of those claims, which is something that they have to prove in order to get an injunction based on that theory of relief.

THE COURT:  Well, I think if they get past public speech, they would get the injunction on First Amendment retaliation.  So I'm not particularly concerned with the rest of it, because you're not even challenging disruption after *Damiano*, correct?

MR. MARRS:  We're not challenging disruption.  I don't believe that the record supports that there was any such disruption at this point in time.  I mean, a hundred complaints in *Damiano* versus one here is not the same league, but there is another element of the balancing of interests under *Pickering*, which is what is the countervailing interest of the employer in regulating the speech.  And as I've said, the State of Oregon has said, "Here is -- here is your interest, education service district and all other schools.  You need to prevent bias incidents in your classrooms, because you need to promote an educational environment that will allow students to achieve as much as they can."  And so it is somewhat important to talk about what's actually going on in the rest of the educational environment.

It's not what plaintiff is describing here where students are seeing one viewpoint on the issue and then plaintiff is being told not to present that same viewpoint.  It's just not

actually what's supported by the record.

THE COURT:  So you are -- I mean, you're not challenging disruption, but you are challenging on the grounds of --

MR. MARRS:  I believe it's the fourth element, Your Honor.

THE COURT:  I don't have (pause) --

MR. MARRS:  I believe it's found in the *Poway* case. It's element 4, whether the state had an adequate justification for treating the employee differently from other members of the general public.

THE COURT:  Well, I'll admit I didn't dive into that portion of *Poway*, because *Damiano* doesn't contain that same standard.

MR. MARRS:  I believe that it's still good law. *Damiano* -- the *Damiano* case focused on disruption, I believe, because that's the theory that was developed on the summary judgment record in that case.

THE COURT:  Okay.

MR. MARRS:  And so the court there stopped short of getting to the next element I believe because there was a fact issue that precluded summary judgment on a disruption theory.

THE COURT:  I still think that comes -- I think this is all under adequate justification and how *Damiano* treated it.  I don't think you can get adequate justification without getting

some kind of disruption.

MR. MARRS:  I believe that that's supported by *Poway*, Your Honor, is that the -- the sequential test that it sets out from the *Eng* case.  And so I don't believe that --

THE COURT:  It's the exact same issue in *Damiano.*  I mean, different factual context, but if the district there is saying, "Hey, we -- we've got to eliminate bias in our schools," I don't care if there was a disruption are not, and also there would be no reason the Ninth Circuit wouldn't have reached it. So --

MR. MARRS:  The ESD policy that's at issue here isn't the same policy that the teachers and administrator in *Damiano* were found to have violated.  It's a separate policy that that district had regulating political speech.  So it wasn't put to the four in the same way.  I believe the justification for the policy at issue in *Damiano* was one based on limiting disruption that's in the school environment.

THE COURT:  All right.  Just to be clear, then, there is an agreement that this was a matter of public concern.

MR. MARRS:  That's correct, Your Honor.

THE COURT:  There is a dispute about whether plaintiff spoke as a private citizen or a public employee.  There's no dispute about, well, causation, the third factor.

MR. MARRS:  That's correct, Your Honor.

THE COURT:  You are now telling me there's a dispute on

adequate justification despite the lack of any disruption.

MR. MARRS:  That's correct.

THE COURT:  And I don't think there's any dispute on Number 5 as whether the State would have taken the adverse employment action absent the protected speech, because the speech was the entire basis for the action.

MR. MARRS:  That's correct.

THE COURT:  Well, I've kicked off three of the five elements I don't have consider under *Eng*.  All right.

MR. MARRS:  Yes, Your Honor.  I think you've adequately identified that all of the cases here rise or fall with the *Pickering* standard.  I have some more support for that if Your Honor wants it.  You've identified the *Berry* case that's cited by *Damiano*.  I believe that's (indiscernible) for the Ninth Circuit, so I won't take up time discussing that.

One of the interesting things here about the case that Your Honor just provided to us, the *Wood* case, or that your -- that you highlighted for us, is that it shows that *Poway* and *Pickering* are good law to this day being applied by other circuits, that *Kennedy* didn't stealth or implicitly abrogate those cases.  As far as we're aware, there's no case in the Ninth Circuit that has recognized *Kennedy* to be overruling *Pickering* or *Poway* in any specific way, and the case itself doesn't purport to do that.  It applies the *Pickering* analysis.  That's the legal lens that the *Kennedy* court looked at the issue through.  And so

plaintiff essentially is asking this Court to be the first to say, no, in fact, *Kennedy*, even though it doesn't say it, it overruled these particular cases.

THE COURT:  I don't think there's any good argument that it overruled the holding of *Poway v. Johnson*, but there's dicta in *Poway* that is clearly irreconcilable with *Kennedy*, which is, one, because of the position of trust and authority they hold on impressionable young minds with which they interact, teachers necessarily act as teachers for purposes of *Pickering* when at school or a school function in the general presence of students in a capacity one might reasonably view as official. That part is not reconcilable with *Kennedy*.

MR. MARRS:  I agree with you, Your Honor, that the *Kennedy* court has narrowed that to when you are performing your job duties, essentially.  That's the import of *Kennedy* to that.

THE COURT:  All right.  And then the other piece of it, which you relied on quite a bit in your brief, is the "ordinary citizen" language, whether an ordinary citizen could have walked into the classroom and done the same thing, because *Kennedy* -- I mean, the record's not as clear on this point, but I don't think an ordinary citizen could have just -- could have done -- you know, marched onto the 50-yard line for those prayers.

MR. MARRS:  And so the facts in *Kennedy* are a little bit muddled, Your Honor.  They get essentially a game of telephone through different case opinions as we go, but initially

the field was open after games, that members of the public, students, other players could come onto the field. Eventually it got closed down because there were a group of Satanists who wanted to come and make a demonstration at midfield after the game, so the district there said, "Oh, we're going to close this down at this point," but, you know, I don't think we're taking the position that anything that occurs -- or that *Poway* still stands for the proposition that anything that occurs on school grounds is necessarily government speech when it's -- when the expressive conduct is that of an employee. We do agree that it is narrower than that.

THE COURT: All right. So, again, this case likely rises and falls on whether the conduct -- whether it's just expressive conduct in the perform- -- in the course and scope of your employment or whether it has to be in the specific job you are hired to do in the course of your instruction.

MR. MARRS: I'm not sure I fully understand the distinction, and maybe that's what the Court is struggling with us with. Here, I'll just link it to the facts of this case.

When the plaintiff was interacting with students, one of his job duties, performing evaluations of students, he was necessarily speaking as an employee to the students that he interacted with, and the display behind him was expressive conduct pursuant to his job.

THE COURT: All right. That was a much better way to

phrase your argument.  And then do you have anything further?

MR. MARRS:  Yes, Your Honor.  There are a couple of additional items that I'd like to touch on.  The first has to do with the idea of hostility.  And maybe Your Honor is not interested in hearing argument about that, but the fact record doesn't support the idea that plaintiff was treated in any specific hostile manner because of his religious views.  I think the record actually reflects that plaintiff's religious views or the idea that he demonstrated this book -- these books because of his sincerely-held religious beliefs, which we don't cast any doubt on, only came into the process later on.  It's not something that was raised with the initial investigation level or the independent investigator who was hired to look at this or the superintendent or the board when it eventually denied the appeal.

And I -- again, I'm not casting any doubt on the sincerity of his religious beliefs.  I'm just saying that it's not something that the ESD was aware of when it was making its decision, so it's certainly not something that the ESD cast aspersions on in the similar fashion to what happened in *Masterpiece Cakeshop*, which, you know, draws into question the fairness of the entire process itself.  There's nothing in the record that indicates that kind of rhetoric or pre-judgment.

THE COURT:  And that would be a separate due process claim subject to *Pickering* -- not subject to *Pickering*, correct?

MR. MARRS:  No.  Your Honor, that -- the Free Exercise

claim is subject to *Pickering*.  I just wanted to highlight one of the additional (indiscernible) of the record that's been made here.

THE COURT:  I still don't understand how the hostility would -- could be -- I don't understand how the hostility element comes into play with public employee speech.  So regardless, I don't think the record is developed enough for any finding of hostility.  I mean, you can disagree that the ESD should have treated it as a bias incident or not, but there's not sufficient evidence in the record to me to say that it's -- that it exhibited hostility the same -- or at least to the level you saw in the Colorado cake case, the Masterpiece cakes.

MR. MARRS:  That's correct, Your Honor.  And we agree with that viewpoint.  That's the point that I was attempting to make, maybe not super eloquently.

The last thing that I want to touch on here is the injunction standard itself.  We haven't talked about that very much.  This is maybe a tangentially slightly new issue here, but the injunction that they're asking for, in addition to being slightly more broad, it is a type of injunction that is disfavored in the Ninth Circuit.  That's an injunction that would essentially grant the plaintiff all of the relief that he is seeking before he's had to prove his case on the merits.  That's a historically disfavored type of injunction here.  And the citation for that is *Miracle v. Hobbs*, 427 F. Supp. 3d 1150.

It's from 2019 in the District of Arizona.

Beyond that, I think it's important to discuss that plaintiff is seeking what I think is fairly characterized as a mandatory injunction. He's seeking to alter the status quo of the -- of the parties before this controversy arose. It's not enough for him to say, "I'm challenging a law that may violate my constitutional rights, therefore, this is a prohibitory injunction."

The Court actually has to look at the relevant status quo and decide whether plaintiff is asking for it to be changed or not. The ESD policy was on the books for -- since 2020 and governs this employee's conduct up until this controversy arose. So that's the relevant status quo to look back to. And an injunction striking that policy from the books effectively is one that would be a mandatory injunction, so they have to meet a higher standard.

THE COURT: And I'm not particularly interested in this idea of striking the policy from the books. I do agree that it's technically a mandatory injunction if only by virtue of he's already had to take the books down and the letter is already in his file. So the Court would affirmatively be -- at least on those two grounds, the narrower grounds described by plaintiff, that would be a mandatory injunction.

MR. MARRS: And that's --

THE COURT: We're still talking about taking one letter

out of the file and ordering -- allowing him to put up books perhaps with or without students present. And, again, that would depend on how the Court ruled.

MR. MARRS: That's correct, Your Honor, but it does matter, because the mandatory injunction does have a higher standard. They've got to show that the law clearly favors them. If anything, our discussion today indicates that the law doesn't clearly favor them at this point in time.

THE COURT: Well, again, you may be right as to students. It's very hard for me to say that a complete prohibition on these books outside of the presence of students would pass constitutional muster.

So anything further on behalf of --

MR. MARRS: No, unless Your Honor has any questions.

THE COURT: I think I've covered them all. I -- I probably will think of some I missed later tonight, but (pause) --

Counsel.

MR. LANGHOFER: Sure. I'll try to make this brief. Three straight points. I'll address the mandatory or prohibitory injunction.

So *FCA*, Ninth Circuit case, recent Ninth Circuit case where a school de-recognized an FCA group, it defined a prohibitory injunction, and it says specifically it preserves the status quo, and the status quo is defined as the legally relevant

relationship before the controversy arose.  So that -- and that's -- that is -- that's the distinction between a prohibitory and mandatory.

And the legally relevant position between the parties at that point was that Mr. Theis was displaying the books.  So it would be a prohibitory injunction under *FCA* and the Ninth Circuit standard.

So the -- and I'll now move on to the -- unless Your Honor has any questions.

THE COURT:  But your position is that the controversy itself was the first time he was told to take the books --

MR. LANGHOFER:  Absolutely.

THE COURT:  -- down, not the (pause) --

MR. LANGHOFER:  And that's -- that's almost all of the case, Your Honor.  Like in -- you know, when a government takes action against somebody and punishes them, they're coming in for an injunction to put them back to where they were at before, because they're saying, "My rights are being violated right now and continuously."  That's why there's irreparable harm.  That's why it's a prohibitory, not mandatory.

Moving on to the private speech, Your Honor, private government speech.  So I think it's very clear from the cases, there is some ambiguity, but I don't think that the cases would stand for the proposition that otherwise private speech becomes government speech simply because a student views it.  And, in

fact, I think that's what *Poway* was -- I think that's the portion that *Poway* rejected like in *Kennedy* -- or that *Kennedy* rejected in *Poway*.

And defendant's counsel here specifically said that it -- he took the position that they're saying if it's imputing a message to students, then, you know, they believe that's when -- that's when you know it's government speech.

And I think the Court was saying, no, that can't be the case. It clearly -- you know, students and parents were viewing this. They saw him with a school shirt on and he was on the field. They could have thought, you know, that was government speech, but that's not the standard, and so you cannot convert private speech into government speech simply because students view it.

And I think that the picture, the wedding picture on the desk of a -- of a teacher is very clear. If a teacher is sitting there counseling a student on something and she sees that, a message is being sent about that. And maybe it's public concern message, maybe it's not.

And that's the other thing here, is this is a public concern. When it's a public concern, which they admit, there is a much higher standard that the government has to meet there. And I think a message is being sent. They don't bring these in, you know, pictures and other things, just for fun. They're trying to send a message, whether it's political or not.

In this case, you know, they admit that you can bring in political messages.  And so I think that -- that's the important thing, is that just because a student views it doesn't mean it's government speech.

And I think that's consistent with the *Wood* -- sorry, I wanted to say Moore -- case, because I think the three standards there make it clear, it's the message was communicated directly with interacting with students.

Now, obviously there is -- it's clear that a message is there, but -- but he's not doing it, he's not communicating that message directly when interacting and it wasn't within the scope of his duties that that message was being displayed.

THE COURT:  All right.  So maybe displaying it to students would be too broad a term, but *Kennedy* clearly talks about timing and circumstances.  And here, the fact that you have students were one-on-one with a counselor and the only decoration is the books, couldn't then you find that it's public speech even if his job was not to provide reading instruction, or at the very least, isn't this a fact-dependent timing and circumstances question at least as it pertains to students in his office?

MR. LANGHOFER:  So -- so, Your Honor, I think the problem with the view of using it is that the standard being that students view it, is there would be no limit there, right?  It literally -- everything in the classroom, everything would be government speech because they are viewing it.  And I --

THE COURT:  No, but I -- let's keep with that -- that thought.  So say -- you know, say he had an after school club and he had these books and they were, like, 50 books that were up and these were three of them.  That sounds a lot more like *Kennedy* than this particular case where, again, timing and circumstances, one-on-one with the kid, they're the only decorations up, and we all agree that they're conveying a message of public concern.

MR. LANGHOFER:  So I think, again, if we're going to -- like, let's say there's 50 books up and there's 50 messages being displayed.  The fact that 50 messages are being displayed rather than two doesn't -- doesn't factor into the analysis whether it's government speech.  The question is was that -- was that -- was the message being communicated as part of his -- as part of his duties, was -- and was he communicating that directly as him doing his duties, just like *Wood* was.  And the answer is no. There -- he did not use them in doing his duties.

And I think that's the distinction.  And that's where the line has to be drawn, otherwise, the school does have the ability to completely say everything you do -- and as Your Honor has noted, that allows viewpoint discrimination.  And if they do that, then they have put the foot on the scales and only allowed one view.  And so I think that's why it's important that the rule not be that a student view it.  It's did the teacher communicate that directly, or the government employee, school employee, whether teacher or not, you know, while doing the duties.  And I

think the answer here is no, and that's why I think that's -- that standard's important.

THE COURT: What I'm struggling with with that theory is when you're speaking on a matter of public concern, you are inherently communicating, because if you're not communicating, you're not speaking. And so the question, then, is if you're in a setting directly with students communicating on a matter of public concern, how does the Court then say, "Well, that's just not part of your duties"?

