IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION


RODERICK E. THEIS, II, an individual,                    No. 2:25-cv-00865-HL

                Plaintiff,                                    **OPINION AND**
                                                                       **ORDER**

     v.

INTERMOUNTAIN EDUCATION SERVICE
BOARD OF DIRECTORS, MARK S. MULVIHILL, and
AIMEE VANNICE

                Defendants.


Rebekah Schultheiss (Millard)
P.O. Box 7582
Springfield, OR 97475

David A. Cortman
Alliance Defending Freedom
1000 Hurricane Shoals Road, NE, Suite D-11000
Lawrenceville, GA 30043

Matthey Ray
Tyson Charles Langhofer
Alliance Defending Freedom
44180 Riverside Pkwy
Landsdowne, VA 20176

              Attorneys for Plaintiff

Julian W. Marrs
Harrang Long P.C.
800 Willamette St., Suite 770
Eugene, OR 97201

Kurt Peterson
Harrang Long P.C.
111 SW Columbias St., Suite 950
Portland, OR 97201

       Attorneys for Defendants

_____

HALLMAN, United States Magistrate Judge:

      Plaintiff Roderick Theis brings this action against Defendants Intermountain Education

Service District ("IMESD") Board of Directors; Mark Mulvihill, Superintendent; and Aimee

VanNice, Assistant Superintendent and Director of Human Resources. Plaintiff, an employee of

IMESD, alleges that Defendants violated his constitutional rights when they prohibited him

from, and disciplined him for, displaying certain books that promoted a binary gender view in his

office, including when children were present. Compl., ECF 1. Now before the Court is Plaintiff's

Motion for Preliminary Injunction, which seeks to (1) stop Defendants from enforcing its Speech

Policy in a way that prevents him from displaying the books and (2) require Defendants to

remove the Letter of Directive related to Plaintiff displaying the books. Mot. 2, ECF 12. The

Court held oral argument on the Motion on July 18, 2025. ECF 31. For the reasons that follow,

the Motion is GRANTED in part and DENIED in part: Defendants are enjoined from prohibiting

Plaintiff from prominently displaying the books when no students are present.

## BACKGROUND

### I.    The parties.

      IMESD is an education service district that provides services to school districts and

schools in Morrow, Umatilla, Union, Wallowa, Grant, Baker, and Malhuer Counties. Compl. ¶

33; Resp. 9, ECF 27. It provides services in four areas, including special education, technology, school improvement, and administrative services. Resp. 9. IMESD does not control the school districts or schools it serves, and it has no control over those schools' classrooms, curriculums, or library content. *Id.* IMESD has a Board of Directors ("the Board") that establishes "policies for IMESD consistent with the requirements of law and the statewide goals and standards established by the State Board of Education." Compl. ¶ 8. The Board also appoints a superintendent to manage IMESD and its employees in a manner consistent with state law and the Board's policies. *Id.* at ¶¶ 11–12. Defendant Mulvihill is IMESD's Superintendent. *Id.* at ¶ 13. Defendant VanNice is IMESD's Assistant Superintendent and Director of Human Resources and is also responsible for the enforcement of IMESD's policies. *Id.* at ¶¶ 22–23.

Plaintiff is a licensed clinical social worker employed by IMESD as an Education Specialist, and he has worked at IMESD since 2008. *Id.* at ¶ 47. In Plaintiff's role, he "travels to schools within IMESD's jurisdiction to meet with students and assess their educational support needs." *Id.* at ¶ 48. That includes meeting one-on-one with students to conduct standardized tests that evaluate their academic level or their social or emotional needs. *Id.* at ¶ 49. He writes reports based on those interactions and tests, and he recommends how the school can best meet the student's needs. *Id.* at ¶ 50.

## II.    The policies underlying this action.

IMESD adopted the Every Student Belongs Policy ("ESB Policy") and the Bias Incident Complaint Procedure Policy ("Bias Incident Policy") in December 2020, and it revised them in December 2021. *Id.* at ¶¶ 36–37; Resp. 9–10. Together, those policies "constitute Defendants' Speech Policy." Compl. ¶ 38. IMESD adopted the ESB Policy and the Bias Incident Policy to comply with Oregon law. Resp. 10. Defendants point to two statutes as the basis for its policies:

first, Or. Rev. Stat. ("ORS") § 659.850(2), which mandates that "[a] person may not be subjected

to discrimination" in a public school funded by the Legislature; and second, ORS § 339.347,

which defines "bias incidents" and requires that education providers adopt policies to address

bias incidents. *See id.* at 10 (citing and describing statutes).

The ESB Policy mirrors the statutory definition under ORS § 339.347(1)(a)(A), which

provides that a "'[b]ias incident" means a person's hostile expression of animus toward another

person, relating to the other person's perceived race, color, religion, gender identity, sexual

orientation, disability or national origin, of which criminal investigation or prosecution is

impossible or inappropriate." Compl. ¶ 40; Ex. E 1, ECF 1-5. The ESB Policy states that, when

responding to bias incidents, IMESD "will use non-disciplinary remedial action whenever

appropriate." Ex. E 1.

The Bias Incident Policy has a four-step process. Ex. F 1–2, ECF 1-6. First, after learning

of a potential bias incident, a staff member reports it to the building or program administrator. *Id.*

at 1. Second, the administrator or designee writes up the complaint, investigates it, provides

notice to the parties involved, determines responsibility, and considers responses, including

educational or redirection options. *Id.* Those options align with ORS § 339.347(3)(e)(D)(i)-(iii),

which requires that educational and redirection procedures:

- Address the history and impact of bias and hate;

- Advance the safety and healing of those impacted by bias and hate;

- Promote accountability and transformation for people who cause harm; and

- Promote transformation of the conditions that perpetuated the harm.

Compl. ¶ 41; Ex. F 1. At the third stage, the complainant and respondent are given opportunities

to appeal, and the superintendent or their designee reviews the administrator's decisions and

actions. Ex. F at 1–2. Finally, after the superintendent's review, a dissatisfied party may further appeal to IMESD's Board. *Id.* at 2.

### III.    Plaintiff's offices and the books he displayed.

Plaintiff has an office in La Grande Middle School (LGMS) that he spends two to three days in per week, and he has an office in the Elgin School District. Compl. ¶¶ 66–67. Plaintiff also had an office in the Union School District during the 2022–23 and 2023–24 school years. *Id.* at ¶ 68. That arrangement is typical for IMESD employees in their assigned schools, and employees "commonly decorate their offices with paintings, personal photos . . . posters, inspirational quotes, books, and other items." *Id.* at ¶¶ 51–52. Plaintiff uses those offices "for writing reports, responding to emails, consulting with teachers regarding student needs, and testing and evaluating students." *Id.* at ¶ 69. His LGMS office has a sign on the door that reads "Staff Only," and students only enter his office while "under his direct supervision during evaluations or testing." *Id.* at ¶ 71.

