Rebekah Schultheiss, OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227–2401
rebekah@millardoffices.com

Tyson C. Langhofer*, VA Bar No. 95204
Matthew C. Ray*, GA Bar No. 347985
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707–4655
tlanghofer@ADFlegal.org
mray@ADFlegal.org

David A. Cortman*, GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339–0774
dcortman@ADFlegal.org

*Counsel for Plaintiff*
***Admitted Pro Hac Vice***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PENDLETON DIVISION

| | |
|---|---|
| **RODERICK E. THEIS, II**, <br><br> *Plaintiff,* <br><br> v. <br><br> **INTERMOUNTAIN EDUCATION SERVICE DISTRICT BOARD OF DIRECTORS**, **MARK S. MULVIHILL**, Superintendent, and **AIMEE VANNICE**, Assistant Superintendent and Director of Human Resources, all in their official capacities, <br><br> *Defendants.* | Case No. 2:25-cv-00865-HL <br><br> **PLAINTIFF'S CORRECTED DECLARATION SUPPORTING HIS MOTION TO ENFORCE THIS COURT'S PRELIMINARY INJUNCTION** |

I, RODERICK E. THEIS, II, declare as follows:

1.    I am a citizen of the United States of America and am over the age of eighteen.

2.    I am a resident of the State of Oregon.

3.    I make this declaration based on my personal knowledge.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

### I.    Ms. Oliver's First Complaint

4.    In my Verified Complaint, I recounted how Principal Wagner of La Grande Middle School told me that a La Grande employee had complained about my decision to display *He Is He* and *She Is She* in my office after first looking up the books online and then deciding that their content was offensive. *See* V. Compl. ¶¶ 94–96, Doc. 1 at 17.[1]

5.    Since then, I have learned that Principal Wagner's account was not accurate and desire to correct the record.

6.    On September 4, 2025, I asked Defendant VanNice for a copy of the complaint submitted on October 18, 2024 about my decision to display these books, and she responded on September 15, attaching copies of the complaint. A true, accurate, and complete copy of this email exchange, including copies of all attachments, is attached to this Declaration as Exhibit 1.

7.    The attachments show that Ms. Rachael Oliver submitted this complaint. Ex. 1 at 2.

8.    Ms. Oliver is a special education teacher at La Grande, but her complaint is not based on online research.

9.    Ms. Oliver states in her complaint that she was "unsure what the point of having the books would be for a diagnostician." Ex. 1 at 2.

10.    Ms. Oliver never asked me why I chose to display these books as décor in my office.

11.    Ms. Oliver does not supervise me or my work in any way.

12.    Defendants admit that they do not require employees "to ask permission before they present specific views or decorate their workspaces." VanNice Decl.

---

[1]    All references to page numbers in documents already filed in this lawsuit refer to the ECF-generated page numbers in the top-right corner of the document. All references to page numbers in exhibits filed with this declaration refer to the bates-stamp number in the bottom-right corner of the document.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

¶ 9, Doc. 28 at 3. Thus, Ms. Oliver is entitled to her opinion as to my choices of office décor, but her opinion has no controlling effect.

13.    Ms. Oliver claims in her complaint that these books are "explicitly religious and clearly transphobic." Ex. 1 at 2.

14.    Ms. Oliver included with her complaint several photographs of *He Is He* and *She Is She.* Ex. 1 at 3–6.

15.    Ms. Oliver's photographs show that she entered my office to read these two books, handled both of them, and took pictures of select pages from each that she deemed significant. Ex. 1 at 3–6.

16.    Ms. Oliver did not seek or receive my consent to enter my office for these purposes.

17.    Ms. Oliver did not seek or receive my consent to review, handle, or photograph any of my personal items, including these books.

18.    Principal Wagner and Defendants knew Ms. Oliver had complained about the display of these books when Principal Wagner met with me and Defendants then launched their investigation. *See* Compl. ¶¶ 90–199, Doc. 1 at 17–32.

## II.    Events Leading to This Lawsuit

19.    On November 22, 2024, Defendants sent me a letter of directive, stating that "further conduct of this nature may result in discipline up to termination of your employment." *See* Compl. ¶¶ 161, Doc. 1 at 27; Compl. Ex. G, Doc. 1-7 at 3.

