**From:**     Aimee VanNice
**To:**       Rod Theis
**Subject:**  RE: Interview
**Date:**     Thursday, October 16, 2025 3:19:59 PM
**Attachments:** 250919 IN LGSD Investigation_Redacted.pdf

Rod,

Please see the attached document. Because the Redacted report was not available until today, IMESD is extending the deadline for your written response to Monday at 12:00 p.m.



**Aimee VanNice** | Director of Human Resources / Assistant Superintendent
Aimee.VanNice@imesd.k12.or.us
**InterMountain ESD** | www.imesd.k12.or.us
541.966.3206 **voice** | 541.966.4696 **fax**

**From:** Rod Theis <Rod.Theis@imesd.k12.or.us>
**Sent:** Wednesday, October 15, 2025 2:25 PM
**To:** Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>
**Subject:** RE: Interview

Hi Aimee,

I am following up on when I might receive the La Grande's investigation report.  I will need it with enough time to prepare my responses by your deadline.

Thank you,

Rod



**Rod Theis, LCSW** | Education Specialist
Rod.Theis@imesd.k12.or.us
**InterMountain ESD** | www.imesd.k12.or.us
541.276.3211 **voice** | 541.966.3240 **fax**

This message, including any attachments or links, may contain privileged, confidential and/or legally protected information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to this message and then delete all copies of the original communication including any attachments and/or links.

**From:** Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>
**Sent:** Monday, October 13, 2025 4:51 PM
**To:** Rod Theis <Rod.Theis@imesd.k12.or.us>
**Subject:** RE: Interview

Rod,

Please see the attached list of questions.  I have provided the questions in a word doc as

**Theis Decl. Ex. 16 at 001**

well as a PDF format.  Please provide your written response no later than Friday, October 17th at 8am.  I will provide a copy of LaGrande's report soon.

Thank you,
aimee



**Aimee VanNice** | Director of Human Resources / Assistant Superintendent
Aimee.VanNice@imesd.k12.or.us
**InterMountain ESD** | www.imesd.k12.or.us
541.966.3206 **voice** | 541.966.4696 **fax**

**From:** Rod Theis <Rod.Theis@imesd.k12.or.us>
**Sent:** Friday, October 10, 2025 3:14 PM
**To:** Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>
**Subject:** RE: Interview

Hi Aimee,

Given that this matter directly concerns the subject of ongoing litigation, I must decline to participate in an investigative interview. However, if IMESD has any questions related to the investigation, please provide them in writing so that I may respond. I also request that you provide a copy of La Grande's report.

Thank you,
Rod



**Rod Theis, LCSW** | Education Specialist
Rod.Theis@imesd.k12.or.us
**InterMountain ESD** | www.imesd.k12.or.us
541.276.3211 **voice** | 541.966.3240 **fax**

This message, including any attachments or links, may contain privileged, confidential and/or legally protected information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to this message and then delete all copies of the original communication including any attachments and/or links.

**From:** Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>
**Sent:** Thursday, October 9, 2025 1:02 PM
**To:** Rod Theis <Rod.Theis@imesd.k12.or.us>
**Subject:** Interview
**Importance:** High

Rod,
IMESD has received the District Investigation and Finding of Facts report, regarding the

**Theis Decl. Ex. 16 at 002**

staff complaint that LaGrande School District received on August 26, 2025.  Following this report, MESD will need to schedule an investigative interview with you.

Look at the following date/time offerings, and let me know when you have a 45-minute availability:

- Wednesday, October 15: Anytime between 8am-9am, 10:30am-11:30am, 1pm-4:30pm
- Thursday, October 16: Anytime between 12:30-4:30pm

Please provide your selected date and time no later than Friday, October 10th at 5pm.

Thank you,
aimee



**Aimee VanNice** | Director of Human Resources / Assistant Superintendent
Aimee.VanNice@imesd.k12.or.us
**InterMountain ESD** | www.imesd.k12.or.us
541.966.3206 **voice** | 541.966.4696 **fax**

**Theis Decl. Ex. 16 at 003**

**District Investigation and Finding of Fact**

**Investigation:** Rod Theis and La Grande School District

**Investigators:** Chris Wagner and Scott Carpenter

**Date:** September 2025

On August 25, 2025, it was reported to LMS Principal Chris Wagner that Rod Theis (IMESD Diagnostician) had, against previous administrative directives, posted books (i.e. *He is He* and *She is She*) in his office that had been determined as violating board policy ACB (Every Student Belongs office) and that on August 25, 2025 students had entered his office and accessed these books and engaged in "story time" with each other using these books on the LMS campus.

A staff complaint (policy GBM-AR) was filed with the district by district staff on August 26, 2025.

This report is a summary of findings of fact, outline of current policy and legal standards, and recommendation for actions regarding the formal complaint.

**Investigator Actions:**

1. Interviews with students
2. Interviews with staff
3. Email correspondence with Rod Theis (did not comply with request for interview)
4. Review of Court Opinion and Order (dated 8/20/25)
5. Review of La Grande School District Board Policy

**Historical Facts:**

1. In Spring 2025, staff brought to Principal Wagner's attention that Rod Theis had three books posted in his office on the LMS campus entitled *He is He and She is She*.
2. Staff were concerned as these books could constitute a bias incident as current policy indicates "All students are entitled to a high-quality educational experience, free from discrimination or harassment based on perceived race, color, religion, gender identity, sexual orientation, disability or national origin."
3. Principal Wagner met with Rod Theis and ask him to remove the books as they were not inclusive of all students and particularly students with gender identity protections.
4. A summary report of the situation was provided to IMESD, Theis's employer, by Principal Wagner and they worked through their internal HR processes to resolve the complaint.
5. Final resolution is still ongoing in the court system.

**Findings of Fact:**

1. All parties agree that on August 25, 2025 four students entered Mr. Theis's office.
2. While the door indicates "staff only" the students were not asked or directed to leave by Mr. Theis upon entry.

**Theis Decl. Ex. 16 at 004**

3. Students indicate that none of them knew Mr. Theis but were bored and were wandering during free time as Wildcat Ambassadors. They saw the books, entered his office, and started a conversation with Mr. Theis.
4. Student indicate they asked Mr. Theis if they could read one of the books posted in his office and were allowed to access the books. Mr. Theis statement indicates, "They [the students] expressed a desire to see my books. I attempted to change the subject and ask who the students were and why they were in my office, but before I knew it, they had grabbed one of my books and began reading it aloud."
5. The student that accessed the book, engaged the others in a "story time" format with him reading the pages, showing the pictures, etc. to the other students seated on the ground or chairs in the office. Mr. Theis did not stop the story time at any point.
6. All students report that Mr. Theis did engage students by telling them about the authors and why they wrote the books.
7. At this point, Mr. Carson was on his way back from the bathroom and popped his head in and asked "What's going on?" Students indicated they were reading a book and doing a story time. Mr. Carson's impression was that students thought it was funny how they were reading the books like they were back in elementary school. He did not see Mr. Theis engage with students but that he quietly watched them reading the book aloud. Mr. Carson then went on down the hall to his classroom.
8. Mrs. Oliver then passed by Mr. Theis's office and saw the same four students accessing the books in a story time format. Due to her previous reports and concerns she decided to use her call phone camera to video what was occurring.
9. Mrs. Oliver then asked kids what they were supposed to be doing as Wildcat Ambassadors and asked them to get back to work. They left the office and she explained what Wildcat Ambassadors were to Mr. Theis. Mr. Theis's statement corroborates this narrative as he stated, "At this point, Rachael Oliver walked by my office and collected the students."
10. Mrs. Oliver indicated in her interview that the students went to Mrs. Fritz room and that later that same day that, "AnneMarie [Fritz] told me that the 4 students present in Mr. Theis office reported to her they were uncomfortable and asked who he was. They explained that he (Mr. Theis) said the author of the books was cool because the author was a product of rape and wrote these books to help others." Email from Mrs. Fritz confirms this statement regarding student's feel uncomfortable regarding the books and their exchange with Mr. Theis
11. Mrs. Oliver then went to Mr. Wagner to report the exchange, student concerns, and share video footage she had collected.
12. On August 26, 2025, Mrs. Oliver filed a formal complaint (ACB-AR) regarding the situation.
13. From August 26 – September 18, 2025 an investigation was conducted by La Grande SD.

**Policy or Legal Standards**

1. Board Policy ACB-AR
   a. All students are entitled to a high-quality educational experience, free from discrimination or harassment based on perceived race, color, religion, gender identity, sexual orientation, disability or national origin.
   b. Bias incident" means a person's hostile expression of animus toward another person, relating to the other person's perceived race, color, religion, gender identity, sexual orientation, disability or national origin, of which criminal investigation or prosecution is impossible or inappropriate. Bias incidents

**Theis Decl. Ex. 16 at 005**

    c. In responding to the use of any symbols of hate or bias incidents, the district will use non-disciplinary remedial action whenever appropriate.

2. Oregon Ethical Educator Standards
    a. Competent Educator Standards
        i. Ability to provide a climate for students that is conducive to learning and respects the rights of all persons without discrimination;
    b. Ethical Educator Standards
        i. A willingness to consider the needs of the students, the district and profession.
    c. Culturally Competent Educator Standards
        i. Capacity to promote equity of student access and outcomes;
        ii. Advocacy for social justice;
        iii. Awareness of laws and policies affecting learners;
        iv. Creates a respectful and collaborative environment;
        v. Ability to navigate conflicts around race, ethnicity, religion, class, and language in a safe and productive manner;
        vi. Ability to work collaboratively with students, staff, and parents from diverse racial, ethnic, religion, class and language background;
        vii. Demonstrates respectful and welcoming verbal and non-verbal interaction skills.

3. Court Opinion and Order (8/20/25)
    a. Pg. 32 Summarizes Court's Opinion and Order Stating:
        i. "Plaintiff seeks to be able to prominently display the books in his office at all times. But as explained, only his display when no students are present is protected under the First Amendment. **Therefore, the Court GRANTS Plaintiff's request to resume displaying the books in his IMESD offices, but he may only do so when no students are present.** Moreover, Defendants may not take disciplinary action against Plaintiff—related to displays of the books—that is inconsistent with the relief granted by this Court."

**Investigator Findings**

It is substantiated that:
1. Mr. Theis did allow students into his office.
2. Mr. Theis did not remove displayed books when students entered.
3. Mr. Theis did allow students to access books that he had been directed by the court to remove upon student entry and had violated the court order.
4. Mr. Theis asserts in his written statement that, "The U.S. District Court of Oregon recently entered an injunction which **allowed me to resume displaying the books in my office when students that I serve are not present in that space** and which prohibited IMESD from taking disciplinary action against me related to displays of the books under those circumstances." However, his statement is not in alignment to the actual court order that indicates that he may display books when "**when no students are present.**"
5. August 25, 2025 was a school day and students were present throughout the building on the day and time in question. Mr. Theis's door was open and student both easily accessed his office and the books that he had been directed to put away when court when students are present. Mr. Theis's statement that school had not

**Theis Decl. Ex. 16 at 006**

books needed to be removed from being displayed or accessed – which he did not do.
6. Both observations of Mr. Carson and Mrs. Oliver indicate student access and support narrative above. Neither indicate Mr. Theis made any attempt to stop students from accessing books or the story time they had engaged in.
7. Camera footage supports above narrative and indicates total length of exchange was about 15 minutes.
8. Mrs. Oliver and Mrs. Fritz (see email from AnneMarie Fritz) both indicate that students expressed concerns in their presence over exchange with Mr. Theis, but students were ambiguous about concerns days later with investigators.

**Conclusions:**

1. Based on evidence, Mr. Theis violated school board policy ACB-AR (Every Student Belongs) and administrative directives aligned to this policy to not display books that do not protect all students right to a high-quality educational experience, free from discrimination or harassment based on perceived race, color, religion, gender identity, sexual orientation, disability or national origin."
2. Based on evidence, Mr. Theis likely violated court order's indicating he may only display them when "no students are present."
3. Based on current evidence and statements, La Grande SD would find Mr. Theis in violation of board policy, TSPC Ethical Educator Standards, and current court orders but will refer this issue to IMESD for resolution as they are his current employer.

**Formal Request:**

Based on findings above, La Grande SD is formally requesting IMESD to maintain and make permanent Mr. Theis's removal from La Grande SD and to not serve La Grande SD students as his actions in this a previous interactions have shown an consistent unwillingness to comply with board policy, educator standards, court orders, and administrative directives dating back to the COVID-19 Pandemic (May 2022) that put of students and district at risk and does not create the inclusive and welcoming environment we desire for all that are served within our district.

Investigator Signature: _____ Date: 9/18/25

# La Grande School District 1

Code:              GBM-AR
Revised/Reviewed:  4/12/16; 10/10/18
Orig. Code:        GBM-AR

## Staff Complaint Form

To: George Mendoza & Chris Wagner

Name of School: La Grande Middle School

Person Making Complaint: Rachael Oliver

Telephone Number: 541-910-7180          Date: 8/26/2025

Nature of complaint (personnel policy or administrative regulation that is violated):

ACB- Every student Belongs
Rod Theis (IMESD Diagnostician) Allowed 8th grade students
to read the book "She is She" in his office in front
of him. 4 students were involved. Video of incident
was recorded at 11:56am on 8/25/25.

Who should we talk to and what evidence should we consider?

(Students involved)
AnneMarie Fritz → Students reported incident to her
Shannon Remily → witnessed presence of books and
Suggested solution/resolution/outcome:        raised concerns.

Students should not have access to these
books at school and without parent concent.

