**Roderick Theis' Responses to IMESD Investigative Interview Questions
Following LaGrande School District's Investigation and Finding of Facts Report**

To begin, I have complied with every directive from LGSD, educator standard, court order, and lawful policies.

In October 2024, when LGMS Principal Chris Wagner and I met to discuss my books, he said that he did not find anything offensive or inappropriate in them and he clarified that he did not believe that I had done anything inappropriate. However, when he requested that I remove the books from my office, I *immediately* complied and took the books to my car, where they remained.

I did not return the books to my LGMS office until *after* the federal district court permitted me to do so. The court ordered that "Defendants Intermountain Education Service Board of Directors, Mark Mulvihill, and Aimee VanNice ARE HEREBY ENJOINED from taking disciplinary action against Plaintiff Roderick Theis if he chooses to resume displaying the books *He is He*, *She is She*, or *Johnny the Walrus* in any of his offices within the IMESD service area while the children *that he serves* are not present in those office spaces. *Theis v. Intermountain Educ. Serv. Bd. of Directors*, No. 2:25-CV-00865-HL, 2025 WL 2406871 ("Opinion"), at *16 (D. Or. Aug. 20, 2025) (emphasis added). The court reasoned that "[a]lthough [I] may have been writing reports or conducting other job-related activities while the books were displayed, it is not enough that the display was in [my] 'office environment.'" *Id*. at *9. That is precisely what I was doing on August 25, 2025, when four teenagers who identified themselves as volunteer "ambassadors" entered my office, unannounced and without permission, and expressed a desire to see my books. While the district court's order is currently on appeal at the Ninth Circuit, *see Appeal No. 25-5641*, I have complied with its terms. Therefore, the investigator's findings that the court's order requires me to remove my books when students are present in school is incorrect. *See* Investigation Report at 3-4. Indeed, the court proceedings clearly demonstrate that the motion for preliminary injunction and the speed with which the court issued its opinion were for the purpose of ensuring that I could display my books *in time for the start of school*.

Further, the willingness of individuals to enter my office with the express purpose of seeing my books cannot be attributed to me as somehow "taking advantage of [my] position to press [any] particular views upon children's impressionable and captive minds," Opinion at *8, which was the primary basis for the court's instructions that I remove my books before *testing sessions*. I did not press my views on anyone. The volunteer ambassadors grabbed my books of their own volition. Nor were they "captive." They did not have to enter my office or read the books, and they were free to leave at any time they wished.

1. **On August 25, did you display the books He is He, She is She, or Johnny the Walrus in your office during work hours when students were on campus at La Grande Middle School?**

I object to the implication of the question that the court's order requires me to remove my books when students are present in the building. *See* Opinion at *16 (Plaintiff may "resume displaying the books *He is He, She is She, or Johnny the Walrus* in any of his offices within the IMESD service area while the children that he serves are *not present in those office spaces*.") (emphasis added).

**Theis Decl. Ex. 18 at 001**

The court proceedings also clearly demonstrate that the motion and the speed with which the court issued its opinion were for the purpose of ensuring that I could display my books *in time for the start of school*.

I resumed displaying the books *He is He* and *She is She* in my office at LGMS on the afternoon of August 22, 2025 following receipt of the U.S. District Court's Order which stated that I could do so when I was not evaluating students pursuant to my job responsibilities. *See* Opinion at \*16 (Holding that Plaintiff may "resume displaying the books *He is He, She is She, or Johnny the Walrus* in any of his offices within the IMESD service area while the children *that he serves* are not present *in those office spaces*.") (emphasis added). The books remained on display in my office on August 25, 2025, when I had no evaluations scheduled. 6th and 7th grade students were on campus participating in their first day of school on August 25th. 8th grade students were not scheduled to start classes until the following day (August 26th).

2.  **Was the door to your office open when you were displaying copies of He is He, She is She, or Johnny the Walrus?**

    The door to my office was open as I was working alone in my office. I close the door when I am working directly with a student in my office and when I leave the building.

3.  **Does the door to your office open up into an area such as a hallway, that can be accessed by students?**

    I object to the implication of the question that the court's order requires me to remove my books when students are present in the hallway or building. *See* Opinion at \*16 (Plaintiff may "resume displaying the books *He is He, She is She, or Johnny the Walrus* in any of his offices within the IMESD service area while the children that he serves are *not present in those office spaces*.") (emphasis added). The court proceedings clearly demonstrate that the motion and the speed with which the court issued its opinion were for the purpose of ensuring that I could display my books *in time for the start of school*.

    The door to my office borders a hallway. Students use the hallway to transition between classes.