MR. LANGHOFER: I think *Kennedy* -- the facts in *Kennedy* help us there, and -- because that's exactly what the school was wrestling with. And they were saying, "Look, students and parents are seeing this. You're still on the clock." You know, he -- "You're still on the clock. They're seeing this. They could take -- they could believe that that's government speech, and that we think the prayer on the 50-yard line is important," but what this court said was, "No. Did he actually force kids to participate? Did he actually try to compel them to do anything?" Those -- those were the factors that they looked at in *Kennedy,* is did they actually do that.

I think the three questions are -- let me see. I'll find it here, Your Honor. The three questions asked by *Kennedy* that they said were important are -- I'm sorry. I've got it here. And so I think that -- that is important and that's why it's helpful here. It allows the school to, you know, actually

carry out its duty. And the (pause) -- okay. So the three questions they asked is whether -- you know, did the employee speak while acting within the scope of his duties, told any student that it was important they participate in any religious activity, or pressure or encourage any student to join.

Those were the factors that *Kennedy* looked at there, and they said, no, they're not present here. And they're also not present in this particular case. And so I don't think it's determinative or dispositive that a student's viewed it; it's, you know, what is the context in which that message was being conveyed.

And I do think it's important to understand, *Kennedy* shows this as well, that teachers can be on the clock and can be doing some duties but also, you know, engaging in personal things as well. Like, you're in a class and you say, "Hey, did you see the game this weekend?" You know, there's some interaction. That's not -- that's not government speech if she says, "I like the Eagles and not the Red-" -- you know, "the Commanders" or whatever, right?

So I think that's why it's important that the standard here, it looks at *Kennedy.* And none of the factors that they looked at in *Kennedy* are present here.

And I'll go on to the second aspect, is that the interest being advanced by the government here is they're saying this is a bias incident and they're saying Oregon prohibits it.

Again, that cannot be the case when there are Oregon schools that actually teach a binary view of gender.  And, in fact, Your Honor, that -- that specific lesson we were talking about, I agree with defense counsel that that's talking about a sex binary.  I agree with that.  If you actually look at the books, and we actually have some of the citations in here, that Ms. Vannice actually questions Mr. Theis about the binary scientific view advanced, which talks about XX/XY, it doesn't say "gender identity" anywhere in those books.  It is not a discussion about gender identity.  Those books do not discuss gender identity.  They're discussing it from a sex biological standpoint just like the biology curriculum and the English curriculum, and so it cannot be that the interest being advanced for them to prohibit all speech on this topic is that Oregon law.

And, in fact, *Damiano* does cite the Oregon law.  They cite other policies as well, but that Oregon law was discussed as a part of the reason there was kind of a conglomeration of policies they cited, but -- so it can't be the case that their interest is being advanced by suppressing all binary views of gender when, in fact, the school that they're -- that he was in actually promotes that same view.

THE COURT:  Well, again, I'll ask you the more fundamental question that I asked defendant, which is if you look at *Eng*, it just says whether the state has an adequate justification.  And then fast forward 16 years later to *Damiano*,

and they're phrasing it as actual or reasonably predicted discussion -- disruption.  It just doesn't seem like they've -- they've looked at it as if -- in the same manner that you are -- they're looking in terms of disruption as far as the state's interest, not is this view correct, because I cannot tell you how much I do not want to get into the view of -- it's just not the role of the courts to say that, yes, there is -- these are inconsistent views of gender or they aren't.  I'm just -- I am not going there.

MR. LANGHOFER:  Absolutely, Your Honor.  And you're absolutely right that the courts consistently look at disruption, and there is no disruption here.  So that interest is not being advanced, obviously, in this case.  So we 100 percent agree on that.

And I just -- the reason that -- I do think that it's relevant in that the only reason we're here is because of the bias incident policy.  And if they didn't -- if he didn't violate that policy, we wouldn't be here, and so it is relevant to determine how -- you know, did he violate it.

And it cannot be a bias incident to promote a binary view of gender if the school is teaching the same thing.  And if you read the books and you see those things like, you know, that we discussed where there -- the view of XX/XY is what's being discussed in the books.

THE COURT:  I think the bias incident is only relevant

to -- as an adverse employment action.  Under the First -- I mean, under the First Amendment analysis, it's the same as being told to remove the books.  You know, whether it's treated as a bias incident or he's just told, "Take them down because we don't like these books," he still has the same First Amendment rights.

MR. LANGHOFER:  I would agree with that, Your Honor.  I think that that's true.  The reason, again, I think -- the reason we believe it's relevant is simply because the interest that they're saying they're advancing doesn't seem to be consistent with what the school is, but I understand that the result is the same.  Whether they just say, "Take them down" or, "You violated this policy," the result is the same, and I would agree with that.

A couple other items.  On the preliminary injunction that -- I think we've already looked through it, but if you look at page 2 of our motion, we actually say what we're requesting, and it does say we're limiting the request to the -- you know, posting the books and removing the letter.

THE COURT:  I think I -- I read so much, I probably didn't get back to page 2.

MR. LANGHOFER:  Yeah.  That's the scope of it right there.  So hopefully that clarifies that.

And we aren't -- that isn't all the relief.  As Your Honor has already pointed out, that's not all the relief we're asking for.  We have (pause) --

THE COURT:  Oh, I get it.  To stop enforcing the speech policy challenged both facially and as-applied to it to prohibit plaintiff from displaying the books or similar messages.

MR. LANGHOFER:  That's correct.  I mean, it would be that -- I mean, the -- what I guess we would have to understand, and, you know -- and Your Honor can look at this, I guess, but there is -- if they're saying, "You can't promote a binary view of gender," we are concerned that he would be punished going forward if he did that in some way which he doesn't, you know, understand.  And so we are asking for the display.  It is -- it is an as-applied.  We want the books to be able to be displayed, but during the pendency, you know, I guess we can just come back to the Court, but if he were to be punished for, again, doing something, I guess, similar, promoting a binary view of gender, we would probably be back in here.

So that's -- you know, Your Honor can look at the scope of that.  If you want to limit it to just the display of the books, then, you know, we can limit it to that, but there is that issue.  I just wanted to raise it for the Court that that could be something that arises.  Not -- not intending to do that, but my client is a little bit, you know, confused on what would be allowed and what wouldn't at this point in time.

Then I think the last thing I would say, Your Honor, that we haven't really discussed that I think is an important part here and it kind of goes back to the first part,

(indiscernible) and *Kennedy* both talk about the importance -- the important role of public schools and an interest that they have in actually teaching tolerance of different views, especially on topics of public concern.  That is a big, broad, overriding concern, and one of the -- and it really directly contradicts the defendants' position right here that they have the right to completely prohibit that, and -- you know, and so I think that is a counter -- another interest that weighs in Mr. Theis's favor that shows that public schools actually have an interest in allowing the promotion of these even in front of students, you know, if it is the private speech and not done in the role directly with the students.

So with those, unless Your Honor has any more questions, I think that that's all I have.

THE COURT:  I don't have any more substantive questions.

Counsel, do you have anything you need to follow up on?

MR. MARRS:  No.  No, Your Honor.

THE COURT:  All right.  Well, I would commend the parties on exceptional briefing and argument.  I clearly am not ruling from the bench today, and I'm going to take some time with this.  When does Mr. Theis return to his job?

MR. LANGHOFER:  It's in August, I want to say the third week of August.  I had a date at some point.

MR. CORTMAN:  It's cited in the motion.

MR. LANGHOFER:  It is cited in the motion.  You're right.

MR. CORTMAN:  It says here, Your Honor, August 29th, 2025.

THE COURT:  That's when my kids go back to school.

MR. CORTMAN:  All right.

THE COURT:  No.  August 29th, Friday.  All right.  Well, I don't know why ESD starts work on a Friday, but --

MR. LANGHOFER:  That's might be that that's the actual beginning.  He might -- teachers might return before, but I think that is the beginning of the school year officially.

THE COURT:  We start early because of Roundup, but he's ESD.  So you know what, I will try to get something out by early August.  That's the best I can -- I can say at this point.

I am not considering the kind of -- a broad, sweeping injunction regarding this policy.  To me, that's not in the cards for several reasons.  I don't know -- again, I don't know what I'm going to do with this motion overall, but it's also possible that it could be a more limited scope of injunction than even the plaintiff's requesting with -- again, my comments should have made very clear that I don't know that these books can be -- or I think the district may be able to prohibit display of books on matters of public concerns around kids.  That's the piece I'm focused on.  I don't know.  But, again, I am concerned that the district cannot broadly prohibit the display of these books

outside the presence of children.  So I don't know what I'm going to do with that even if I agree with your arguments regarding the display in front of children.  So I -- we have a lot to chew on.

Again, I commend the parties' arguments and briefing in this case.  And thank you for traveling all the way out to Pendleton for argument.

MR. MARRS:  Thanks for having us, Your Honor.

MR. LANGHOFER:  Thank you, Your Honor.

THE COURT:  All right.

(Proceedings adjourned at 2:45 p.m.)

# **C E R T I F I C A T E**

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 4th day of August 2025.


/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Official Court Reporter
Certificates Expire:  9/2027

**/**

**/s** [1] - 70:12

**1**

**1** [1] - 29:3
**100** [1] - 64:13
**1000** [1] - 2:4
**1150** [1] - 54:25
**16** [1] - 63:25
**18** [2] - 1:7, 3:1
**1:03** [1] - 3:1

**2**

**2** [2] - 65:16, 65:20
**2006** [2] - 11:12, 17:16
**20176** [2] - 2:9, 2:13
**2019** [1] - 55:1
**2020** [1] - 55:11
**2025** [4] - 1:7, 3:1, 68:4, 70:9
**29th** [2] - 68:3, 68:7
**2:25-cv-00865-HL** [1] - 1:6
**2:45** [1] - 69:10

**3**

**30042** [1] - 2:5
**326-8186** [1] - 1:24
**3d** [1] - 54:25

**4**

**4** [1] - 48:9
**427** [1] - 54:25
**44180** [2] - 2:8, 2:12
**447** [1] - 11:12
**4th** [1] - 70:9

**5**

**5** [1] - 50:4
**50** [5] - 5:21, 60:3, 60:9, 60:10
**50-yard** [2] - 51:22, 61:16
**503** [1] - 1:24
**523** [1] - 10:19
**597** [1] - 10:19

**6**

**642** [1] - 11:12

**7**

**7** [1] - 20:13

**7582** [1] - 2:15
**770** [1] - 2:19

**8**

**800** [1] - 2:18

**9**

**9/2027** [1] - 70:14
**97401** [1] - 2:19
**97475** [1] - 2:15

**A**

**ability** [3] - 10:15, 10:22, 60:19
**able** [7] - 4:8, 4:15, 11:6, 22:7, 31:13, 66:11, 68:22
**above-entitled** [1] - 70:5
**abrogate** [1] - 50:20
**absent** [1] - 50:5
**absolutely** [5] - 31:23, 37:22, 57:12, 64:10, 64:11
**absurd** [1] - 35:17
**access** [1] - 43:14
**accurate** [1] - 23:6
**achieve** [1] - 47:19
**act** [1] - 51:9
**acted** [1] - 41:14
**acting** [2] - 20:4, 62:3
**action** [9] - 27:17, 28:15, 32:9, 32:13, 50:5, 50:6, 57:16, 65:1
**actions** [1] - 44:12
**actively** [1] - 22:23
**activities** [1] - 41:14
**activity** [2] - 10:25, 62:5
**actual** [4] - 28:13, 29:8, 64:1, 68:9
**adding** [1] - 24:11
**addition** [1] - 54:19
**additional** [5] - 3:25, 4:7, 33:12, 53:3, 54:2
**address** [10] - 4:1, 5:4, 8:20, 10:1, 10:3, 10:4, 20:22, 32:9, 32:22, 56:20
**addressed** [3] - 32:10, 33:1, 33:4
**addressing** [4] - 5:19, 11:24, 24:16, 46:9
**adequate** [5] - 48:9, 48:24, 48:25, 50:1,

63:24
**adequately** [1] - 50:10
**adjourned** [1] - 69:10
**administration** [1] - 39:22
**administrator** [2] - 38:15, 49:12
**admit** [4] - 26:15, 48:12, 58:21, 59:1
**admits** [1] - 16:21
**admitted** [1] - 33:9
**admittedly** [1] - 42:8
**adopted** [1] - 22:10
**advanced** [5] - 62:24, 63:8, 63:13, 63:19, 64:13
**advancing** [1] - 65:9
**advantage** [1] - 38:20
**adverse** [7] - 27:17, 28:14, 32:9, 32:13, 50:4, 65:1
**affirmatively** [1] - 55:21
**afternoon** [3] - 4:22, 5:9, 33:17
**ago** [1] - 5:21
**agree** [25] - 7:24, 8:1, 8:2, 12:13, 13:14, 16:6, 16:12, 16:15, 24:9, 25:5, 30:25, 37:19, 37:22, 46:16, 51:13, 52:10, 54:13, 55:18, 60:7, 63:4, 63:5, 64:13, 65:6, 65:12, 69:2
**agreed** [2] - 9:4, 42:10
**agreement** [1] - 49:19
**agrees** [1] - 12:11
**AIMEE** [1] - 1:10
**Alito's** [1] - 41:10
**allegation** [1] - 19:10
**allegations** [1] - 34:6
**allegedly** [1] - 27:18
**alleging** [1] - 8:17
**ALLIANCE** [3] - 2:3, 2:7, 2:11
**allow** [7] - 6:7, 15:20, 17:22, 17:24, 21:15, 31:1, 47:19
**allowed** [7] - 8:14, 18:10, 19:9, 19:10, 19:16, 60:21, 66:22
**allowing** [10] - 19:12, 23:3, 30:19, 36:3, 36:4, 40:24, 41:1, 46:25, 56:1, 67:10
**allows** [4] - 16:22, 28:7, 60:20, 61:25
**almost** [2] - 8:8, 57:14
**alone** [1] - 6:25

**alter** [1] - 55:4
**ambiguity** [1] - 57:23
**Amendment** [13] - 7:20, 7:25, 10:18, 22:5, 28:15, 32:19, 35:1, 37:17, 46:12, 46:18, 47:5, 65:2, 65:5
**amount** [1] - 3:21
**analysis** [9] - 7:22, 8:16, 11:23, 27:1, 39:6, 46:21, 50:24, 60:11, 65:2
**ANDREW** [1] - 1:20
**Andrew** [1] - 3:5
**animus** [3] - 6:19, 6:21, 38:14
**announce** [1] - 20:6
**answer** [4] - 5:8, 46:22, 60:15, 61:1
**apologize** [6] - 12:21, 15:12, 15:15, 31:9, 31:12, 31:25
**appeal** [1] - 53:14
**appearances** [1] - 4:4
**applicable** [2] - 9:24, 44:24
**applied** [9] - 7:20, 9:16, 11:12, 11:22, 31:22, 40:4, 50:19, 66:2, 66:11
**applies** [2] - 28:11, 50:24
**apply** [7] - 8:23, 9:25, 10:14, 10:15, 11:10, 12:5, 37:14
**applying** [4] - 10:7, 11:16, 38:13, 40:12
**appreciate** [1] - 43:3
**appropriate** [6] - 36:2, 36:4, 43:5, 43:7, 44:24, 46:11
**area** [4] - 13:15, 14:1, 42:9, 46:2
**argue** [7] - 8:7, 8:8, 8:17, 8:20, 11:9, 26:17, 39:1
**argues** [1] - 46:17
**arguing** [4] - 4:24, 5:1, 8:7, 8:8
**argument** [14] - 3:8, 4:9, 4:25, 9:2, 31:11, 38:24, 39:15, 39:24, 44:15, 51:4, 53:1, 53:5, 67:20, 69:6
**Argument** [1] - 1:18
**arguments** [5] - 3:24, 5:5, 10:11, 69:2, 69:4
**arises** [1] - 66:20