"On October 2, 2024, Plaintiff began displaying two books on the windowsill behind his desk in his LGMS office: *He is He* and *She is She* by Ryan and Bethany Bomberger." *Id.* at ¶ 73. The covers were visible, displaying illustrations of a smiling boy and girl, respectively, along with the tagline "a book about your identity." *Id.* at ¶¶ 74–76. Those books were the only decorations that Plaintiff had in his LGMS office. *See id.* at ¶ 74. Plaintiff purchased the books himself and stated that he "displayed the covers of the [b]ooks as his expression." *Id.* at ¶¶ 77, 79. Plaintiff evaluated four students in that office while displaying the books. *Id.* at ¶ 72. No student or staff members asked about those books or commented on them, no student was "visibly upset or distracted by" them, and no one handled or read either of them. *Id.* at ¶¶ 80–82.

Plaintiff also displayed a book—*Johnny the Walrus* by Matt Walsh—on the desk in his

Elgin and Union School District offices. *Id.* at ¶ 83. A description for that book explains that:

> Johnny is a little boy with a big imagination. One day he pretends to be a big
> scary dinosaur, the next day he's a knight in shining armor or a playful puppy. But
> when the internet people find out Johnny likes to make-believe, he's forced to
> make a decision between the little boy he is and the things he pretends to be – and
> he's not allowed to change his mind.

*Id.* at ¶ 86. Plaintiff purchased that book using his personal funds and "displayed [it] as his

expression in his Union office during the" 2022–23 and 2023–24 school years "and in his Elgin

office during the" 2024–25 school year. *Id.* at ¶ 88. Only the front and back covers were visible

to visitors in Plaintiff's Elgin office. *Id.* at ¶ 89. On one occasion—while Plaintiff was

conducting an evaluation—a student asked about *Johnny the Walrus*. *Id.* at ¶ 129. Plaintiff

summarized the book and shared parts of it with the student. *Id.*

## IV.    Complaint and subsequent investigation.

"On October 21, 2024, LGMS Principal Chris Wagner emailed Plaintiff" because he had

received a complaint about the books—*He is He* and *She is She*—on display in Plaintiff's LGMS

office. *Id.* at ¶¶ 91, 94. Principal Wagner instructed Plaintiff to place the books out of sight. *Id.* at

¶ 92. When they met on October 23, Principal Wagner explained that he had received a

complaint from a La Grande School District ("LGSD") employee who was concerned that the

messages conveyed by Plaintiff's books "could be considered offensive to transgender students."

*Id.* at ¶¶ 93–95. That employee had seen the books in Plaintiff's office, researched them online,

"and then determined they were offensive." *Id.* at ¶ 96.

Plaintiff and Principal Wagner reviewed the books together. *Id.* at ¶ 97. Although

Principal Wagner said he did not find anything offensive or inappropriate about them, he "noted

that each book contained several Bible verses," and was concerned that they "could be

considered pushing a certain point of view on a student." *Id.* at ¶¶ 97–98. "[H]e again requested that Plaintiff remove the [b]ooks from his office to maintain the neutrality at school." *Id.* at ¶ 101.

On October 22, Defendant VanNice notified Plaintiff that a LGSD employee had filed a bias incident complaint against him with IMESD due to his display of *He is He* and *She is She*. *Id.* at ¶ 104. She informed him that IMESD would investigate the display of the books as "'a potential bias incident relating to another person's gender identity.'" *Id.* at ¶ 105.

On October 29, Plaintiff met with VanNice and others from IMESD. *Id.* at ¶ 107. VanNice again explained the reason for the meeting and then questioned Plaintiff about his reason for displaying them. *Id.* at ¶¶ 109–10. Plaintiff first explained that the books were "decoration to make his office more kid friendly" and that he wanted to send positive messages that "girls can do anything and that it's great to be a girl" and, similarly, that "boys can do great things" and "it's great to be a boy." *Id.* at ¶ 113. VanNice asked Plaintiff numerous questions about the books' content. *Id.* at ¶ 116. For example, she asked Plaintiff about "a page in *She is She* that contained several Bible verses." *Id.* at ¶¶ 118–20. And she asked Plaintiff about a page "contain[ing] several scientific facts about how boys and girls are different in important ways." *Id.* at ¶¶ 123–24. For example, the book explained that:

- As soon as we exist, something special inside each of us (called DNA) determines whether we will be girls or boys. That DNA never changes, no matter ***how*** we feel.

- Doctors know ***long*** before we're born whether we are females or males. They use a special machine to see inside a mother's womb. The image is called an ***ultrasound***.

- There are ***thousands*** of physical differences between girls and boys. From our brains to our faces to our lungs and other body parts, we are wonderfully created equal but not the same.

- From running to swimming to soccer and volleyball, it's important to have separate girls' & boys' sports teams to give us *all* a chance to *shine*. It's fun to compete when it's fair.

*Id.* at ¶ 124 (emphasis in original).

When VanNice asked Plaintiff how the book could be used to support a transgender student, Plaintiff told her that he did not use the books as part of his work with students. *Id.* at ¶¶ 126–27. He explained that they were displayed behind his desk so "that he could supervise access to them." *Id.* at ¶ 128. Plaintiff cited the student who asked him about *Johnny the Walrus* as an example. *Id.* at ¶ 129. When asked again whether *She is She* "support[s] transgender" or "support[s] a she wanting to be a he," Plaintiff responded that it does not. *See id.* at ¶¶ 140–43 (quoting Ex. K 4, ECF 1-11; Ex. L 3, ECF 1-12). VanNice asked Plaintiff whether he believed displaying the books constituted a hostile expression of animus, and Plaintiff stated that "he has no ill will towards anyone, that he wished no harm to anybody," and that he did not believe that the books contained "messages of ill will or hostility." *Id.* at ¶¶ 144–45. Plaintiff acknowledged that a student who had thoughts about being transgender might see the books. *Id.* at ¶¶ 146–47. And he indicated that he "might put the books aside" if he knew that a transgender student would be entering his office. Ex. K 6.