20.    On May 21, 2025, I filed my complaint in this lawsuit. *See* Compl., Doc. 1, at 46.

21.    Since filing this lawsuit, three colleagues have filed complaints against me, and Defendants have used these complaints as a pretext for pursuing efforts to terminate my employment.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

## III.    The Post-Litigation Complaints

22.    Within nine days following the filing of this lawsuit, three colleagues filed complaints against me, all because of my lawsuit, though Defendants withheld this information from me until July 14, 2025—more than six weeks after receiving the last. A true, accurate, and complete copy of Kim Youncs' email (apparently on behalf of Defendant VanNice) of July 14, 2025, including the attachments she included, is attached to this Declaration as Exhibit 2.

### A.  Ms. Young's Complaint on May 22, 2025

23.    On May 22, 2025—the day after I filed this lawsuit—Ms. Young, an InterMountain school psychologist, submitted a complaint against me regarding some text messages we exchanged on April 2 on the topic of gender dysphoria in children and the books displayed in my office. Ex. 2 at 4–5. A true, accurate, and complete copy of these text messages is attached to this Declaration as Exhibit 3.

24.    Ms. Young failed to note in her complaint that she was the one who initiated the conversation about my views on gender dysphoria in children, the books I displayed in my office, and related topics. *See* Ex. 3 at 3 ("Is that what your books were about? Lack of discrimination?"). She continued to press the point by saying: "[The books] aren't neutral and you wouldn't like me sharing pro trans propaganda with children would you?" *Id.* at 4. However, according to Defendant Mulvihill, Policy ACB allows InterMountain employees to promote "pro trans propaganda," as it only prohibits employees from communicating a "binary view of gender." *See* Compl. Ex. H, Doc. 1-8 at 2.

25.    Ms. Young also failed to note in her complaint that she asked me for my views on a host of other subjects, including her child's gender identity, President Trump's executive orders, government corruption, women's right to vote, and even "biracial" marriage." Ex. 3 at 10, 18–25.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

26.    I responded respectfully to all her questions and even noted that I was "simply telling [her] what I think generally about the subjects that [she was] asking me about." *Id.* at 17.

27.    Ms. Young also failed to note in her complaint that I specifically communicated how much I cared for her and her child: "I know you love your child and are doing as you believe is best." *Id.* at 17; *accord id.* at 15 ("I have only love and high regard for you and your child.").

28.    Ms. Young claimed in her complaint that she felt "concerned," "worr[ied]," "very uneasy," and "teary eyed." Ex. 2 at 5. But this is at odds with another fact that she omitted from her complaint: that she texted me again later that day to ask about the results of InterMountain's investigation into my display of these two books. Ex. 3 at 31.

29.    Ms. Young also failed to note in her complaint that she was texting me because of her past experiences with me, where I showed care and concern for her.

30.    Given the complete context of our text message exchange, it is clear that Ms. Young did not file this complaint out of any genuine concern but instead as a response to my lawsuit with the objective of seeing me removed from my position at InterMountain.

**B. Ms. Oliver's Second Complaint on May 23, 2025**

31.    On May 23, 2025—two days after I filed this lawsuit—Ms. Oliver filed her second complaint against me. Ex. 2 at 2–3.

32.    In this complaint, Ms. Oliver claimed that I had an "inability to remain professional," had an "inability to communicate professionally with parents," and "overstepped [my] professional role regularly." Ex. 2 at 3.

33.    Ms. Oliver's decision to pass judgment on my work and professionalism is curious since she does not supervise me or my work in any way.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

34.    Ms. Oliver also failed to support her accusations against me. She provided no evidence except her own assertions.

35.    Despite what Ms. Oliver claims, I never said that the student in question needed "day treatment level care" from La Grande Middle School. Rather, I commented—based on my observations of the student during the meeting, information about the student given to me, and the results of my evaluation of the student—that the student may need this higher level of care if La Grande could not find another way to serve her. But I never committed La Grande, either verbally or in writing, to provide that level of care or any level of care for this student. My goal was simply to advocate for the student's needs since others were minimizing them.

36.    In her complaint, Ms. Oliver says that she "felt" my statements "were way out of line considering he doesn't know the student" and that she disagreed with my assessment of the student's needs. Ex. 2 at 2. But that's just a professional disagreement. After the meeting, neither Ms. Oliver nor any other staff member expressed any concerns to me about anything I said during the meeting.