Note: All complaints will follow the chain of command. Administration/Supervisor shall respond in
writing at each level within 7 working days.

Office Use: Disposition of Complaint:

_____                    8/26/2025
Signature: Oliver                                     Date:

cc: District Office

Staff Complaint Form – GBM-AR
1-1

Theis Decl. Ex. 16 at 008

**Theis Decl. Ex. 16 at 009**

Interviews August 28, 2025

Questions for Students:

▮▮▮▮▮▮▮▮

1. On Monday, August 25, what led you to entering Mr. Theis's room?
   Walking around and walked into his room, me ▮▮▮▮▮▮▮▮▮▮ Walked in and said hi. Say this book that said he is he she is she and talked a little about sports. ▮▮▮▮ grabbed she is she book and he read it and he (Mr. Theis) told us a little about the author, talked a little about it and sports and then left.
2. Did Mr. Theis invite you or ask you to come into his room.
   No
3. How long did you stay?
   10 or 15 minutes probably, not too long.
4. Describe what took place in Mr. Theis's room during that time?
   Read the book and just said what he did for work (Mr. Theis) He told us about the author's back story.
5. Who was in the room with you? Why?
   ▮▮▮▮▮▮▮▮▮▮▮▮ We asked to go out since everything was done, talked outside Mrs. Oliver's room. Just talked and walked around the school.
6. How did you get access to the book?
   It was on the shelf, we walked in, talked to him. I joked is this your man cave, asked him what he did. ▮▮▮▮ pointed out the He is He book and asked if he could grab it.
7. Who read the book?
   ▮▮▮▮ read the He is He book and I read the She is She book.
8. Were any comments made during the reading by anyone in the group or Mr. Theis?
   We talked about on one of the shirts it said something about adoption.com. I think maybe his wife was adopted and then read the book together.
9. What were Mr. Theis's actions and/or comments in relation to books.
   Nothing too crazy, he just told us about the author and why they make the stories. Mr. Theis said he and his wife were adopted, they decided to make the books because they were adopted.
10. How did you feel about the book and interaction?
    Nothing too crazy. It just said He is He not a she.
11. Staff reported you or others felt uncomfortable about the situation. Please explain.
    I don't remember anyone feeling uncomfortable for the entire thing. They sat there for the entire thing. I wasn't uncomfortable.
12. Why were you in Mr. Theis's room?
13. What were you trying to accomplish?
    No reason, just seen him in 7th grade and just wanted to say hi.
14. What led you to leave?
    Was a small room for 6 people, really had nothing else to say. We left and came back, but it may have been all in the same time.
15. Where did you go next?

**Theis Decl. Ex. 16 at 010**

We had roamed around, I had a little green pickle ball and I tossed that in the air. Then it was around lunch time.

16. Is there anything else you would like to share?

Not that I can think of.

███████████████

17. On Monday, August 25, what led you to entering Mr. Theis's room?

Mrs. Stebbins said we could take a little break so we decided to go in and say hi. I always wondered what his room was for. I didn't know him.

18. Did Mr. Theis invite you or ask you to come into his room.

No

19. How long did you stay?

10 or 15 minutes maybe.

20. Describe what took place in Mr. Theis's room during that time?

There was this book and we pretended to have a little story time. We sat on a seat and the other 3 kids sat on the floor and we read the book to them. I read the book to them. The books looked silly and weird.

21. Who was in the room with you? Why?

████████████████████████████

22. How did you get access to the book?

They were sitting behind them and asked if we could read them.

23. Who read the book?

I read the book and ██████ read the book. He read the other book. The books were like He is him or something like that.

24. Were any comments made during the reading by anyone in the group or Mr. Theis?

He just said he really liked the books.

25. What were Mr. Theis's actions and/or comments in relation to books.

I think he just kept working, I dunno, I don't think he really said anything.

26. How did you feel about the book and interaction?

I dunno, it was interesting. Maybe not super school appropriate though. Well it was I think the whole book was kind of about anti switching genders and I didn't realize that when I picked it up.

27. Staff reported you or others felt uncomfortable about the situation. Please explain.

I didn't really feel uncomfortable. At first the book just kind of looked silly and then we started reading it, then it was kind of weird. I didn't understand why he would have a book like that in school.

28. Why were you in Mr. Theis's room?

We were just on a little break and I had never met him before.

29. What were you trying to accomplish?

Just meeting him.

30. What led you to leave?

We finished the book and Mrs. Irvin probably wanted us back.

31. Where did you go next?

**Theis Decl. Ex. 16 at 011**

We either went to the library, maybe to say hi to Mr. Comfort. We might have walked by and said hi again to Mr. Theis.

32. Is there anything else you would like to share?
No.

██████████

33. On Monday, August 25, what led you to entering Mr. Theis's room?
I was just following the group, they were just talking to him.
34. Did Mr. Theis invite you or ask you to come into his room.
No, they just walked in because they wanted to know who he was.  They saw a book and wanted to read the book.
35. How long did you stay?
Maybe like 10 minutes
36. Describe what took place in Mr. Theis's room during that time?
████████████ was reading the book to us, we read and left and came back because there was another book we wanted to read.
37. Who was in the room with you? Why?
████████████████ Mr. Theis
38. How did you get access to the book?
They were just like on his little shelf thing behind his desk. Somebody said what is that book can we read it.  It was apparently a little kids book.
39. Who read the book?
████ read one, we left, came back and ████ read the other.
40. Were any comments made during the reading by anyone in the group or Mr. Theis?
No, but he had told us about the author and why he read the book.  He (Mr. Theis) said one specific part I thought was odd. He was saying he wrote the book because his mom was a victim of rape and he got adopted out - the author. It was in the back of the book. We were talking about adoption because it said it in the book and that's why Mr. Theis brought it up.
41. What were Mr. Theis's actions and/or comments in relation to books.
What I said previously.
42. How did you feel about the book and interaction?
I didn't really think too much of it, it was just whatever.
43. Staff reported you or others felt uncomfortable about the situation. Please explain.
I dunno, the backstory maybe.  I didn't personally feel uncomfortable.
44. Why were you in Mr. Theis's room?
Wanted to say because we didn't know who he was.
45. What were you trying to accomplish?
We wanted to read the book.
46. What led you to leave?
We were in the counselors office to staple a poster that had fallen.
47. Where did you go next?
I went back to my class after.

**Theis Decl. Ex. 16 at 012**

48. Is there anything else you would like to share?
No.

████████████

49. On Monday, August 25, what led you to entering Mr. Theis's room?
I believe ██████ walked in and so we followed him in and saw some books and decided to read them and have story time.
50. Did Mr. Theis invite you or ask you to come into his room.
No we just invited ourselves in.
51. How long did you stay?
Probably like 7-10 minutes
52. Describe what took place in Mr. Theis's room during that time?
We were talking about random stuff and the books he is he and she is she, I took it off the shelf and ██████ took it and read it. We had story time then left.
53. Who was in the room with you? Why?
████████████████████████████. ████ first went in.
54. How did you get access to the book?
I think he (Mr. Thesis) said you can check it out. They were on the little white board in the back.
55. Who read the book?
██████ read the book and ██████ read the other book. We left to check on classes, me and ██████ It was hot and so I asked her to leave, and then kinda walked around again and went back and read the other book. Just walked into the room and got the other book. Mr. Theis was in there both times.
56. Were any comments made during the reading by anyone in the group or Mr. Theis?
We were goofing around, we were commenting on the drawers. I don't remember Mr. Theis saying anything.
57. What were Mr. Theis's actions and/or comments in relation to books.
He did say that the author was adopted and the story behind the book and why the author and his wife made these books. Explained they were about identity. The author was adopted and wanted to let the world know that he is he and she is she.
58. How did you feel about the book and interaction?
It was kind of goofy. We relatively paid attention to the book.
59. Staff reported you or others felt uncomfortable about the situation. Please explain.
It might have been the closeness because we were shoved in that room. I wasn't uncomfortable in that room, I was by ██████
60. Why were you in Mr. Theis's room?
Just walked in and followed people.
61. What were you trying to accomplish?
Nothing.
62. What led you to leave?
We finished the book and decided that we were gone too long and needed to head back to the classroom.
63. Where did you go next?

My classroom. (Mrs. Oliver)

64. Is there anything else you would like to share?
    I do think that someone, ███ tore off ███ name tag to see if it would suction. We stood in front of the fan and made funny faces.

Questions for Staff:

Rachel Oliver:

1. Explain how you became aware of books in Mr. Theis's office.
   I was the person who was originally concerned about them last year. Been following the stuff in the news, so when I saw them reappear, I found it interesting. I know they were there and saw they were there on Monday when kids were still around. I caught him with those 8th graders by accident. I happened to walk by when the kids were in there looking at the books.
   The books I observed were He is He and She is She.

2. Explain what you observed and/or heard about access to the books on Monday, August 25th.
   I saw ███ kind of doing a read aloud situation with 3 other ambassadors. Rod was behind his desk and the 3 other kids were sitting. I said "where are you kids supposed to be?" The kids left and Rod asked what Ambassadors were. I had this conversation with Rod after I videoed.
   AnneMarie told me that the 4 students present in Mr. Theis office reported to her they were uncomfortable and asked who he was. They explained that he (Mr. Theis) said the author of the books was cool because the author was a product of rape and wrote these books to help others.

3. What specific actions and/or statements of Mr. Theis did you observe or hear relative to the books?
   I didn't hear any. I just saw that kids were looking at the books and it was reported to AnneMarie later.

4. Did you take any action? Why or why not?
   I didn't do anything besides redirect the kids to go somewhere else, because I knew there was an open court case. Reported the incident.

5. Did you engage Mr. Theis or kids regarding the books? Explain.
   No, I just changed the subject. Budded my head, asked the kids where they need to be, and talked to Rod about Ambassadors.

6. We observed you engaging Mr. Theis and/or a small group of kids when kids accessed a book in Mr. Theis's room on August 25th. Please describe your presence and/or actions.
   I was taking a video to show that the books were displayed, but when I was recording I happened on to kids in the room. I didn't know the kids were in their with the books.

7. What are your thoughts and feelings about Mr. Theis's use of these books at LMS?
   I don't see how they are appropriate, they are directed towards elementary students for one, but I also as a parent, who was struggling with gender identity. If they saw those

books I would feel uncomfortable and feel bad for my kids. I wouldn't want them exposed and I feel it poses judgement in my opinion. Public school is for everyone. That is why I reported it in the first place.

8. Beyond Monday, August 25, what are your observations of Mr. Theis's use of books at LMS?

He had them on display in his office last year and reported to Mr. Wagner and they were removed. Then I saw them again last Friday (August 22, 2025)
They were in approximately the same place.

9. Did any kids come to you and share thoughts and or feelings about the exchange? Please share.

No, they talked to AnneMarie Fritz who then talked to me. I knew she reported it to Mr. Wagner.

10. Is there anything else you would like to tell us?

I don't think so. I appreciate being supported, I felt like I was doing the right thing.

Klel Carson

11. Explain how you became aware of books in Mr. Theis's office.

12. Explain what you observed and/or heard about access to the books on Monday, August 25th.

13. What specific actions and/or statements of Mr. Theis did you observe or hear relative to the books?

14. Did you take any action? Why or why not?

15. Did you engage Mr. Theis or kids regarding the books? Explain.

16. We observed you engaging Mr. Theis and/or a small group of kids when kids accessed a book in Mr. Theis's room on August 25th. Please describe your presence and/or actions.

17. What are your thoughts and feelings about Mr. Theis's use of these books at LMS?

18. Beyond Monday, August 25, what are your observations of Mr. Theis's use of books at LMS?

19. Did any kids come to you and share thoughts and or feelings about the exchange? Please share.

20. Is there anything else you would like to tell us?

I was on the way back from class from the bathroom, I stopped there and I was curious what was going on. I saw the books back when he and kids weren't in there. I thought to myself why have those books? When I went by his class there was a kid reading the book and I was like what's going on? He was reading it like he was a teacher and they were students. I said what are you doing? The student said they are for everyone being a smartalec. He kept saying they're for everyone.
I didn't see Rod ingage, he was just sitting there, he said nothing. Just was sitting there.

**Theis Decl. Ex. 16 at 015**

Questions for Rod Theis

1. What is your role at LMS?
2. What are the daily tasks are responsible for?
3. What is your daily exposure to students?
4. How regular is it for students to come visit? Describe these.
5. Are these visits a function of your job?
6. You have been previously directed to not have the books He is He and She is She displayed in this building. Is there a reason they are back this year?
7. Have you received any additional directive from IMESD or otherwise relative to these books?
8. We have received a complaint that these books were present and students accessed these books on Monday, August 25th. Please describe.
9. What led students into your room?
10. What is your relationship with them?
11. There is a video of students reading these books with you. Describe your and their actions and statements during the time they were with you.
12. At any time did you attempt to stop the reading based on previous direction from LGSD, IMESD, or others? Please explain.
13. Is there anyone else aware of the interaction that we should interview?
14. What is your understanding of Oregon law, ethical standards, and board policy relative to this interaction?
15. What is your intent in displaying the books?
16. In future situations, will this continue?
17. Are you willing to comply with directives that these books are out of sight and not accessible when students are present?

Theis Decl. Ex. 16 at 016

Theis Decl. Ex. 16 at 017

 La Grande SCHOOL DISTRICT

Scott Carpenter <scott.carpenter@lagrandesd.org>

## Meeting Request
15 messages

**Chris Wagner** <chris.wagner@lagrandesd.org>                                   Thu, Aug 28, 2025 at 2:26 PM
To: Rod Theis <Rod.Theis@imesd.k12.or.us>
Cc: Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>, Scott Carpenter <scott.carpenter@lagrandesd.org>

Rod,

I find it necessary to meet with you in order to discuss circumstances regarding a complaint filed with La Grande School District regarding student access to books in your office.  As part of this process, you are entitled to representation at this meeting.