4.  **Were you displaying the books He is He, She is She, or Johnny the Walrus when students visited your office?**

    As stated above, the books *He is He* and *She is She* were on display in my office on August 25, 2025, when I was not scheduled to work with students, consistent with the terms of the court's order.

5.  **What work were you doing at that time?**

    I was primarily working on case planning and online file reviews. I had no evaluations of students scheduled that day.

6.  **Is it correct that when students entered your office while you had these books on display, you did not remove the books?**

**Theis Decl. Ex. 18 at 002**

On August 25, four teenagers whom I did not know entered my office, unannounced and without permission. *See* Investigation Report at 7-10, "Questions for Students" ("Did Mr. Theis invite you or ask you to come into his room?" "No we just invited ourselves in.") When they expressed a desire to see my books, I attempted to change the subject and ask why they were in my office and who they were. They informed me that they were "ambassadors."

Not knowing what "ambassadors" were, I asked them. They explained that "ambassadors" were volunteers to help 6th and 7th grade students on their first day of school. They denied having anywhere to be at this time and denied that they were under anyone's authority at this time. The descriptions that they offered suggested to me that they were in the school as some form of volunteer staff and that they were on their free time.

I did not remove any of my office decorations (including the two books on display) when the volunteer ambassadors entered my office.

7. **Is it correct that students were permitted by you to take the books and read aloud from them to the other students? Which books?**

*He is He* and *She is She* were displayed in my office. During my questioning of the volunteers, one of them grabbed *She is She*. *See* Investigation Report at 7, "Questions for Students" ("[Volunteer] grabbed she is she book and he read it").

Upon ensuring that they were not in the building as students; that they had nowhere to be at that time and were under no one's authority; that they were there completely upon their own free will; upon being unable to deter them from their fascination with the books on display in my office; and upon being persuaded that they posed no threat to the integrity of my books, I stopped trying to deter them from reading the books. This was consistent with the court's order. I was not working with the volunteers as part of my official duties, the volunteers were not at school in a student capacity, they themselves wished to see the books, and they were free to leave at any time.

8. **Did the students ask to read the books? Did you say yes?**

As to the first question, yes, the volunteers repeatedly express interest in my books displayed in my office. In fact, it appeared that seeing the books was their sole purpose for coming to my office. One of these teenage boys, in particular, seemed insistent on gaining access to the books and he pressed to read them.

As to the second question, no, I did not say yes.

9. **How long did the students read aloud from the books in your office?**

The volunteer ambassadors read for about 10 minutes.

10. **Did the students read aloud from the books to other students? Did this occur while you were in the office?**

**Theis Decl. Ex. 18 at 003**

One of the male volunteer ambassadors read the books aloud to the other volunteers who were present and who had all expressed interest in the books. I was working at my desk and on my computer during this time.

11. **The La Grande SD findings note that you "attempted to change the subject and ask who the students were and why they were in [your] office." Is this correct? What did you do to try and change the subject?**

Yes. I initially asked them 1) who they were, 2) why they were in my office, 3) where they were supposed to be, and 4) who was in charge of them. I asked follow up questions based on their responses such as 5) what "ambassadors" were, 6) if "ambassadors" are some sort of student leadership position, 7) what "ambassadors do. Despite my efforts, however, I noticed them growing impatient with my questions and they began pressing to see the books again.

12. **Did the student who was reading aloud from the book display the book to other students seated in your office? How many students were there?**

There were four volunteers: two male, two female. Each had expressed interest in seeing the books. Indeed, it seemed their sole purpose for coming to my office was to see the books. One volunteer read to the other three.

13. **How many students were in the office with you when the books were read aloud from?**

See above.

14. **Is it correct that you interacted with the students by discussing the books, their author, and why they wrote the book?**

The only interaction that I recall with the volunteers while they were reading the books was when they expressed confusion and asked me about the books' reference to "adoptedandloved.com." In response to their question, I explained to them that the author was adopted, that I thought the author founded the website due to his appreciation for the value of adoption since his biological mother was raped and subsequently placed him up for adoption, and that I thought the website was cool and a way to help others.

15. **How long did that discussion go on for?**

Less than a minute – it was a quick clarification of the "adoptedandloved.com" reference that the volunteers asked about.

16. **The La Grande SD findings state that you told students that the author was cool because they were a product of rape, and wrote the books to help others. Is that correct?**

I did not make the alleged statement. As noted above, I explained that the author likely started the website "adoptedandloved.com" because of his positive experience of being adopted after his biological mother was raped and subsequently placed him up for adoption. I said I thought the author's founding of "adoptedandloved.com" was cool and a way to help others.

**Theis Decl. Ex. 18 at 004**