**Arizona** [1] - 55:1
**arose** [3] - 55:5, 55:12, 57:1
**art** [1] - 43:15
**as-applied** [5] - 7:20, 31:22, 40:4, 66:2, 66:11
**aspect** [3] - 11:21, 22:12, 62:23
**aspersions** [1] - 53:19
**assert** [1] - 5:12
**assertions** [1] - 12:16
**Assistant** [1] - 1:10
**assure** [1] - 3:19
**attempted** [2] - 12:21, 27:22
**attempting** [1] - 54:14
**attitude** [1] - 13:4
**August** [6] - 67:23, 67:24, 68:3, 68:7, 68:14, 70:9
**authority** [1] - 51:7
**automatically** [1] - 22:4
**avoid** [1] - 22:7
**aware** [2] - 50:21, 53:17

**B**

**balancing** [5] - 18:15, 26:14, 33:8, 39:8, 47:13
**ban** [9] - 5:15, 5:16, 5:18, 6:5, 10:8, 10:9, 14:19, 16:13, 39:23
**banned** [2] - 7:2, 7:6
**banner** [2] - 34:20, 34:21
**banners** [1] - 15:17
**based** [8] - 7:21, 8:3, 25:23, 26:4, 29:23, 29:25, 47:2, 49:16
**basis** [3] - 7:4, 13:10, 50:6
**become** [1] - 23:24
**becomes** [2] - 28:8, 57:24
**BEFORE** [1] - 1:20
**beginning** [2] - 68:10, 68:11
**behalf** [1] - 56:13
**behind** [8] - 22:22, 27:23, 34:15, 34:20, 34:22, 35:19, 36:13, 52:23
**beliefs** [7] - 7:12, 10:21, 10:23, 13:3, 25:24, 53:10, 53:16
**below** [1] - 70:3

**bench** [1] - 67:21
**Berry** [4] - 11:11, 36:8, 44:17, 50:13
**best** [1] - 68:14
**better** [2] - 18:2, 52:25
**between** [6] - 15:16, 24:1, 44:15, 44:23, 57:2, 57:4
**beyond** [4] - 42:6, 43:9, 46:7, 55:2
**bias** [17] - 31:3, 31:15, 36:3, 39:12, 39:18, 39:21, 42:19, 43:4, 43:16, 47:17, 49:7, 54:9, 62:25, 64:17, 64:20, 64:25, 65:4
**Bible** [5] - 11:13, 17:8, 17:17, 36:6, 44:7
**big** [1] - 67:4
**bigger** [3] - 29:22, 30:1, 30:5
**biggest** [1] - 13:15
**binary** [28] - 6:6, 6:9, 6:13, 6:15, 6:22, 7:2, 7:10, 11:8, 14:19, 20:9, 22:10, 23:11, 26:5, 28:6, 28:16, 29:5, 29:8, 30:8, 30:10, 30:21, 45:18, 63:2, 63:5, 63:7, 63:19, 64:20, 66:7, 66:14
**biological** [2] - 45:25, 63:11
**biology** [5] - 6:13, 7:3, 22:14, 27:13, 63:12
**bit** [7] - 21:18, 40:7, 42:13, 45:17, 51:17, 51:24, 66:21
**blanket** [1] - 46:23
**blaze** [2] - 12:2, 12:4
**blue** [1] - 13:10
**board** [1] - 53:14
**BOARD** [1] - 1:9
**book** [3] - 5:19, 25:1, 53:9
**bookbag** [1] - 43:11
**books** [84] - 5:16, 6:12, 7:7, 12:11, 12:16, 12:24, 13:10, 13:12, 13:22, 16:14, 16:16, 17:22, 17:23, 19:6, 20:18, 20:23, 27:18, 27:22, 28:25, 29:5, 29:16, 30:20, 31:2, 31:13, 32:22, 34:7, 34:15, 35:6, 36:12, 36:14, 36:19, 36:21, 36:25, 37:2, 37:9, 37:24, 38:25,

39:2, 40:5, 40:9, 40:24, 41:1, 41:4, 42:2, 42:21, 42:22, 43:9, 43:10, 43:16, 43:22, 43:24, 44:4, 44:5, 45:1, 45:6, 46:5, 53:9, 55:11, 55:14, 55:18, 55:20, 56:1, 56:11, 57:5, 57:11, 59:17, 60:3, 60:9, 63:5, 63:9, 63:10, 64:22, 64:24, 65:3, 65:5, 65:18, 66:3, 66:11, 66:18, 68:21, 68:22, 68:25
**bookshelf** [8] - 22:17, 27:23, 29:13, 36:6, 36:12, 36:15, 36:20, 36:22
**bound** [3] - 6:12, 7:24, 9:6
**bounds** [1] - 44:9
**bowing** [1] - 41:23
**Box** [1] - 2:15
**boy** [2] - 13:6
**breadth** [1] - 43:4
**break** [1] - 35:6
**brief** [5] - 3:25, 5:4, 41:12, 51:17, 56:19
**briefing** [7] - 3:20, 32:1, 32:4, 32:5, 35:13, 67:20, 69:4
**briefs** [2] - 30:7
**brightened** [1] - 13:1
**bring** [2] - 58:23, 59:1
**bringing** [1] - 14:23
**broad** [11] - 5:11, 6:4, 29:19, 30:22, 40:23, 42:17, 43:4, 54:20, 59:14, 67:4, 68:15
**broadening** [1] - 27:19
**broader** [12] - 14:22, 27:19, 27:25, 28:10, 29:15, 29:19, 30:14, 31:7, 31:17, 40:7, 40:18, 44:15
**broadly** [4] - 23:13, 24:5, 30:11, 68:25
**business** [1] - 46:15

## C

**cabin** [1] - 39:24
**cake** [1] - 54:12
**cakes** [1] - 54:12
**Cakeshop** [1] - 53:20
**campus** [4] - 25:20, 26:23, 26:24, 43:11
**cannot** [7] - 17:6,

58:12, 63:1, 63:13, 64:5, 64:20, 68:25
**capacities** [1] - 1:11
**capacity** [3] - 38:2, 41:15, 51:11
**captive** [1] - 38:22
**car** [1] - 35:6
**cards** [1] - 68:16
**care** [1] - 49:8
**carry** [1] - 62:1
**carrying** [1] - 25:16
**cartoon** [1] - 13:1
**case** [64] - 3:21, 3:22, 5:21, 6:17, 8:5, 10:14, 10:17, 11:13, 11:17, 12:5, 13:18, 14:2, 14:5, 17:3, 17:16, 18:17, 20:1, 26:21, 27:4, 27:5, 27:9, 32:4, 36:9, 38:12, 38:14, 39:15, 41:25, 42:6, 42:9, 42:13, 42:14, 44:6, 44:16, 44:17, 45:5, 48:8, 48:16, 48:18, 49:4, 50:13, 50:16, 50:17, 50:21, 50:23, 51:25, 52:12, 52:19, 54:12, 54:23, 56:22, 57:15, 58:9, 59:1, 59:6, 60:5, 62:8, 63:1, 63:18, 64:13, 69:5
**cases** [16] - 8:8, 9:7, 9:12, 9:18, 11:20, 17:11, 18:1, 20:9, 32:5, 34:25, 40:12, 50:11, 50:21, 51:3, 57:22, 57:23
**cast** [2] - 53:10, 53:18
**casting** [1] - 53:15
**causation** [1] - 49:23
**celebrate** [2] - 13:6
**certain** [9] - 9:12, 19:15, 19:16, 23:8, 25:22, 33:19, 37:10, 46:24
**certainly** [6] - 3:22, 44:21, 44:24, 45:1, 46:3, 53:18
**Certificates** [1] - 70:14
**certified** [1] - 70:7
**certify** [1] - 70:3
**challenge** [1] - 31:17
**challenged** [3] - 21:10, 40:4, 66:2
**challenging** [5] - 47:7, 47:9, 48:3, 55:6
**changed** [1] - 55:10
**characterized** [1] -

55:3
**Charles** [1] - 2:8
**cheery** [2] - 13:4
**chew** [1] - 69:3
**child** [1] - 38:25
**children** [13] - 13:20, 14:11, 16:19, 34:7, 34:9, 34:11, 38:25, 39:2, 39:5, 41:2, 44:4, 69:1, 69:3
**choice** [2] - 21:20
**chose** [1] - 12:24
**Christianity** [1] - 45:10
**Circuit** [25] - 9:6, 9:8, 9:18, 10:14, 11:11, 11:15, 11:22, 12:5, 12:8, 14:1, 18:17, 24:2, 34:18, 37:18, 38:10, 40:13, 42:9, 42:10, 49:9, 50:14, 50:22, 54:21, 56:22, 57:6
**circuits** [1] - 50:20
**circumstance** [1] - 42:4
**circumstances** [3] - 59:15, 59:19, 60:5
**citation** [1] - 54:25
**citations** [1] - 63:6
**cite** [2] - 63:15, 63:16
**cited** [7] - 36:9, 44:17, 50:13, 63:18, 67:25, 68:1
**cites** [1] - 44:16
**citizen** [8] - 16:2, 16:3, 16:7, 35:11, 49:22, 51:18, 51:21
**claim** [5] - 9:17, 11:17, 32:19, 53:24, 54:1
**claiming** [1] - 5:17
**claims** [14] - 7:14, 7:21, 7:25, 8:3, 8:4, 8:12, 8:21, 9:2, 9:23, 27:19, 33:1, 46:24, 47:1
**clarifies** [1] - 65:22
**clarify** [2] - 33:20, 45:16
**clarifying** [1] - 33:18
**class** [6] - 6:16, 15:10, 20:7, 23:23, 27:13, 62:15
**classroom** [11] - 14:25, 15:8, 15:19, 20:16, 21:3, 30:3, 30:20, 36:2, 40:15, 51:19, 59:24
**classrooms** [3] - 15:17, 23:7, 47:18

**clause** [1] - 10:20
**clear** [19] - 10:25, 14:5, 14:7, 17:13, 23:22, 27:4, 27:20, 29:10, 29:21, 32:1, 34:13, 42:13, 49:18, 51:20, 57:22, 58:16, 59:7, 59:9, 68:21
**clearest** [1] - 41:9
**clearly** [14] - 9:7, 19:3, 21:9, 22:18, 24:7, 25:3, 38:14, 38:24, 51:6, 56:6, 56:8, 58:9, 59:14, 67:20
**client** [1] - 66:21
**client's** [1] - 28:10
**clock** [7] - 18:9, 25:20, 41:20, 45:12, 61:13, 61:14, 62:13
**close** [1] - 52:5
**closed** [1] - 52:3
**club** [1] - 60:2
**co** [1] - 7:7
**co-worker** [1] - 7:7
**Coach** [1] - 19:4
**coach** [2] - 19:5, 41:21
**coaches** [2] - 18:10, 41:22
**coats** [1] - 3:14
**Colorado** [1] - 54:12
**colored** [1] - 16:25
**combine** [1] - 7:9
**coming** [3] - 27:14, 32:5, 57:16
**Commanders** [1] - 62:18
**commend** [3] - 32:3, 67:19, 69:4
**comment** [1] - 11:19
**comments** [2] - 12:17, 68:20
**communicate** [3] - 16:18, 34:14, 60:23
**communicated** [2] - 59:7, 60:13
**communicates** [1] - 21:18
**communicating** [7] - 23:5, 35:3, 59:10, 60:14, 61:5, 61:7
**communication** [2] - 21:10
**community** [1] - 38:2
**compel** [1] - 61:18
**compelled** [1] - 21:25
**compelling** [2] - 11:5, 11:7
**complaint** [3] - 12:24, 26:16, 40:21
**complaints** [3] - 26:7,

47:11
**complete** [1] - 56:10
**completed** [1] - 25:12
**completely** [3] - 13:10, 60:19, 67:7
**complicated** [1] - 32:4
**computer** [1] - 3:12
**conceded** [1] - 33:7
**concern** [18] - 12:12, 12:19, 13:13, 13:24, 16:18, 29:9, 32:20, 33:8, 39:7, 49:19, 58:19, 58:21, 60:7, 61:4, 61:8, 67:4, 67:5
**concerned** [4] - 18:4, 47:6, 66:8, 68:24
**concerns** [1] - 68:23
**conclusion** [1] - 4:9
**concurrence** [2] - 9:16, 41:10
**conduct** [9] - 28:23, 28:24, 41:19, 42:1, 52:10, 52:13, 52:14, 52:24, 55:12
**conference** [1] - 38:6
**conflating** [1] - 31:10
**conflicts** [1] - 34:18
**conformed** [1] - 70:6
**confused** [1] - 66:21
**conglomeration** [1] - 63:17
**consider** [1] - 50:9
**considerable** [1] - 3:20
**considering** [2] - 39:18, 68:15
**consistent** [4] - 19:21, 22:14, 59:5, 65:9
**consistently** [1] - 64:11
**constitutional** [4] - 5:23, 22:25, 55:7, 56:12
**consulting** [1] - 43:14
**contain** [1] - 48:13
**contend** [1] - 6:9
**content** [2] - 7:20, 20:5
**context** [9] - 10:7, 10:12, 11:4, 24:9, 24:10, 36:17, 36:23, 49:6, 62:10
**contexts** [1] - 11:1
**continue** [2] - 32:7, 39:1
**continuing** [1] - 6:18
**continuously** [1] - 57:19
**contradicts** [1] - 67:5

**contrary** [1] - 6:1
**control** [1] - 23:7
**controlled** [1] - 21:6
**controversy** [4] - 55:5, 55:12, 57:1, 57:10
**conversation** [2] - 20:20, 29:23
**convert** [2] - 26:22, 58:12
**convey** [4] - 12:18, 15:6, 34:16, 36:11
**conveyed** [7] - 12:21, 13:12, 14:11, 24:7, 24:8, 24:10, 62:11
**conveying** [3] - 13:4, 37:10, 60:7
**cornerstones** [1] - 34:23
**correct** [27] - 6:14, 12:12, 12:13, 12:20, 13:13, 16:14, 24:14, 26:11, 29:1, 30:4, 31:6, 32:23, 40:10, 43:18, 43:23, 45:14, 47:8, 49:20, 49:24, 50:2, 50:7, 53:24, 54:13, 56:4, 64:5, 66:4, 70:4
**correctly** [1] - 38:17
**Cortman** [2] - 2:4, 4:12
**CORTMAN** [4] - 4:12, 67:25, 68:3, 68:6
**Counsel** [2] - 32:7, 56:18
**counsel** [9] - 4:3, 4:10, 33:13, 33:19, 40:20, 40:24, 58:4, 63:4, 67:17
**counsel's** [1] - 41:2
**counseling** [1] - 58:17
**counselor** [1] - 59:16
**counter** [1] - 67:8
**countervailing** [3] - 39:9, 39:11, 47:14
**couple** [5] - 14:17, 16:20, 28:1, 53:2, 65:14
**course** [12] - 16:11, 16:17, 17:10, 24:11, 24:12, 25:3, 37:7, 41:3, 41:17, 44:8, 52:14, 52:16
**COURT** [115] - 1:1, 1:21, 1:23, 3:7, 3:10, 3:17, 4:14, 4:21, 4:24, 5:2, 7:15, 7:17, 7:19, 8:22, 9:1, 9:5, 10:6, 11:9, 12:1, 12:4, 12:7, 12:10,