Throughout the meeting, Plaintiff pointed out books in other classrooms and the library that contained violence and sexual scenes or references. *See, e.g.*, Compl. ¶¶ 148–51. VanNice did not consider those other books as relevant to the complaint, and she informed Plaintiff that the books he displayed were not appropriate in any of his office spaces in any school district. *Id.* at ¶¶ 152–53. She encouraged Plaintiff to display neutral books. *See id.* at ¶ 154; Ex. K 7. Plaintiff asked whether he could have more books displayed covering a variety of topics. Ex. M 6, ECF 1-13. But VanNice told him that those books—*He is He* and *She is She*—were not

appropriate for his office spaces. *Id.* When Plaintiff asked whether the books were considered religious, VanNice replied that she would let him decide that, but—in any event—they did not "support transgender or gender neutral." Ex. K 7.

**V.      IMESD's determination and Plaintiff's subsequent appeals.**

On November 22, VanNice issued a Letter of Directive detailing IMESD's findings and final determination regarding Plaintiff's display of the books. Compl. ¶¶ 156–57; *see also* Ex. G, ECF 1-7. The letter concluded that Plaintiff's "display of *He is He*, *She is She*, and *Johnny the Walrus* for students visiting [his] office for purposes of evaluations and student services[] amounts to a bias incident" under the ESB Policy because it constituted "a hostile expression of animus toward another person relating to their actual or perceived gender identity." Compl. ¶ 160; Ex. G 2. It explained that his "admission that if [he] knew a transgender student were visiting [his] office [he] might set the books aside connotes that [he] underst[ood] the impact the books displayed may have on certain students based upon their actual or perceived gender identity." Ex. G 2. The letter informed Plaintiff that continuing to display the books could result in discipline up to and including termination of his employment. *Id.*

Pursuant to the Bias Incident Response Policy, Plaintiff appealed the initial determination to Superintendent Mulvihill. Compl. ¶¶ 163–64; Ex. M. IMESD's legal counsel and a private consultant assisted with the appeal. Ex. H 1, ECF 1-8. First, the appeal substantiated the finding that Plaintiff's conduct in displaying *He is He* and *She is She* constituted a bias incident under the ESB policy. *Id.* "The investigation found that the books promote a binary view of gender, which excludes and invalidates an understanding of gender diversity and transgender students, staff, and others." *Id.* It concluded that displaying the books "contributes to an unwelcoming environment," which is contrary to IMESD's goals. *Id.* Second, the appeal substantiated the

finding that Plaintiff's conduct "conflicted with the District's policy and responsibilities under Oregon law to ensure an inclusive educational environment." *Id.* It noted that ORS § 339.347 requires educational services providers like IMESD to adopt policies affirming that "students are entitled to a high-quality educational experience free from discrimination or harassment based on perceived . . . gender identity," and that "employees of education providers are entitled to work in an environment that is free from discrimination or harassment based on . . . gender identity." *Id.* at 1–2. And it "found that by prominently displaying *She is She* and *He is He*, [Plaintiff] introduced materials into the public school environment that, even if done so unintentionally, communicates a message that is excluding on the basis of gender identity and undermines the inclusive environment" that LGSD and IMESD are obligated to maintain. *Id.* at 2–4. The appeal rejected Plaintiff's contention that the investigation was biased or warranted a different outcome. *Id.*

Plaintiff further appealed to IMESD's Board. Compl. ¶ 196; Ex. O, ECF 1-15. And the Board denied Plaintiff's appeal. Compl. ¶¶ 198–99; Ex. P, ECF 1-16.

## VI.    Procedural history.

Plaintiff filed his Complaint on May 21, 2025. ECF 1. It includes six causes of action brought under 42 U.S.C. § 1983, including violations of (1) Plaintiff's First Amendment right to freedom of speech due to content and viewpoint discrimination, (2) Plaintiff's First Amendment right to freedom of speech due to retaliation, (3) Plaintiff's First Amendment right to free exercise of religion, (4) Plaintiff's right to be free from unconstitutional conditions, (5) Plaintiff's Fourteenth Amendment right to due process of law, and (6) Plaintiff's Fourteenth Amendment right to equal protection of the law. Compl. ¶¶ 33–44.

On May 29, Plaintiff filed the Motion for Preliminary Injunction now before the Court. ECF 12. Plaintiff seeks an order that Defendants (1) "stop enforcing the Speech policy challenged herein . . . so as to prohibit Plaintiff from displaying the [b]ooks or similar messages in the workplace" and (2) "remove any reference to the Letter of Directive and related investigations in the District's records for Plaintiff."[1] Mot. 2.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking such an injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts "apply a 'sliding scale test' that 'permits plaintiffs to satisfy this [first] requirement with a "serious question" on the merits when the balance of hardships tips sharply in their favor.'" *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (quoting *Where Do We Go Berkeley v. California Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022)). "Serious questions are issues that 'cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation.'" *Id.* (quoting *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023)). A plaintiff does not show a serious question by merely raising a plausible claim, "nor can a district court forgo legal analysis just because it has not identified precedent that places the question beyond debate." *Id.* (internal

---

[1] At oral argument, counsel for Plaintiff clarified that the relief requested under the first prong—although broadly stated—is limited to allowing Plaintiff to display the books in his office. Tr. 31:12–19, ECF 35.

quotation omitted). "This 'less demanding' merits standard requires serious factual questions that need to be resolved in the case." *Id.*

"The final two injunction factors—the balance of equities and the public interest—merge where a government agency" is a defendant against whom preliminary injunctive relief is sought. *Id.*

There are two forms of preliminary injunctions. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). A "prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Id.* (citation modified); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1993) (explaining that a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). "The status quo ante litem . . . means the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (internal quotation omitted). The second type of preliminary injunction, a mandatory injunction, goes well beyond preserving the status quo and instead "orders a responsible party to take action." *Id.* They are generally disfavored and "not granted unless extreme or very serious damage will result," and they are not issued where the merits are doubtful or the injury complained of can be compensated through damages. *Id.*

## DISCUSSION

### I.    Whether Plaintiff is seeking a mandatory or prohibitory injunction.

As an initial matter, the Parties disagree as to whether Plaintiff is seeking a mandatory or prohibitory injunction. This Court concludes that Plaintiff is seeking a prohibitory injunction.