37.    In her complaint, Ms. Oliver alludes to complaints made against me to Principal Wagner. Ex. 2 at 3. Other than the complaints that led to this lawsuit and those outlined in this Declaration, I am unaware of any other reports about me being made to Principal Wagner. Also, despite what she says, Principal Wagner has never addressed my professionalism with me before.

38.    Ms. Oliver's complaint omits critical information. For example, throughout the 2024–25 school year, which was Ms. Oliver's first at La Grande, I had a positive relationship with her, and she sought my guidance and consultation multiple times.

39.    In fact, on the morning of May 23, a few hours before Ms. Oliver filed this complaint, Ms. Oliver and I worked with two other staff members to create a support plan for another student during an initial eligibility meeting. Many of us

6

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

became quite emotional during this meeting because of the joy we were experiencing as we validated the student's needs, created a plan to support that student, and thus brought hope to this family.

40.    Plus, about week before Ms. Oliver filed this complaint, she participated in another meeting with Principal Wagner and me on May 14 that she failed to mention in her complaint. After this meeting, Principal Wager and Ms. Oliver both told me that they appreciated my contributions to the discussion.

41.    Last, despite what Ms. Oliver claims, Principal Wagner has only ever commended my contributions during meetings with La Grande students or parents. And he has made it very clear to me on multiple occasions during the 2023–24 and 2024–25 school years that he and his staff appreciate my insight, care, and guidance.

42.    Based on the totality of the evidence, it is clear that Ms. Oliver filed this complaint in response to this lawsuit and with the goal of seeing me removed from my position at InterMountain, rather than out of any genuine concern.

**C. Ms. Durant's Complaint on May 30, 2025**

43.    On May 30, 2025—nine days after I filed this lawsuit—Ms. Durant, another InterMountain school psychologist, filed a complaint against me. Ex. 2 at 6–7.

44.    Ms. Durant's complaint stemmed from a personal conversation we had on January 17, 2025—over four months earlier. Ex. 2 at 6.

45.    Ms. Durant admitted that ours was a "private conversation" that "was only between us" as there "were no other people in the room." Ex. 2 at 6–7. Indeed, this conversation took place after a work-related meeting, and we were discussing a licensure program to which I had applied. This conversation had nothing to do with our work-related responsibilities.

46.    Ms. Durant claims that I said: "As long as I don't have to deal with any of that transgender stuff." Ex. 2 at 6. And she claims that my comment "insinuated

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

an anti-transgender attitude or prejudice." *Id.* I never made this comment, and I do not hold any prejudice against people who identify as transgender or who experience gender dysphoria. Instead, I value all of my coworkers and all of the students with whom I work, and I treat all of them with dignity and respect.

47.    Ms. Durant claims that my alleged comment violates Policy ACB because it "could have been hurtful to someone who is transgender themselves or has a close friend or family member who is transgender." Ex. 2 at 6. But she later admits that no one else was "in the room or building" to overhear our conversation. *Id.*

48.    Curiously, Ms. Durant notes: "At first, I didn't think I needed to report what happened." Ex. 2 at 6. But she changed her mind only after "Rod's lawsuit against the ESD became public." *Id.*

49.    In addition, Ms. Durant admits that she filed this complaint only after consulting with Ms. Young, who also filed a complaint against me. Ex. 2 at 7.

50.    In late June 2025 (but before I knew about Ms. Durant's complaint), I called Ms. Durant to see if she would work with me on an unrelated contract issue with InterMountain. During that phone call, Ms. Durant explicitly told me that she wanted nothing to do with me "because of the lawsuit."

51.    Given the lengthy delay between our private conversation and this complaint, Ms. Durant's coordination with Ms. Young, and Ms. Durant's litigation-based animosity towards me, it is clear to me that Ms. Durant did not file this complaint out of any genuine concern but simply in response to my lawsuit with the goal of seeing me removed from my position at InterMountain.

### D. InterMountain's Investigation & Findings

52.    Despite the facial flaws in these three complaints and their suspect timing, Defendants launched an investigation into them. A true, accurate, and complete copy of my emails between July 14 and 16, 2025 with Kim Youncs are attached to this Declaration as Exhibit 4.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

53.    On July 25, 2025, my attorneys sent Defendants' investigator a response to each of these complaints on my behalf. A true, accurate, and complete copy of the July 25, 2025 response to these three complaints is attached to this Declaration as Exhibit 5.