I would like to meet with you on Tuesday, September 2nd in the afternoon.  Please let me know what time would work for you.  If Tuesday does not work, please let me know your earliest availability.

Respectfully,
Chris
--

Christopher J Wagner
**Principal**
La Grande Middle School
(541)663-3425
chris.wagner@lagrandesd.org

*Act Justly, Love Mercy, Walk Humbly*

**Rod Theis** <Rod.Theis@imesd.k12.or.us>                                   Fri, Aug 29, 2025 at 11:27 AM
To: Chris Wagner <chris.wagner@lagrandesd.org>
Cc: Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>, Scott Carpenter <scott.carpenter@lagrandesd.org>

Hi Chris,

I have received your meeting request regarding the referenced complaint.

I will need to consult with my legal counsel before confirming availability, and they are currently out for the holiday weekend, so at this time I cannot confirm availability on Tuesday afternoon.  I will plan to follow up with you regarding availability early next week.

Act justly, love mercy & walk humbly,

Rod

Theis Decl. Ex. 16 at 018

 **Rod Theis, LCSW | Education Specialist**

Rod.Theis@imesd.k12.or.us

**InterMountain ESD** | www.imesd.k12.or.us

541.276.3211 **voice** | 541.966.3240 **fax**

This message, including any attachments or links, may contain privileged, confidential and/or legally protected information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to this message and then delete all copies of the original communication including any attachments and/or links.

[Quoted text hidden]

---

**Chris Wagner** <chris.wagner@lagrandesd.org>                                  Tue, Sep 2, 2025 at 9:57 AM
To: Rod Theis <Rod.Theis@imesd.k12.or.us>
Cc: Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>, Scott Carpenter <scott.carpenter@lagrandesd.org>

Thank you for responding. Please let me know when you are available.
Chris
[Quoted text hidden]

---

**Rod Theis** <Rod.Theis@imesd.k12.or.us>                                  Wed, Sep 3, 2025 at 2:03 PM
To: Chris Wagner <chris.wagner@lagrandesd.org>
Cc: Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>, Scott Carpenter <scott.carpenter@lagrandesd.org>

Hi Chris,

I haven't forgotten about your request and am hopeful to have something more concrete to share with you by tomorrow afternoon.

[Quoted text hidden]

---

**Chris Wagner** <chris.wagner@lagrandesd.org>                                  Wed, Sep 3, 2025 at 2:40 PM
To: Rod Theis <Rod.Theis@imesd.k12.or.us>
Cc: Aimee VanNice <Aimee.VanNice@imesd.k12.or.us>, Scott Carpenter <scott.carpenter@lagrandesd.org>

Hi Rod,
Sounds good, thanks for letting me know.
Chris
[Quoted text hidden]

---

**Chris Wagner** <chris.wagner@lagrandesd.org>                                  Thu, Sep 4, 2025 at 11:27 AM
To: George Mendoza <george.mendoza@lagrandesd.org>, Scott Carpenter <scott.carpenter@lagrandesd.org>

Latest response. Let me know if you would like me to forward this to Wyatt.

---------- Forwarded message ---------
From: **Rod Theis** <Rod.Theis@imesd.k12.or.us>
Date: Thu, Sep 4, 2025 at 10:50AM
Subject: RE: Meeting Request
To: Chris Wagner <chris.wagner@lagrandesd.org>

**Theis Decl. Ex. 16 at 019**

Hi Chris,

As I'm sure you are aware, I am currently involved in litigation with IMESD regarding the display of certain books in my office. The U.S. District Court of Oregon recently entered an injunction which allowed me to resume displaying the books in my office when students that I serve are not present in that space and which prohibited IMESD from taking disciplinary action against me related to displays of the books under those circumstances.

Consistent with the Court's order, I once again began displaying the books in my LGMS office on Friday, August 22. On Monday, August 25, before school was scheduled to resume, a group of students (whom I did not know) entered my office unannounced. They expressed a desire to see my books. I attempted to change the subject and ask who the students were and why they were in my office, but before I knew it, they had grabbed one of my books and began reading it aloud. At this point, Rachael Oliver walked by my office and collected the students, whom she seemed to be familiar with.

Given Rachael's proximity to my office during these events and the fact that she has previously filed a complaint against me with IMESD, this incident appears to have been a targeted action against me for a matter which is, as I noted above, currently the subject of ongoing litigation.

Therefore, I request that LGSD's attorney contact mine to discuss the display of my books moving forward. Please provide his or her contact information. I would also appreciate a copy of the complaint.

Thank you,

[Quoted text hidden]
[Quoted text hidden]

---

**George Mendoza** <george.mendoza@lagrandesd.org>                              Thu, Sep 4, 2025 at 4:05 PM
To: Chris Wagner <chris.wagner@lagrandesd.org>, Wyatt Baum <wyatt@baumsmith.com>
Cc: Scott Carpenter <scott.carpenter@lagrandesd.org>

[Quoted text hidden]
--



**George Mendoza**
Superintendent

**541-663-3201**
**541-663-3215 Fax**

george.mendoza@lagrandesd.org

---

**George Mendoza** <george.mendoza@lagrandesd.org>                              Thu, Sep 4, 2025 at 4:06 PM
To: Debra Comfort <debra.comfort@lagrandesd.org>, Wyatt Baum <wyatt@baumsmith.com>, Scott Carpenter <scott.carpenter@lagrandesd.org>, Chris Wagner <chris.wagner@lagrandesd.org>

Deb,

Please find a time for Chris, Wyatt, Scott and I to visit.

---------- Forwarded message ---------
From: **Chris Wagner** <chris.wagner@lagrandesd.org>
Date: Thu, Aug 28, 2025 at 2:26 PM

**Theis Decl. Ex. 16 at 020**

Subject: Meeting Request
To: Rod Theis <Rod.Theis@imesd.k12.or.us>
[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

---

**George Mendoza** <george.mendoza@lagrandesd.org>                    Thu, Sep 4, 2025 at 4:16 PM
To: Chris Wagner <chris.wagner@lagrandesd.org>, Wyatt Baum <wyatt@baumsmith.com>
Cc: Scott Carpenter <scott.carpenter@lagrandesd.org>

Attorney-Client:

**Theis Decl. Ex. 16 at 021**

Wyatt S. Baum

Baum Smith LLC

PO Box 967

808 Adams Avenue

La Grande, Oregon 97850

Phone: 541 963 3104

Facsimile: 541 963 9254

www.baumsmith.com



CONFIDENTIAL COMMUNICATION: This message may contain information that is privileged and confidential. Do not read, copy or disseminate this communication if you are not the person or organization for whom it is intended. Please notify me of any mistake by email or phone.


TAX ADVICE: If this communication includes federal tax advice it cannot be used for the purpose of avoiding tax penalties unless you have expressly engaged us to provide written advice in a form that satisfies IRS standards for covered opinions or we have informed you that those standards do not apply to this communication.

Theis Decl. Ex. 16 at 022

[Quoted text hidden]

---

**Debra Comfort** <debra.comfort@lagrandesd.org>
To: George Mendoza <george.mendoza@lagrandesd.org>                          Fri, Sep 5, 2025 at 8:55 AM
Cc: Wyatt Baum <wyatt@baumsmith.com>, Scott Carpenter <scott.carpenter@lagrandesd.org>, Chris Wagner
<chris.wagner@lagrandesd.org>

Done! Calendar invite sent for Sept 17th at 10 am. Wyatt is out on vacation next week.
Deb
[Quoted text hidden]
--
Debra Comfort
Administrative Assistant to the Superintendent/Board Secretary
La Grande School District
541.663.3202



La Grande

---

**Chris Wagner** <chris.wagner@lagrandesd.org>
To: Debra Comfort <debra.comfort@lagrandesd.org>                          Fri, Sep 5, 2025 at 11:14 AM
Cc: George Mendoza <george.mendoza@lagrandesd.org>, Wyatt Baum <wyatt@baumsmith.com>, Scott Carpenter
<scott.carpenter@lagrandesd.org>

---

**Chris Wagner** <chris.wagner@lagrandesd.org>
To: Rod Theis <Rod.Theis@imesd.k12.or.us>                          Fri, Sep 19, 2025 at 10:29 AM
Bcc: scott.carpenter@lagrandesd.org

Hi Rod,
At this time, we have concluded our fact finding.  Your written statement was sufficient.  At this time, we are not planning
on having our legal counsel consult with yours.
Thanks,
Chris

On Wed, Sep 10, 2025 at 9:59 AM Rod Theis <Rod.Theis@imesd.k12.or.us> wrote:

Hi Chris,


Thank you for setting up the meeting between our legal counsels.  All additional relevant information and documentation
outlining my position can be discussed at that time.


Thank you,


Rod

---

 **Rod Theis, LCSW | Education Specialist**

**Theis Decl. Ex. 16 at 023**

Rod.Theis@imesd.k12.or.us

**InterMountain ESD** | www.imesd.k12.or.us

541.276.3211 **voice** | 541.966.3240 **fax**

This message, including any attachments or links, may contain privileged, confidential and/or legally protected information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to this message and then delete all copies of the original communication including any attachments and/or links.

**From:** Chris Wagner <chris.wagner@lagrandesd.org>
**Sent:** Monday, September 8, 2025 9:18 AM
**To:** Rod Theis <Rod.Theis@imesd.k12.or.us>
**Subject:** Re: Meeting Request

Rod,

Thank you for your email. Based on your response, we will take your position as outlined in your writing and we will look to set up a meeting with your legal counsel and ours. He will be available after September 17. You are welcome to provide any additional information or documentation you would like us to consider, and we will include it in the record.

On Thu, Sep 4, 2025 at 10:50 AM Rod Theis <Rod.Theis@imesd.k12.or.us> wrote:

Hi Chris,

As I'm sure you are aware, I am currently involved in litigation with IMESD regarding the display of certain books in my office. The U.S. District Court of Oregon recently entered an injunction which allowed me to resume displaying the books in my office when students that I serve are not present in that space and which prohibited IMESD from taking disciplinary action against me related to displays of the books under those circumstances.

Consistent with the Court's order, I once again began displaying the books in my LGMS office on Friday, August 22. On Monday, August 25, before school was scheduled to resume, a group of students (whom I did not know) entered my office unannounced. They expressed a desire to see my books. I attempted to change the subject and ask who the students were and why they were in my office, but before I knew it, they had grabbed one of my books and began reading it aloud. At this point, Rachael Oliver walked by my office and collected the students, whom she seemed to be familiar with.

Given Rachael's proximity to my office during these events and the fact that she has previously filed a complaint against me with IMESD, this incident appears to have been a targeted action against me for a matter which is, as I noted above, currently the subject of ongoing litigation.

**Theis Decl. Ex. 16 at 024**

Therefore, I request that LGSD's attorney contact mine to discuss the display of my books moving forward. Please provide his or her contact information. I would also appreciate a copy of the complaint.

Thank you,

Rod

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Chris Wagner** <chris.wagner@lagrandesd.org>                    Fri, Sep 19, 2025 at 10:31 AM
To: Scott Carpenter <scott.carpenter@lagrandesd.org>

---------- Forwarded message ---------
From: **Chris Wagner** <chris.wagner@lagrandesd.org>
Date: Fri, Sep 19, 2025 at 10:29AM
Subject: Re: Meeting Request
To: Rod Theis <Rod.Theis@imesd.k12.or.us>

[Quoted text hidden]
[Quoted text hidden]

---

**Chris Wagner** <chris.wagner@lagrandesd.org>                    Fri, Sep 19, 2025 at 11:52 AM
To: George Mendoza <george.mendoza@lagrandesd.org>, Scott Carpenter <scott.carpenter@lagrandesd.org>, Wyatt Baum <wyatt@baumsmith.com>

Would you like me to do this?

---------- Forwarded message ---------
From: **Rod Theis** <Rod.Theis@imesd.k12.or.us>
Date: Fri, Sep 19, 2025 at 11:49AM
Subject: RE: Meeting Request
To: Chris Wagner <chris.wagner@lagrandesd.org>

Hi Chris,

Please provide me the name and contact information for LGSD's attorney.

[Quoted text hidden]
[Quoted text hidden]

**Theis Decl. Ex. 16 at 025**

 La Grande
SCHOOL DISTRICT

Scott Carpenter <scott.carpenter@lagrandesd.org>

## Fwd: Concern for 8/25/25
1 message

Chris Wagner <chris.wagner@lagrandesd.org>
To: Scott Carpenter <scott.carpenter@lagrandesd.org>

Fri, Sep 19, 2025 at 9:18 AM

See below

---------- Forwarded message ---------
From: **AnneMarie Fritz** <annemarie.fritz@lagrandesd.org>
Date: Mon, Aug 25, 2025 at 1:20 PM
Subject: Concern for 8/25/25
To: Chris Wagner <chris.wagner@lagrandesd.org>

Today at around 12:30, four 8th Grade Ambassadors came to see me with a concern they had.
They had what they called "Story Time", and it left 3 of them uncomfortable. 1 very quiet.
They said Mr. Thea shared a childrens book with them and together they read it. The kids said it was about he being a he and she being a she.
Then they said Mr. thea told them the author had been raped or something and wrote the book as a way to heal.
I had trouble following them- but they were obviously upset and uncomfortable about the interaction. So I apologized to them and told them I was sorry something like this happened on their first day back to school.
I have students names if you need them.