12:15, 13:8, 13:15, 15:11, 15:13, 16:6, 16:16, 17:12, 17:15, 18:14, 19:24, 22:20, 23:13, 23:19, 24:6, 24:24, 26:1, 27:14, 28:21, 28:23, 29:20, 30:17, 31:5, 31:7, 31:10, 31:20, 31:24, 32:3, 32:11, 32:13, 32:17, 32:24, 33:13, 33:16, 35:23, 36:5, 36:14, 36:21, 37:2, 37:12, 37:16, 37:23, 38:6, 38:9, 38:19, 39:14, 40:19, 42:16, 43:3, 43:12, 43:21, 44:2, 45:4, 45:14, 45:23, 46:12, 47:4, 48:2, 48:7, 48:12, 48:19, 48:23, 49:5, 49:18, 49:21, 49:25, 50:3, 50:8, 51:4, 51:16, 52:12, 52:25, 53:23, 54:4, 55:17, 55:25, 56:9, 56:15, 57:10, 57:13, 59:13, 60:1, 61:3, 63:22, 64:25, 65:19, 66:1, 67:15, 67:19, 68:5, 68:7, 68:12, 69:9
**court** [8] - 4:14, 10:25, 15:13, 42:11, 48:20, 50:25, 51:14, 61:17
**Court** [27] - 3:4, 5:9, 5:22, 7:5, 9:16, 11:15, 26:20, 27:17, 30:18, 39:19, 40:3, 40:8, 41:11, 42:12, 44:17, 44:23, 45:20, 51:1, 52:18, 55:9, 55:21, 56:3, 58:8, 61:8, 66:13, 66:19, 70:13
**court's** [1] - 40:14
**Court's** [5] - 5:3, 5:8, 6:1, 29:25, 46:14
**COURTROOM** [1] - 3:4
**courts** [3] - 11:24, 64:7, 64:11
**covered** [2] - 3:25, 56:15
**create** [2] - 32:24, 35:19
**creating** [1] - 32:6
**cross** [2] - 10:9, 44:9
**CRR** [2] - 1:24, 70:13
**crux** [1] - 45:5
**curricular** [3] - 21:20,

21:21, 24:18
**curriculum** [6] - 6:14, 22:11, 22:14, 24:17, 63:12, 63:13
**cut** [2] - 26:13, 26:17

---

## D

**D-1100** [1] - 2:5
**daily** [2] - 7:4, 10:24
**Damiano** [21] - 7:19, 8:2, 8:13, 8:17, 8:22, 9:3, 36:9, 39:15, 47:7, 47:12, 48:13, 48:16, 48:24, 49:5, 49:12, 49:16, 50:14, 63:15, 63:25
**date** [1] - 67:24
**DATED** [1] - 70:9
**David** [4] - 2:4, 4:12, 10:9, 44:9
**days** [1] - 15:1
**de** [1] - 56:23
**de-recognized** [1] - 56:23
**deal** [2] - 31:18, 31:19
**decide** [1] - 55:10
**decided** [2] - 20:6, 36:1
**deciding** [1] - 41:5
**decision** [5] - 6:1, 36:18, 40:14, 42:12, 53:18
**decisions** [1] - 3:22
**declined** [1] - 42:12
**decorate** [6] - 15:21, 15:22, 16:23, 21:15, 23:4, 23:10
**decorating** [2] - 5:14, 24:20
**decoration** [2] - 22:17, 59:16
**decorations** [4] - 17:5, 19:19, 23:7, 60:6
**decorative** [4] - 12:16, 13:3, 13:11, 20:23
**defendant** [1] - 63:23
**defendant's** [1] - 58:4
**defendants** [14] - 4:23, 5:11, 5:12, 5:15, 6:4, 6:9, 6:14, 7:6, 7:11, 12:13, 14:4, 14:18, 26:13, 28:5
**DEFENDANTS** [1] - 2:17
**Defendants** [1] - 1:12
**defendants'** [4] - 5:24, 10:11, 12:23, 67:6
**DEFENDING** [3] - 2:3,

2:7, 2:11
**defense** [2] - 33:14, 63:4
**defined** [3] - 29:15, 56:23, 56:25
**definitely** [1] - 26:12
**demonstrated** [1] - 53:9
**demonstrates** [4] - 6:25, 21:14, 26:21, 30:11
**demonstrating** [1] - 37:9
**demonstration** [1] - 52:4
**demonstrative** [1] - 36:13
**denial** [1] - 42:7
**denied** [2] - 42:11, 53:14
**deny** [1] - 30:18
**denying** [1] - 42:15
**department** [1] - 11:11
**dependent** [1] - 59:19
**DEPUTY** [1] - 3:4
**described** [2] - 45:18, 55:22
**describing** [1] - 47:23
**description** [1] - 45:7
**desk** [13] - 5:14, 17:4, 17:5, 17:6, 17:8, 19:15, 19:20, 22:22, 24:20, 27:23, 35:19, 58:16
**desks** [2] - 15:22, 17:22
**despite** [1] - 50:1
**determinative** [1] - 62:9
**determine** [1] - 64:19
**determined** [1] - 36:2
**developed** [3] - 25:18, 48:17, 54:7
**dicta** [2] - 14:8, 51:6
**different** [27] - 5:16, 14:15, 15:7, 15:18, 19:11, 20:12, 21:14, 21:17, 22:12, 26:12, 34:4, 35:23, 37:13, 37:23, 38:12, 40:11, 41:18, 41:25, 42:4, 42:5, 44:11, 46:1, 49:6, 51:25, 67:3
**differently** [3] - 11:16, 18:13, 48:10
**difficult** [1] - 25:25
**digitally** [1] - 70:7
**directive** [2] - 40:7, 43:8
**directly** [9] - 24:17,

36:13, 59:7, 59:11, 60:14, 60:24, 61:7, 67:5, 67:12
**Director** [1] - 1:10
**DIRECTORS** [1] - 1:9
**disagree** [4] - 39:17, 39:21, 46:16, 54:8
**disagreed** [1] - 7:7
**disagreement** [1] - 7:8
**discipline** [2] - 28:24, 40:25
**disciplined** [1] - 27:24
**discriminate** [1] - 28:4
**discrimination** [6] - 7:21, 8:23, 18:15, 18:19, 20:10, 60:20
**discuss** [3] - 20:8, 55:2, 63:10
**discussed** [6] - 25:2, 43:22, 63:16, 64:23, 64:24, 66:24
**discussing** [2] - 50:15, 63:11
**discussion** [10] - 22:1, 25:4, 30:12, 38:16, 43:24, 44:20, 46:1, 56:7, 63:10, 64:2
**disfavored** [2] - 54:21, 54:24
**display** [29] - 12:11, 27:22, 29:15, 29:21, 31:2, 31:13, 34:15, 35:15, 36:10, 37:24, 39:2, 39:21, 40:10, 40:11, 40:24, 42:21, 43:9, 43:15, 43:16, 44:3, 44:5, 45:1, 45:6, 52:23, 66:10, 66:17, 68:22, 68:25, 69:3
**displayed** [10] - 6:12, 13:22, 13:25, 38:25, 41:2, 46:6, 59:12, 60:10, 66:11
**displaying** [12] - 5:15, 5:17, 5:19, 27:18, 28:25, 30:1, 40:5, 42:22, 44:7, 57:5, 59:13, 66:3
**displays** [1] - 35:7
**dispositive** [1] - 62:9
**dispute** [9] - 21:11, 32:11, 32:13, 32:20, 32:21, 49:21, 49:23, 49:25, 50:3
**disputes** [1] - 19:1
**disruption** [26] - 7:8, 8:10, 8:17, 8:18, 26:3, 26:4, 26:15, 27:12, 32:21, 33:9,

34:24, 47:7, 47:9, 47:11, 48:3, 48:16, 48:22, 49:1, 49:8, 49:16, 50:1, 64:2, 64:4, 64:11, 64:12
**disruptive** [2] - 22:12, 23:15
**distinction** [10] - 9:21, 14:12, 14:18, 14:24, 15:16, 17:20, 24:1, 52:18, 57:2, 60:17
**DISTRICT** [4] - 1:1, 1:2, 1:9, 1:21
**district** [26] - 5:16, 6:5, 8:9, 10:8, 10:9, 13:8, 13:9, 15:1, 15:20, 15:25, 16:13, 16:21, 42:11, 42:17, 42:20, 43:5, 44:14, 44:23, 46:13, 46:15, 47:17, 49:6, 49:14, 52:5, 68:22, 68:25
**District** [3] - 3:4, 3:5, 55:1
**districts** [1] - 24:24
**dive** [1] - 48:12
**diverges** [1] - 16:5
**diversity** [1] - 29:6
**dividing** [1] - 44:22
**DIVISION** [1] - 1:3
**DNA** [1] - 45:25
**Dodge** [7] - 8:13, 38:11, 38:12, 38:19, 38:23, 44:5, 44:16
**done** [4] - 25:9, 51:19, 51:21, 67:11
**doubly** [1] - 10:18
**doubt** [2] - 53:11, 53:15
**down** [11] - 7:3, 15:11, 37:2, 43:8, 45:5, 52:3, 52:6, 55:20, 57:13, 65:4, 65:11
**Downs** [1] - 44:16
**drawn** [1] - 60:18
**draws** [1] - 53:20
**due** [1] - 53:23
**during** [6] - 12:23, 15:2, 17:23, 36:18, 41:12, 66:12
**duties** [31] - 15:5, 17:10, 18:9, 18:10, 19:1, 19:8, 20:16, 21:11, 24:12, 24:13, 34:12, 34:21, 37:7, 41:5, 41:12, 41:17, 42:4, 43:20, 43:25, 44:25, 45:15, 51:15, 52:21, 59:12, 60:14, 60:15, 60:16, 60:25,

61:9, 62:3, 62:14
**duty** [1] - 62:1

## E

**Eagles** [1] - 62:18
**early** [2] - 68:12, 68:13
**eats** [1] - 34:2
**EDUCATION** [1] - 1:8
**education** [1] - 47:16
**educational** [3] - 39:12, 47:19, 47:21
**effectively** [1] - 55:14
**egregious** [1] - 26:19
**either** [1] - 27:23
**element** [5] - 47:13, 48:5, 48:9, 48:21, 54:5
**elements** [3] - 21:13, 39:6, 50:9
**eliminate** [1] - 49:7
**eliminating** [1] - 39:12
**eloquently** [1] - 54:15
**employed** [1] - 28:11
**employee** [30] - 6:2, 6:5, 7:1, 11:13, 17:16, 18:25, 19:22, 20:3, 24:9, 24:15, 24:23, 27:3, 33:24, 34:20, 35:10, 35:18, 35:21, 37:8, 38:15, 38:18, 39:7, 43:20, 48:10, 49:22, 52:10, 52:22, 54:6, 60:24, 62:2
**employee's** [1] - 55:12
**employees** [8] - 5:13, 6:7, 15:20, 15:21, 16:22, 21:15, 36:3
**employer** [6] - 34:22, 38:5, 39:10, 41:24, 43:1, 47:14
**employment** [7] - 16:17, 20:16, 21:11, 27:17, 50:5, 52:15, 65:1
**encourage** [1] - 62:5
**end** [5] - 20:8, 28:20, 29:11, 30:17
**enforcing** [2] - 40:3, 66:1
**Eng** [3] - 49:4, 50:9, 63:24
**engage** [3] - 18:11, 28:16, 41:13
**engaged** [4] - 19:8, 27:3, 31:3, 41:14
**engaging** [2] - 20:4, 62:14
**English** [4] - 6:13,

22:14, 46:7, 63:12
**entire** [5] - 13:18, 21:25, 27:8, 50:6, 53:21
**entitled** [1] - 70:5
**environment** [6] - 21:6, 21:7, 45:19, 47:19, 47:22, 49:17
**equal** [1] - 9:3
**ESD** [15] - 22:24, 33:22, 33:24, 35:14, 35:18, 37:8, 39:23, 40:3, 49:11, 53:17, 53:18, 54:8, 55:11, 68:8, 68:13
**especially** [4] - 11:11, 25:23, 45:1, 67:3
**essentially** [13] - 15:9, 16:2, 18:9, 24:11, 25:7, 34:25, 38:3, 40:8, 41:4, 51:1, 51:15, 51:24, 54:22
**Eugene** [1] - 2:19
**evaluating** [6] - 25:7, 25:12, 34:11, 34:16, 43:13, 45:3
**evaluation** [3] - 25:9, 25:11, 25:13
**evaluations** [1] - 52:21
**event** [1] - 45:22
**eventually** [2] - 52:2, 53:14
**everywhere** [2] - 27:7, 28:11
**evidence** [4] - 15:23, 16:24, 33:8, 54:10
**evolution** [1] - 18:20
**exact** [2] - 13:21, 49:5
**exactly** [6] - 23:18, 31:25, 33:20, 34:19, 41:7, 61:11
**example** [6] - 19:15, 24:25, 34:1, 35:14, 37:8, 43:10
**examples** [2] - 19:7, 35:16
**exceptional** [1] - 67:20
**excludes** [1] - 29:6
**excuse** [2] - 44:3, 46:18
**Exercise** [16] - 7:14, 9:6, 9:8, 9:17, 9:22, 10:7, 10:12, 10:20, 11:10, 11:23, 11:25, 18:1, 22:5, 33:2, 44:10, 53:25
**Exhibit** [3] - 28:22, 29:4, 45:21

**exhibit** [5] - 45:20, 45:23, 45:24, 45:25, 46:3
**exhibited** [1] - 54:11
**exhibits** [1] - 30:12
**existence** [8] - 18:25, 19:4, 19:5, 19:22, 24:15, 24:23, 25:15, 27:3
**expand** [1] - 5:6
**Expire** [1] - 70:14
**explain** [1] - 24:22
**explained** [1] - 25:6
**express** [2] - 6:7, 22:13
**expressing** [4] - 6:5, 7:2, 22:6, 39:20
**expression** [7] - 5:24, 6:19, 6:21, 22:18, 41:11, 41:14, 41:19
**expressive** [8] - 10:24, 12:22, 20:24, 41:19, 42:1, 52:10, 52:14, 52:23
**extent** [1] - 33:4

## F

**F.3d** [1] - 11:12
**face** [1] - 5:25
**facially** [4] - 27:21, 28:3, 40:4, 66:2
**fact** [17] - 6:25, 7:9, 7:11, 13:19, 19:2, 20:21, 42:17, 48:21, 51:2, 53:5, 58:1, 59:15, 59:19, 60:10, 63:2, 63:15, 63:20
**fact-dependent** [1] - 59:19
**factor** [5] - 39:8, 41:6, 46:25, 49:23, 60:11
**factors** [7] - 22:15, 39:9, 39:16, 40:13, 61:19, 62:6, 62:21
**facts** [8] - 7:5, 33:19, 42:7, 42:13, 42:14, 51:23, 52:19, 61:10
**factual** [2] - 42:4, 49:6
**faculty** [1] - 13:22
**fairly** [1] - 55:3
**fairness** [1] - 53:21
**faith** [1] - 10:23
**fall** [1] - 50:11
**falls** [1] - 52:13
**family** [2] - 15:24, 18:12
**far** [4] - 30:19, 35:13, 50:21, 64:4
**fashion** [1] - 53:19

**fast** [1] - 63:25
**favor** [3] - 42:14, 56:8, 67:8
**favors** [1] - 56:6
**FCA** [3] - 56:22, 56:23, 57:6
**female** [1] - 46:4
**few** [4] - 3:23, 33:18, 35:16, 41:13
**field** [4] - 41:23, 52:1, 52:2, 58:11
**file** [3] - 40:7, 55:21, 56:1
**fine** [2] - 38:23, 44:22
**fired** [1] - 28:16
**First** [14] - 7:20, 7:25, 10:18, 22:4, 28:15, 32:19, 35:1, 37:17, 46:12, 46:18, 47:5, 65:1, 65:2, 65:5
**first** [10] - 4:3, 4:10, 5:12, 18:22, 32:3, 33:22, 51:1, 53:3, 57:11, 66:25
**five** [1] - 50:8
**fixed** [1] - 6:22
**flag** [3] - 22:21, 23:1, 23:15
**flags** [1] - 23:4
**flies** [1] - 5:25
**Florida** [4] - 20:2, 20:6, 22:9, 22:20
**fluid** [3] - 6:20, 6:22, 23:10
**focus** [1] - 32:25
**focused** [6] - 16:9, 27:17, 31:21, 32:15, 48:16, 68:24
**folks** [3] - 34:21, 37:10, 46:9
**follow** [1] - 67:17
**foot** [2] - 33:25, 60:21
**football** [2] - 14:13, 41:23
**FOR** [6] - 1:2, 2:3, 2:7, 2:11, 2:14, 2:17
**force** [1] - 61:17
**foregoing** [1] - 70:3
**forgot** [1] - 4:4
**forms** [1] - 7:25
**forth** [4] - 15:25, 17:24, 20:13, 27:2
**forward** [3] - 33:23, 63:25, 66:9
**four** [2] - 15:2, 49:15
**fourth** [1] - 48:5
**framework** [1] - 9:1
**frankly** [1] - 13:18
**free** [3] - 22:22, 41:13, 44:11