The distinction between a mandatory and prohibitory injunction "can fairly be categorized as one of action versus inaction." *Fellowship of Christian Athletes v. San Jose*

*Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023). Thus, "[t]he inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo." *Id.* And the Ninth Circuit has explained that "the status quo is 'the legally relevant relationship between the parties before the controversy arose.'" *Id.* (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014)); *cf Parks v. Lake Oswego Sch. Dist.*, 758 F. Supp. 3d 1247, 1260–61 (D. Or. 2024) (determining that a petitioner sought a mandatory injunction when his requested relief was to be restored to the position that he had been fired from).

Here, the status quo between the Parties was when Plaintiff was able to display the books in his office. In *Fellowship of Christian Athletes*, the Ninth Circuit cited the "longstanding relationship between the parties" as the baseline from which the status quo should be determined. 82 F.4th at 685. There, the longstanding relationship was 20 years of the school district recognizing the Fellowship of Christian Athletes as a student club before it refused to recognize the group. *Id.* Here, the relationship between the parties is not as long, but it is no less significant. Plaintiff had displayed *Johnny the Walrus* for multiple school years. But Plaintiff only displayed *He is He* and *She is She* for several weeks. Nevertheless, it was IMESD's affirmative action that changed Plaintiff's ability to use the books as decoration. Because Plaintiff now seeks to restore that status quo in which he may display the books, the relief sought is properly viewed as a prohibitory injunction. Although Plaintiff also seeks for Defendants to remove the Letter of Directive, that too is a return to the status quo before the controversy arose.[2]

---

[2] Moreover, as explained below, the Court declines to grant Plaintiff any preliminary injunctive relief related to the Letter of Directive.

Thus, that relief does not subject the preliminary injunction to the more demanding standard of a mandatory injunction.[3]

## II.    Whether Plaintiff has shown a likelihood of success on the merits of his claims.

Plaintiff has shown that he is likely to succeed on part of his First Amendment retaliation claim insofar as IMESD has restricted his ability to display the books in his office and outside of the presence of students. As for his remaining claims, he either cannot obtain any relief beyond that which he can obtain on his First Amendment retaliation claim, or he cannot demonstrate a likelihood of success on the merits of those claims.

### A.    Plaintiff's First Amendment retaliation claim.

The protections of the First Amendment generally prohibit the government "from retaliating or discriminating against individuals for engaging in protected speech." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1137 (9th Cir. 2025). And the Supreme Court has continually recognized that neither teachers nor students "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But their freedom of speech is not boundless, because "[i]n addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). Thus, "the government has 'interests as an employer in regulating the speech of its employees that differ significantly from those it

---

[3] The Court's conclusions throughout this Opinion would remain the same even under the more demanding "mandatory" standard. "A district court should not issue a mandatory injunction unless extreme or very serious damage will result, and especially not in doubtful cases or where the injury complained of is capable of damages." *Parks*, 758 F. Supp. 3d at 1261 (citation modified). But injury to Plaintiff's First Amendment rights is very serious damage that cannot be properly compensated by damages. *Compare id.* (noting that no one was restricting the petitioner's right to exercise free speech as the case progressed).

possesses in connection with regulation of the speech of the citizenry in general.'" *Damiano*, 140

F.4th at 1137 (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*,

391 U.S. 563, 568 (1968)). Due to that tension, the Supreme Court has created a framework to

analyze these situations that is a "'fact-sensitive and deferential weighing of the government's

legitimate interests'" against the First Amendment rights of public employees. *Id.* (quoting *Bd. of*

*Cnty. Comm'rs, Wabaunsee Cnty., Kansas v. Umbehr*, 518 U.S. 668, 677 (1996)).

In the Ninth Circuit, a First Amendment retaliation claim turns on a sequential five-step

series of questions:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the
> plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's
> protected speech was a substantial or motivating factor in the adverse
> employment action; (4) whether the state had an adequate justification for treating
> the employee differently from other members of the general public; and (5)
> whether the state would have taken the adverse employment action even absent
> the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).[4] The plaintiff bears the burden on the first

three questions, and—if met—the burden shifts to the defendant on the remaining two questions.

*Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019).

Here, only the second and fourth questions are in dispute. The Parties agree that Plaintiff

spoke on a matter of public concern by addressing gender identity issues.[5] Reply 4, ECF 30;

Resp. 30. And they agree that Plaintiff's speech was a motivating factor in the adverse action and

that the adverse action would not have been taken absent his speech. *See* Tr. 49:21–50:9. Based

---

[4] The first two inquiries determine whether expression is "protected speech" under the First
Amendment. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022).

[5] Because the Parties agree that the display of the books amounted to speech on a matter of
public concern, this Court will not further analyze this prong. But the Court notes that the mere
display of a book whose contents contain matters of public concern does not automatically
constitute speech on a matter of public concern, particularly if the subject matter of the books is
not apparent from the display.

on the discussion of the remaining factors below, the Court concludes that Plaintiff has established a First Amendment retaliation claim on which he is likely to succeed.

### 1. Whether Plaintiff spoke as a private citizen or public employee.

The Parties' dispute primarily turns on one central question: did Plaintiff's prominent display of the books in his office constitute his private speech, or did it amount to government speech attributable to IMESD? This Court concludes that when Plaintiff displayed the books during testing sessions and interactions with students, it constituted speech attributable to IMESD. But this Court also concludes that when Plaintiff displayed the books when no children were present and only staff could view them, it constituted private speech.

The Supreme Court has—on several occasions—evaluated whether a government employee spoke as a private citizen or a public employee. In *Garcetti v. Ceballos*, the Court explained that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006) (emphasis added) (concluding that a prosecutor was speaking as an employee because he wrote the memo pursuant to his duties as a prosecutor); *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issues is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). In *Lane*, the Court concluded that an employee spoke as a private citizen when they testified at criminal proceedings related to matters that they learned about in the course of their public employment. 573 U.S. at 239–41 (noting that cases "dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special

value precisely because those employees gain knowledge of matters of public concern through their employment").

Most recently, the Court considered the distinction in *Kennedy*, 597 U.S. at 507. That case involved a football coach who knelt midfield and prayed quietly for 30 seconds at the conclusion of each game. *Id.* at 514–15. In concluding that his speech was private rather than government speech, the Court stressed that "he was not engaged in speech 'ordinarily within the scope' of his duties as a coach." *Id.* at 529 (quoting *Lane*, 573 U.S. at 240). The Court noted he was not speaking "pursuant to government policy," "not seeking to convey a government-created message," and was not "engaged in any other speech the District paid him to produce as a coach." *Id.* at 529–30. Because his job allowed him and other coaches post-game time in which to "engage in all manner of private speech," it was not dispositive that he was merely within his "office environment." *Id.* at 530.