54.    On September 18, 2025, Defendant VanNice informed me that Inter-Mountain's investigator concluded that there was not sufficient evidence to find that I committed a bias incident in connection with Ms. Young's complaint. A true, accurate, and complete copy of Defendant VanNice's September 18, 2025 regarding Ms. Young's complaint is attached to this Declaration as Exhibit 6.

55.    Also on September 18, 2025, Defendant VanNice informed me that InterMountain's investigator concluded that there was not sufficient evidence to find that I committed a bias incident in connection with Ms. Durant's complaint. A true, accurate, and complete copy of Defendant VanNice's September 18, 2025 letter regarding Ms. Durant's complaint is attached to this Declaration as Exhibit 7.

56.    In both of these letters, Defendant VanNice explained my expression of personal opinions were not "derogatory or hostile expressions of animus toward another person," as "required for a bias incident to occur." Ex. 6 at 1; Ex. 7 at 1. Indeed, she explained that my comments to Ms. Durant "were not directed at any specific student, colleague, or member of the school community," and thus, it was not a "bias incident." Ex. 7 at 1.

57.    Defendant VanNice's interpretation of Policy ACB's definition of bias incidents conflicts with Defendant Mulvihill's interpretation of the same policy. After all, in response to Ms. Oliver's complaint about me displaying *He Is He* and *She Is She*, he wrote: "You pointed out that there is no evidence you targeted or harmed anyone directly. The investigator did not find that any one person was directly targeted. However, the investigator found that Board Policy ACB does not require evidence of direct targeting for it to be violated." Compl. Ex. H, Doc. 1-8, at 4.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

58.     When I displayed *He Is He*, *She Is She*, and *Johnny the Walrus*, I was not directing this display at "any specific student, colleague, or member of the school community." Ex. 7 at 1. Thus, based on Defendant VanNice's interpretation of Policy ACB, these displays should not have constituted bias incidents either.

59.     These disparities in interpreting Policy ACB shows that not even the officials charged with enforcing it know what it means or what is required to show that it has been violated.

60.     Also on September 18, 2025, Defendant VanNice informed me that InterMountain's investigator concluded that there was "insufficient evidence to conclude that any existing policy, administrative rule, or ethical standard were [sic] violated" in connection with Ms. Oliver's second complaint against me. But the investigator still concluded that my conduct at the meeting in question fell short of InterMountain's expectations. Defendant VanNice then invited me to appeal this decision if I chose to do so. A true, accurate, and complete copy of Defendant VanNice's September 18, 2025 letter regarding Ms. Oliver's second complaint against me is attached to this Declaration as Exhibit 8.

61.     As a result, Defendant VanNice sent me a letter of reprimand on September 24, 2025 based on Ms. Oliver's second complaint against me. A true, accurate, and complete copy of Defendant VanNice's letter of reprimand is attached to this Declaration as Exhibit 9.

62.     On October 3, 2025, my attorneys appealed both the decision letter (*i.e.*, Ex. 8) and the letter of reprimand (*i.e.*, Ex. 9) stemming from Ms. Oliver's second complaint against me, asking that both be rescinded and removed from my employment file. A true, accurate, and complete copy of my attorneys' appeal letter is attached to this Declaration as Exhibit 10.

63.     On October 13, 2025, Defendant Mulvihill rejected my attorneys' appeal, saying that only Ms. Oliver could appeal to him with respect to her second

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

complaint. A true, accurate, and complete copy of Defendant Mulvihill's rejection of my attorneys' appeal is attached to this Declaration as Exhibit 11.

64. On October 14, 2025, my attorneys emailed InterMountain's attorney, insisting that Defendant Mulvihill consider my appeal in light of the fact that Defendant VanNice specifically invited it. A true, accurate, and complete copy of my attorneys' email to InterMountain's attorney, along with all attachments originally included and the response from InterMountain's attorney, is attached to this Declaration as Exhibit 12.

65. Neither Defendant Mulvihill, nor any other Defendant, nor any other InterMountain official has since responded to my appeal beyond the response InterMountain's counsel provided. Ex. 12 at 1.

66. Ms. Oliver filed this second complaint because she dislikes and disagrees with my beliefs regarding transgenderism and gender identity and wanted me removed from InterMountain. And thus, she disapproves of me displaying my books in my office, even when the students I serve are not present.