--

~Anne Marie Fritz
La Grande Middle School
Social Studies Teacher

Whatever you are- be a good one! -Abe Lincoln

--

Christopher J Wagner
Principal
La Grande Middle School
(541)663-3425
chris.wagner@lagrandesd.org

*Act Justly, Love Mercy, Walk Humbly*

Theis Decl. Ex. 16 at 026



**La Grande**
SCHOOL DISTRICT

**BOARD OF EDUCATION**
Joe Justice, Chairman
Robin Maille, Vice Chairman
Merle Comfort
Michelle Perry
Randy Shaw
Danelle Wilson
Chris Woodworth
**SUPERINTENDENT**
George Mendoza

TO:         Rod Theis
FROM:    Scott Carpenter and Erika Pinkerton

DATE:      May 24, 2022

Mr. Theis,

The district has completed its reviewed of your formal complaint regarding interactions you had with Mrs. Rinker on January 6, 2022, February 4, 2022, and May 4, 2022. In your complaint, you indicated her actions on these dates constitute violations of district policy GBNA (Hazing, Harassment, Intimidation, Bullying, Menacing or Cyberbullying – Staff) and policy GBCB (Staff Conduct). District fact finding on these allegations include interviews with appropriate witnesses and a review of related email communication. Based on our review of all the evidence collected during this process the district finds the following:

- Violation of policy GBNA (Hazing, Harassment, Intimidation, Bullying, Menacing or Cyberbullying – Staff) - Unsubstantiated

- Violation of policy GCBC (Staff Conduct) – Substantiated

The district is committed to maintaining a positive and safe environment for all district staff and educational partners, and will be moving forward with this employee to address the violation through established staff discipline procedures. As discussed previously, the district process does not include apologies, but seeks to adjust employee behavior (if needed) and move forward with a clear understanding of district policy expectations.

To best support both you and Mrs. Rinker moving forward in doing your work at Greenwood, the district has developed the following plan for the remainder of the school year:

- Refrain from interactions with the other employee.
- Concerns with professional conduct will be directly reported to building administration and not addressed to the employee.
- No email communication between (Mrs. Rinker and yourself) for the remainder of the year. Necessary requests or correspondence will go through the building administration.
- An alternate diagnostician or staff member will be used when completing observations/evaluations in Mrs. Rinker's classroom.
- Both parties will attend all required/necessary meetings that have multiple participants/witnesses if there is potential wrongdoing.
- Both parties are free to participate in all staff and building events.

This plan will terminate at the end of the 2021/22 school year or on the mutual consent of both parties. We hope this creates clarity moving forward, and protects the working environment for all parties for the remainder of the school year.

Sincerely,

Scott Carpenter
LGSD Assistant Superintendent
Scott.carpenter@lagrandesd.org
541-663-3203

Erika Pinkerton
LGSD Director of Student Services
Erika.pinkerton@lagrandesd.org
541-663-3221

**OPPORTUNITY & EXCELLENCE**
Union County School District Number One
1305 North Willow Street
La Grande, OR 97850-1392
(541) 663-3202  Fax (541) 663-3215

**Theis Decl. Ex. 16 at 027**

**Theis Decl. Ex. 16 at 028**

# La Grande School District 1

Code:               ACB
Adopted:            12/09/20
Revised/Readopted:  1/12/22
Orig. Code:         ACB

## Every Student Belongs

The La Grande School District is committed to "preparing all La Grande students for their brightest future!" This commitment means student success will not be predicted nor predetermined by race, ethnicity, family economics, mobility, language, gender, gender identity, sexual orientation, disability, or initial proficiencies.

All students are entitled to a high quality educational experience, free from discrimination or harassment based on perceived race, color, religion, gender identity, sexual orientation, disability or national origin.

All employees are entitled to work in an environment that is free from discrimination or harassment based on perceived race, color, religion, gender identity, sexual orientation, disability or national origin.

All visitors are entitled to participate in a school or educational environment that is free from discrimination or harassment based on perceived race, color, religion, gender identity, sexual orientation, disability or national origin.

"Bias incident" means a person's hostile expression of animus toward another person, relating to the other person's perceived race, color, religion, gender identity, sexual orientation, disability or national origin, of which criminal investigation or prosecution is impossible or inappropriate. Bias incidents may include derogatory language or behavior.

"Symbol of hate" means nooses[1], symbols of neo-Nazi ideology or the battle flag of the Confederacy.

The district prohibits the use or display of any symbols of hate on school property[2] or in an education program[3] except where used in teaching curriculum that is aligned with state standards of education for public schools.

In responding to the use of any symbols of hate or bias incidents, the district will use non-disciplinary remedial action whenever appropriate.

---

[1] The display of a noose on public property with the intent to intimidate may be a Class A Misdemeanor under Senate Bill 398 (2021).

[2] "School property" means any property under the control of the district.

[3] "Education program" includes any program, service, school or activity sponsored by the district.

Every Student Belongs – ACB
1-2

**Theis Decl. Ex. 16 at 029**

The district prohibits retaliation against an individual[4] because that individual has in good faith reported information that the individual believes is evidence of a violation of a state or federal law, rule or regulation.

Nothing in this policy is intended to interfere with the lawful use of district facilities pursuant to a lease or license.

The district will use administrative regulation ACB-AR - Bias Incident Complaint Procedure to process reports or complaints of bias incidents.

END OF POLICY

---

**Legal Reference(s):**

ORS 659.850
ORS 659.852

OAR 581-002-0005
OAR 581-022-2312

OAR 581-022-2370

House Bill 2697 (2021)
House Bill 3041 (2021)
*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).
*Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764 (9th Cir. 2014).
*State v. Robertson*, 293 Or. 402 (1982).

**Cross Reference(s):**

AC - Nondiscrimination
GBEA - Workplace Harassment
GBNA - Hazing, Harassment, Intimidation, Bullying, Menacing or Cyberbullying – Staff
GBN/JBA - Sexual Harassment
JBA/GBN - Sexual Harassment
JFCF - Harassment, Intimidation, Bullying, Cyberbullying, Teen Dating Violence, or Domestic Violence – Student

---

[4] ORS 659.852 prohibits retaliation only against students. Other statutes (and other complaint procedures) prohibit retaliation against staff and others for reporting or providing information regarding a complaint or investigation.

Every Student Belongs – ACB
2-2

**Theis Decl. Ex. 16 at 030**

# The Ethical Educator & Professional Practices

**Responsibilities of TSPC:**
In 1973, the Teacher Standards and Practices Commission became an autonomous body. It was created amid demands across the nation that educators police their own ranks. As a result, one of the statutory responsibilities of TSPC is to maintain professional Standards of Competent and Ethical Performance of Oregon Educators. These Standards can be found in Oregon Administrative Rules, Chapter 584, Division 020. Approximately 200 discipline cases are investigated by the Commission each year.

**What is a Competent and Ethical Educator?**

The competent educator demonstrates:

- Knowledge and use of curriculum and instruction to meet the needs of all students;
- Ability to provide a climate for students that is conducive to learning and respects the rights of all persons without discrimination;
- An understanding of students and ability to establish and maintain good rapport and assist the growth of students;
- Ability to work effectively with students, staff, parents and community.

The ethical educator demonstrates:

- A willingness to accept the requirements of membership in the education profession;
- A willingness to consider the needs of the students, the district and profession.

**What is a Culturally Competent Educator?**

The competent educator demonstrates:

- Capacity to promote equity of student access and outcomes;
- Advocacy for social justice;
- Awareness of laws and policies affecting learners;
- Creates a respectful and collaborative environment;
- Ability to navigate conflicts around race, ethnicity, religion, class, and language in a safe and productive manner;
- Ability to work collaboratively with students, staff, and parents from diverse racial, ethnic, religion, class and language background;
- Demonstrates respectful and welcoming verbal and non-verbal interaction skills.

Theis Decl. Ex. 16 at 031

Case 2:25-cv-00865-HL    Document 48-16    Filed 11/14/25    Page 32 of 70

**What is the Responsibility of the Superintendent?**
OAR 584-020-0041(2)

The district's chief administrator must report to TSPC within 30 days when, after appropriate investigation, the chief administrator **reasonably** believes that an educator has violated standards by committing acts of gross neglect of duty or gross unfitness.

**What is Gross Neglect of Duty?**
OAR 584-020-0040(4)

*Gross neglect of duty is any serious and material inattention to or breach of professional responsibilities. Some examples of Gross Neglect of Duty are: unreasonable physical force against students or fellow employees; sexual conduct with a student; appearing on duty or at any district-sponsored activity while under the influence of alcohol or any controlled substance; knowing falsification of any document or knowing misrepresentation directly related to licensure, employment or professional duties; knowing and unauthorized use of school computer equipment to receive, store, produce or send sexually explicit materials; knowing and willful failure of a chief administrator to report a violation of Commission standards; etc. See OAR 584-020-0040(4) for additional examples of Gross Neglect of Duty.*

**What is Gross Unfitness?**
OAR 584-020-0040(5)

*Gross unfitness is any conduct which renders an educator unqualified to perform his or her professional responsibilities. Conduct constituting gross unfitness may include conduct occurring outside of school hours and off school premises when such conduct bears a demonstrable relationship to the educator's ability to fulfill professional responsibilities effectively. Some examples of Gross Unfitness are: fraud or misrepresentation; conviction of violating any federal, state, or local law; violation of a term of probation imposed by a court; admission of or engaging in acts constituting criminal conduct, even in the absence of a conviction; etc. See OAR 584-020-0040(5) for additional examples of Gross Unfitness.*

**What Happens When TSPC Receives a Complaint?**
ORS 342.176

- TSPC conducts an investigation to determine whether or not the allegation(s) is factual.
- The educator is notified of the complaint and encouraged to respond to the allegation(s).
- The Commission considers the Preliminary Investigation report and determines whether or not there is sufficient cause or evidence to charge the educator with a violation of TSPC Standards.
- The Commission may dismiss the complaint for lack of sufficient cause; **or**
- Enter into a settlement agreement with the educator (Order of discipline); **or**
- TSPC may inform the educator of charges and of an opportunity for hearing.

**Theis Decl. Ex. 16 at 032**

**What Happens When the Educator Requests a Hearing?**
ORS 342.177(1)

The Commission is represented by legal counsel from the Attorney General's Office. The educator may be represented by an attorney. Hearings are conducted by an Administrative Law Judge. Based on evidence presented at the hearing, the Administrative Law Judge makes a recommendation to the Commission regarding whether the educator has engaged in unprofessional conduct. The Administrative Law Judge submits a Proposed Order to the full Commission. The Proposed Order is advisory to the Commission which is voted on in public session.

**What Sanctions May the Commission Impose?**
ORS 342.175(2) and ORS 342.177(3)

By law, the Commission must permanently revoke or deny a license to educators who are convicted of crimes listed in ORS 342.143 (sex-related crimes including prostitution). In other cases, the Commission may revoke, suspend, issue a public reprimand, or place an educator on probation depending on the facts and circumstances of the case.

**What are the Factors for Imposing Disciplinary Sanctions?**
OAR 584-020-0045

- If the misconduct or violation is an isolated occurrence, part of a continuing pattern, or one of a series of incidents.
- The likelihood of a recurrence of the misconduct or violation.
- The educator's past performance.
- The extent, severity, and imminence of any danger to students, other educators or the public.
- If the misconduct was open and notorious or had negative effects on the public image of the school.
- The educator's state of mind at the time of the misconduct and afterwards.
- The danger that students will imitate the educator's behavior or use it as a model.
- The age and level of maturity of the students served by the educator.
- Any extenuating circumstances or other factors bearing on the appropriate nature of a disciplinary sanction.

**What Happens When an Order is Adopted by TSPC?**
ORS 342.203

The educator, the educator's school district and the complainant are notified. The Commission maintains records of all disciplined educators. Annually, the list of sanctioned educators is posted on the TSPC Website. When an Order is adopted, it is reported to the National

**Theis Decl. Ex. 16 at 033**

Association of State Directors of Teacher Education and Certification (NASDTEC) which maintains a national list of disciplined educators.

## What Can Educators Do To Avoid Complaints Being Filed With TSPC?

*Think about your interaction with students.*

- Do you fail to maintain professional physical and emotional boundaries with students?
- Do you flirt with students?
- Do you discuss your personal life with your students?
- Do you telephone students or send emails of a personal nature?
- Do you close your classroom door if you are talking to a student alone?
- Do you transport students in your personal vehicle?
- Do you fail to inform your supervisor and refer to a counselor any student who may have a romantic attachment to you?
- Do you buy gifts for students?

*Think about your knowledge of state law, school policies and procedures.*

- Do you know the laws, district policies, school rules and your rights?
- Do you know the Oregon child abuse reporting law ORS 419B.010?
- Do you know the policies in your school regarding the proper handling of money and finances?
- Do you have clear behavioral management rules?
- Do you know about corporal punishment laws ORS 339.250 and district policies?
- Do you know about confidentiality requirements?
- Do you know your district's Acceptable Use Policy regarding technology, including computers, e-mail and internet access.

*Think about your reputation in the community.*

- Do you maintain a professional reputation in the community and school district?
- Do you communicate with parents and document that communication?
- Do you engage in behavior in the community that students may use as a positive model?