**Free** [17] - 7:13, 9:6, 9:8, 9:17, 9:22, 10:7, 10:12, 10:20, 11:10, 11:23, 11:24, 18:1, 22:5, 33:2, 44:10, 53:25
**freedom** [1] - 5:23
**FREEDOM** [3] - 2:3, 2:7, 2:11
**Friday** [2] - 68:7, 68:8
**friendly** [1] - 34:9
**friends** [1] - 18:12
**front** [12] - 13:1, 16:10, 16:22, 18:7, 22:23, 30:9, 36:6, 36:22, 39:25, 42:18, 67:10, 69:3
**fully** [2] - 25:6, 52:17
**fun** [1] - 58:24
**function** [1] - 51:10
**fundamental** [1] - 63:23

### G

**GA** [1] - 2:5
**game** [6] - 14:13, 14:14, 14:15, 51:24, 52:5, 62:16
**games** [1] - 52:1
**gate** [1] - 5:24
**gay** [1] - 5:16
**gender** [37] - 6:6, 6:8, 6:10, 6:13, 6:15, 6:20, 6:22, 7:2, 7:8, 7:11, 11:8, 14:20, 19:11, 20:9, 22:10, 23:11, 28:6, 28:17, 29:5, 29:6, 29:9, 30:8, 30:10, 30:21, 45:18, 46:1, 46:4, 46:10, 63:2, 63:9, 63:10, 63:11, 63:20, 64:8, 64:21, 66:8, 66:14
**general** [4] - 27:15, 31:11, 48:11, 51:10
**generally** [3] - 9:23, 36:24, 42:19
**giant** [2] - 34:20, 34:21
**girl** [2] - 13:6, 13:7
**given** [7] - 3:14, 4:17, 5:3, 10:14, 27:9, 41:21, 45:2
**gloss** [1] - 33:19
**government** [44] - 5:13, 5:18, 6:3, 16:1, 16:4, 17:1, 17:3, 17:6, 18:2, 18:25,

19:13, 19:18, 19:20, 19:22, 20:14, 22:19, 23:24, 24:3, 24:15, 24:19, 24:21, 26:23, 33:6, 33:25, 34:4, 35:2, 35:3, 37:1, 38:3, 52:9, 57:15, 57:22, 57:25, 58:7, 58:11, 58:13, 58:22, 59:4, 59:25, 60:12, 60:24, 61:15, 62:17, 62:24
**governs** [1] - 55:12
**grammar** [1] - 46:10
**grammatical** [1] - 46:8
**Grande** [1] - 6:11
**grant** [2] - 30:18, 54:22
**gray** [2] - 14:1, 42:8
**great** [2] - 13:5, 13:6
**ground** [1] - 12:4
**grounds** [5] - 32:17, 48:3, 52:9, 55:22
**group** [2] - 52:3, 56:23
**guess** [4] - 66:5, 66:6, 66:12, 66:14

### H

**hall** [1] - 7:3
**Hallman** [1] - 3:6
**HALLMAN** [1] - 1:20
**hallways** [1] - 14:20
**hang** [2] - 23:1, 35:18
**hanging** [2] - 23:15, 36:1
**happy** [7] - 5:6, 5:7, 8:19, 10:1, 10:4, 12:25
**harbor** [1] - 10:21
**hard** [2] - 24:24, 56:10
**harm** [2] - 28:14, 57:19
**HARRANG** [1] - 2:17
**hat** [6] - 37:12, 37:19, 37:20, 38:23, 39:21, 39:23
**hate** [1] - 35:15
**head** [1] - 41:23
**hearing** [1] - 53:5
**heavily** [1] - 20:2
**held** [2] - 6:2, 53:10
**help** [3] - 14:12, 14:15, 61:11
**helpful** [1] - 61:25
**higher** [4] - 11:1, 55:16, 56:5, 58:22
**highlight** [2] - 35:13, 54:1
**highlighted** [1] - 50:18

**highlights** [1] - 36:10
**hired** [3] - 41:20, 52:16, 53:13
**historically** [1] - 54:24
**Hobbs** [1] - 54:25
**hold** [2] - 10:23, 51:8
**holding** [3] - 14:9, 14:10, 51:5
**Honor** [79] - 3:16, 4:18, 4:20, 4:22, 5:1, 5:6, 8:1, 9:4, 9:14, 10:1, 10:16, 11:4, 12:3, 12:20, 14:17, 14:22, 16:21, 23:6, 23:18, 23:20, 24:14, 28:2, 28:22, 29:4, 29:10, 30:4, 30:13, 30:24, 30:25, 31:18, 32:2, 32:8, 32:10, 33:11, 33:17, 36:9, 36:24, 38:11, 39:4, 39:24, 40:10, 41:8, 43:18, 43:23, 45:13, 45:24, 48:6, 49:3, 49:20, 49:24, 50:10, 50:13, 50:17, 51:13, 51:24, 53:2, 53:4, 53:25, 54:13, 56:4, 56:14, 57:9, 57:15, 57:21, 59:21, 60:19, 61:22, 63:3, 64:10, 65:6, 65:24, 66:6, 66:16, 66:23, 67:13, 67:18, 68:3, 69:7, 69:8
**Honor's** [5] - 9:20, 26:12, 33:3, 40:17, 44:15
**HONORABLE** [1] - 1:20
**Honorable** [1] - 3:5
**hopefully** [1] - 65:22
**hostile** [4] - 6:19, 6:21, 6:23, 53:7
**hostility** [7] - 7:11, 11:21, 53:4, 54:4, 54:5, 54:8, 54:11
**hot** [2] - 3:18, 4:5
**Human** [1] - 1:11
**Humiston** [3] - 1:24, 70:12, 70:13
**hundred** [4] - 26:6, 26:7, 47:11
**Hurricane** [1] - 2:4
**hypothetical** [2] - 23:17, 38:10

### I

**idea** [7] - 12:18, 46:2,

46:25, 53:4, 53:6, 53:9, 55:18
**identified** [4] - 20:1, 39:11, 50:11, 50:13
**identities** [2] - 46:4, 46:10
**identity** [5] - 19:11, 46:1, 63:9, 63:10, 63:11
**idiosyncratic** [1] - 46:14
**II** [1] - 1:5
**IMESD** [7] - 3:10, 15:19, 16:1, 16:21, 21:15, 30:21, 33:22
**IMESD's** [1] - 17:21
**impact** [1] - 45:25
**imparting** [1] - 45:10
**implicated** [1] - 22:4
**implication** [1] - 27:25
**implicitly** [1] - 50:20
**import** [1] - 51:15
**importance** [1] - 67:1
**important** [20] - 4:16, 10:22, 13:5, 14:18, 21:23, 22:1, 22:9, 47:20, 55:2, 59:3, 60:22, 61:2, 61:16, 61:23, 61:24, 62:4, 62:12, 62:20, 66:24, 67:2
**impressionable** [3] - 38:22, 40:14, 51:8
**impute** [1] - 34:21
**imputed** [3] - 41:24, 42:25, 44:21
**imputing** [1] - 58:5
**IN** [1] - 1:1
**incident** [11] - 31:3, 31:15, 42:19, 43:5, 43:17, 54:9, 62:25, 64:17, 64:20, 64:25, 65:4
**incidental** [1] - 41:5
**incidents** [3] - 36:3, 39:13, 47:18
**include** [1] - 10:24
**includes** [2] - 16:23, 16:24
**including** [4] - 5:14, 14:20, 15:20, 28:24
**inconsistent** [3] - 46:16, 46:18, 64:8
**incorrect** [1] - 46:14
**incredibly** [1] - 30:22
**independent** [1] - 53:13
**indicated** [1] - 9:19
**indicates** [2] - 53:22, 56:7

**indicating** [1] - 30:11
**indiscernible** [4] - 25:18, 50:14, 54:2, 67:1
**individual** [1] - 38:18
**inherent** [1] - 44:18
**inherently** [1] - 61:5
**initial** [2] - 36:17, 53:12
**injunction** [35] - 30:18, 30:23, 31:1, 31:13, 31:16, 31:21, 32:16, 32:18, 40:2, 40:22, 42:7, 42:10, 42:11, 42:15, 47:2, 47:5, 54:17, 54:19, 54:20, 54:21, 54:24, 55:4, 55:8, 55:14, 55:15, 55:19, 55:23, 56:5, 56:21, 56:24, 57:6, 57:17, 65:14, 68:16, 68:19
**inquiry** [1] - 18:22
**instance** [1] - 24:25
**instances** [1] - 43:19
**instruction** [2] - 52:16, 59:18
**intending** [4] - 34:14, 34:16, 36:11, 66:20
**interact** [3] - 21:4, 34:10, 51:8
**interacted** [1] - 52:23
**interacting** [13] - 17:17, 20:15, 20:19, 21:2, 22:19, 35:9, 37:7, 37:10, 38:1, 42:23, 52:20, 59:8, 59:11
**interaction** [3] - 15:17, 44:20, 62:16
**interacts** [1] - 34:11
**interchange** [1] - 24:17
**interest** [15] - 11:5, 11:7, 39:10, 39:11, 47:14, 47:16, 62:24, 63:13, 63:19, 64:5, 64:12, 65:8, 67:2, 67:8, 67:9
**interested** [2] - 53:5, 55:17
**interesting** [2] - 19:25, 50:16
**interests** [1] - 47:13
**interjecting** [1] - 4:6
**INTERMOUNTAIN** [1] - 1:8
**interpreted** [1] - 28:4
**introduce** [1] - 4:11
**introduction** [1] - 5:4

**invalidates** [1] - 29:6
**investigation** [5] - 12:23, 29:4, 36:17, 36:19, 53:12
**investigator** [1] - 53:13
**invitation** [1] - 3:17
**invited** [1] - 21:7
**inwardly** [1] - 10:21
**irrational** [1] - 13:10
**irreconcilable** [2] - 9:7, 51:6
**irreparable** [1] - 57:19
**issue** [21] - 7:23, 9:6, 22:7, 29:19, 30:23, 32:9, 34:19, 35:8, 36:25, 37:4, 37:11, 39:25, 45:16, 47:24, 48:22, 49:5, 49:11, 49:16, 50:25, 54:18, 66:19
**issues** [8] - 3:21, 3:25, 4:7, 5:5, 5:19, 32:5, 32:22, 32:25
**it'll** [1] - 5:5
**items** [2] - 53:3, 65:14
**itself** [7] - 14:9, 14:21, 36:10, 50:23, 53:21, 54:17, 57:11

## J

**job** [11] - 15:5, 16:12, 42:4, 43:25, 45:7, 51:15, 52:15, 52:21, 52:24, 59:18, 67:22
**Johnson** [7] - 14:4, 14:7, 14:8, 19:25, 34:19, 51:5
**join** [1] - 62:5
**JUDGE** [1] - 1:21
**judgment** [3] - 48:18, 48:22, 53:22
**Julian** [2] - 2:18, 4:22
**July** [2] - 1:7, 3:1
**Justice** [2] - 9:15, 41:10
**justification** [6] - 48:9, 48:24, 48:25, 49:15, 50:1, 63:25
**juxtaposition** [1] - 19:25

## K

**keep** [3] - 4:14, 27:14, 60:1
**keffiyeh** [1] - 44:10
**Kellie** [3] - 1:24, 70:12, 70:13

**Kellie_Humiston@ ord.uscourts.gov** [1] - 1:25
**Kennedy** [48] - 6:1, 9:5, 9:8, 9:15, 10:17, 14:6, 14:9, 14:13, 16:4, 16:8, 18:3, 18:23, 19:21, 23:21, 24:1, 24:2, 27:2, 41:4, 41:8, 41:9, 41:21, 42:6, 42:7, 50:20, 50:22, 50:25, 51:2, 51:6, 51:12, 51:14, 51:15, 51:19, 51:23, 58:2, 59:14, 60:4, 61:10, 61:19, 61:22, 62:6, 62:12, 62:21, 62:22, 67:1
**Kennedy's** [4] - 19:4, 24:4, 24:22
**key** [4] - 14:10, 16:10, 18:22, 40:13
**kicked** [1] - 50:8
**kid** [3] - 12:25, 34:8, 60:6
**kids** [8] - 14:16, 26:6, 36:22, 37:3, 42:2, 61:17, 68:5, 68:23
**kind** [10] - 5:7, 18:15, 22:18, 44:3, 46:13, 49:1, 53:22, 63:17, 66:25, 68:15
**kinds** [1] - 10:23

## L

**lack** [1] - 50:1
**Langhofer** [3] - 2:8, 4:13, 5:10
**LANGHOFER** [64] - 3:9, 3:16, 4:13, 5:1, 5:3, 7:16, 7:18, 8:1, 8:25, 9:4, 9:14, 10:16, 11:18, 12:3, 12:6, 12:9, 12:13, 12:20, 13:14, 14:17, 15:12, 15:15, 16:15, 16:20, 17:13, 17:19, 18:23, 20:11, 23:3, 23:18, 23:20, 24:14, 25:5, 26:11, 28:1, 28:22, 29:1, 30:4, 30:24, 31:6, 31:9, 31:12, 31:23, 31:25, 32:8, 32:12, 32:14, 32:23, 33:3, 33:15, 56:19, 57:12, 57:14, 59:21, 60:8, 61:10, 64:10, 65:6, 65:21, 66:4, 67:23, 68:1,

68:9, 69:8
**language** [3] - 40:12, 41:4, 51:18
**Lansdowne** [2] - 2:9, 2:13
**last** [4] - 3:18, 11:18, 54:16, 66:23
**law** [16] - 6:10, 6:12, 6:16, 10:14, 12:5, 14:2, 27:8, 45:8, 48:15, 50:19, 55:6, 56:6, 56:7, 63:14, 63:15, 63:16
**Lawrenceville** [1] - 2:5
**lawyers** [1] - 33:18
**leads** [1] - 37:4
**league** [1] - 47:12
**learn** [1] - 40:15
**least** [12] - 7:24, 14:8, 18:17, 23:16, 24:9, 24:25, 31:20, 45:8, 54:11, 55:21, 59:19, 59:20
**left** [1] - 9:5
**legal** [6] - 5:11, 6:4, 12:4, 12:8, 33:20, 50:24
**legally** [2] - 56:25, 57:4
**legitimate** [1] - 26:9
**lens** [1] - 50:25
**less** [3] - 32:25, 36:25, 42:13
**lesson** [4] - 45:25, 46:7, 46:9, 63:3
**letter** [14] - 28:12, 28:18, 29:2, 29:3, 31:2, 31:14, 32:22, 40:6, 40:7, 40:25, 43:8, 55:20, 55:25, 65:18
**level** [3] - 36:17, 53:12, 54:11
**LGBT** [4] - 22:21, 23:1, 23:15, 26:8
**LGBTQ** [1] - 5:19
**life** [1] - 10:24
**likely** [1] - 52:12
**limit** [3] - 59:23, 66:17, 66:18
**limitation** [2] - 26:9, 40:25
**limited** [6] - 20:14, 21:5, 21:7, 30:25, 37:5, 68:19
**limiting** [3] - 34:24, 49:16, 65:17
**limits** [1] - 10:10
**line** [7] - 6:18, 34:19,