Shortly after *Kennedy* was decided, the Ninth Circuit considered the employee versus private citizen distinction in *Dodge*, 56 F.4th at 767. The court explained that the distinction "'depends on the scope and content of [the employee's] job responsibilities.'" *Id.* at 778 (citing and quoting *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011)).[6] It is

---

[6] Defendants rely heavily on *Johnson* in support of their position. Resp. 8. Plaintiff retorts that *Kennedy* "explicitly rejected" *Johnson*'s standards for "determining when teachers speak in their official capacities." Reply 4. This Court disagrees that *Johnson* was explicitly rejected by *Kennedy*.

To be sure, *Johnson* must be reexamined in light of *Kennedy*. In *Kennedy*, the Supreme Court rejected the Ninth Circuit's "excessively broad" conception of the coach's job. 597 U.S. at 530–31. And that excessively broad conception was primarily based on the Ninth Circuit's analysis in *Johnson*. *See Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 824 (9th Cir. 2017). Moreover, *Johnson*'s broad statement that "teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or . . . in the general presence of students," 658 F.3d at 968 (emphasis in original), is of questionable precedential value in light of *Kennedy*'s direction to consider the scope and context of the speech.

private speech if the person does not have an official duty to make the statements or "if the speech was not the product of 'performing the tasks [they were] paid to perform.'" *Id.* (citation modified) (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)). But in a school setting, when speech can be "reasonably viewed by students and parents as officially promoted by the school" or is made by someone taking advantage of their position to press their particular views upon children's impressionable and captive minds, it is properly considered speech by a public employee. *Id.* (citing *Johnson*, 658 F.3d at 967–68 (concluding that a teacher displaying banners with religious slogans spoke as a public employee)).

   This Court begins its inquiry by considering Plaintiff's official responsibilities and duties as an IMESD employee. There is no dispute as to what Plaintiff's job entails: he administers standardized tests to students in a one-on-one format in his offices at various locations within the IMESD service area. Compl. ¶¶ 48–49. His job does not include decorating his office, but he nevertheless did so in order to "make his office more kid friendly." *Id.* at ¶ 111. And he planned to supervise any inquiries about—or access to—*He is He* and *She is She* just as he had with *Johnny the Walrus*, by waiting to discuss them until after the assessment was over. *Id.* at ¶ 129. Plaintiff's official job duties did not include displaying certain books or instructing on them. But he displayed them *while engaged in speech that IMESD paid him to produce* as an Education

---

   But the holding in *Johnson* is not "clearly irreconcilable" with *Kennedy* such that it is impliedly overruled. *See Miller v. Gammie*, 335 F.3d 889, 890 (9th Cir. 2003) (en banc) (addressing standards). If anything, *Kennedy* confirms *Johnson*'s conclusion that teachers act as teachers when they are performing the tasks that they are paid to perform. Moreover, both the Ninth Circuit—in *Dodge*—and the Eleventh Circuit in *Wood v. Florida Dep't of Educ.*, 142 F.4th 1286, 1291 (11th Cir. 2025), have extensively cited *Johnson* with approval since *Kennedy* was decided. Thus, this Court disagrees that *Kennedy* explicitly overruled the Ninth Circuit's holding in *Johnson* and related cases.

Specialist. Moreover, by displaying the books prominently behind his desk—indeed, they were the only decorations in his office—the display can be reasonably viewed as being promoted by the school or as the efforts of an employee to press his particular views upon students. Therefore, this Court concludes that Plaintiff spoke as an IMESD employee when he displayed the books while students were present.[7]

But this Court declines to conclude that Plaintiff's display of the books was *entirely* speech attributable to IMESD. Plaintiff left the books visible whether or not students were present. And that difference is significant. In *Dodge*, the Ninth Circuit considered whether a teacher was speaking as a private citizen or a public employee when he wore a "Make America Great Again" ("MAGA") hat "while attending a teacher-only training." 56 F.4th at 778. Because he wore it when no students were around, the court determined that parents and students could not reasonably attribute the message to the school, and that he was not trying to press his views on impressionable or captive students. *Id.* Thus, it concluded that the teacher spoke as a private citizen when wearing the hat. *Id.*

This Court reaches a similar conclusion with respect to Plaintiff's display when no students were present in his office. Plaintiff's LGMS office had a "Staff Only" sign, Compl. ¶ 71, and there is no identified risk that parents or students could enter the office without him present and view the display. Although Plaintiff may have been writing reports or conducting other job-related activities while the books were displayed, it is not enough that the display was in his

---

[7] Plaintiff argues that, because his official duties had no relation to the subject matter of the books, his display of the books was not speech as an employee. Mot. 30–31. But "teachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction." *Johnson*, 658 F.3d at 967–68. As such, there is no basis to distinguish between an employee's curricular and non-circular speech, at least when that speech is directed to students in the course the teacher's official duties. *See Wood*, 142 F.4th at 1292 (so holding).

"office environment." When no students were present in Plaintiff's office, the message of the books would not be reasonably attributable to IMESD, and the display could not press Plaintiff's views on impressionable or captive students. *See Dodge*, 56 F.4th at 778.

In summary, Plaintiff spoke as a public employee by prominently displaying the books while students were present, and that expression is not protected by the First Amendment. But when displaying the books outside the presence of students, Plaintiff spoke as a private citizen and was therefore protected by the First Amendment.

> **2.    Whether Defendants had an adequate justification for treating Plaintiff differently than members of the general public.**

During oral argument, Defendants argued that their countervailing interest in regulating speech was complying with Oregon's anti-bias law. *See* Tr. 47:9–22. But this Court finds that Defendants have failed to show that they have a legitimate administrative interest outweighing Plaintiff's right to display the books when students are not present.[8]

"Under the *Pickering* balancing test, the ultimate question is whether the government's legitimate administrative interests outweigh the employee's right to engage in the expressive activity at issue." *Damiano*, 140 F.4th at 1138. This question evaluates whether the governmental entity has an adequate justification for treating the employee differently than a member of the general public. *Eng*, 552 F.3d at 1071. And although it recognizes that a governmental entity has some discretion in restricting speech in its role as an employer, those restrictions "'must be directed at speech that has some potential to affect the entity's operations.'" *Id.* (quoting *Garcetti*, 547 U.S. at 418). For example, if the government cites its interest "as an employer in a

---

[8] Because this Court concludes that only Plaintiff's display of the books when students are not present is entitled to First Amendment protection, its analysis about Defendants' interests is limited to the display when students are not present.

smoothly-running office," then it must show that the plaintiff's protected First Amendment expression presents an "actual, material and substantial disruption," or demonstrate "reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (citation modified). Although complaints from the public or fellow employees about an employee's speech may suffice, they must be considered in context to determine whether they reach a sufficient level of disruption. *Damiano*, 140 F.4th at 1144 (citing cases evaluating whether coworker complaints were sufficient disruption).