## IV.   The Post-Injunction Complaints & Termination Proceedings

### A. This Court's Injunction

67. On August 20, 2025, this Court partially granted my motion for a preliminary injunction. *See* Op. & Order, Doc. 39.

68. This Court ordered: "Defendants Intermountain Educational Service Board of Directors, Mark Mulvihill, and Aimee VanNice ARE HEREBY ENJOINED from taking disciplinary action against Plaintiff Roderick Theis if he chooses to resume displaying the books *He is He*, *She is She*, or *Johnny the Walrus* in any of his offices within the IMESD service area while the children that he serves are not present in those office spaces." Op. & Order, Doc. 39 at 33.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

**B. Eighth-Grade Ambassadors' August 25, 2025 Visit to My Office**

69.    Based on this Court's injunction, I resumed displaying *He Is He* and *She Is She* in my La Grande office on Friday, August 22, 2025—but only when the students that I serve were not present.

70.    The following Monday (August 25, 2025) was the first day of school for sixth and seventh graders, and some eighth-graders had volunteered and been accepted to serve as "ambassadors" to help the younger students during their first day of school.

71.    These eighth-grade ambassadors were not at the school to attend classes or any other official events, as their grade did not begin school until the next day, August 26, 2025.

72.    During the noon hour, I was working on some reports in my office with the door open when four of these eighth-grade ambassadors suddenly entered my office and immediately demanded to be allowed to read *He Is He* and *She Is She*.

73.    I did not invite these eighth-grade ambassadors into my office.

74.    I did not know any of these eighth-grade ambassadors.

75.    None of these eighth-grade ambassadors who entered my office were there to receive any of the standardized tests or behavioral assessments that I administer as part of my responsibilities at InterMountain. Indeed, I had no evaluations of students scheduled that day.

76.    None of these eighth-grade ambassadors were required to be in my office. They were volunteers in the school who appeared to be operating independently but who were definitely not under my supervision at the time.

77.    None of these eighth-grade ambassadors who entered my office were there to receive any professional services from me. Thus, none of them qualify as "children that [I] serve[ ]." Op. & Order, Doc. 39 at 33.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

78.    I never gave these eighth-grade ambassadors permission to handle or read *He Is He* and *She Is She*. Instead, I tried to shift the conversation to other topics by asking them who they were, why they were in my office, where they were supposed to be at that time, who was in charge of them, and questions about the ambassadors program.

79.    In response to my questions, these eighth-grade ambassadors told me that they were not in the building as students, that they had nowhere they were supposed to be at that time, that they were not under anyone's authority, and that they were in my office by their own free will. Even so, I could not deter them from their insistence to see the books on display in my office.

80.    Based on all I had learned from these eighth-grade ambassadors, it was clear that I would not be violating this Court's injunction if these students succeeded in accessing my books. I was not working with the ambassadors in my official duties, they were not there in their roles as students, and they were free to leave my office at any time.

81.    So before I knew it, these eighth-grade ambassadors had grabbed *She Is She* and began reading it as a group just inside my office doorway.

82.    Shortly after they grabbed the books, Ms. Oliver came to my office. I later learned that she first passed by my office with her cell phone out, video-recording the eighth-grade ambassadors as they were in my office.

83.    From the way she interacted with these eighth-grade ambassadors, the way they responded to her, and the comments she made to me at that time about them, it was clear that Ms. Oliver knew them.

84.    Never before have I had a student enter my office unannounced, never before has any student expressed interest in reading *He Is He* and *She Is She* immediately after entering my office. Yet these eighth-grade ambassadors did not just express that interest; they demanded to see these books and grabbed them without

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

my consent. Thus, it appeared to me that they had been told ahead of time that the books were there and they should try to get them.

85. About a half hour later, these same eighth-grade ambassadors suddenly returned to my office, grabbed *He Is He*, and spent a few minutes reading it.

86. Once again, I did not give these eighth-grade ambassadors permission to handle or read *He Is He*.

87. The fact that these eighth-grade ambassadors returned to my office later to read *He Is He* made clear to me that someone instructed them to do this so they could say they had read both books.

88. During this time, the eighth-grade ambassadors asked me about the books' reference to "adoptedandloved.com." I explained that the author had been adopted and that I thought he founded the website to show his appreciation for the value of adoption, as his mother had been raped and then placed him for adoption. I also indicated that I thought it was commendable that the author had founded this website as a way to help others.

89. The fact that Ms. Oliver obviously knew these students and appeared in my office doorway with a cell phone out to record everything just after they first entered my office indicated to me at that time that she coordinated this entire incident with them, that they were acting at her direction and encouragement, and that she did all this with the intent of filing her third complaint against me.