**"If I could take back those five minutes…"**

**From TSPC case files**

Theis Decl. Ex. 16 at 034

Use of school computer equipment to receive, store product or send sexually explicit materials OAR 584-020-0040(4)(q)

*Educator used classroom computer to access sexually explicit materials on the Internet. Educator downloaded sexually explicit materials, copied materials on school equipment and distributed to other staff.*

**Sanction: 90 days suspension, special conditions for reinstatement and 2 years probation upon reinstatement**

Knowing misrepresentation directly related to licensure OAR 584-020-0040(4)(c)

*On TSPC Application for renewal of licensure Educator failed to report a criminal conviction (Assault IV).*

**Sanction: Application denied/right to apply suspended for 128 days, reinstatement requires anger management evaluation, 2 years probation (requiring treatment/counseling if referred by evaluator)**

Any sexual conduct with a student
OAR 584-020-0040(4)(f) and OAR 584-020-0040(5)(c)

*Educator engaged in sexual behavior with a high school student in the Educator's home. Educator pled guilty to the crime of Official Misconduct and was convicted.*

**Sanction: Revocation**

Appearing on duty or at any district-sponsored activity while under the influence of alcohol OAR 584-020-0040(4)(g)

*Educator serving as athletic director attends sports events after consuming alcoholic beverages on two separate occasions. Educator required to enroll in an alcohol treatment program as a part of settlement agreement with TSPC.*

**Sanction: Public reprimand and 4 years probation (with special conditions requiring educator to continue alcohol treatment plan and submit progress reports every 6 months to Executive Director)**

**Theis Decl. Ex. 16 at 035**

<u>Conviction of violation of any federal, state, or local law</u>
OAR 584-020-0040(5)(c)

*Educator convicted of Driving Under the Influence of Intoxicants. Educator required by court order to complete alcohol treatment program.*

**Sanction: Public reprimand and 4 years probation (with special conditions requiring educator to abstain from consumption of alcohol, submit progress reports every 6 months to Executive Director and continue alcohol treatment plan)**

<u>Failed to refrain from exploiting professional relationships with any student for personal gain, or in support of persons or issues.</u>
OAR 584-020-0035(1)(b)

*Educator exploited her professional relationship with a student to promote her own religious issues. Educator repeatedly communicated with a student suffering from an illness that religious faith would be the source of healing for her condition.*

**Sanction: 6 months suspension, special conditions for reinstatement and four years probation upon reinstatement.**

**Theis Decl. Ex. 16 at 036**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| RODERICK E. THEIS, II, an individual, | No. 2:25-cv-00865-HL |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| INTERMOUNTAIN EDUCATION SERVICE BOARD OF DIRECTORS, MARK S. MULVIHILL, and AIMEE VANNICE | |
| Defendants. | |

Rebekah Schultheiss (Millard)
P.O. Box 7582
Springfield, OR 97475

David A. Cortman
Alliance Defending Freedom
1000 Hurricane Shoals Road, NE, Suite D-11000
Lawrenceville, GA 30043

Matthey Ray
Tyson Charles Langhofer
Alliance Defending Freedom
44180 Riverside Pkwy
Landsdowne, VA 20176

      Attorneys for Plaintiff

1 – OPINION & ORDER

**Theis Decl. Ex. 16 at 037**

Julian W. Marrs
Harrang Long P.C.
800 Willamette St., Suite 770
Eugene, OR 97201

Kurt Peterson
Harrang Long P.C.
111 SW Columbias St., Suite 950
Portland, OR 97201

Attorneys for Defendants

---

HALLMAN, United States Magistrate Judge:

Plaintiff Roderick Theis brings this action against Defendants Intermountain Education Service District ("IMESD") Board of Directors; Mark Mulvihill, Superintendent; and Aimee VanNice, Assistant Superintendent and Director of Human Resources. Plaintiff, an employee of IMESD, alleges that Defendants violated his constitutional rights when they prohibited him from, and disciplined him for, displaying certain books that promoted a binary gender view in his office, including when children were present. Compl., ECF 1. Now before the Court is Plaintiff's Motion for Preliminary Injunction, which seeks to (1) stop Defendants from enforcing its Speech Policy in a way that prevents him from displaying the books and (2) require Defendants to remove the Letter of Directive related to Plaintiff displaying the books. Mot. 2, ECF 12. The Court held oral argument on the Motion on July 18, 2025. ECF 31. For the reasons that follow, the Motion is GRANTED in part and DENIED in part: Defendants are enjoined from prohibiting Plaintiff from prominently displaying the books when no students are present.

## BACKGROUND

### I.    The parties.

IMESD is an education service district that provides services to school districts and schools in Morrow, Umatilla, Union, Wallowa, Grant, Baker, and Malhuer Counties. Compl. ¶

2 – OPINION & ORDER

**Theis Decl. Ex. 16 at 038**

33; Resp. 9, ECF 27. It provides services in four areas, including special education, technology, school improvement, and administrative services. Resp. 9. IMESD does not control the school districts or schools it serves, and it has no control over those schools' classrooms, curriculums, or library content. *Id.* IMESD has a Board of Directors ("the Board") that establishes "policies for IMESD consistent with the requirements of law and the statewide goals and standards established by the State Board of Education." Compl. ¶ 8. The Board also appoints a superintendent to manage IMESD and its employees in a manner consistent with state law and the Board's policies. *Id.* at ¶¶ 11–12. Defendant Mulvihill is IMESD's Superintendent. *Id.* at ¶ 13. Defendant VanNice is IMESD's Assistant Superintendent and Director of Human Resources and is also responsible for the enforcement of IMESD's policies. *Id.* at ¶¶ 22–23.

Plaintiff is a licensed clinical social worker employed by IMESD as an Education Specialist, and he has worked at IMESD since 2008. *Id.* at ¶ 47. In Plaintiff's role, he "travels to schools within IMESD's jurisdiction to meet with students and assess their educational support needs." *Id.* at ¶ 48. That includes meeting one-on-one with students to conduct standardized tests that evaluate their academic level or their social or emotional needs. *Id.* at ¶ 49. He writes reports based on those interactions and tests, and he recommends how the school can best meet the student's needs. *Id.* at ¶ 50.

## II.    The policies underlying this action.

IMESD adopted the Every Student Belongs Policy ("ESB Policy") and the Bias Incident Complaint Procedure Policy ("Bias Incident Policy") in December 2020, and it revised them in December 2021. *Id.* at ¶¶ 36–37; Resp. 9–10. Together, those policies "constitute Defendants' Speech Policy." Compl. ¶ 38. IMESD adopted the ESB Policy and the Bias Incident Policy to comply with Oregon law. Resp. 10. Defendants point to two statutes as the basis for its policies:

3 – OPINION & ORDER

first, Or. Rev. Stat. ("ORS") § 659.850(2), which mandates that "[a] person may not be subjected to discrimination" in a public school funded by the Legislature; and second, ORS § 339.347, which defines "bias incidents" and requires that education providers adopt policies to address bias incidents. *See id.* at 10 (citing and describing statutes).

The ESB Policy mirrors the statutory definition under ORS § 339.347(1)(a)(A), which provides that a "'[b]ias incident" means a person's hostile expression of animus toward another person, relating to the other person's perceived race, color, religion, gender identity, sexual orientation, disability or national origin, of which criminal investigation or prosecution is impossible or inappropriate." Compl. ¶ 40; Ex. E 1, ECF 1-5. The ESB Policy states that, when responding to bias incidents, IMESD "will use non-disciplinary remedial action whenever appropriate." Ex. E 1.

The Bias Incident Policy has a four-step process. Ex. F 1–2, ECF 1-6. First, after learning of a potential bias incident, a staff member reports it to the building or program administrator. *Id.* at 1. Second, the administrator or designee writes up the complaint, investigates it, provides notice to the parties involved, determines responsibility, and considers responses, including educational or redirection options. *Id.* Those options align with ORS § 339.347(3)(e)(D)(i)-(iii), which requires that educational and redirection procedures:

- Address the history and impact of bias and hate;
- Advance the safety and healing of those impacted by bias and hate;
- Promote accountability and transformation for people who cause harm; and
- Promote transformation of the conditions that perpetuated the harm.

Compl. ¶ 41; Ex. F 1. At the third stage, the complainant and respondent are given opportunities to appeal, and the superintendent or their designee reviews the administrator's decisions and

4 – OPINION & ORDER

Theis Decl. Ex. 16 at 040

actions. Ex. F at 1–2. Finally, after the superintendent's review, a dissatisfied party may further appeal to IMESD's Board. *Id.* at 2.

## III.     Plaintiff's offices and the books he displayed.

Plaintiff has an office in La Grande Middle School (LGMS) that he spends two to three days in per week, and he has an office in the Elgin School District. Compl. ¶¶ 66–67. Plaintiff also had an office in the Union School District during the 2022–23 and 2023–24 school years. *Id.* at ¶ 68. That arrangement is typical for IMESD employees in their assigned schools, and employees "commonly decorate their offices with paintings, personal photos . . . posters, inspirational quotes, books, and other items." *Id.* at ¶¶ 51–52. Plaintiff uses those offices "for writing reports, responding to emails, consulting with teachers regarding student needs, and testing and evaluating students." *Id.* at ¶ 69. His LGMS office has a sign on the door that reads "Staff Only," and students only enter his office while "under his direct supervision during evaluations or testing." *Id.* at ¶ 71.

"On October 2, 2024, Plaintiff began displaying two books on the windowsill behind his desk in his LGMS office: *He is He* and *She is She* by Ryan and Bethany Bomberger." *Id.* at ¶ 73. The covers were visible, displaying illustrations of a smiling boy and girl, respectively, along with the tagline "a book about your identity." *Id.* at ¶¶ 74–76. Those books were the only decorations that Plaintiff had in his LGMS office. *See id.* at ¶ 74. Plaintiff purchased the books himself and stated that he "displayed the covers of the [b]ooks as his expression." *Id.* at ¶¶ 77, 79. Plaintiff evaluated four students in that office while displaying the books. *Id.* at ¶ 72. No student or staff members asked about those books or commented on them, no student was "visibly upset or distracted by" them, and no one handled or read either of them. *Id.* at ¶¶ 80–82.

5 – OPINION & ORDER

**Theis Decl. Ex. 16 at 041**

Plaintiff also displayed a book—*Johnny the Walrus* by Matt Walsh—on the desk in his Elgin and Union School District offices. *Id.* at ¶ 83. A description for that book explains that:

> Johnny is a little boy with a big imagination. One day he pretends to be a big scary dinosaur, the next day he's a knight in shining armor or a playful puppy. But when the internet people find out Johnny likes to make-believe, he's forced to make a decision between the little boy he is and the things he pretends to be – and he's not allowed to change his mind.

*Id.* at ¶ 86. Plaintiff purchased that book using his personal funds and "displayed [it] as his expression in his Union office during the" 2022–23 and 2023–24 school years "and in his Elgin office during the" 2024–25 school year. *Id.* at ¶ 88. Only the front and back covers were visible to visitors in Plaintiff's Elgin office. *Id.* at ¶ 89. On one occasion—while Plaintiff was conducting an evaluation—a student asked about *Johnny the Walrus*. *Id.* at ¶ 129. Plaintiff summarized the book and shared parts of it with the student. *Id.*

## IV.    Complaint and subsequent investigation.

"On October 21, 2024, LGMS Principal Chris Wagner emailed Plaintiff" because he had received a complaint about the books—*He is He* and *She is She*—on display in Plaintiff's LGMS office. *Id.* at ¶¶ 91, 94. Principal Wagner instructed Plaintiff to place the books out of sight. *Id.* at ¶ 92. When they met on October 23, Principal Wagner explained that he had received a complaint from a La Grande School District ("LGSD") employee who was concerned that the messages conveyed by Plaintiff's books "could be considered offensive to transgender students." *Id.* at ¶¶ 93–95. That employee had seen the books in Plaintiff's office, researched them online, "and then determined they were offensive." *Id.* at ¶ 96.

Plaintiff and Principal Wagner reviewed the books together. *Id.* at ¶ 97. Although Principal Wagner said he did not find anything offensive or inappropriate about them, he "noted that each book contained several Bible verses," and was concerned that they "could be

6 – OPINION & ORDER

**Theis Decl. Ex. 16 at 042**

considered pushing a certain point of view on a student." *Id.* at ¶¶ 97–98. "[H]e again requested that Plaintiff remove the [b]ooks from his office to maintain the neutrality at school." *Id.* at ¶ 101.

On October 22, Defendant VanNice notified Plaintiff that a LGSD employee had filed a bias incident complaint against him with IMESD due to his display of *He is He* and *She is She*. *Id.* at ¶ 104. She informed him that IMESD would investigate the display of the books as "'a potential bias incident relating to another person's gender identity.'" *Id.* at ¶ 105.

On October 29, Plaintiff met with VanNice and others from IMESD. *Id.* at ¶ 107. VanNice again explained the reason for the meeting and then questioned Plaintiff about his reason for displaying them. *Id.* at ¶¶ 109–10. Plaintiff first explained that the books were "decoration to make his office more kid friendly" and that he wanted to send positive messages that "girls can do anything and that it's great to be a girl" and, similarly, that "boys can do great things" and "it's great to be a boy." *Id.* at ¶ 113. VanNice asked Plaintiff numerous questions about the books' content. *Id.* at ¶ 116. For example, she asked Plaintiff about "a page in *She is She* that contained several Bible verses." *Id.* at ¶¶ 118–20. And she asked Plaintiff about a page "contain[ing] several scientific facts about how boys and girls are different in important ways." *Id.* at ¶¶ 123–24. For example, the book explained that:

- As soon as we exist, something special inside each of us (called DNA) determines whether we will be girls or boys. That DNA never changes, no matter *how* we feel.

- Doctors know *long* before we're born whether we are females or males. They use a special machine to see inside a mother's womb. The image is called an *ultrasound*.