44:20, 44:22, 51:22, 60:18, 61:16
**link** [1] - 52:19
**literally** [2] - 20:19, 59:24
**live** [1] - 10:23
**logged** [1] - 3:11
**LONG** [1] - 2:17
**longstanding** [1] - 5:25
**look** [19] - 8:12, 8:13, 8:22, 9:15, 9:22, 16:3, 29:2, 35:5, 39:14, 53:13, 55:9, 55:13, 63:5, 63:23, 64:11, 65:15, 66:6, 66:16
**Look** [2] - 8:18, 61:12
**looked** [8] - 7:19, 15:23, 50:25, 61:19, 62:6, 62:22, 64:3, 65:15
**looking** [7] - 12:1, 12:5, 29:20, 30:15, 32:19, 39:16, 64:4
**looks** [2] - 45:20, 62:21
**loses** [1] - 14:14
**lounge** [1] - 13:22
**lounges** [1] - 14:20
**lunch** [1] - 34:2
**lunchtime** [1] - 17:9

## M

**MAGA** [6] - 37:12, 37:19, 37:20, 38:23, 39:20, 39:23
**MAGISTRATE** [1] - 1:21
**main** [1] - 8:6
**maintaining** [1] - 43:21
**male** [1] - 46:4
**mandated** [1] - 35:14
**mandatory** [9] - 30:22, 55:4, 55:15, 55:19, 55:23, 56:5, 56:20, 57:3, 57:20
**manner** [3] - 45:11, 53:7, 64:3
**marched** [1] - 51:22
**MARK** [1] - 1:9
**Marrs** [2] - 2:18, 4:22
**MARRS** [47] - 4:22, 33:17, 35:24, 36:8, 36:16, 36:23, 37:4, 37:13, 37:22, 38:1, 38:8, 38:11, 39:4, 39:24, 41:7, 42:22,

43:7, 43:18, 43:23, 44:13, 45:12, 45:15, 45:24, 46:20, 47:9, 48:5, 48:8, 48:15, 48:20, 49:2, 49:11, 49:20, 49:24, 50:2, 50:7, 50:10, 51:13, 51:23, 52:17, 53:2, 53:25, 54:13, 55:24, 56:4, 56:14, 67:18, 69:7

**Masterpiece** [3] - 11:21, 53:20, 54:12
**math** [3] - 37:20, 37:21, 45:9
**matter** [17] - 12:11, 12:19, 13:13, 13:24, 16:18, 20:9, 22:22, 24:18, 32:20, 33:7, 39:7, 45:9, 46:24, 49:19, 56:5, 61:4, 61:7
**matters** [1] - 68:23
**Matthew** [2] - 2:12, 4:18
**mean** [41] - 10:6, 13:9, 14:3, 14:4, 14:13, 17:1, 17:15, 18:14, 20:6, 23:14, 25:2, 26:1, 26:5, 26:15, 26:25, 27:14, 28:9, 28:17, 28:18, 29:22, 32:19, 33:2, 36:5, 37:18, 38:19, 38:24, 39:14, 41:1, 42:16, 43:12, 45:5, 47:11, 48:2, 49:6, 51:20, 54:8, 59:4, 65:2, 66:4, 66:5
**means** [2] - 35:17, 70:5
**measure** [1] - 18:18
**media** [1] - 18:11
**meet** [4] - 20:25, 26:16, 55:15, 58:22
**meeting** [3] - 29:11, 29:12, 37:19
**members** [6] - 37:8, 38:2, 39:3, 42:24, 48:10, 52:1
**mention** [1] - 3:13
**merely** [2] - 20:23, 41:5
**merged** [1] - 40:22
**merits** [2] - 47:1, 54:23
**message** [32] - 6:6, 12:18, 12:25, 13:5, 13:12, 15:6, 16:18, 21:1, 22:6, 22:11,

22:13, 23:23, 27:10, 34:9, 34:14, 34:17, 34:21, 36:11, 42:2, 45:10, 58:6, 58:18, 58:19, 58:23, 58:25, 59:7, 59:9, 59:11, 59:12, 60:7, 60:13, 62:10
**messages** [9] - 5:15, 15:24, 16:24, 23:5, 40:5, 59:2, 60:9, 60:10, 66:3
**messaging** [1] - 26:8
**microphone** [1] - 4:16
**Middle** [1] - 6:11
**middle** [1] - 32:5
**midfield** [1] - 52:4
**might** [7] - 22:6, 34:21, 35:13, 51:11, 68:9, 68:10
**Millard** [1] - 2:14
**minds** [3] - 38:22, 40:14, 51:8
**Miracle** [1] - 54:25
**missed** [1] - 56:16
**moment** [2] - 41:22
**moments** [1] - 41:13
**mood** [1] - 21:19
**Moore** [1] - 59:6
**most** [4] - 9:22, 10:7, 10:22, 11:19
**motion** [6] - 4:1, 42:10, 65:16, 67:25, 68:1, 68:18
**mouth** [1] - 38:4
**move** [5] - 8:6, 8:15, 23:21, 27:15, 57:8
**moving** [1] - 57:21
**MR** [116] - 3:9, 3:16, 4:12, 4:13, 4:18, 4:22, 5:1, 5:3, 7:16, 7:18, 8:1, 8:25, 9:4, 9:14, 10:16, 11:18, 12:3, 12:6, 12:9, 12:13, 12:20, 13:14, 14:17, 15:12, 15:15, 16:15, 16:20, 17:13, 17:19, 18:23, 20:11, 23:3, 23:18, 23:20, 24:14, 25:5, 26:11, 28:1, 28:22, 29:1, 30:4, 30:24, 31:6, 31:9, 31:12, 31:23, 31:25, 32:8, 32:12, 32:14, 32:23, 33:3, 33:15, 33:17, 35:24, 36:8, 36:16, 36:23, 37:4, 37:13, 37:22, 38:1, 38:8, 38:11, 39:4, 39:24, 41:7,

42:22, 43:7, 43:18, 43:23, 44:13, 45:12, 45:15, 45:24, 46:20, 47:9, 48:5, 48:8, 48:15, 48:20, 49:2, 49:11, 49:20, 49:24, 50:2, 50:7, 50:10, 51:13, 51:23, 52:17, 53:2, 53:25, 54:13, 55:24, 56:4, 56:14, 56:19, 57:12, 57:14, 59:21, 60:8, 61:10, 64:10, 65:6, 65:21, 66:4, 67:18, 67:23, 67:25, 68:1, 68:3, 68:6, 68:9, 69:7, 69:8
**MS** [1] - 4:19
**muddled** [1] - 51:24
**Mulvihill** [1] - 29:3
**MULVIHILL** [1] - 1:9
**must** [4] - 20:21, 33:1, 41:16
**muster** [1] - 56:12

### N

**name** [1] - 5:9
**narrow** [1] - 39:25
**narrowed** [1] - 51:14
**narrower** [3] - 35:4, 52:11, 55:22
**nature** [3] - 23:9, 28:23, 36:10
**NE** [1] - 2:4
**necessarily** [6] - 36:8, 37:5, 41:16, 51:9, 52:9, 52:22
**need** [4] - 19:14, 47:17, 47:18, 67:17
**neutral** [5] - 9:23, 11:5, 27:22, 28:3, 38:13
**never** [1] - 9:16
**new** [7] - 5:5, 11:24, 12:1, 12:4, 18:24, 19:21, 54:18
**next** [4] - 5:19, 29:3, 48:21
**Ninth** [26] - 9:6, 9:8, 9:18, 10:14, 11:11, 11:15, 11:22, 12:5, 12:8, 14:1, 18:17, 24:2, 34:18, 37:18, 38:9, 38:10, 40:12, 42:9, 42:10, 49:9, 50:14, 50:21, 54:21, 56:22, 57:6
**nobody** [1] - 18:25
**non** [2] - 22:21, 23:11

**non-teacher** [1] - 22:21
**none** [3] - 20:17, 32:21, 62:21
**note** [1] - 22:9
**noted** [1] - 60:20
**nothing** [2] - 20:5, 53:21
**Number** [1] - 50:4
**number** [2] - 20:25, 39:16

### O

**object** [1] - 22:6
**obviously** [7] - 10:24, 15:1, 17:10, 28:10, 45:6, 59:9, 64:13
**occurred** [1] - 41:11
**occurs** [2] - 52:7, 52:8
**OF** [3] - 1:2, 1:9, 1:17
**offered** [1] - 36:14
**office** [22] - 4:5, 11:14, 14:16, 15:1, 15:21, 16:19, 21:5, 22:17, 23:1, 23:4, 23:7, 23:10, 31:14, 34:7, 38:2, 42:21, 42:23, 43:12, 43:15, 59:20
**offices** [2] - 16:23, 21:15
**Official** [1] - 70:13
**official** [4] - 1:11, 19:8, 38:2, 51:11
**officially** [1] - 68:11
**once** [2] - 26:2
**one** [46] - 3:11, 7:7, 11:18, 11:21, 14:18, 16:21, 16:24, 17:15, 20:14, 20:15, 20:25, 21:23, 23:20, 24:25, 26:15, 28:1, 29:18, 34:22, 35:12, 38:14, 38:25, 39:6, 39:8, 40:13, 43:1, 46:4, 46:11, 46:25, 47:12, 47:24, 49:16, 50:16, 51:7, 51:11, 52:20, 54:1, 55:14, 55:25, 59:16, 60:6, 60:22, 67:5
**one's** [1] - 3:14
**one-on-one** [2] - 59:16, 60:6
**ones** [1] - 9:20
**open** [4] - 4:1, 9:5, 15:8, 52:1
**opinion** [2] - 21:24, 39:20
**opinions** [2] - 9:11,

51:25
**opposed** [2] - 24:12, 30:2
**opposite** [4] - 6:8, 20:8, 28:7
**OR** [2] - 2:15, 2:19
**Oral** [1] - 1:18
**oral** [1] - 3:7
**order** [5] - 40:3, 40:15, 40:24, 43:5, 47:2
**ordering** [2] - 30:21, 56:1
**ordinary** [3] - 51:17, 51:18, 51:21
**OREGON** [1] - 1:2
**Oregon** [15] - 1:8, 3:5, 6:10, 6:15, 22:20, 27:8, 35:15, 35:25, 39:11, 47:15, 62:25, 63:1, 63:14, 63:15, 63:16
**original** [1] - 70:6
**otherwise** [3] - 13:8, 57:24, 60:18
**outcome** [1] - 44:19
**outlined** [1] - 43:19
**outlines** [1] - 35:16
**outside** [7] - 19:8, 25:3, 25:19, 37:24, 39:2, 56:11, 69:1
**outwardly** [1] - 35:3
**overall** [1] - 68:18
**overcome** [1] - 11:6
**overriding** [1] - 67:4
**overruled** [2] - 51:3, 51:5
**overruling** [1] - 50:22
**owe** [8] - 18:24, 19:3, 19:5, 19:21, 24:15, 24:23, 25:15, 27:2
**owes** [1] - 16:2
**own** [7] - 15:1, 34:6, 35:2, 35:6, 42:24

### P

**p.m** [2] - 3:1, 69:10
**P.O** [1] - 2:15
**page** [3] - 20:13, 65:16, 65:20
**paragraph** [1] - 29:3
**parents** [7] - 18:7, 22:6, 24:3, 26:7, 43:14, 58:9, 61:13
**Parkway** [2] - 2:8, 2:12
**part** [19] - 14:10, 19:1, 19:3, 20:19, 20:20, 20:22, 20:24, 41:5, 41:17, 43:25, 45:6, 45:8, 51:12, 60:13,

**part's** [1] - 16:8
**participate** [2] - 61:18, 62:4
**particular** [8] - 3:24, 14:3, 37:14, 38:15, 38:21, 51:3, 60:5, 62:8
**particularly** [5] - 3:24, 35:9, 40:13, 47:6, 55:17
**parties** [6] - 3:13, 20:1, 32:4, 55:5, 57:4, 67:20
**parties'** [2] - 3:20, 69:4
**parts** [1] - 14:7
**pass** [2] - 26:18, 56:12
**passive** [1] - 24:19
**past** [2] - 23:16, 47:4
**patience** [1] - 3:19
**pause** [11] - 11:25, 12:2, 27:15, 28:21, 38:7, 44:10, 48:7, 56:17, 57:13, 62:1, 65:25
**pendency** [2] - 36:18, 66:12
**PENDLETON** [1] - 1:3
**Pendleton** [2] - 1:8, 69:6
**people** [3] - 19:15, 39:19, 39:20
**percent** [1] - 64:13
**perform** [1] - 52:14
**performing** [6] - 34:12, 34:20, 42:3, 44:25, 51:14, 52:21
**perhaps** [4] - 10:21, 23:15, 40:23, 56:2
**period** [2] - 14:5, 15:2
**permissible** [3] - 18:16, 22:25, 23:12
**permitted** [1] - 36:7
**person** [2] - 21:18, 35:1
**personal** [6] - 5:14, 17:22, 17:23, 21:20, 22:18, 62:14
**personality** [1] - 21:16
**perspective** [2] - 17:24, 17:25
**pertains** [1] - 59:20
**petitioner's** [1] - 41:11
**phonetic** [1] - 3:8
**phonetic)** [2] - 3:8, 3:9
**photo** [2] - 5:17, 5:19
**photos** [4] - 5:14, 15:24, 19:16
**phrase** [2] - 27:20,

53:1
**phrasing** [1] - 64:1
**picked** [1] - 16:9
**Pickering** [48] - 7:17, 7:22, 7:24, 8:3, 8:6, 8:12, 8:20, 8:24, 9:3, 9:9, 9:11, 9:12, 9:17, 10:1, 10:2, 10:3, 10:8, 10:13, 11:2, 11:10, 11:12, 11:16, 11:22, 12:10, 13:18, 18:15, 23:14, 26:3, 26:9, 27:16, 32:18, 33:5, 33:10, 34:23, 37:5, 39:6, 43:2, 46:21, 47:13, 50:12, 50:19, 50:22, 50:24, 51:9, 53:24, 54:1
**picture** [3] - 23:23, 58:15
**pictures** [2] - 13:1, 58:24
**piece** [3] - 16:10, 51:16, 68:23
**Plaintiff** [1] - 1:6
**plaintiff** [38] - 4:2, 4:10, 4:12, 4:13, 4:18, 4:20, 4:24, 5:10, 12:10, 14:4, 25:2, 26:5, 27:22, 33:19, 34:2, 34:14, 35:5, 36:11, 36:21, 37:7, 38:20, 40:5, 42:1, 42:22, 43:25, 44:25, 46:17, 47:23, 47:24, 49:21, 51:1, 52:20, 53:6, 54:22, 55:3, 55:10, 55:22, 66:3
**PLAINTIFF** [4] - 2:3, 2:7, 2:11, 2:14
**plaintiff's** [6] - 4:1, 12:15, 34:6, 43:20, 53:8, 68:20
**plan** [1] - 5:7
**play** [2] - 25:21, 54:6
**players** [1] - 52:2
**pleadings** [1] - 34:6
**point** [23] - 8:5, 8:11, 11:9, 20:23, 21:10, 23:22, 26:25, 29:23, 30:2, 30:13, 39:5, 40:17, 41:2, 44:1, 47:11, 51:20, 52:6, 54:14, 56:8, 57:5, 66:22, 67:24, 68:14
**pointed** [1] - 65:24
**points** [2] - 21:22, 56:20
**policies** [4] - 7:10,