Defendants have failed to meet their burden to show that Plaintiff's display of the books when no students are present adversely impacts its interests. There was one bias incident complaint about Plaintiff's display in his LGMS office. VanNice Decl. ¶ 10, ECF 28. And that complaint was substantiated "because of the impact that the expression would have on the environment for the students [Plaintiff] serves." *Id.* at ¶ 11. Because this Court concluded that only Plaintiff's display of the books when no students are present is entitled to First Amendment protection, that cited concern is unavailing. And although VanNice's declaration also references the potential impact for staff and visitors, *id.*, this Court finds that that alone is an insufficient basis for this Court to find an actual, material, and substantial disruption, or even a reasonable prediction of such a disruption. [9] This Court recognizes that Defendants are required to comply

---

[9] Plaintiff argues that "the Speech Policy facilitates a heckler's veto." Mot. 20–22. Even if this assertion is correct, it does not change the analysis. "[T]he First Amendment generally does not permit the so-called 'heckler's veto,'" in which the public—with the government's help—can "shout down unpopular ideas that stir anger." *Damiano*, 140 F.4th at 1145 (citation modified). But the heckler's veto, and disruption related to speech more generally, is a consideration for evaluating the government's justification under *Pickering* balancing. Because the IMESD has not justified its restrictions on Plaintiff's private speech, it is not necessary to consider whether those restrictions amount to a heckler's veto.

with Oregon law. But citing statutory requirements does not change their burden to justify their restrictions on Plaintiff's First Amendment rights.

In sum, this Court finds that Defendants have failed to show an adequate justification to require Plaintiff to not display the books when no students are present. Therefore, Plaintiff has shown that he is likely to succeed—in part—on the merits of his First Amendment retaliation claim.

**B.      Plaintiff's remaining First Amendment speech-based claims.**

Plaintiff argues that strict scrutiny, rather than *Pickering*, should be used to evaluate his First Amendment speech-based claims because IMESD engaged in content and viewpoint discrimination, Mot. 15, and the ESB policy amounts to a prior restraint on speech, *id.* at 22. Plaintiff further argues that, because strict scrutiny applies, he is entitled to broad relief permitting him to display the books at all times. Reply 27. This Court disagrees.

To begin with, *Pickering* applies to all of Plaintiff's remaining speech-related claims under the First Amendment. In *Damiano*, the Ninth Circuit confirmed that "as-applied, content- and viewpoint-based discrimination claims are subject to the *Pickering* analysis." *Damiano*, 140 F.4th at 1149. And in *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017), the court explained that a "similar analysis" to *Pickering* "is used when assessing prospective restrictions on government speech." Thus, in the context of public employment, each of those claims first rests on the distinction between protected private speech and unprotected "speech uttered pursuant to public employees' official duties." *Id.*; *see also Dodge*, 56 F.4th at 786 (analyzing viewpoint discrimination *after* concluding that wearing a MAGA hat at a teacher-only training was protected private speech). Then, *Pickering* balancing applies, requiring the government to justify restrictions on an employee's protected speech. *See, e.g.*, *Moonin*, 868 F.3d at 864–65

(describing the government's burden when it seeks to justify imposing a prior restraint on an employee's protected speech); *see also Page v. Clark Cnty. Fire Dist. 6*, No. 3:23-CV-05849-DGE, 2024 WL 4665789, at *11 (W.D. Wash. Nov. 4, 2024) (noting that "[t]he *Pickering* analysis applies to prospective restrictions on government employee speech[.]").

Ultimately, this Court need not determine whether Plaintiff is likely to succeed on the merits of his remaining First Amendment speech-based claims because they would afford him no more relief than his retaliation claim. As explained, *Pickering* applies to these claims. And the Court has concluded that Plaintiff spoke as a public employee by prominently displaying the books while students were present. Thus, even if Defendants engaged in content and viewpoint restriction, and even if the ESB policy amounted to a prior restraint, Plaintiff still would not be permitted to display the books to students. Conversely, because Plaintiff has already demonstrated that displaying the books outside the presence of students was protected by the First Amendment—and Defendants have failed to justify restricting his display—he has already shown that he is entitled to relief from that restriction.

In sum, *Pickering* applies to all of Plaintiff's First Amendment speech-based claims, and whether Plaintiff is likely to succeed in showing that Defendants engaged in content or viewpoint discrimination or that the ESB policy was a prior restraint does not impact the scope of relief to which he is entitled.

### C.    Plaintiff's free exercise claim.

As a threshold matter, Plaintiff has not met his burden of establishing a free exercise violation by Defendants. Accordingly, he is unlikely to succeed on the merits of his free exercise

claim, and it is unnecessary for this Court to engage in *Pickering* balancing with respect to this claim.[10]

### 1.    Legal standards.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. And it applies "to the States under the terms of the Fourteenth Amendment." *Kennedy*, 597 U.S. at 524. Importantly, it protects both inward beliefs and outward expressions of those beliefs. *Id.*

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* If a plaintiff makes that showing, then the government must satisfy "strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* Conversely, a policy "that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

---

[10] Plaintiff argues that *Pickering* does not apply to his free exercise claims. Mot. 12-15. This Court is bound by prior decisions of the Ninth Circuit holding that *Pickering* balancing also applies to Plaintiff's free exercise claim. To be sure, *Kennedy* expressly left open the issue of whether *Pickering* applies in the context of a free exercise claim. *Kennedy*, 597 U.S. at 532. But the Ninth Circuit has a "practice of applying a balancing test when confronted with constitutional challenges to restrictions on public employee speech in the workplace." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 649–50 (9th Cir. 2006). That extends to a public employer's restrictions on displays of religious items. *Id.* at 651 (applying *Pickering* balancing when an employer refused to allow the plaintiff to display a Bible on his desk or have a "Happy Birthday Jesus" sign). In the absence of contravening caselaw from the Supreme Court, this Court is bound by Ninth Circuit precedent. *United States v. Brown*, 720 F. Supp. 3d 1020, 1026 (D. Or. 2024) (explaining that district courts in the Ninth Circuit are bound by circuit court precedent unless that caselaw is clearly irreconcilable with reasoning or theory of higher authority). Accordingly, *Pickering* balancing would apply to Plaintiff's free exercise claim if Plaintiff could otherwise meet his burden of demonstrating a free exercise claim.