### C. InterMountain Investigates

90. My suspicions proved correct. On August 27, 2025, Defendant VanNice sent me a letter notifying me that InterMountain had received a complaint about me from La Grande Middle School. A true, accurate, and complete copy of Defendant VanNice's August 27, 2025 letter is attached to this Declaration as Exhibit 13.

91. The next day, Principal Wagner emailed me, asking to meet to discuss "a complaint filed ... regarding student access to books in [my] office." A true,

14
**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

accurate, and complete copy of Principal Wagner's email—along with subsequent responses, in which I expressed my concerns that Ms. Oliver staged this incident to impact this lawsuit—is attached to this Declaration as Exhibit 14.

92. On October 9, 2025, Defendant VanNice emailed me as part of her investigation into this latest complaint. A true, accurate, and complete copy of her October 9, 2025 email, along with subsequent responses and an attachment she later sent, are attached to this Declaration as Exhibit 15.

93. On October 16, 2025, Defendant VanNice finally (after my repeated requests) emailed me the information InterMountain had compiled about this latest complaint against me. Upon receiving this email, I realized from the file name of the attachment that InterMountain had compiled its "District Investigation and Finding of Fact" on September 19, 2025—almost three weeks before Defendant VanNice first contacted me, seeking my side of the story. A true, accurate, and complete copy of Defendant VanNice's October 16, 2025 email—along with the attached "District Investigation and Finding of Fact"—is attached to this Declaration as Exhibit 16.

94. The "District Investigation and Finding of Fact" opens with a four-page report from the investigator. Ex. 16 at 4–7.

### 1. The Investigator's Misreading of the Injunction

95. Among other flaws in this report, the investigator references my September 4 email to Principal Wagner, where I stated: "The U.S. District Court of Oregon recently entered an injunction which **allowed me to resume displaying the books in my office when <u>students that I serve are not present</u> in that space** and which prohibited IMESD from taking disciplinary action against me related to displays of the books in those circumstances." Ex. 16 at 6 (all emphasis original). The investigator then observed: "However, his statement is not in alignment to the

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

actual court order that indicates that he may display books when '**when [sic] no students are present.**'" *Id.* (emphasis original).

96.    In actuality, my September 4 email almost quotes verbatim this Court's injunction, which states:

> Defendants Intermountain Educational Service Board of Directors, Mark Mulvihill, and Aimee VanNice ARE HEREBY ENJOINED from taking disciplinary action against Platiniff Roderick Theis if he chooses to resume displaying the books *He is He*, *She is She*, or *Johnny the Walrus* in any of his offices within the IMESD service area **while the children that he serves are not present in those office spaces**.

Op. & Order, Doc. 39 at 33 (boldface added).

97.    The investigator quotes portions of this Court's reasoning and ignores the most complete expression of this Court's injunction. *Compare* Ex. 16 at 6 (quoting Op. & Order, Doc. 39 at 32) *with* Op. & Order, Doc. 39 at 33.

98.    The investigator also ignores that this entire episode was a setup from the same person who has been targeting me for removal.

### 2. Ms. Oliver's Third Complaint

99.    Next, the "District Investigation and Finding of Fact" includes the complaint that sparked all these proceedings, and unsurprisingly, Ms. Oliver filed it the day after the eighth-grade ambassadors entered my office. Ex. 16 at 8.

100.    Ms. Oliver states in her complaint that I allowed the students to read *She Is She* in my office. Ex. 16 at 8. This is false. The students grabbed the book and began reading it without my consent.

101.    Ms. Oliver's complaint indicates that she recorded video of the incident, and Defendants provided me a copy of her video. A true, accurate, and complete copy of Ms. Oliver's video footage that Defendants provided me is attached to this Declaration as Exhibit 17.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

102.    In addition, the investigator states: "Camera footage ... indicates total length of exchange was about 15 minutes." Ex. 16 at 7. In actuality, the length of Ms. Oliver's video was 15 seconds. Ex. 17.

### 3.  The Eighth-Grade Ambassadors' Interviews

103.    Next, the "District Investigation and Finding of Fact" records 64 questions posed to the four eighth-grade ambassadors involved in this incident, and many of the answers contradict the investigator's conclusions. Ex. 16 at 10–15.