- There are *thousands* of physical differences between girls and boys. From our brains to our faces to our lungs and other body parts, we are wonderfully created equal but not the same.

7 – OPINION & ORDER

- From running to swimming to soccer and volleyball, it's important to have separate girls' & boys' sports teams to give us *all* a chance to *shine*. It's fun to compete when it's fair.

*Id.* at ¶ 124 (emphasis in original).

When VanNice asked Plaintiff how the book could be used to support a transgender student, Plaintiff told her that he did not use the books as part of his work with students. *Id.* at ¶¶ 126–27. He explained that they were displayed behind his desk so "that he could supervise access to them." *Id.* at ¶ 128. Plaintiff cited the student who asked him about *Johnny the Walrus* as an example. *Id.* at ¶ 129. When asked again whether *She is She* "support[s] transgender" or "support[s] a she wanting to be a he," Plaintiff responded that it does not. *See id.* at ¶¶ 140–43 (quoting Ex. K 4, ECF 1-11; Ex. L 3, ECF 1-12). VanNice asked Plaintiff whether he believed displaying the books constituted a hostile expression of animus, and Plaintiff stated that "he has no ill will towards anyone, that he wished no harm to anybody," and that he did not believe that the books contained "messages of ill will or hostility." *Id.* at ¶¶ 144–45. Plaintiff acknowledged that a student who had thoughts about being transgender might see the books. *Id.* at ¶¶ 146–47. And he indicated that he "might put the books aside" if he knew that a transgender student would be entering his office. Ex. K 6.

Throughout the meeting, Plaintiff pointed out books in other classrooms and the library that contained violence and sexual scenes or references. *See, e.g.*, Compl. ¶¶ 148–51. VanNice did not consider those other books as relevant to the complaint, and she informed Plaintiff that the books he displayed were not appropriate in any of his office spaces in any school district. *Id.* at ¶¶ 152–53. She encouraged Plaintiff to display neutral books. *See id.* at ¶ 154; Ex. K 7. Plaintiff asked whether he could have more books displayed covering a variety of topics. Ex. M 6, ECF 1-13. But VanNice told him that those books—*He is He* and *She is She*—were not

8 – OPINION & ORDER

Theis Decl. Ex. 16 at 044

appropriate for his office spaces. *Id.* When Plaintiff asked whether the books were considered religious, VanNice replied that she would let him decide that, but—in any event—they did not "support transgender or gender neutral." Ex. K 7.

## V.    IMESD's determination and Plaintiff's subsequent appeals.

On November 22, VanNice issued a Letter of Directive detailing IMESD's findings and final determination regarding Plaintiff's display of the books. Compl. ¶¶ 156–57; *see also* Ex. G, ECF 1-7. The letter concluded that Plaintiff's "display of *He is He*, *She is She*, and *Johnny the Walrus* for students visiting [his] office for purposes of evaluations and student services[] amounts to a bias incident" under the ESB Policy because it constituted "a hostile expression of animus toward another person relating to their actual or perceived gender identity." Compl. ¶ 160; Ex. G 2. It explained that his "admission that if [he] knew a transgender student were visiting [his] office [he] might set the books aside connotes that [he] underst[ood] the impact the books displayed may have on certain students based upon their actual or perceived gender identity." Ex. G 2. The letter informed Plaintiff that continuing to display the books could result in discipline up to and including termination of his employment. *Id.*

Pursuant to the Bias Incident Response Policy, Plaintiff appealed the initial determination to Superintendent Mulvihill. Compl. ¶¶ 163–64; Ex. M. IMESD's legal counsel and a private consultant assisted with the appeal. Ex. H 1, ECF 1-8. First, the appeal substantiated the finding that Plaintiff's conduct in displaying *He is He* and *She is She* constituted a bias incident under the ESB policy. *Id.* "The investigation found that the books promote a binary view of gender, which excludes and invalidates an understanding of gender diversity and transgender students, staff, and others." *Id.* It concluded that displaying the books "contributes to an unwelcoming environment," which is contrary to IMESD's goals. *Id.* Second, the appeal substantiated the

9 – OPINION & ORDER

Theis Decl. Ex. 16 at 045

finding that Plaintiff's conduct "conflicted with the District's policy and responsibilities under Oregon law to ensure an inclusive educational environment." *Id.* It noted that ORS § 339.347 requires educational services providers like IMESD to adopt policies affirming that "students are entitled to a high-quality educational experience free from discrimination or harassment based on perceived . . . gender identity," and that "employees of education providers are entitled to work in an environment that is free from discrimination or harassment based on . . . gender identity." *Id.* at 1–2. And it "found that by prominently displaying *She is She* and *He is He*, [Plaintiff] introduced materials into the public school environment that, even if done so unintentionally, communicates a message that is excluding on the basis of gender identity and undermines the inclusive environment" that LGSD and IMESD are obligated to maintain. *Id.* at 2–4. The appeal rejected Plaintiff's contention that the investigation was biased or warranted a different outcome. *Id.*

Plaintiff further appealed to IMESD's Board. Compl. ¶ 196; Ex. O, ECF 1-15. And the Board denied Plaintiff's appeal. Compl. ¶¶ 198–99; Ex. P, ECF 1-16.

## VI.    Procedural history.

Plaintiff filed his Complaint on May 21, 2025. ECF 1. It includes six causes of action brought under 42 U.S.C. § 1983, including violations of (1) Plaintiff's First Amendment right to freedom of speech due to content and viewpoint discrimination, (2) Plaintiff's First Amendment right to freedom of speech due to retaliation, (3) Plaintiff's First Amendment right to free exercise of religion, (4) Plaintiff's right to be free from unconstitutional conditions, (5) Plaintiff's Fourteenth Amendment right to due process of law, and (6) Plaintiff's Fourteenth Amendment right to equal protection of the law. Compl. ¶¶ 33–44.

10 – OPINION & ORDER

**Theis Decl. Ex. 16 at 046**

On May 29, Plaintiff filed the Motion for Preliminary Injunction now before the Court. ECF 12. Plaintiff seeks an order that Defendants (1) "stop enforcing the Speech policy challenged herein . . . so as to prohibit Plaintiff from displaying the [b]ooks or similar messages in the workplace" and (2) "remove any reference to the Letter of Directive and related investigations in the District's records for Plaintiff."[1] Mot. 2.

### STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking such an injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts "apply a 'sliding scale test' that 'permits plaintiffs to satisfy this [first] requirement with a "serious question" on the merits when the balance of hardships tips sharply in their favor.'" *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (quoting *Where Do We Go Berkeley v. California Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022)). "Serious questions are issues that 'cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation.'" *Id.* (quoting *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023)). A plaintiff does not show a serious question by merely raising a plausible claim, "nor can a district court forgo legal analysis just because it has not identified precedent that places the question beyond debate." *Id.* (internal

---

[1] At oral argument, counsel for Plaintiff clarified that the relief requested under the first prong—although broadly stated—is limited to allowing Plaintiff to display the books in his office. Tr. 31:12–19, ECF 35.

11 – OPINION & ORDER

**Theis Decl. Ex. 16 at 047**

quotation omitted). "This 'less demanding' merits standard requires serious factual questions that need to be resolved in the case." *Id.*

"The final two injunction factors—the balance of equities and the public interest—merge where a government agency" is a defendant against whom preliminary injunctive relief is sought. *Id.*

There are two forms of preliminary injunctions. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). A "prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Id.* (citation modified); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1993) (explaining that a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). "The status quo ante litem . . . means the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (internal quotation omitted). The second type of preliminary injunction, a mandatory injunction, goes well beyond preserving the status quo and instead "orders a responsible party to take action." *Id.* They are generally disfavored and "not granted unless extreme or very serious damage will result," and they are not issued where the merits are doubtful or the injury complained of can be compensated through damages. *Id.*

## DISCUSSION

I.    **Whether Plaintiff is seeking a mandatory or prohibitory injunction.**

As an initial matter, the Parties disagree as to whether Plaintiff is seeking a mandatory or prohibitory injunction. This Court concludes that Plaintiff is seeking a prohibitory injunction.

The distinction between a mandatory and prohibitory injunction "can fairly be categorized as one of action versus inaction." *Fellowship of Christian Athletes v. San Jose*

12 – OPINION & ORDER

**Theis Decl. Ex. 16 at 048**

*Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023). Thus, "[t]he inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo." *Id.* And the Ninth Circuit has explained that "the status quo is 'the legally relevant relationship between the parties before the controversy arose.'" *Id.* (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014)); *cf Parks v. Lake Oswego Sch. Dist.*, 758 F. Supp. 3d 1247, 1260–61 (D. Or. 2024) (determining that a petitioner sought a mandatory injunction when his requested relief was to be restored to the position that he had been fired from).

Here, the status quo between the Parties was when Plaintiff was able to display the books in his office. In *Fellowship of Christian Athletes*, the Ninth Circuit cited the "longstanding relationship between the parties" as the baseline from which the status quo should be determined. 82 F.4th at 685. There, the longstanding relationship was 20 years of the school district recognizing the Fellowship of Christian Athletes as a student club before it refused to recognize the group. *Id.* Here, the relationship between the parties is not as long, but it is no less significant. Plaintiff had displayed *Johnny the Walrus* for multiple school years. But Plaintiff only displayed *He is He* and *She is She* for several weeks. Nevertheless, it was IMESD's affirmative action that changed Plaintiff's ability to use the books as decoration. Because Plaintiff now seeks to restore that status quo in which he may display the books, the relief sought is properly viewed as a prohibitory injunction. Although Plaintiff also seeks for Defendants to remove the Letter of Directive, that too is a return to the status quo before the controversy arose.[2]

---

[2] Moreover, as explained below, the Court declines to grant Plaintiff any preliminary injunctive relief related to the Letter of Directive.

13 – OPINION & ORDER

Thus, that relief does not subject the preliminary injunction to the more demanding standard of a mandatory injunction.[3]

## II.    Whether Plaintiff has shown a likelihood of success on the merits of his claims.

Plaintiff has shown that he is likely to succeed on part of his First Amendment retaliation claim insofar as IMESD has restricted his ability to display the books in his office and outside of the presence of students. As for his remaining claims, he either cannot obtain any relief beyond that which he can obtain on his First Amendment retaliation claim, or he cannot demonstrate a likelihood of success on the merits of those claims.

### A.    Plaintiff's First Amendment retaliation claim.

The protections of the First Amendment generally prohibit the government "from retaliating or discriminating against individuals for engaging in protected speech." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1137 (9th Cir. 2025). And the Supreme Court has continually recognized that neither teachers nor students "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But their freedom of speech is not boundless, because "[i]n addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). Thus, "the government has 'interests as an employer in regulating the speech of its employees that differ significantly from those it

---

[3] The Court's conclusions throughout this Opinion would remain the same even under the more demanding "mandatory" standard. "A district court should not issue a mandatory injunction unless extreme or very serious damage will result, and especially not in doubtful cases or where the injury complained of is capable of damages." *Parks*, 758 F. Supp. 3d at 1261 (citation modified). But injury to Plaintiff's First Amendment rights is very serious damage that cannot be properly compensated by damages. *Compare id.* (noting that no one was restricting the petitioner's right to exercise free speech as the case progressed).

14 – OPINION & ORDER

**Theis Decl. Ex. 16 at 050**

possesses in connection with regulation of the speech of the citizenry in general.'" *Damiano*, 140 F.4th at 1137 (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968)). Due to that tension, the Supreme Court has created a framework to analyze these situations that is a "'fact-sensitive and deferential weighing of the government's legitimate interests'" against the First Amendment rights of public employees. *Id.* (quoting *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kansas v. Umbehr*, 518 U.S. 668, 677 (1996)).

In the Ninth Circuit, a First Amendment retaliation claim turns on a sequential five-step series of questions:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).[4] The plaintiff bears the burden on the first three questions, and—if met—the burden shifts to the defendant on the remaining two questions. *Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019).

Here, only the second and fourth questions are in dispute. The Parties agree that Plaintiff spoke on a matter of public concern by addressing gender identity issues.[5] Reply 4, ECF 30; Resp. 30. And they agree that Plaintiff's speech was a motivating factor in the adverse action and that the adverse action would not have been taken absent his speech. *See* Tr. 49:21–50:9. Based

---

[4] The first two inquiries determine whether expression is "protected speech" under the First Amendment. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022).

[5] Because the Parties agree that the display of the books amounted to speech on a matter of public concern, this Court will not further analyze this prong. But the Court notes that the mere display of a book whose contents contain matters of public concern does not automatically constitute speech on a matter of public concern, particularly if the subject matter of the books is not apparent from the display.

15 – OPINION & ORDER

**Theis Decl. Ex. 16 at 051**

on the discussion of the remaining factors below, the Court concludes that Plaintiff has established a First Amendment retaliation claim on which he is likely to succeed.

### 1.    Whether Plaintiff spoke as a private citizen or public employee.

The Parties' dispute primarily turns on one central question: did Plaintiff's prominent display of the books in his office constitute his private speech, or did it amount to government speech attributable to IMESD? This Court concludes that when Plaintiff displayed the books during testing sessions and interactions with students, it constituted speech attributable to IMESD. But this Court also concludes that when Plaintiff displayed the books when no children were present and only staff could view them, it constituted private speech.