37:17, 63:16, 63:18
**policy** [24] - 7:1, 7:2, 17:21, 27:21, 28:2, 30:16, 35:14, 37:14, 38:13, 40:3, 40:9, 44:14, 49:11, 49:12, 49:13, 49:16, 55:11, 55:14, 55:18, 64:17, 64:18, 65:12, 66:2, 68:16
**political** [5] - 15:24, 16:23, 49:14, 58:25, 59:2
**portion** [3] - 20:24, 48:13, 58:1
**position** [21] - 5:24, 6:4, 8:9, 11:19, 14:19, 15:25, 29:25, 30:6, 33:23, 34:1, 35:17, 38:21, 42:20, 44:13, 45:8, 51:7, 52:7, 57:4, 57:10, 58:5, 67:6
**positions** [3] - 5:12, 9:11, 33:20
**positive** [1] - 12:25
**possess** [1] - 43:10
**possible** [1] - 68:18
**poster** [2] - 16:25
**posting** [1] - 65:18
**potentially** [1] - 6:21
**Poway** [28] - 14:4, 14:24, 15:7, 15:16, 16:2, 19:24, 20:2, 24:1, 24:2, 34:23, 37:5, 40:13, 43:2, 44:16, 44:20, 45:8, 48:8, 48:13, 49:2, 50:18, 50:23, 51:5, 51:6, 52:7, 58:1, 58:2, 58:3
**pray** [1] - 34:2
**prayer** [1] - 61:16
**prayers** [3] - 19:4, 19:5, 51:22
**praying** [3] - 14:14, 41:23
**pre** [1] - 53:22
**pre-judgment** [1] - 53:22
**precedent** [2] - 34:18, 44:24
**precluded** [1] - 48:22
**predicted** [1] - 64:1
**preliminary** [6] - 31:16, 31:21, 40:2, 40:22, 42:10, 65:14
**presence** [8] - 13:16, 13:25, 37:24, 39:2, 39:5, 51:10, 56:11,

69:1
**present** [13] - 13:20, 20:17, 20:18, 21:13, 22:15, 22:16, 25:24, 37:6, 47:25, 56:2, 62:7, 62:8, 62:22
**preserve** [1] - 7:23
**preserved** [1] - 9:10
**preserves** [1] - 56:24
**presiding** [1] - 3:6
**press** [1] - 38:21
**pressure** [1] - 62:5
**pretty** [3] - 17:13, 25:3, 34:13
**prevail** [2] - 14:5, 30:19
**prevent** [1] - 47:17
**preventing** [1] - 39:10
**prevents** [1] - 35:15
**principle** [1] - 5:25
**principles** [2] - 31:8, 39:22
**private** [20] - 13:17, 13:19, 13:23, 20:5, 23:17, 35:11, 35:20, 41:13, 41:15, 41:22, 42:24, 44:6, 45:1, 46:22, 49:22, 57:21, 57:24, 58:13, 67:11
**privately** [2] - 42:21, 42:23
**pro** [1] - 26:8
**pro-LGBT** [1] - 26:8
**problem** [7] - 10:7, 27:6, 29:23, 30:1, 30:5, 30:8, 59:22
**problematic** [1] - 35:25
**proceed** [1] - 5:2
**Proceedings** [1] - 69:10
**PROCEEDINGS** [1] - 1:17
**proceedings** [1] - 70:5
**process** [4] - 20:22, 53:11, 53:21, 53:23
**prohibit** [10] - 17:25, 27:7, 30:21, 40:4, 42:20, 63:14, 66:2, 67:7, 68:22, 68:25
**prohibited** [1] - 29:15
**prohibition** [1] - 56:11
**prohibitory** [6] - 55:7, 56:20, 56:24, 57:2, 57:6, 57:20
**prohibits** [4] - 27:8, 27:9, 28:6, 62:25
**promote** [6] - 23:10, 28:16, 29:5, 47:18, 64:20, 66:7

**promotes** [2] - 6:6, 63:21
**promoting** [5] - 6:9, 13:4, 26:4, 28:6, 66:14
**promotion** [8] - 7:10, 11:7, 14:19, 29:8, 30:8, 30:10, 45:18, 67:10
**prong** [2] - 23:14, 23:16
**pronouns** [4] - 20:7, 20:20, 22:3, 46:8
**proposition** [2] - 52:8, 57:24
**protected** [2] - 46:23, 50:5
**protecting** [1] - 10:22
**protection** [1] - 9:3
**protects** [2] - 10:18, 10:20
**prove** [2] - 47:2, 54:23
**provide** [1] - 59:18
**provided** [3] - 23:3, 45:21, 50:17
**providers** [1] - 39:12
**public** [52] - 6:2, 6:14, 11:13, 12:11, 12:19, 13:13, 13:17, 13:19, 13:24, 16:18, 17:16, 17:18, 18:16, 20:3, 20:4, 20:10, 24:8, 24:9, 32:20, 33:7, 34:20, 34:22, 35:10, 36:7, 38:18, 39:7, 39:8, 44:4, 44:22, 45:11, 46:13, 46:22, 47:4, 48:11, 49:19, 49:22, 52:1, 54:6, 58:18, 58:20, 58:21, 59:17, 60:7, 61:4, 61:8, 67:2, 67:4, 67:9, 68:23
**publish** [1] - 18:22
**punished** [4] - 7:6, 28:12, 66:8, 66:13
**punishes** [1] - 57:16
**punishment** [2] - 28:13, 28:19
**purely** [1] - 41:15
**purport** [1] - 50:23
**purposes** [4] - 31:21, 46:12, 46:19, 51:9
**pursuant** [2] - 13:2, 52:24
**put** [13] - 4:8, 13:9, 22:21, 29:12, 30:20, 33:19, 34:7, 36:14, 36:21, 49:14, 56:1, 57:17, 60:21

putting [4] - 36:5, 36:19, 38:3, 38:4

## Q

questions [16] - 3:23, 4:6, 5:6, 5:8, 10:13, 16:7, 33:12, 56:14, 57:9, 61:21, 61:22, 62:2, 63:7, 67:14, 67:16
quite [3] - 3:23, 40:1, 51:17
quo [5] - 55:4, 55:10, 55:13, 56:25
quote [1] - 38:22

## R

rainbow [1] - 16:25
rainbow-colored [1] - 16:25
raise [2] - 4:7, 66:19
raised [1] - 53:12
raising [2] - 8:6, 29:23
rather [1] - 60:10
rationale [5] - 35:19, 35:21, 39:19, 39:22, 41:9
rationales [1] - 43:1
RAY [1] - 4:18
Ray [2] - 2:12, 4:18
reached [1] - 49:9
read [13] - 3:20, 13:22, 13:23, 16:13, 17:9, 17:23, 21:24, 25:10, 25:13, 41:11, 64:22, 65:19
reading [2] - 16:14, 59:18
really [10] - 12:17, 19:19, 20:5, 21:22, 22:1, 27:11, 35:8, 35:12, 66:24, 67:5
reason [13] - 5:20, 8:15, 8:19, 11:3, 26:14, 28:9, 29:8, 49:9, 63:17, 64:15, 64:16, 65:7
reasonably [3] - 38:20, 51:11, 64:1
reasons [3] - 28:1, 33:6, 68:17
Rebekah [2] - 2:14, 4:19
recent [3] - 6:1, 18:1, 56:22
recognize [2] - 17:7, 40:17
recognized [2] -

50:22, 56:23
recognizing [1] - 25:19
reconcilable [2] - 14:9, 51:12
record [17] - 4:4, 4:8, 4:11, 15:23, 33:21, 44:1, 45:17, 47:10, 48:1, 48:18, 53:5, 53:8, 53:22, 54:2, 54:7, 54:10, 70:4
record's [1] - 51:20
Red [1] - 62:18
refer [1] - 33:22
reference [2] - 40:6, 46:7
referring [1] - 9:20
reflected [1] - 41:10
reflects [1] - 53:8
regarding [2] - 68:16, 69:2
regardless [2] - 35:21, 54:6
regulate [1] - 34:3
regulating [2] - 47:15, 49:14
reinforce [1] - 30:7
rejected [2] - 58:2
relates [2] - 44:14, 45:17
relationship [1] - 57:1
relevant [10] - 45:7, 46:17, 55:9, 55:13, 56:25, 57:4, 64:16, 64:18, 64:25, 65:8
relied [1] - 51:17
relief [8] - 40:1, 40:18, 40:21, 40:22, 47:3, 54:22, 65:23, 65:24
relies [1] - 20:2
religious [15] - 7:12, 10:18, 10:21, 10:23, 13:3, 17:25, 18:2, 18:4, 18:13, 25:23, 53:7, 53:8, 53:10, 53:16, 62:4
remain [1] - 4:17
remains [2] - 14:10, 45:8
remarks [1] - 5:4
remedy [1] - 30:19
remember [1] - 38:16
remove [5] - 3:13, 31:2, 31:14, 40:6, 65:3
removing [2] - 40:25, 65:18
repeat [1] - 30:7
REPORTER [1] - 1:23
reporter [2] - 4:15,

15:14
Reporter [1] - 70:13
represent [1] - 5:10
request [5] - 31:12, 31:16, 40:21, 65:17
requesting [4] - 31:10, 40:20, 65:16, 68:20
required [3] - 22:3, 40:15, 43:25
requiring [2] - 18:20, 24:17
Resources [1] - 1:11
respectfully [1] - 12:1
rest [3] - 9:2, 47:6, 47:21
restraint [3] - 7:10, 7:14, 8:4
restricted [2] - 30:1, 44:12
result [4] - 20:9, 28:23, 65:10, 65:12
retaliation [6] - 7:20, 8:2, 27:18, 31:22, 32:19, 47:6
return [2] - 67:22, 68:10
review [2] - 7:24, 42:12
rhetoric [1] - 53:22
rights [7] - 5:23, 22:5, 26:24, 35:1, 55:7, 57:18, 65:5
rise [1] - 50:11
rises [1] - 52:13
risk [1] - 35:17
Riverside [2] - 2:8, 2:12
RMR [2] - 1:24, 70:13
Road [1] - 2:4
Rod [1] - 5:10
RODERICK [1] - 1:5
role [19] - 14:15, 18:25, 19:5, 19:22, 24:15, 24:20, 24:21, 24:23, 25:10, 25:11, 25:12, 25:15, 25:16, 25:19, 27:3, 64:7, 67:2, 67:11
room [2] - 13:2, 37:3
Roundup [1] - 68:12
rule [2] - 46:23, 60:22
ruled [5] - 5:22, 8:2, 22:2, 38:10, 56:3
ruling [2] - 29:25, 67:21
run [2] - 5:7, 22:8

## S

safely [1] - 14:1

Satanists [1] - 52:3
saw [4] - 15:2, 24:3, 54:11, 58:10
scales [1] - 60:21
School [1] - 6:11
school [46] - 5:13, 5:16, 6:2, 6:7, 6:15, 8:9, 10:8, 10:9, 11:4, 13:23, 15:20, 17:2, 18:3, 18:8, 18:19, 19:2, 19:9, 22:8, 23:6, 24:24, 25:21, 25:25, 26:1, 26:22, 26:23, 37:9, 38:18, 45:19, 49:17, 51:10, 52:8, 56:23, 58:10, 60:2, 60:18, 60:24, 61:11, 61:25, 63:20, 64:21, 65:10, 68:5, 68:11
school's [1] - 17:21
schoolhouse [1] - 5:24
schools [8] - 11:8, 20:4, 27:10, 47:17, 49:7, 63:1, 67:2, 67:9
Schultheiss [2] - 2:14, 4:19
SCHULTHEISS [1] - 4:19
science [1] - 18:20
scientific [1] - 63:8
scope [21] - 14:22, 16:11, 16:17, 20:16, 24:12, 24:13, 25:3, 29:14, 30:14, 30:25, 32:16, 41:3, 41:17, 43:19, 44:8, 52:14, 59:11, 62:3, 65:21, 66:16, 68:19
scrutiny [5] - 7:13, 8:16, 9:13, 9:25, 11:10
scrutiny-type [1] - 8:16
seated [1] - 3:7
second [7] - 3:11, 6:4, 23:14, 23:16, 26:3, 26:8, 62:23
secondly [3] - 14:24, 21:3, 22:9
secretly [1] - 10:21
secular [3] - 17:24, 18:2, 18:11
see [12] - 3:14, 15:10, 32:21, 34:8, 34:10, 34:16, 39:1, 42:2, 45:2, 61:21, 62:15, 64:22

seeing [4] - 21:8, 47:24, 61:13, 61:14
seeking [4] - 40:1, 54:23, 55:3, 55:4
seem [2] - 64:2, 65:9
sees [1] - 58:17
send [1] - 58:25
sense [4] - 17:7, 35:25, 37:14, 38:13
sent [2] - 58:18, 58:23
separate [2] - 49:13, 53:23
sequential [2] - 46:21, 49:3
service [1] - 47:16
SERVICE [1] - 1:8
Services [1] - 11:12
Sesame [3] - 45:23, 45:24, 46:3
session [1] - 3:5
set [5] - 3:7, 20:13, 21:19, 26:21, 33:25
sets [2] - 27:2, 49:3
setting [1] - 61:7
setup [1] - 4:17
several [1] - 68:17
sex [3] - 46:1, 63:4, 63:11
share [1] - 12:25
shed [1] - 5:23
shelf [1] - 13:10
shirt [2] - 18:8, 58:10
Shoals [1] - 2:4
short [1] - 48:20
show [9] - 7:5, 8:10, 11:4, 11:5, 19:16, 21:16, 31:13, 56:6
showed [1] - 7:11
showing [1] - 7:7
shows [7] - 7:12, 18:6, 31:2, 33:21, 50:18, 62:13, 67:9
signature [3] - 70:6, 70:7
signed [1] - 70:7
signing [1] - 70:3
silently [1] - 41:23
similar [4] - 40:5, 53:19, 66:3, 66:14
simpler [1] - 30:18
simplicity [1] - 33:23
simply [7] - 7:7, 23:24, 43:8, 46:5, 57:25, 58:13, 65:8
sincerely [1] - 53:10
sincerely-held [1] - 53:10
sincerity [1] - 53:16
single [1] - 11:17

**sitting** [2] - 4:17, 58:17
**situation** [3] - 9:25, 10:12, 15:19
**slightly** [9] - 34:4, 37:13, 38:12, 41:18, 41:25, 42:4, 42:5, 54:18, 54:20
**slow** [2] - 15:11, 41:12
**social** [1] - 18:11
**Social** [1] - 11:12
**somewhat** [1] - 47:20
**somewhere** [2] - 22:25, 29:12
**soon** [1] - 33:24
**sorry** [5] - 14:8, 15:12, 32:15, 59:5, 61:23
**sort** [3] - 38:13, 46:2, 46:8
**sounds** [1] - 60:4
**space** [3] - 15:21, 23:4, 43:12
**speaking** [7] - 20:4, 36:24, 38:3, 38:18, 52:22, 61:4, 61:6
**speaks** [2] - 11:15, 38:3
**specific** [9] - 28:5, 31:12, 31:16, 32:22, 35:16, 50:23, 52:15, 53:7, 63:3
**specifically** [6] - 13:2, 27:24, 29:22, 44:11, 56:24, 58:4
**specified** [1] - 28:25
**spectrum** [1] - 20:8
**speech** [106] - 5:13, 5:18, 5:23, 6:3, 7:9, 10:18, 12:19, 13:17, 13:19, 13:24, 14:10, 16:1, 16:4, 17:1, 17:3, 17:6, 18:2, 18:3, 18:4, 18:11, 18:13, 18:16, 18:22, 18:24, 19:8, 19:13, 19:18, 19:20, 20:5, 20:10, 20:14, 21:1, 21:25, 22:18, 22:19, 22:22, 23:8, 23:17, 23:24, 24:4, 24:8, 24:19, 24:20, 24:21, 25:14, 26:10, 26:22, 26:24, 33:6, 33:25, 34:3, 34:4, 35:8, 35:10, 35:20, 36:7, 37:1, 39:8, 39:10, 39:17, 40:3, 41:16, 42:18, 42:25, 44:4, 44:6, 44:11, 44:21, 44:22, 45:1, 45:11,