520, 531 (1993). The policy is instead subject to rational basis review. *Tingley v. Ferguson*, 47

F.4th 1055, 1077 (9th Cir. 2022). And under rational basis review, the policy is presumed valid

and will be sustained if the government shows that it is rationally related to a legitimate state

interest. *Id.* at 1078 (citation modified).

A policy is not neutral "if the object of [it] is to infringe upon or restrict practices because

of [its] religious motivation." *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 533. A court may

analyze the facial neutrality of a policy by examining its text, and it may also determine a policy

is not neutral by examining the effect of the policy. *Id.* at 533–35 ("The Free Exercise clause

protects against governmental hostility which is masked as well as overt."); *see also Masterpiece

Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 639 (2018) (evaluating whether an

adjudicatory body's statements during its decision-making process evinced "hostility to religion"

that were inconsistent with the requirements of the Free Exercise clause). Even if the policy has

an adverse impact on religious practices, it may still be considered "neutral" if the government is

addressing a legitimate concern "for reasons quite apart from discrimination." *Church of Lukumi

Babalu Aye, Inc.*, 508 U.S. at 535.

A policy "is not generally applicable if it invites the government to consider the particular

reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton

v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021) (citation modified). It is also not

generally applicable "if it prohibits religious conduct while permitting secular conduct that

undermines the government's asserted interests in a similar way." *Id.* at 534.

### 2.    Analysis.

Plaintiff has failed to show that Defendants impermissibly burdened his sincere religious

practice pursuant to its Speech Policy.

To begin with, Plaintiff has failed to show that Defendant's Speech Policy is not neutral. There is no indication that the ESB Policy restricts any religious practices because of their religious motivations. Indeed, the policy explicitly seeks to prevent discrimination or harassment based on religion. And even if the ESB Policy adversely impacted religious practices, it is addressing the legitimate concern of ensuring an open and welcoming school environment for all students and employees.

Plaintiff also has not shown that Defendants were "hostile" towards his religious beliefs. In *Masterpiece Cakeshop*, the Court noted that a commissioner disparaged the petitioner's faith, including by comparing his invocation of his beliefs to "defenses of slavery and the Holocaust," and demeaned it by characterizing it as a "despicable piece[] of rhetoric." 584 U.S. at 635. Those comments, combined with the failure of other commissioners to object or disavow them, led the Court to conclude that the Commission demonstrated hostility towards Plaintiff's religion and otherwise cast doubt on the fairness and impartiality of the Commission. *Id.* at 636–37. Here, VanNice asked about the pages in *She is She* that contained Bible verses. Compl. ¶¶ 118–20. And she asked whether the Bible supports "they/them." *Id.* at ¶ 121. This Court finds that those inquiries—particularly when compared to the statements in *Masterpiece*—do not support a finding or inference that Defendants were motivated by hostility toward Plaintiff's religion.

Finally, the Court concludes that Plaintiff has failed to show that the Speech Policy is not generally applicable. It prohibits all bias incidents, regardless of their motivation. And it does not provide any mechanism for individualized exceptions that would invite IMESD to consider the reasons for the conduct.

Because the Speech Policy is neutral and generally applicable, it is presumed valid.[11] Plaintiff has therefore failed to show that he is likely to succeed on the merits of his free exercise claim.

### D.    Plaintiff's equal protection claim.

Even if Plaintiff is likely to succeed on the merits of his Equal Protection Clause claim—which this Court does not resolve—he would not be entitled to any greater relief than that afforded to him by his First Amendment retaliation claim. Thus, this claim does not change the scope of the preliminary injunction to which he is entitled.

The Ninth Circuit has "held that allegations of disparate treatment based on viewpoint give rise to a cognizable equal protection claim." *Damiano*, 140 F.4th at 1150. But the distinction between private speech and speech on behalf of a government employer remains critical, because "the government has the right to speak for itself, and, when it does, it is entitled to say what it wishes and to select the views that it wants to express." *Johnson*, 658 F.3d at 975 (citation modified); *see also Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has created or commissioned."). But if a public employee brings an equal protection claim based on protected, private speech, "the government may defend against the claim by showing that its legitimate interests outweigh the public employee's speech rights under *Pickering*." *Damiano*, 140 F.4th at 1151.

---

[11] Because Plaintiff does not argue that the Speech Policy would fail rational basis review, *see* Mot. 10–15, the Court declines to further engage in that analysis.

Plaintiff's likelihood of success on the merits of his Equal Protection Clause claim depends upon the Court's conclusion that he spoke as an employee when displaying the books when students were present. IMESD is entitled to select the views that it wishes to express, including by way of deciding which books are appropriate for display. Conversely, that control may not *necessarily* infringe upon Plaintiff's liberties as a private citizen, specifically, his display when students are not present in his office. Therefore, it is unnecessary to separately consider Plaintiff's equal protection claim because it does not change the scope of the preliminary injunction to which he is entitled.

**E.    Plaintiff's Due Process Clause claim.**

Plaintiff argues that the Speech Policy violates his Fourteenth Amendment Due Process Clause rights because it (1) fails to give employees adequate notice of when it applies and (2) lacks explicit standards for those who apply it. Mot. 38–39. The Court finds that Plaintiff has not demonstrated that he is likely to prevail on this claim.

"The operative question under the fair notice theory is whether a reasonable person would know what is prohibited." *Tingley*, 47 F.4th at 1089. It must give "a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). And it may not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

"When First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). That is because "First Amendment freedoms need breathing space to survive." *N.A.A.C.P. v. Button*, 371 U.S. 415, 432–33 (1963); *see also Grayned v. City of*

*Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."). Nevertheless, even when First Amendment rights are implicated, some uncertainty is permissible because "'we can never expect mathematical certainty from our language.'" *California Tchrs. Ass'n*, 271 F.3d at 1150 (quoting *Grayned*, 408 U.S. at 110).