104.    For example, the investigator states that I allowed the students to read the books. Ex. 16 at 5 ("Student indicate [sic] they ... were allowed to access the books."); *accord id.* at 26 (claiming I "shared a childrens [sic] book with them"). This contradicts my September 4 email to Principal Wagner, which the investigator quotes. *Id.* ("[B]efore I knew it, they had grabbed one of my books and began reading it aloud."). But it also contradicts the uniform testimony of the two eighth-grade ambassadors who addressed the topic. *Id.* at 10 ("[Redacted] grabbed she is she book...."); *id.* at 13 ("I took it off the shelf and [redacted] took it and read it.").

105.    In addition, the investigator recounts how a staff member reported that these eighth-grade ambassadors felt uncomfortable about their interactions with me. Ex. 16 at 5; *accord id.* at 26 (claiming "it left 3 of them uncomfortable"). The investigator then notes that "students were ambiguous about concerns days later." *Id.* at 7. Yet all of this flatly contradicts what all four eighth-grade ambassadors said. *Id.* at 10 ("I don't remember anyone feeling uncomfortable for the entire thing.... I wasn't uncomfortable."); *id.* at 11 ("I didn't really feel uncomfortable."); *id.* at 12 ("I didn't personally feel uncomfortable."); *id.* at 13 ("I wasn't uncomfortable in that room."). It also contradicts Ms. Oliver's video footage, which shows the ambassadors to be relaxed and at ease when they were in my office. Ex. 17.

106.    Furthermore, it is curious that the investigator failed to include in his report that two of the eighth-grade ambassadors made comments that suggest Ms.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

Oliver coordinated this entire incident, as they indicated that they met outside Ms. Oliver's room before coming to my office, Ex. 16 at 10 (Q: "Who was in the room with you?" A: "We ... talked outside Mrs. Oliver's room."), and then went to her classroom after leaving my office, *id.* at 13–14 (Q: "Where did you go next?" A: "My classroom (Mrs. Oliver)[.]").

### 4. Ms. Oliver's Interview

107.    Next, the "District Investigation and Finding of Fact" includes questions posed to Ms. Oliver during the investigation, and once again, it is curious to see the facts from her answers that InterMountain's investigator omitted from his report. Ex. 16 at 14–15.

108.    For example, Ms. Oliver admitted that she has a history of bias against me and that this bias continues. After all, she admitted that she "was the person who was originally concerned about [the books in my office] last year." Ex. 16 at 14. She continued by saying that she had "reported to Mr. Wagner" about my display of the books "last year," and that as a result, "they were removed." *Id.* at 15.

109.    Ms. Oliver also admitted that she had "[b]een following the stuff [*i.e.*, my case] in the news." Ex. 16 at 14. As a result, she would have heard about this Court's injunction issued on August 20, 2025. *See* Op. & Order, Doc. 39 at 33.

110.    Ms. Oliver also admitted that she had taken the very unusual step of monitoring my office décor on what appears to be a daily basis. For she told the investigator that she "saw them [*i.e.*, my books] again last Friday (August 22, 2025)" and that they "were in approximately the same place." Ex. 16 at 15. That was the first day I resumed displaying the books after this Court's injunction.

111.    Ms. Oliver also admitted that her animosity towards my beliefs about human sexuality (which Defendants dub a "binary view of gender") led her to submit her first complaint against me, as well as her third. For she explained that she

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

does not think displaying these books is "appropriate" because of the views they express and that this "is why I reported it in the first place." Ex. 16 at 14–15.

112.    Plus, Ms. Oliver also admitted to coordinating with other witnesses involved in this complaint, including Ms. Fritz. Ex. 16 at 15 ("[T]hey talked to Anne-Marie Fritz who then talked to me. I knew she reported it to Mr. Wagner.").

113.    In addition, Ms. Oliver's answers include statements that are simply false. For example, she claims that she "was taking a video to show that the books were being displayed" and that she "happened on to the kids in the room." Ex. 16 at 14. If she just wanted to show that the books were being displayed, she would have taken pictures, as she did to support her first complaint against me. *See* Ex. 1 at 3–6. Plus, the footage shows that she walked straight to my office, showing that this was not a happenstance encounter. Indeed, from the footage, it is not even clear what the eighth-grade ambassadors were reading. Ex. 17. It also shows that the eighth-grade ambassadors were not surprised to see her in the hallway recording them, confirming my suspicion that she sent them to my office for the purpose of setting up her third complaint against me. *Id.*

### 5.  My Responses

114.    On October 20, 2025, I submitted responses to InterMountain's "District Investigation and Finding of Fact." A true, accurate, and complete copy of my responses is attached to this Declaration as Exhibit 18.