The Supreme Court has—on several occasions—evaluated whether a government employee spoke as a private citizen or a public employee. In *Garcetti v. Ceballos*, the Court explained that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006) (emphasis added) (concluding that a prosecutor was speaking as an employee because he wrote the memo pursuant to his duties as a prosecutor); *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issues is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."). In *Lane*, the Court concluded that an employee spoke as a private citizen when they testified at criminal proceedings related to matters that they learned about in the course of their public employment. 573 U.S. at 239–41 (noting that cases "dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special

16 – OPINION & ORDER

value precisely because those employees gain knowledge of matters of public concern through their employment").

Most recently, the Court considered the distinction in *Kennedy*, 597 U.S. at 507. That case involved a football coach who knelt midfield and prayed quietly for 30 seconds at the conclusion of each game. *Id.* at 514–15. In concluding that his speech was private rather than government speech, the Court stressed that "he was not engaged in speech 'ordinarily within the scope' of his duties as a coach." *Id.* at 529 (quoting *Lane*, 573 U.S. at 240). The Court noted he was not speaking "pursuant to government policy," "not seeking to convey a government-created message," and was not "engaged in any other speech the District paid him to produce as a coach." *Id.* at 529–30. Because his job allowed him and other coaches post-game time in which to "engage in all manner of private speech," it was not dispositive that he was merely within his "office environment." *Id.* at 530.

Shortly after *Kennedy* was decided, the Ninth Circuit considered the employee versus private citizen distinction in *Dodge*, 56 F.4th at 767. The court explained that the distinction "'depends on the scope and content of [the employee's] job responsibilities.'" *Id.* at 778 (citing and quoting *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011)).[6] It is

---

[6] Defendants rely heavily on *Johnson* in support of their position. Resp. 8. Plaintiff retorts that *Kennedy* "explicitly rejected" *Johnson*'s standards for "determining when teachers speak in their official capacities." Reply 4. This Court disagrees that *Johnson* was explicitly rejected by *Kennedy*.

To be sure, *Johnson* must be reexamined in light of *Kennedy*. In *Kennedy*, the Supreme Court rejected the Ninth Circuit's "excessively broad" conception of the coach's job. 597 U.S. at 530–31. And that excessively broad conception was primarily based on the Ninth Circuit's analysis in *Johnson*. *See Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 824 (9th Cir. 2017). Moreover, *Johnson*'s broad statement that "teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or . . . in the general presence of students," 658 F.3d at 968 (emphasis in original), is of questionable precedential value in light of *Kennedy*'s direction to consider the scope and context of the speech.

17 – OPINION & ORDER

private speech if the person does not have an official duty to make the statements or "if the speech was not the product of 'performing the tasks [they were] paid to perform.'" *Id.* (citation modified) (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)). But in a school setting, when speech can be "reasonably viewed by students and parents as officially promoted by the school" or is made by someone taking advantage of their position to press their particular views upon children's impressionable and captive minds, it is properly considered speech by a public employee. *Id.* (citing *Johnson*, 658 F.3d at 967–68 (concluding that a teacher displaying banners with religious slogans spoke as a public employee)).

This Court begins its inquiry by considering Plaintiff's official responsibilities and duties as an IMESD employee. There is no dispute as to what Plaintiff's job entails: he administers standardized tests to students in a one-on-one format in his offices at various locations within the IMESD service area. Compl. ¶¶ 48–49. His job does not include decorating his office, but he nevertheless did so in order to "make his office more kid friendly." *Id.* at ¶ 111. And he planned to supervise any inquiries about—or access to—*He is He* and *She is She* just as he had with *Johnny the Walrus*, by waiting to discuss them until after the assessment was over. *Id.* at ¶ 129. Plaintiff's official job duties did not include displaying certain books or instructing on them. But he displayed them *while engaged in speech that IMESD paid him to produce* as an Education

---

But the holding in *Johnson* is not "clearly irreconcilable" with *Kennedy* such that it is impliedly overruled. *See Miller v. Gammie*, 335 F.3d 889, 890 (9th Cir. 2003) (en banc) (addressing standards). If anything, *Kennedy* confirms *Johnson*'s conclusion that teachers act as teachers when they are performing the tasks that they are paid to perform. Moreover, both the Ninth Circuit—in *Dodge*—and the Eleventh Circuit in *Wood v. Florida Dep't of Educ.*, 142 F.4th 1286, 1291 (11th Cir. 2025), have extensively cited *Johnson* with approval since *Kennedy* was decided. Thus, this Court disagrees that *Kennedy* explicitly overruled the Ninth Circuit's holding in *Johnson* and related cases.

18 – OPINION & ORDER

**Theis Decl. Ex. 16 at 054**

Specialist. Moreover, by displaying the books prominently behind his desk—indeed, they were the only decorations in his office—the display can be reasonably viewed as being promoted by the school or as the efforts of an employee to press his particular views upon students. Therefore, this Court concludes that Plaintiff spoke as an IMESD employee when he displayed the books while students were present.[7]

But this Court declines to conclude that Plaintiff's display of the books was *entirely* speech attributable to IMESD. Plaintiff left the books visible whether or not students were present. And that difference is significant. In *Dodge*, the Ninth Circuit considered whether a teacher was speaking as a private citizen or a public employee when he wore a "Make America Great Again" ("MAGA") hat "while attending a teacher-only training." 56 F.4th at 778. Because he wore it when no students were around, the court determined that parents and students could not reasonably attribute the message to the school, and that he was not trying to press his views on impressionable or captive students. *Id.* Thus, it concluded that the teacher spoke as a private citizen when wearing the hat. *Id.*

This Court reaches a similar conclusion with respect to Plaintiff's display when no students were present in his office. Plaintiff's LGMS office had a "Staff Only" sign, Compl. ¶ 71, and there is no identified risk that parents or students could enter the office without him present and view the display. Although Plaintiff may have been writing reports or conducting other job-related activities while the books were displayed, it is not enough that the display was in his

---

[7] Plaintiff argues that, because his official duties had no relation to the subject matter of the books, his display of the books was not speech as an employee. Mot. 30–31. But "teachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction." *Johnson*, 658 F.3d at 967–68. As such, there is no basis to distinguish between an employee's curricular and non-circular speech, at least when that speech is directed to students in the course the teacher's official duties. *See Wood*, 142 F.4th at 1292 (so holding).

19 – OPINION & ORDER

Theis Decl. Ex. 16 at 055

"office environment." When no students were present in Plaintiff's office, the message of the books would not be reasonably attributable to IMESD, and the display could not press Plaintiff's views on impressionable or captive students. *See Dodge*, 56 F.4th at 778.

In summary, Plaintiff spoke as a public employee by prominently displaying the books while students were present, and that expression is not protected by the First Amendment. But when displaying the books outside the presence of students, Plaintiff spoke as a private citizen and was therefore protected by the First Amendment.

### 2. Whether Defendants had an adequate justification for treating Plaintiff differently than members of the general public.

During oral argument, Defendants argued that their countervailing interest in regulating speech was complying with Oregon's anti-bias law. *See* Tr. 47:9–22. But this Court finds that Defendants have failed to show that they have a legitimate administrative interest outweighing Plaintiff's right to display the books when students are not present.[8]

"Under the *Pickering* balancing test, the ultimate question is whether the government's legitimate administrative interests outweigh the employee's right to engage in the expressive activity at issue." *Damiano*, 140 F.4th at 1138. This question evaluates whether the governmental entity has an adequate justification for treating the employee differently than a member of the general public. *Eng*, 552 F.3d at 1071. And although it recognizes that a governmental entity has some discretion in restricting speech in its role as an employer, those restrictions "'must be directed at speech that has some potential to affect the entity's operations.'" *Id.* (quoting *Garcetti*, 547 U.S. at 418). For example, if the government cites its interest "as an employer in a

---

[8] Because this Court concludes that only Plaintiff's display of the books when students are not present is entitled to First Amendment protection, its analysis about Defendants' interests is limited to the display when students are not present.

20 – OPINION & ORDER

**Theis Decl. Ex. 16 at 056**

smoothly-running office," then it must show that the plaintiff's protected First Amendment expression presents an "actual, material and substantial disruption," or demonstrate "reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (citation modified). Although complaints from the public or fellow employees about an employee's speech may suffice, they must be considered in context to determine whether they reach a sufficient level of disruption. *Damiano*, 140 F.4th at 1144 (citing cases evaluating whether coworker complaints were sufficient disruption).

Defendants have failed to meet their burden to show that Plaintiff's display of the books when no students are present adversely impacts its interests. There was one bias incident complaint about Plaintiff's display in his LGMS office. VanNice Decl. ¶ 10, ECF 28. And that complaint was substantiated "because of the impact that the expression would have on the environment for the students [Plaintiff] serves." *Id.* at ¶ 11. Because this Court concluded that only Plaintiff's display of the books when no students are present is entitled to First Amendment protection, that cited concern is unavailing. And although VanNice's declaration also references the potential impact for staff and visitors, *id.*, this Court finds that that alone is an insufficient basis for this Court to find an actual, material, and substantial disruption, or even a reasonable prediction of such a disruption. [9] This Court recognizes that Defendants are required to comply

---

[9] Plaintiff argues that "the Speech Policy facilitates a heckler's veto." Mot. 20–22. Even if this assertion is correct, it does not change the analysis. "[T]he First Amendment generally does not permit the so-called 'heckler's veto,'" in which the public—with the government's help—can "shout down unpopular ideas that stir anger." *Damiano*, 140 F.4th at 1145 (citation modified). But the heckler's veto, and disruption related to speech more generally, is a consideration for evaluating the government's justification under *Pickering* balancing. Because the IMESD has not justified its restrictions on Plaintiff's private speech, it is not necessary to consider whether those restrictions amount to a heckler's veto.

21 – OPINION & ORDER

with Oregon law. But citing statutory requirements does not change their burden to justify their restrictions on Plaintiff's First Amendment rights.

In sum, this Court finds that Defendants have failed to show an adequate justification to require Plaintiff to not display the books when no students are present. Therefore, Plaintiff has shown that he is likely to succeed—in part—on the merits of his First Amendment retaliation claim.

**B.    Plaintiff's remaining First Amendment speech-based claims.**

Plaintiff argues that strict scrutiny, rather than *Pickering*, should be used to evaluate his First Amendment speech-based claims because IMESD engaged in content and viewpoint discrimination, Mot. 15, and the ESB policy amounts to a prior restraint on speech, *id.* at 22. Plaintiff further argues that, because strict scrutiny applies, he is entitled to broad relief permitting him to display the books at all times. Reply 27. This Court disagrees.

To begin with, *Pickering* applies to all of Plaintiff's remaining speech-related claims under the First Amendment. In *Damiano*, the Ninth Circuit confirmed that "as-applied, content- and viewpoint-based discrimination claims are subject to the *Pickering* analysis." *Damiano*, 140 F.4th at 1149. And in *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017), the court explained that a "similar analysis" to *Pickering* "is used when assessing prospective restrictions on government speech." Thus, in the context of public employment, each of those claims first rests on the distinction between protected private speech and unprotected "speech uttered pursuant to public employees' official duties." *Id.*; *see also Dodge*, 56 F.4th at 786 (analyzing viewpoint discrimination *after* concluding that wearing a MAGA hat at a teacher-only training was protected private speech). Then, *Pickering* balancing applies, requiring the government to justify restrictions on an employee's protected speech. *See, e.g., Moonin*, 868 F.3d at 864–65

22 – OPINION & ORDER

**Theis Decl. Ex. 16 at 058**

(describing the government's burden when it seeks to justify imposing a prior restraint on an employee's protected speech); *see also Page v. Clark Cnty. Fire Dist. 6*, No. 3:23-CV-05849-DGE, 2024 WL 4665789, at *11 (W.D. Wash. Nov. 4, 2024) (noting that "[t]he *Pickering* analysis applies to prospective restrictions on government employee speech[.]").

Ultimately, this Court need not determine whether Plaintiff is likely to succeed on the merits of his remaining First Amendment speech-based claims because they would afford him no more relief than his retaliation claim. As explained, *Pickering* applies to these claims. And the Court has concluded that Plaintiff spoke as a public employee by prominently displaying the books while students were present. Thus, even if Defendants engaged in content and viewpoint restriction, and even if the ESB policy amounted to a prior restraint, Plaintiff still would not be permitted to display the books to students. Conversely, because Plaintiff has already demonstrated that displaying the books outside the presence of students was protected by the First Amendment—and Defendants have failed to justify restricting his display—he has already shown that he is entitled to relief from that restriction.

In sum, *Pickering* applies to all of Plaintiff's First Amendment speech-based claims, and whether Plaintiff is likely to succeed in showing that Defendants engaged in content or viewpoint discrimination or that the ESB policy was a prior restraint does not impact the scope of relief to which he is entitled.

### C.     Plaintiff's free exercise claim.

As a threshold matter, Plaintiff has not met his burden of establishing a free exercise violation by Defendants. Accordingly, he is unlikely to succeed on the merits of his free exercise

23 – OPINION & ORDER

**Theis Decl. Ex. 16 at 059**

claim, and it is unnecessary for this Court to engage in *Pickering* balancing with respect to this claim.[10]

### 1.    Legal standards.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. And it applies "to the States under the terms of the Fourteenth Amendment." *Kennedy*, 597 U.S. at 524. Importantly, it protects both inward beliefs and outward expressions of those beliefs. *Id.*

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* If a plaintiff makes that showing, then the government must satisfy "strict scrutiny by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* Conversely, a policy "that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

---

[10] Plaintiff argues that *Pickering* does not apply to his free exercise claims. Mot. 12-15. This Court is bound by prior decisions of the Ninth Circuit holding that *Pickering* balancing also applies to Plaintiff's free exercise claim. To be sure, *Kennedy* expressly left open the issue of whether *Pickering* applies in the context of a free exercise claim. *Kennedy*, 597 U.S. at 532. But the Ninth Circuit has a "practice of applying a balancing test when confronted with constitutional challenges to restrictions on public employee speech in the workplace." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 649–50 (9th Cir. 2006). That extends to a public employer's restrictions on displays of religious items. *Id.* at 651 (applying *Pickering* balancing when an employer refused to allow the plaintiff to display a Bible on his desk or have a "Happy Birthday Jesus" sign). In the absence of contravening caselaw from the Supreme Court, this Court is bound by Ninth Circuit precedent. *United States v. Brown*, 720 F. Supp. 3d 1020, 1026 (D. Or. 2024) (explaining that district courts in the Ninth Circuit are bound by circuit court precedent unless that caselaw is clearly irreconcilable with reasoning or theory of higher authority). Accordingly, *Pickering* balancing would apply to Plaintiff's free exercise claim if Plaintiff could otherwise meet his burden of demonstrating a free exercise claim.