46:13, 46:15, 46:18, 46:19, 46:22, 46:23, 47:5, 47:15, 49:14, 50:5, 52:9, 54:6, 57:21, 57:22, 57:24, 57:25, 58:7, 58:12, 58:13, 59:4, 59:17, 59:25, 60:12, 61:15, 62:17, 63:14, 66:1, 67:11
**Speech** [1] - 22:5
**spent** [1] - 3:20
**split** [1] - 4:25
**Springfield** [1] - 2:15
**square** [2] - 12:15, 40:1
**squares** [1] - 39:15
**staff** [7] - 15:3, 29:22, 37:8, 37:18, 39:3, 40:10, 42:24
**stances** [1] - 33:21
**stand** [2] - 34:23, 57:24
**standard** [24] - 7:13, 8:4, 11:2, 19:21, 20:13, 25:17, 26:3, 26:8, 26:20, 26:21, 27:2, 33:10, 42:5, 43:6, 48:14, 50:12, 54:17, 55:16, 56:6, 57:7, 58:12, 58:22, 59:22, 62:20
**standard's** [1] - 61:2
**standards** [1] - 59:6
**standing** [1] - 3:17
**standpoint** [2] - 33:10, 63:12
**stands** [1] - 52:8
**Star** [2] - 10:9, 44:9
**start** [4] - 4:2, 7:17, 33:18, 68:12
**starts** [1] - 68:8
**State** [5] - 35:14, 35:25, 39:11, 47:15, 50:4
**state** [9] - 4:3, 6:10, 6:12, 6:16, 39:12, 43:20, 45:17, 48:9, 63:24
**state's** [1] - 64:4
**statement** [9] - 6:18, 6:19, 6:20, 6:23, 8:4, 41:9, 45:2, 46:10
**statements** [2] - 36:3, 36:16
**STATES** [2] - 1:1, 1:21
**States** [1] - 3:4
**status** [5] - 55:4, 55:9, 55:13, 56:25
**stealth** [1] - 50:20

**stenographic** [1] - 70:4
**steps** [1] - 26:13
**stick** [2] - 40:19, 40:23
**still** [20] - 9:6, 11:4, 18:8, 18:9, 18:14, 23:14, 24:6, 28:10, 41:1, 42:16, 42:20, 43:21, 48:15, 48:23, 52:7, 54:4, 55:25, 61:13, 61:14, 65:5
**stop** [3] - 11:7, 40:3, 66:1
**stopped** [1] - 48:20
**straight** [1] - 56:20
**straightforward** [2] - 30:20, 30:22
**Street** [4] - 2:18, 45:23, 45:24, 46:3
**strict** [5] - 7:13, 8:16, 9:13, 9:25, 11:9
**strike** [1] - 40:8
**striking** [2] - 55:14, 55:18
**strongest** [1] - 38:24
**struggle** [4] - 13:15, 13:19, 41:1, 42:16
**struggling** [5] - 14:3, 24:6, 44:2, 52:18, 61:3
**student** [12] - 15:5, 23:24, 24:16, 25:1, 25:4, 25:8, 57:25, 58:17, 59:3, 60:23, 62:4, 62:5
**student's** [1] - 62:9
**students** [66] - 5:22, 13:16, 13:25, 15:2, 15:3, 15:8, 16:10, 16:14, 16:23, 17:7, 18:4, 18:6, 20:15, 20:19, 20:21, 21:4, 21:6, 22:3, 22:5, 22:19, 22:24, 23:2, 24:3, 24:8, 24:10, 29:7, 29:22, 30:2, 30:9, 34:15, 35:9, 37:6, 37:25, 39:25, 40:11, 40:14, 40:16, 42:18, 42:24, 43:13, 44:20, 44:25, 45:2, 45:10, 47:19, 47:24, 51:11, 52:2, 52:20, 52:21, 52:22, 56:2, 56:10, 56:11, 58:6, 58:9, 58:13, 59:8, 59:14, 59:16, 59:20, 59:23, 61:7, 61:12, 67:10, 67:12
**subject** [6] - 7:21, 9:3,

23:14, 53:24, 54:1
**substantial** [4] - 8:18, 26:3, 26:4, 27:12
**substantive** [1] - 67:15
**successful** [1] - 10:11
**sudden** [1] - 25:4
**sufficient** [1] - 54:9
**Suite** [2] - 2:5, 2:19
**summarize** [1] - 5:5
**summary** [2] - 48:17, 48:22
**super** [1] - 54:15
**Superintendent** [2] - 1:9, 1:10
**superintendent** [1] - 53:14
**Supp** [1] - 54:25
**supplanting** [1] - 37:1
**support** [3] - 17:2, 50:12, 53:6
**supported** [2] - 48:1, 49:2
**supports** [2] - 42:7, 47:10
**suppose** [1] - 4:3
**supposed** [1] - 12:22
**suppressing** [1] - 63:19
**Supreme** [6] - 5:22, 6:1, 9:16, 11:15, 26:20, 42:12
**surprisingly** [1] - 20:2
**swastika** [2] - 35:18, 36:1
**sweeping** [1] - 68:15
**swept** [1] - 42:18
**symbols** [1] - 35:15

## T

**talks** [2] - 59:14, 63:8
**tangentially** [1] - 54:18
**target** [1] - 28:5
**targeting** [3] - 18:3, 23:8, 25:23
**taught** [1] - 11:8
**teach** [5] - 18:19, 18:20, 22:10, 37:21, 63:2
**teacher** [22] - 5:17, 5:18, 7:3, 16:13, 17:8, 18:20, 20:15, 21:9, 21:18, 22:21, 24:10, 24:16, 36:6, 37:20, 37:24, 38:6, 38:17, 45:9, 58:16, 60:23, 60:25
**teacher's** [3] - 17:6,

19:15, 19:20
**teachers** [18] - 5:23, 14:20, 15:20, 17:22, 19:7, 23:4, 25:19, 25:20, 25:22, 26:24, 43:14, 43:22, 43:24, 49:12, 51:9, 62:13, 68:10
**teaches** [3] - 6:13, 6:15, 46:8
**teaching** [11] - 7:3, 20:21, 20:22, 20:24, 21:9, 22:23, 25:11, 27:10, 27:13, 64:21, 67:3
**technically** [1] - 55:19
**telephone** [1] - 51:25
**temperature** [1] - 3:14
**tension** [2] - 44:15, 44:18
**term** [1] - 59:14
**termination** [1] - 28:24
**terms** [1] - 64:4
**test** [6] - 9:11, 10:13, 18:24, 24:7, 24:11, 49:3
**testimony** [1] - 12:23
**testing** [1] - 43:13
**texting** [1] - 18:11
**THE** [121] - 1:1, 1:2, 1:20, 2:3, 2:7, 2:11, 2:14, 2:17, 3:4, 3:7, 3:10, 3:17, 4:14, 4:21, 4:24, 5:2, 7:15, 7:17, 7:19, 8:22, 9:1, 9:5, 10:6, 11:9, 12:1, 12:4, 12:7, 12:10, 12:15, 13:8, 13:15, 15:11, 15:13, 16:6, 16:16, 17:12, 17:15, 18:14, 19:24, 22:20, 23:13, 23:19, 24:6, 24:24, 26:1, 27:14, 28:21, 28:23, 29:20, 30:17, 31:5, 31:7, 31:10, 31:20, 31:24, 32:3, 32:11, 32:13, 32:17, 32:24, 33:13, 33:16, 35:23, 36:5, 36:14, 36:21, 37:2, 37:12, 37:16, 37:23, 38:6, 38:9, 38:19, 39:14, 40:19, 42:16, 43:3, 43:12, 43:21, 44:2, 45:4, 45:14, 45:23, 46:12, 47:4, 48:2, 48:7, 48:12, 48:19, 48:23, 49:5, 49:18, 49:21, 49:25,

50:3, 50:8, 51:4, 51:16, 52:12, 52:25, 53:23, 54:4, 55:17, 55:25, 56:9, 56:15, 57:10, 57:13, 59:13, 60:1, 61:3, 63:22, 64:25, 65:19, 66:1, 67:15, 67:19, 68:5, 68:7, 68:12, 69:9
**Theis** [16] - 3:10, 5:10, 5:15, 6:11, 7:6, 14:25, 15:17, 16:12, 22:13, 29:11, 57:5, 63:7, 67:22
**THEIS** [1] - 1:5
**Theis's** [2] - 7:12, 67:8
**theme** [1] - 27:15
**theory** [4] - 47:2, 48:17, 48:22, 61:3
**therefore** [3] - 24:3, 33:8, 55:7
**they've** [7] - 8:10, 28:3, 28:15, 33:9, 56:6, 64:2, 64:3
**thinks** [2] - 13:5, 44:23
**third** [3] - 21:9, 49:23, 67:23
**Thise** [1] - 3:8
**Thomas** [1] - 9:15
**threatened** [1] - 28:19
**three** [11] - 15:2, 20:13, 20:16, 21:13, 50:8, 56:20, 59:6, 60:4, 61:21, 61:22, 62:1
**three-week** [1] - 15:2
**Tice** [1] - 3:9
**tiered** [1] - 27:1
**timing** [3] - 59:15, 59:19, 60:5
**Tinker** [3] - 5:22, 25:17, 26:24
**today** [6] - 4:15, 5:11, 13:11, 31:19, 56:7, 67:21
**today's** [1] - 9:2
**together** [1] - 34:13
**tolerance** [1] - 67:3
**tonight** [1] - 56:16
**took** [1] - 58:5
**topic** [2] - 23:21, 63:14
**topics** [1] - 67:4
**totally** [2] - 8:25, 12:3
**touch** [2] - 53:3, 54:16
**towards** [3] - 6:20, 6:22, 7:12
**traditional** [1] - 46:9
**trailblazing** [1] - 12:8

**TRANSCRIPT** [1] - 1:17
**transcript** [2] - 70:4, 70:6
**transgender** [1] - 29:7
**traveling** [1] - 69:5
**treat** [2] - 18:2, 18:12
**treated** [6] - 42:17, 42:19, 48:24, 53:6, 54:9, 65:3
**treating** [1] - 48:10
**treatment** [1] - 43:5
**trial** [1] - 3:18
**tried** [1] - 23:22
**true** [4] - 6:10, 36:8, 65:7, 70:4
**Trump** [1] - 39:22
**trust** [1] - 51:7
**try** [6] - 10:17, 26:17, 30:13, 56:19, 61:18, 68:13
**trying** [10] - 8:7, 12:15, 22:13, 24:2, 24:22, 26:13, 26:17, 27:7, 32:24, 58:25
**turn** [2] - 19:24, 33:13
**turning** [1] - 13:16
**two** [14] - 5:11, 15:1, 20:15, 21:22, 26:12, 27:1, 34:13, 36:11, 36:12, 36:24, 46:4, 46:22, 55:22, 60:11
**two-tiered** [1] - 27:1
**type** [4] - 8:16, 22:17, 54:20, 54:24
**Tyson** [3] - 2:8, 4:13, 5:10

## U

**unclear** [1] - 44:1
**unconstitutional** [1] - 6:25
**unconstitutionally** [1] - 29:18
**under** [29] - 8:4, 8:12, 9:3, 10:2, 10:17, 11:22, 13:18, 14:3, 16:2, 18:23, 23:17, 26:8, 28:15, 31:1, 33:5, 33:10, 35:20, 36:5, 36:8, 39:19, 39:22, 44:5, 44:24, 47:13, 48:24, 50:9, 57:6, 65:1, 65:2
**underlying** [1] - 43:1
**undermines** [1] - 27:11
**undisputed** [2] - 7:5, 15:4

**undisputedly** [2] - 12:19, 13:13
**union** [2] - 16:25
**unions** [1] - 17:2
**United** [1] - 3:4
**UNITED** [2] - 1:1, 1:21
**unless** [6] - 9:7, 33:1, 33:11, 56:14, 57:8, 67:13
**unnecessary** [1] - 19:2
**unrelated** [2] - 46:2
**up** [21] - 3:14, 4:1, 4:25, 13:1, 13:10, 14:23, 16:9, 28:24, 34:7, 36:19, 36:25, 37:20, 42:9, 42:18, 50:15, 55:12, 56:1, 60:3, 60:6, 60:9, 67:17
**useful** [1] - 35:13
**uttered** [1] - 26:23

## V

**VA** [2] - 2:9, 2:13
**vacation** [1] - 19:16
**vague** [1] - 29:18
**vagueness** [1] - 7:1
**van** [1] - 28:18
**VANNICE** [1] - 1:10
**Vannice** [3] - 28:19, 29:12, 63:7
**Vannice's** [1] - 29:2
**verbal** [1] - 33:23
**versus** [8] - 13:17, 13:19, 20:4, 31:10, 39:7, 46:22, 46:25, 47:12
**view** [41] - 6:6, 6:9, 6:13, 6:15, 7:2, 7:11, 8:11, 11:8, 14:20, 20:9, 22:10, 23:11, 23:16, 28:6, 28:16, 29:5, 29:9, 30:8, 30:10, 30:21, 35:4, 36:1, 36:5, 45:18, 46:9, 46:14, 51:11, 58:14, 59:22, 59:23, 60:22, 60:23, 63:2, 63:8, 63:21, 64:5, 64:6, 64:21, 64:23, 66:7, 66:14
**viewed** [1] - 62:9
**viewing** [2] - 58:9, 59:25
**viewpoint** [21] - 7:8, 7:21, 8:3, 8:13, 8:14, 8:15, 8:23, 18:15, 18:18, 19:11, 20:10,

28:4, 35:20, 37:10, 37:11, 38:4, 46:25, 47:24, 47:25, 54:14, 60:20
**viewpoint-based** [2] - 7:21, 8:3
**viewpoints** [3] - 35:2, 35:3, 38:15
**views** [10] - 6:8, 23:24, 38:21, 53:7, 53:8, 57:25, 59:3, 63:19, 64:8, 67:3
**violate** [3] - 55:6, 64:17, 64:19
**violated** [3] - 49:13, 57:18, 65:11
**violates** [1] - 6:10
**violating** [1] - 6:16
**violation** [1] - 14:21
**virtue** [1] - 55:19
**vs** [2] - 3:10, 11:11

## W

**waited** [1] - 7:15
**walked** [1] - 51:18
**walking** [1] - 15:9
**wants** [2] - 12:7, 50:13
**watching** [2] - 18:5, 18:7
**ways** [2] - 12:1, 12:4
**wearing** [4] - 10:9, 44:9
**wedding** [3] - 5:17, 19:16, 58:15
**week** [4] - 3:18, 15:2, 67:24
**weekend** [1] - 62:16
**weighs** [2] - 42:14, 67:8
**whereas** [4] - 8:17, 20:23, 21:11, 22:12
**whole** [2] - 16:7, 27:11
**Willamette** [1] - 2:18
**win** [4] - 10:2, 10:4, 33:5, 33:9
**Wood** [9] - 20:1, 20:12, 21:22, 22:3, 22:16, 50:17, 59:5, 60:15
**word** [1] - 26:23
**words** [1] - 38:4
**worker** [2] - 7:7, 22:24
**workplace** [1] - 40:6
**workspace** [3] - 33:25, 34:8, 34:15
**worried** [1] - 15:13
**wrestling** [1] - 61:12

## X

**XX/XY** [2] - 63:8, 64:23

## Y

**year** [2] - 11:20, 68:11
**years** [2] - 5:21, 63:25
**young** [2] - 17:7, 51:8
**yourselves** [1] - 4:11

## Z

**zero** [1] - 26:7