Here, this Court finds that Plaintiff has failed to show that the Speech Policy violates his due process rights. First, the ESB Policy defines what it proscribes: a "'[b]ias incident' means a person's hostile expression of animus toward another person, relating to the other person's perceived race, color, religion, *gender identity*, sexual orientation, disability or national origin . . . ." Ex. E 1 (emphasis added). Plaintiff takes issue with its prohibition of "hostile expression[s] of animus." *See* Mot. 39 ("whatever that is"). But when interviewed, he understood that term to mean an act of ill will. Ex. K 6; *see also* Ex. L at 4 ("I understand it as being an[] act towards someone."). And other definitions that he included in his appeals aligned with that understanding. *See, e.g.* Ex. M 4 ("*Hostile expression of animus* is defined as 'an act, word, or other medium that conveys deep-seated ill will, antagonism, or hostility towards another person . . . .'"). Even applying the stricter First Amendment standard for vagueness, this Court concludes that the ESB policy gave Plaintiff fair notice of what was prohibited. A person of ordinary intelligence would understand that bias incidents were expressions of ill will directed toward another person based on their protected characteristics. Although Plaintiff clearly disputes whether his display *constituted* such a bias incident, that is a separate inquiry from whether the ESB Policy is so vague as to violate his due process rights.

Moreover, the Speech Policy included standards for enforcement. The Bias Incident Policy includes a four-step process for investigations and appeals of reported incidents. *See* Ex. F

1–2. It is a detailed process with multiple parties, and it is grounded in the terms of the ESB

Policy, which itself reflects standards set by Oregon law. At this stage, Plaintiff has not shown

that it authorizes or encourages discriminatory enforcement. Again, Plaintiff's disagreement with

the results of the process does not mean the policy violates due process.

In sum, Plaintiff has failed to show that he is likely to succeed on the merits of his Due

Process Clause claim.

### III.    Whether the remaining preliminary injunction factors favor Plaintiff.

As discussed below, the remaining preliminary injunction factors favor Plaintiff, at least

insofar as the injunction would allow Plaintiff to display the books when no students are present.

### A.    Whether Plaintiff has shown a likelihood of irreparable injury.

Plaintiff has demonstrated that irreparable injury is likely in the absence of an injunction.

In the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context

can establish irreparable injury sufficient to merit the grant of relief by demonstrating the

existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001

(9th Cir. 2005) (citation modified). That standard recognizes that "the loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).

For the reasons discussed above, Plaintiff has demonstrated a likelihood of prevailing in

part on his First Amendment retaliation claim. Therefore, he has shown a likelihood of

irreparable injury warranting a preliminary injunction.

### B.    Whether the balance of equities tips in favor of Plaintiff and an injunction is in the public interest.

As noted, the final two *Winters* factors—whether the balance of equities tips in the

movants favor and whether an injunction is in the public interest—merge when the party

defending against a preliminary injunction is a public entity. *Parks*, 758 F. Supp. 3d at 1266.

"When balancing the equities, 'a court must identify the possible harm caused by the preliminary

injunctions against the possibility of the harm caused by not issuing it.'" *Id.* (quoting *Univ. of*

*Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court should weigh

the hardships of each party and "'pay particular regard for the public consequences in employing

the extraordinary remedy of injunction.'" *Id.* (quoting *Winter*, 555 U.S. at 24).

These remaining factors favor Plaintiff. As explained above, Defendants failed to make

any showing that they would experience any hardships or disruptions should the injunction be

granted, particularly given the limited scope imposed by the Court. And the Court cannot identify

any public consequence in allowing Plaintiff to privately display the books in his office when

students are not present. Therefore, these remaining factors favor granting a preliminary

injunction.

## IV.    Scope of injunctive relief.

Having concluded that Plaintiff is likely to succeed on parts of his claims and that the

remaining *Winter* factors favor granting injunctive relief, the Court turns to the scope of relief to

which Plaintiff is entitled.

"Once a constitutional violation is found, a federal court is required to tailor the scope of

the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425

U.S. 284, 293–94 (1976) (citation modified). "The general rule regarding the scope of

preliminary injunctive relief is that it 'should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs before the court.'" *Regents of the Univ. of*

*California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *rev'd in part,*

*vacated in part*, 591 U.S. 1 (2020) (citation omitted). And "where relief can be structured on an

individual basis, it must be narrowly tailored to remedy the specific harm shown." *City & Cnty.*
*of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (citation modified).

Plaintiff seeks to be able to prominently display the books in his office at all times. But as
explained, only his display when no students are present is protected under the First Amendment.
Therefore, the Court GRANTS Plaintiff's request to resume displaying the books in his IMESD
offices, but he may only do so when no students are present. Moreover, Defendants may not take
disciplinary action against Plaintiff—related to displays of the books—that is inconsistent with
the relief granted by this Court.

Plaintiff also requests that the Letter of Directive be removed from his personnel file. But
the Letter of Directive was based, at least in part, on the display of books to students. Indeed, the
Letter of Directive determined that Plaintiff's display of the books "*for students* visiting [his]
office for purposes of evaluations and student services[]" amounted to a bias incident. Compl. ¶
160 (emphasis added); Ex. G 2. Because the letter of directive was based in part on Plaintiff's
unprotected speech, removing the letter of directive from Plaintiff's file is not narrowly tailored
to remedy the specific harm in this case. The Court therefore DECLINES to grant his request for
the Letter of Directive to be removed from his file.

## V.    Security.

Plaintiff asks this Court to waive the security requirement of Rule 65(c). Mot. 3. "The
court may issue a preliminary injunction or a temporary restraining order only if the movant
gives security in an amount that the court considers proper to pay the costs and damages
sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.
65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with
discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067,

1086 (9th Cir. 2009) (internal quotations omitted). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [their] conduct." *Id.* (citation modified). The Court concludes that Plaintiff should not be required to pay a security because the injunction entered is narrow and not likely to harm Defendants.

## CONCLUSION

The Court GRANTS IN PART Plaintiff's Motion for Preliminary Injunction, ECF 12. Defendants Intermountain Education Service Board of Directors, Mark Mulvihill, and Aimee VanNice ARE HEREBY ENJOINED from taking disciplinary action against Plaintiff Roderick Theis if he chooses to resume displaying the books *He is He*, *She is She*, or *Johnny the Walrus* in any of his offices within the IMESD service area while the children that he serves are not present in those office spaces. At this time, this Court DECLINES to grant Plaintiff's request that the Letter of Directive be removed from his personnel file because it was based, at least in part, on his display of the books when students were present. This injunction takes effect immediately and remains in effect during the pendency of this lawsuit unless modified by a final judgment or other order of the Court, the agreement of all parties, or any binding change in the law.

IT IS SO ORDERED.

DATED this 20th day of August, 2025.

_____
ANDREW HALLMAN
United States Magistrate Judge