115.    After reviewing InterMountain's "District Investigation and Findings of Fact," it is clear to me that Ms. Oliver directed the eighth-grade ambassadors to come to my office, to access the books displayed there, and to then share their experiences with her and Ms. Fritz so that they could file complaints against me. And in this way, Defendants could use the ambassadors' actions to try to evade this Court's injunction and still discipline, or even terminate, me.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

### 6. InterMountain's Pre-termination Meeting Notice

116.    On October 31, 2025, Defendant VanNice handed me a pre-termination meeting notice, informing me that InterMountain was placing me on paid administrative leave while it considered terminating my employment. She then demanded that I surrender my laptop and name badge and immediately escorted me from the building. A true, accurate, and complete copy of Defendant VanNice's pretermination meeting notice is attached to this Declaration as Exhibit 19.

117.    Defendant VanNice's pretermination meeting notice relied heavily on the letter of reprimand that resulted from Ms. Oliver's second complaint against me, the one with the still-pending appeal. Ex. 19 at 2. *See supra* ¶¶ 31–42, 60–66.

### 7. InterMountain's Pre-termination Meeting

118.    On November 4, 2025, Defendants held the pre-termination meeting by video. The following individuals attended the meeting along with me: my counsel, Tyson Langhofer and Rebekah Schultheiss; Defendant Mulvihill; Danielle Sackett, Executive Assistant to Defendant Mulvihill; and counsel for IMESD, Elliot Field and Kurt Peterson.

119.    During the meeting, Defendant Mulvihill asked for my verbal response to the pretermination letter (*i.e.*, Ex. 19). I informed Defendant Mulvihill that I was unable to adequately respond because the letter does not provide any information regarding the dates of the alleged incidents in the notice. I asked Defendant Mulvihill to provide additional information about the incidents listed in the notice so that I could adequately respond to the allegations.

120.    Defendant Mulvihill agreed to provide additional information. I agreed to provide a written response within 48 hours of receiving the additional information.

121.    Defendant Mulvihill indicated that he would issue his final decision after receiving my written response.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

122.    Defendant Mulvihill then ended the meeting.

123.    On November 5, 2025, Defendant Mulvihill emailed a letter with additional information on the incidents mentioned in the Pre-termination Letter (*i.e.*, Ex. 19). A true, accurate, and complete copy of Defendant Mulvihill's letter is attached to this Declaration as Exhibit 20.

124.    On November 7, 2025, I emailed Defendant Mulvihill my written response to the Pre-termination Letter (*i.e.*, Ex. 19) and follow-up letter (*i.e.*, Ex. 20). A true, accurate, and complete copy of my written response to Defendant Mulvihill's letters is attached to this Declaration as Exhibit 21.

125.    While Defendants have not yet made any official decision, from listening to the deliberations at the pre-termination meeting, it appears to me that they had already made up their mind before the meeting to terminate my employment.

126.    Unless this Court enforces its preliminary injunction, I am certain that Defendants will fire me for doing what this Court said I have a First Amendment right to do: to display my books while the children I serve are not present. *See* Op. & Order, Doc. 39 at 33.

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**

22

## Declaration Under Penalty of Perjury

I, RODERICK E. THEIS, II, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this __12__ day of November, 2025.

RODERICK E. THEIS, II

**Plaintiff's Declaration Supporting His Motion**

**Certificate of Service**

I hereby certify that on the 14th day of November, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

Kurt C. Peterson
WILLIAMS KASTNER
805 SW Broadway
Suite 2440
Portland, Oregon 97205
kpeterson@williamskastner.com

Janet Marie Schroer
HART WAGNER, LLP
1000 SW Broadway
Suite 2000
Portland, Oregon 97205
jms@hartwagner.com

*Counsel for Defendants*

Respectfully submitted this the 14th day of November, 2025.

*s/ Tyson C. Langhofer*
Tyson C. Langhofer*
VA Bar No. 95204
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707–4655
tlanghofer@ADFlegal.org

*Counsel for Plaintiff*

**Plaintiff's Corrected Declaration Supporting His Motion
to Enforce This Court's Preliminary Injunction**