24 – OPINION & ORDER

**Theis Decl. Ex. 16 at 060**

520, 531 (1993). The policy is instead subject to rational basis review. *Tingley v. Ferguson*, 47 F.4th 1055, 1077 (9th Cir. 2022). And under rational basis review, the policy is presumed valid and will be sustained if the government shows that it is rationally related to a legitimate state interest. *Id.* at 1078 (citation modified).

A policy is not neutral "if the object of [it] is to infringe upon or restrict practices because of [its] religious motivation." *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 533. A court may analyze the facial neutrality of a policy by examining its text, and it may also determine a policy is not neutral by examining the effect of the policy. *Id.* at 533–35 ("The Free Exercise clause protects against governmental hostility which is masked as well as overt."); *see also Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 639 (2018) (evaluating whether an adjudicatory body's statements during its decision-making process evinced "hostility to religion" that were inconsistent with the requirements of the Free Exercise clause). Even if the policy has an adverse impact on religious practices, it may still be considered "neutral" if the government is addressing a legitimate concern "for reasons quite apart from discrimination." *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 535.

A policy "is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021) (citation modified). It is also not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

### 2.    Analysis.

Plaintiff has failed to show that Defendants impermissibly burdened his sincere religious practice pursuant to its Speech Policy.

25 – OPINION & ORDER

**Theis Decl. Ex. 16 at 061**

To begin with, Plaintiff has failed to show that Defendant's Speech Policy is not neutral. There is no indication that the ESB Policy restricts any religious practices because of their religious motivations. Indeed, the policy explicitly seeks to prevent discrimination or harassment based on religion. And even if the ESB Policy adversely impacted religious practices, it is addressing the legitimate concern of ensuring an open and welcoming school environment for all students and employees.

Plaintiff also has not shown that Defendants were "hostile" towards his religious beliefs. In *Masterpiece Cakeshop*, the Court noted that a commissioner disparaged the petitioner's faith, including by comparing his invocation of his beliefs to "defenses of slavery and the Holocaust," and demeaned it by characterizing it as a "despicable piece[] of rhetoric." 584 U.S. at 635. Those comments, combined with the failure of other commissioners to object or disavow them, led the Court to conclude that the Commission demonstrated hostility towards Plaintiff's religion and otherwise cast doubt on the fairness and impartiality of the Commission. *Id.* at 636–37. Here, VanNice asked about the pages in *She is She* that contained Bible verses. Compl. ¶¶ 118–20. And she asked whether the Bible supports "they/them." *Id.* at ¶ 121. This Court finds that those inquiries—particularly when compared to the statements in *Masterpiece*—do not support a finding or inference that Defendants were motivated by hostility toward Plaintiff's religion.

Finally, the Court concludes that Plaintiff has failed to show that the Speech Policy is not generally applicable. It prohibits all bias incidents, regardless of their motivation. And it does not provide any mechanism for individualized exceptions that would invite IMESD to consider the reasons for the conduct.

26 – OPINION & ORDER

Because the Speech Policy is neutral and generally applicable, it is presumed valid.[11] Plaintiff has therefore failed to show that he is likely to succeed on the merits of his free exercise claim.

### D.    Plaintiff's equal protection claim.

Even if Plaintiff is likely to succeed on the merits of his Equal Protection Clause claim—which this Court does not resolve—he would not be entitled to any greater relief than that afforded to him by his First Amendment retaliation claim. Thus, this claim does not change the scope of the preliminary injunction to which he is entitled.

The Ninth Circuit has "held that allegations of disparate treatment based on viewpoint give rise to a cognizable equal protection claim." *Damiano*, 140 F.4th at 1150. But the distinction between private speech and speech on behalf of a government employer remains critical, because "the government has the right to speak for itself, and, when it does, it is entitled to say what it wishes and to select the views that it wants to express." *Johnson*, 658 F.3d at 975 (citation modified); *see also Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has created or commissioned."). But if a public employee brings an equal protection claim based on protected, private speech, "the government may defend against the claim by showing that its legitimate interests outweigh the public employee's speech rights under *Pickering*." *Damiano*, 140 F.4th at 1151.

---

[11] Because Plaintiff does not argue that the Speech Policy would fail rational basis review, *see* Mot. 10–15, the Court declines to further engage in that analysis.

27 – OPINION & ORDER

**Theis Decl. Ex. 16 at 063**

Plaintiff's likelihood of success on the merits of his Equal Protection Clause claim depends upon the Court's conclusion that he spoke as an employee when displaying the books when students were present. IMESD is entitled to select the views that it wishes to express, including by way of deciding which books are appropriate for display. Conversely, that control may not *necessarily* infringe upon Plaintiff's liberties as a private citizen, specifically, his display when students are not present in his office. Therefore, it is unnecessary to separately consider Plaintiff's equal protection claim because it does not change the scope of the preliminary injunction to which he is entitled.

### E.    Plaintiff's Due Process Clause claim.

Plaintiff argues that the Speech Policy violates his Fourteenth Amendment Due Process Clause rights because it (1) fails to give employees adequate notice of when it applies and (2) lacks explicit standards for those who apply it. Mot. 38–39. The Court finds that Plaintiff has not demonstrated that he is likely to prevail on this claim.

"The operative question under the fair notice theory is whether a reasonable person would know what is prohibited." *Tingley*, 47 F.4th at 1089. It must give "a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). And it may not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

"When First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). That is because "First Amendment freedoms need breathing space to survive." *N.A.A.C.P. v. Button*, 371 U.S. 415, 432–33 (1963); *see also Grayned v. City of*

28 – OPINION & ORDER

**Theis Decl. Ex. 16 at 064**

*Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."). Nevertheless, even when First Amendment rights are implicated, some uncertainty is permissible because "'we can never expect mathematical certainty from our language.'" *California Tchrs. Ass'n*, 271 F.3d at 1150 (quoting *Grayned*, 408 U.S. at 110).

Here, this Court finds that Plaintiff has failed to show that the Speech Policy violates his due process rights. First, the ESB Policy defines what it proscribes: a "'[b]ias incident' means a person's hostile expression of animus toward another person, relating to the other person's perceived race, color, religion, *gender identity*, sexual orientation, disability or national origin . . . ." Ex. E 1 (emphasis added). Plaintiff takes issue with its prohibition of "hostile expression[s] of animus." *See* Mot. 39 ("whatever that is"). But when interviewed, he understood that term to mean an act of ill will. Ex. K 6; *see also* Ex. L at 4 ("I understand it as being an[] act towards someone."). And other definitions that he included in his appeals aligned with that understanding. *See, e.g.* Ex. M 4 ("*Hostile expression of animus* is defined as 'an act, word, or other medium that conveys deep-seated ill will, antagonism, or hostility towards another person . . . .'"). Even applying the stricter First Amendment standard for vagueness, this Court concludes that the ESB policy gave Plaintiff fair notice of what was prohibited. A person of ordinary intelligence would understand that bias incidents were expressions of ill will directed toward another person based on their protected characteristics. Although Plaintiff clearly disputes whether his display *constituted* such a bias incident, that is a separate inquiry from whether the ESB Policy is so vague as to violate his due process rights.

Moreover, the Speech Policy included standards for enforcement. The Bias Incident Policy includes a four-step process for investigations and appeals of reported incidents. *See* Ex. F

29 – OPINION & ORDER

**Theis Decl. Ex. 16 at 065**

1–2. It is a detailed process with multiple parties, and it is grounded in the terms of the ESB Policy, which itself reflects standards set by Oregon law. At this stage, Plaintiff has not shown that it authorizes or encourages discriminatory enforcement. Again, Plaintiff's disagreement with the results of the process does not mean the policy violates due process.

In sum, Plaintiff has failed to show that he is likely to succeed on the merits of his Due Process Clause claim.

## III.   Whether the remaining preliminary injunction factors favor Plaintiff.

As discussed below, the remaining preliminary injunction factors favor Plaintiff, at least insofar as the injunction would allow Plaintiff to display the books when no students are present.

### A.   Whether Plaintiff has shown a likelihood of irreparable injury.

Plaintiff has demonstrated that irreparable injury is likely in the absence of an injunction. In the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (citation modified). That standard recognizes that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).

For the reasons discussed above, Plaintiff has demonstrated a likelihood of prevailing in part on his First Amendment retaliation claim. Therefore, he has shown a likelihood of irreparable injury warranting a preliminary injunction.

### B.   Whether the balance of equities tips in favor of Plaintiff and an injunction is in the public interest.

As noted, the final two *Winters* factors—whether the balance of equities tips in the movants favor and whether an injunction is in the public interest—merge when the party

30 – OPINION & ORDER

**Theis Decl. Ex. 16 at 066**

defending against a preliminary injunction is a public entity. *Parks*, 758 F. Supp. 3d at 1266.

"When balancing the equities, 'a court must identify the possible harm caused by the preliminary

injunctions against the possibility of the harm caused by not issuing it.'" *Id.* (quoting *Univ. of*

*Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court should weigh

the hardships of each party and "'pay particular regard for the public consequences in employing

the extraordinary remedy of injunction.'" *Id.* (quoting *Winter*, 555 U.S. at 24).

These remaining factors favor Plaintiff. As explained above, Defendants failed to make

any showing that they would experience any hardships or disruptions should the injunction be

granted, particularly given the limited scope imposed by the Court. And the Court cannot identify

any public consequence in allowing Plaintiff to privately display the books in his office when

students are not present. Therefore, these remaining factors favor granting a preliminary

injunction.

**IV.    Scope of injunctive relief.**

Having concluded that Plaintiff is likely to succeed on parts of his claims and that the

remaining *Winter* factors favor granting injunctive relief, the Court turns to the scope of relief to

which Plaintiff is entitled.

"Once a constitutional violation is found, a federal court is required to tailor the scope of

the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425

U.S. 284, 293–94 (1976) (citation modified). "The general rule regarding the scope of

preliminary injunctive relief is that it 'should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs before the court.'" *Regents of the Univ. of*

*California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *rev'd in part,*

*vacated in part*, 591 U.S. 1 (2020) (citation omitted). And "where relief can be structured on an

31 – OPINION & ORDER

**Theis Decl. Ex. 16 at 067**

individual basis, it must be narrowly tailored to remedy the specific harm shown." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (citation modified).

Plaintiff seeks to be able to prominently display the books in his office at all times. But as explained, only his display when no students are present is protected under the First Amendment. Therefore, the Court GRANTS Plaintiff's request to resume displaying the books in his IMESD offices, but he may only do so when no students are present. Moreover, Defendants may not take disciplinary action against Plaintiff—related to displays of the books—that is inconsistent with the relief granted by this Court.

Plaintiff also requests that the Letter of Directive be removed from his personnel file. But the Letter of Directive was based, at least in part, on the display of books to students. Indeed, the Letter of Directive determined that Plaintiff's display of the books "*for students* visiting [his] office for purposes of evaluations and student services[]" amounted to a bias incident. Compl. ¶ 160 (emphasis added); Ex. G 2. Because the letter of directive was based in part on Plaintiff's unprotected speech, removing the letter of directive from Plaintiff's file is not narrowly tailored to remedy the specific harm in this case. The Court therefore DECLINES to grant his request for the Letter of Directive to be removed from his file.

## V.    Security.

Plaintiff asks this Court to waive the security requirement of Rule 65(c). Mot. 3. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067,

32 – OPINION & ORDER

**Theis Decl. Ex. 16 at 068**

1086 (9th Cir. 2009) (internal quotations omitted). "In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [their] conduct." *Id.* (citation modified). The Court concludes that Plaintiff should not be required to pay a security because the injunction entered is narrow and not likely to harm Defendants.

## CONCLUSION

The Court GRANTS IN PART Plaintiff's Motion for Preliminary Injunction, ECF 12. Defendants Intermountain Education Service Board of Directors, Mark Mulvihill, and Aimee VanNice ARE HEREBY ENJOINED from taking disciplinary action against Plaintiff Roderick Theis if he chooses to resume displaying the books *He is He*, *She is She*, or *Johnny the Walrus* in any of his offices within the IMESD service area while the children that he serves are not present in those office spaces. At this time, this Court DECLINES to grant Plaintiff's request that the Letter of Directive be removed from his personnel file because it was based, at least in part, on his display of the books when students were present. This injunction takes effect immediately and remains in effect during the pendency of this lawsuit unless modified by a final judgment or other order of the Court, the agreement of all parties, or any binding change in the law.

IT IS SO ORDERED.

DATED this 20th day of August, 2025.

_____
ANDREW HALLMAN
United States Magistrate Judge

33 – OPINION & ORDER

Theis Decl. Ex. 16 at 069

**Theis Decl. Ex. 16 at 070**