Rebekah Schultheiss, OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com

Tyson C. Langhofer*, VA Bar No. 95204
Matthew C. Ray*, GA Bar No. 347985
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
tlanghofer@ADFlegal.org
mray@ADFlegal.org

David A. Cortman*, GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Plaintiff*
**Admitted Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PENDLETON DIVISION**

**RODERICK E. THEIS, II,**

Plaintiff,

v.

**INTERMOUNTAIN EDUCATION SERVICE DISTRICT BOARD OF DIRECTORS, MARK S. MULVIHILL,** Superintendent, and **AIMEE VANNICE,** Assistant Superintendent and Director of Human Resources, all in their official capacities,

Defendants.

Case No. 2:25-cv-00865-HL

**PLAINTIFF'S CORRECTED RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**Request for Oral Argument**

## TABLE OF CONTENTS


Table of Authorities .... v

Local Rule 7-1 Conferral .... 1

Motion .... 1

Introduction .... 3

Factual and procedural Background .... 5

- I. Theis faithfully served students for 17 years as an InterMountain education specialist. .... 5
- II. Policies of InterMountain and its schools allow employees to decorate their offices with personal—and often ideological—messages. .... 5
- III. Theis's faith inspired him to display three children's books in his offices. .... 6
- IV. After a La Grande teacher complained, InterMountain censored Theis for promoting a "binary view of gender." .... 6
  - A. InterMountain investigated Theis for violating its Speech Policy. .... 7
  - B. InterMountain punished Theis for violating its Speech Policy. .... 8
  - C. InterMountain's superintendent rejected Theis's appeal. .... 9
- V. Theis sued, and the complaints against him multiplied. .... 9
- VI. When Theis resumed the display as the injunction allowed, Oliver coordinated a setup. .... 10
- VII. InterMountain launched another investigation and fired Theis. .... 11
- VIII. Theis appealed to the Ninth Circuit. .... 12

Legal Standard .... 13

Argument .... 14

- I. InterMountain retaliated against Theis for his protected speech. .... 14
  - A. Theis spoke on a matter of public concern. .... 15
  - B. Theis spoke as a private citizen. .... 15
    - 1. As this Court held, Theis spoke as a private citizen when he displayed the books while the students he served were not present. .... 16

2. Theis spoke as a private citizen when he displayed the books in the presence of students. .......... 16

a. The Supreme Court has rejected the Ninth Circuit's "excessively broad" test for official speech. .......... 17

i. *Kennedy III* rejected a visibility-based test. .......... 18

ii. Treating passive, noncurricular speech as government speech conflicts with decisions elsewhere. .......... 19

C. *Pickering* balancing favors Theis. .......... 20

1. Displaying the books when no students could see them caused no disruption. .......... 20

2. Displaying the books in the presence of students did not disrupt InterMountain's ability to efficiently deliver its services. .......... 21

D. InterMountain punished and fired Theis because of his views and lawsuit. .......... 22

1. The parties agree that Theis's speech was a motivating factor for his initial punishment. .......... 22

2. InterMountain's claim that it didn't fire Theis for his views raises no genuine dispute of material fact. .......... 22

II. InterMountain violated Theis's free-exercise rights .......... 26

A. InterMountain showed hostility to Theis's religious speech .......... 27

B. InterMountain burdened Theis's religious exercise under a policy that is not neutral or generally applicable. .......... 28

C. Strict scrutiny applies to Theis's free-exercise claim. .......... 30

D. InterMountain fails strict scrutiny. .......... 31

1. Censoring and firing Theis is not narrowly tailored to any interest. .......... 31

2. InterMountain has no compelling interest in censoring Theis's religious speech. .......... 32

III. InterMountain's policy violates the Constitution both facially and as applied. .......... 33

IV. Defendants denied Theis equal protection by banning his religious views and firing him. .......... 37

V. Theis is entitled to injunctive and declaratory relief and damages .......... 37

A. Theis is entitled to reinstatement, a permanent injunction, and a declaratory judgment ..... 37

B. Theis is entitled to damages ..... 39

Conclusion ..... 40

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .... 27, 30

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) .... 37

*American States Insurance Company v. Kearns*,
15 F.3d 142 (9th Cir. 1994) .... 39

*American Trucking Associations, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .... 38

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .... 13, 22

*Arizona Alliance for Retired Americans v. Mayes*,
186 F.4th 622 (9th Cir. 2026) .... 28

*Ball v. Massanari*,
254 F.3d 817 (9th Cir. 2001) .... 37

*Barber v. Rounds*,
169 F.4th 577 (5th Cir. 2026) .... 19

*Barone v. City of Springfield*,
902 F.3d 1091 (9th Cir. 2018) .... 35

*Bates v. Pakseresht*,
146 F.4th 772 (9th Cir. 2025) .... 26, 27, 29, 35

*Bello-Reyes v. Gaynor*,
985 F.3d 696 (9th Cir. 2021) .... 26

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009) .... 31

*Board of Education of Westside Community Schools v. Mergens*,
496 U.S. 226 (1990) .... 18

*Cajune v. Independent School District 194*,
105 F.4th 1070 (8th Cir. 2024) .... 20

*Center for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .... 27, 35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .... 29, 31

*Clicks Billiards Inc. v. Sixshooters Inc.*,
251 F.3d 1252 (9th Cir. 2001) .... 26

*Damiano v. Grants Pass School District No. 7*,
140 F.4th 1117 (9th Cir. 2025) .... 36, 37, 39

*Dodge v. Evergreen School District #114*,
56 F.4th 767 (9th Cir. 2022) .......... 16, 17, 33

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .......... 38

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 38

*Eng v. Cooley*,
552 F.3d 1062 (9th Cir. 2009) .......... 14

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 38

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*,
82 F.4th 664 (9th Cir. 2023) .......... 28

*Flores v. Morgan Hill Unified School District*,
324 F.3d 1130 (9th Cir. 2003) .......... 37

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) .......... 33

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .......... 31

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .......... 15, 16

*Garcia v. Lawn*,
805 F.2d 1400 (9th Cir. 1986) .......... 39

*Grayned v. City of Rockford*,
408 U.S.104 (1972) .......... 33, 34

*Greisen v. Hanken*,
925 F.3d 1097 (9th Cir. 2019) .......... 14

*Health Freedom Defense Fund v. Carvalho*,
148 F.4th 1020 (9th Cir. 2025) .......... 39

*Hedges v. Wauconda Community. School District No 118*,
9 F.3d 1295 (7th Cir. 1993) .......... 18, 31

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......... 37

*Howard v. City of Coos Bay*,
871 F.3d 1032 (9th Cir. 2017) .......... 23

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
585 U.S. 878 (2018) .......... 15, 35

*Johnson v. Poway Unified School District*,
658 F.3d 954 (9th Cir. 2011) .......... 17

*Kennedy v. Bremerton School District (Kennedy I)*,
869 F.3d 813 (9th Cir. 2017) .......... 17

*Kennedy v. Bremerton School District (Kennedy II)*,
991 F.3d 1004 (9th Cir. 2021) ........ 17, 18

*Kennedy v. Bremerton School District (Kennedy III)*,
597 U.S. 507 (2022) ........ 17, 18, 26, 28, 30, 33

*Las Vegas Sands, LLC v. Nehme*,
632 F.3d 526 (9th Cir. 2011) ........ 13

*Lytle v. Carl*,
382 F.3d 978 (9th Cir. 2004) ........ 39

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ........ 27, 30

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........ 38

*Mid Vermont Christian School v. Saunders*,
151 F.4th 86 (2d Cir. 2025) ........ 28

*Momox-Caselis v. Donohue*,
987 F.3d 835 (9th Cir. 2021) ........ 22

*Monell v. Department of Social Services*,
436 U.S. 658 (1978) ........ 39

*Moonin v. Tice*,
868 F.3d 853 (9th Cir. 2017) ........ 34, 35

*Oyler v. Boles*,
368 U.S. 448 (1962) ........ 37

*Pinard v. Clatskanie School District 6J*,
467 F.3d 755 (9th Cir. 2006) ........ 26

*Posey v. Lake Pend Oreille School District No. 84*,
546 F.3d 1121 (9th Cir. 2008) ........ 16

*Robinson v. York*,
566 F.3d 817 (9th Cir. 2009) ........ 32

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ........ 38

*Santa Fe Independent School District v. Doe*,
530 U.S. 290 (2000) ........ 18

*Settlegoode v. Portland Public. Schools*,
371 F.3d 503 (9th Cir. 2004) ........ 26

*Theis v. InterMountain Education Service District - Board of Directors*,
182 F.4th 1091 (9th Cir. 2026) ........ 12, 16, 17, 19

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1969) ........ 33

*Tucker v. State of California Department of Education*,
97 F.3d 1204 (9th Cir. 1996) ........ 35

*Unigestion Holdings, S.A. v. UPM Technology, Inc.*,
580 F. Supp. 3d 932 (D. Or. 2022) ........ 13
*United States v. National Treasury Employees Union*,
513 U.S. 454 (1995) ........ 35
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ........ 33

**<u>Statutes</u>**

28 U.S.C. § 2201(a) ........ 38
U.S.C. § 1983........ 39
U.S.C. § 1988........ 39

**<u>Rules</u>**

Federal Rule of Civil Procedure 56(a)........ 13

## LOCAL RULE 7-1 CONFERRAL

The parties made a good-faith effort to resolve the issues presented in this Motion but were unable to do so. Defendants oppose this motion.

## MOTION

Under Federal Rule of Civil Procedure 56, Plaintiff Rod Theis moves for summary judgment on all claims against Defendants InterMountain Education Service District ("InterMountain") Board of Directors, Superintendent Mark Mulvihill, and Assistant Superintendent Aimee VanNice. That includes partial summary judgment that Defendants violated the First Amendment by barring Theis's display when the children he serves are not present, and for a declaration, an injunction, and expungement of the November 22, 2024 Letter of Directive to that extent. Plaintiff seeks summary judgment on liability; the amount of damages should be determined in further proceedings.

In November 2024, Defendants barred Theis from displaying three books in his offices: *He Is He*, *She Is She*, and *Johnny the Walrus*. Theis displayed them to express his Christian belief that God created humans in His own image and that He created them male and female. Defendants found that Theis's display violated District Board Policies ACB and ACB-AR (the "Speech Policy") and warned "further conduct of this nature may result in discipline up to and including termination of [Theis's] employment." A year later, Defendants made good on that threat: They fired Theis for displaying the books, even when the students he served were not present.

As the memorandum below explains, Theis deserves relief for five reasons: (1) InterMountain retaliated against him for his protected speech and for filing this lawsuit; (2) it burdened his free exercise of religion; (3) its actions and its Speech

Policy fail strict scrutiny; (4) its Speech Policy is unconstitutionally vague, overbroad, and inflicts a prior restraint, facially and as applied; and (5) it denied him due process and equal protection of the law.

Theis relies on the memorandum below, the declarations and exhibits filed with it, and the rest of the record. Those shows no genuine dispute as to any material fact and that Theis is entitled to judgment as a matter of law.

Theis asks the Court to grant summary judgment in his favor, reinstate him as an Education Specialist, declare InterMountain's challenged actions and Speech Policy unconstitutional as applied to him, permanently enjoin that unconstitutional Speech Policy, facially and as applied to him, and award damages and such further relief as the Court deems just and proper.

## INTRODUCTION

For 17 years, Rod Theis evaluated students for InterMountain, earning his colleagues' praise. Then he displayed three children's books expressing his belief that God made people male and female. After a coworker complained, InterMountain found that Theis had "promote[d] a binary view of gender," ordered the books removed, and threatened his job. A year later, it fired him.

InterMountain lets everyone else decorate their offices as they choose. At La Grande, the teacher who reported Theis displays a progress pride flag. And the schools Theis served teach his message in class. What they teach as biology and grammar, InterMountain punished as bias.

When this Court barred discipline for displaying the books outside his students' presence, Theis put them back. Three days later, four eighth-graders he did not serve walked in uninvited and grabbed the books. The same complaining teacher stood in the doorway, recording. The students were not bothered. She complained anyway, and InterMountain fired Theis.

InterMountain now blames districts that refused his services. But its own motion insists Defendants were "well within their rights to discipline, and later terminate, Plaintiff for the display of those books." Every termination document traces to that episode, and the first refusal InterMountain cites came from La Grande, over the books. No reasonable jury could credit that excuse.

This Court already held that the display outside students' presence was private, nondisruptive speech. That alone warrants partial summary judgment. The Ninth Circuit held, on a preliminary record, that the display was government speech when students were present. But it never saw the firing. These students

were not his, came uninvited, and took the books themselves. Schools do not endorse everything they fail to censor.

InterMountain also said punishing Theis required no "direct targeting," then cleared him of later complaints because no one was targeted. That shifting policy gives no fair notice. And punishing one religious view while tolerating its opposite is neither neutral nor generally applicable.

Disagreement is not disruption. An employer that invites employees to post their views cannot fire the one whose view it dislikes. The Court should deny Defendants' motion, grant Theis's, and order him reinstated.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Theis faithfully served students for 17 years as an InterMountain education specialist.

For 17 years, Theis served public school students as a licensed clinical social worker and InterMountain education specialist. Theis Decl. ¶ 4. He traveled among 17 districts InterMountain serves to give standardized tests and behavioral assessments and to report the results. Theis Decl. ¶¶ 4–6. Colleagues, including his supervisor, gave him glowing recommendations, and InterMountain thanked him for his "dedication to the students in our region." *Id.* ¶ 8, Ex. 1.

His role was limited. He was not a counselor and did not advise students. Theis Decl. ¶ 7. He administered prescribed evaluations and reported the results, and his "Staff Only" office was closed to students except during testing. *Id.* ¶¶ 5–7.

### II. Policies of InterMountain and its schools allow employees to decorate their offices with personal—and often ideological—messages.

Itinerant employees receive office space from their schools. InterMountain lets itinerant employees decorate their school offices as they see fit; it does "not require ... employees to ask permission before they present specific views or decorate their workspace." Theis Decl. ¶ 20; VanNice Decl. ¶ 9 (Doc. 28). Employees display all kinds of personal speech: paintings, photos, posters, quotes, and books. That includes ideological décor such as a union picket-line picture with rainbow signs spelling "UNIONS." Theis Decl. ¶ 21. That union warns against "misgendering." Or. Educ. Ass'n, Ensuring and Protecting Opportunities for Girls, Women and LGBTQ+ Students and Educators (May 2023), https://perma.cc/MZR8-KVGS. La Grande, where Theis had an office, likewise permits ideological décor. There's a poster of President Obama saying "Yes, we can," a progress pride flag declaring

"YOU ARE LOVED," displayed by none other than Rachael Oliver, a "Black lives MATTER" poster, and a rainbow Oregon School Counselors Association union sticker. Theis Decl. ¶ 29, Ex. 6. That association urges members to use transgender terms and hide a child's gender dysphoria from parents. Or. Sch. Counselors Ass'n, Statement to Students and Families (Feb. 2025), https://perma.cc/YS3P8YPH.

## III. Theis's faith inspired him to display three children's books in his offices.

In October 2024, Theis placed two children's books, *He Is He* and *She Is She*, on the windowsill of his La Grande office with only the covers visible. Theis Decl. ¶¶ 10–11, Ex. 2. Each cover showed a smiling child—a boy on one, a girl on the other—along with the title and the phrase "a book about your identity." *Id.* He never used them with students. *Id.* ¶ 14. Four students visited his office in three weeks, and no one complained or asked about the books. *Id.* ¶ 16.

In his Elgin and Union offices, Theis displayed *Johnny the Walrus* for three school years without issue. *Id.* ¶¶ 10, 12. He shared it once with a curious student after an evaluation ended. *Id.* ¶ 15. No one ever complained about *Johnny the Walrus*. *Id.* ¶ 12. InterMountain didn't even know about the book until Theis raised it during the investigation into the other two books. *Id.*

All three books celebrate God's design for boys and girls. Their display reflected Theis's beliefs that God created every person male or female, that we should accept our God-given sex and not seek to change it, and that this sex is revealed through DNA, which cannot change. *Id.* ¶¶ 9, 13, 17.

## IV. After a La Grande teacher complained, InterMountain censored Theis for promoting a "binary view of gender."

About three weeks later, La Grande principal Chris Wagner asked Theis to remove the books pending a meeting about "concerns." Theis Decl. ¶ 34, Ex. 8.

Special education teacher Rachael Oliver had entered Theis's office without his knowledge, photographed *He Is He* and *She Is She*, and complained they were "explicitly religious and clearly transphobic"—while admitting they never "explicitly" mention "trans people." *Id.* ¶¶ 38–39, 44–47; *id.* Ex. 9. Wagner saw nothing inappropriate in the books but asked Theis to remove them to "maintain a more neutral environment," *id.* ¶ 35, even though other employees displayed ideological— including pro-LGBT—décor, *id.* ¶¶ 21–30. Theis complied. *Id.* ¶ 35.

### A. InterMountain investigated Theis for violating its Speech Policy.

Oliver also complained separately to InterMountain. Assistant Superintendent Aimee VanNice opened an investigation into the display as a "potential bias incident" under Policies ACB and ACB-AR. Theis Decl. ¶ 50, Ex. 10. The Speech Policy defines "bias incident" as a "hostile expression of animus" relating to "perceived ... gender identity." *Id.* ¶ 50, Ex. 11. It lets anyone allege a "bias incident" because it defines "[p]ersons impacted by a bias incident ... broadly to include persons directly targeted by an act, as well as the community of students as a whole who are likely to be impacted by the act." *Id.* Violators face "discipline up to and including termination." *Id.*

During the investigation, VanNice interrogated Theis "in an accusatory and leading manner, much like a prosecutor" before two note-takers. Theis Decl. ¶ 52, Exs. 12–13. Though students saw only the covers, VanNice quizzed him on the books' science, pronouns, and religion. *Id.* Exs. 12–13. Theis explained that he doesn't use the books in his work and displayed them to "[s]end a positive message": it is "great to be a girl" and "[b]oys can do great things." *Id.*; *see id.* ¶ 17. Turning to a page of Bible verses, VanNice asked: "Does the [B]ible support they/them?" Theis

explained that it supports the books' views because "[w]e are all designed by God, and [H]e was intentional." *Id.* Exs. 12–13.

VanNice next demanded to know how the books "would help a transgender student." Theis Decl. Exs. 12–13. Theis reminded her that he does not use them with students, *id.* ¶ 14; they are decorations, and many teachers decorate their La Grande classrooms with personal books. *Id.* Many feature violence, drug and alcohol use, sexual content, same-sex relationships, and non-binary characters, all of which students freely access. *Id.* ¶¶ 31–32. VanNice then asked whether *She Is She* "support[s] a she wanting to be a he?" Theis answered: "No." She asked if he thought the display was "a hostile expression of animus towards others." Theis said he had "no ill will towards anyone" and couldn't see how anyone would feel hostility from two book covers.

VanNice concluded that the books could not return to Theis's office because they did "not support transgender or gender neutral." *Id.* Exs. 12–13. He could display only books that do not "display a view that might be contrary to someone else's beliefs," because employees "on the clock" "are not allowed to express views and opinions on specific subjects." InterMountain applies no such rule to any other employee's personal speech in his or her office. *Id.* ¶¶ 18, 20–30.

### B. InterMountain punished Theis for violating its Speech Policy.

About three weeks later, VanNice sent Theis a letter of directive. Theis Decl. ¶ 53, Ex. 14. She determined Theis violated the Speech Policy by displaying "inappropriate materials," i.e., "transphobic books." *Id.* She concluded that even though no student or parent complained and Theis had denied any hostility toward anyone. *Id.* ¶¶ 16, 53, 57, Exs. 12–14. She ordered training on gender identity and

warned that "further conduct of this nature may result in discipline up to and including termination." Theis Decl. ¶ 53, Ex. 14.

### C. InterMountain's superintendent rejected Theis's appeal.

Theis appealed to Superintendent Mark Mulvihill. He explained that colleagues decorate their offices, that he chose the books as "positive kid-friendly artwork," that no one read them, that he bore no "ill will toward anyone," and that the books had affected no one except one employee. Theis Decl. ¶ 54, Ex. 15. Mulvihill responded that the Policy "does not require evidence of direct targeting," yet in a subsequent investigation, VanNice cleared Theis because an alleged "remark was not directed at any specific student, colleague, or member of the school community." *Id.* ¶¶ 55, 95–98. Mulvihill denied the appeal because the books "promote a binary view of gender" and "contradict[ ] [InterMountain's] commitment to inclusivity." *Id.* ¶ 55, Ex. 16.

Yet the schools InterMountain serves teach the same binary view. In biology class, students learn "secondary-sex characteristics are tied to a person's biological sex," Answering.Br. 58, and reproduction requires one male and one female. Theis Decl. ¶ 33, Ex. 7. English classes instruct students to use "he/him" or "she/her" pronouns when referring to a single, gendered individual, not "they/them." *Id.* Theis believes the same thing, and the books express the same message. *Id.* ¶¶ 9, 33.

## V. Theis sued, and the complaints against him multiplied.

Theis sued in May 2025. Theis Decl. ¶ 59. Within nine days, three new complaints followed. InterMountain psychologist Taia Young complained about a seven-week-old text exchange about Theis's books and views, a conversation she initiated. *Id.* ¶¶ 62–64, Exs. 22–23. Two days after Theis sued, Oliver complained a third time, accusing him of unprofessionalism. *Id.* ¶¶ 70–75. And InterMountain

psychologist Liz Durant complained about a four-month-old remark she decided to report only after "Rod's lawsuit ... became public." *Id.* ¶¶ 82–87. The complainants admitted coordinating with each other. *Id.* ¶ 88. A week after he sued, Theis received the lowest evaluation of his career which faulted him for insufficient "sensitivity to individual differences (i.e., ... gender)." *Id.* ¶ 60, Exs. 19–21.

The complaints were baseless. But InterMountain investigated him anyway. InterMountain ultimately cleared Theis of the Young and Durant complaints because his remarks "were not directed at any specific" person—the standard Mulvihill refused to apply to the books. *Id.* ¶¶ 93–95, Exs. 26–27. On Oliver's, InterMountain concluded Theis hadn't violated "any existing policy, administrative rule, or ethical standard." *Id.* ¶ 99. It reprimanded him anyway. *Id.* ¶¶ 99–100, Exs. 28–29.

## VI. When Theis resumed the display as the injunction allowed, Oliver coordinated a setup.

On August 20, 2025, this Court preliminarily enjoined Defendants from disciplining Theis for displaying the books "while the children that he serves are not present." Op. & Order, Doc. 39 at 33; Theis Decl. ¶¶ 105–106. Two days later, Theis resumed the display. Theis Decl. ¶ 107. That same day, Oliver—who admitted she'd been "following the stuff [about this case] in the news" and was monitoring his office—noticed. *Id.* ¶¶ 148–149, Ex. 35, at 14–15.

On August 25, four eighth-grade "ambassadors," entered Theis's office unannounced and without his consent. Theis Decl. ¶¶ 108–111. The eighth-graders didn't start school until the next day, but some had volunteered as "ambassadors" to help sixth- and seventh-graders with their first day of school. *Id.* Theis had no assessments scheduled and did not know them. *Id.* ¶¶ 112–113. They told him they

had nowhere to be and were under no one's authority. *Id.* ¶ 117. No student had ever entered his office unannounced or asked to read the books. *Id.* ¶ 123.

The ambassadors "repeatedly" asked to see the books. *Id.* ¶ 110. While Theis asked who they were and why they were there, they grabbed *She Is She* from the windowsill and began reading it. Theis Decl. ¶¶ 110, 116, 119. Because they were not there as students, had no duties, and came of "their own free will," Theis did not stop them. *Id.* ¶¶ 117–118. Nor would Theis have physically stopped the ambassador or taken the books back by force. *Id.* ¶ 119.

Then—as if on cue—Oliver appeared in the doorway, recording with her phone. Theis Decl. ¶ 121. The ambassadors weren't surprised to see Oliver. *Id.* ¶ 122. They knew her and had "talked outside" her room beforehand. *Id.* ¶¶ 122, 145. Thirty minutes later, they returned uninvited, grabbed *He Is He*, read it, and returned to Oliver's classroom. *Id.* ¶¶ 124, 145. All later denied being "uncomfortable," and Oliver's video shows them laughing as they read. *Id.* ¶¶ 139–140, 144; Conventionally Filed Ex. 17, Doc. 49.

The next day, Oliver complained again, alleging Theis violated InterMountain's Speech Policy because the ambassadors read the books. *Id.* ¶¶ 137–138; Ex. 35, at 9.

## VII. InterMountain launched another investigation and fired Theis.

On August 27, VanNice opened another investigation and barred Theis from La Grande. *Id.* ¶ 128, Ex. 33. Principal Wagner described the subject of the investigation as "a complaint filed ... regarding student access to books in [Theis's] office." Theis Decl. ¶ 129, Ex. 34.

During the investigation, the ambassadors admitted that Theis did not invite them in and they grabbed the books themselves. They all said that reading the

books did not make them feel uncomfortable. Ex. 35 at 10–13; Theis Decl. ¶¶ 143–44. But the investigator did not address these statements, Oliver's role, or her admitted animosity, *id.* ¶¶ 136, 145–147, 150, Ex. 35. And the investigator made findings before anyone sought Theis's side, *id.* ¶¶ 130–131, Ex. 35.

Two months later, InterMountain placed Theis on leave pending termination. *Id.* ¶ 155, Ex. 37. The Pre-Termination Meeting Notice began with the August 25 incident. After a pre-termination meeting and Theis's written responses, Mulvihill recommended Theis's termination. Theis Decl. ¶ 173, Ex. 40. Mulvihill's recommendation also began with the book incident: La Grande "found that you violated [La Grande] school board policy" based on what Theis said about "books [he] brought to school." Ex. 40 at 1; Theis Decl. ¶ 173. On December 17, 2025, the Board accepted Mulvihill's recommendation and fired Theis. Theis Decl. ¶ 175, Ex. 42.

## VIII. Theis appealed to the Ninth Circuit.

Theis appealed the partial denial of his motion for preliminary injunction. The Ninth Circuit held that Theis's display in the presence of students "falls outside the First Amendment's ambit," because it was government speech. *Theis v. Inter-Mountain Educ. Serv. Dist. - Bd. of Directors*, 182 F.4th 1091, 1098 (9th Cir. 2026).

In September 2026, Theis amended his complaint to add allegations about his termination and to seek reinstatement. Doc. 61. Defendants moved for summary judgment on October 30, 2026. Docs. 67, 68. Theis opposes that motion and cross-moves for summary judgment.

## LEGAL STANDARD

Under Rule 56(a), a party is entitled to summary judgment if it shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is material if it could affect the outcome of the case. And a dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When parties cross-move for summary judgment, courts evaluate each motion separately, viewing the record in the light most favorable to the nonmovant. *Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 580 F. Supp. 3d 932, 940 (D. Or. 2022). In evaluating the motions, courts should "consider each party's evidence, regardless under which motion the evidence is offered." *L. V. Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## ARGUMENT

### I. InterMountain retaliated against Theis for his protected speech.

A First Amendment retaliation claim asks five questions in sequence: (1) whether the plaintiff spoke on a matter of public concern; (2) whether he spoke as a private citizen or a public employee; (3) whether his protected speech was a substantial or motivating factor in the adverse action; (4) whether the state had an adequate justification for treating him differently from the general public; and (5) whether the state would have taken the adverse action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Theis bears the burden on the first three questions; if he meets it, the burden shifts to Defendants on the last two. *Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019). Theis meets his burden. Defendants cannot meet theirs.

This Court already ruled that InterMountain violated Theis's First Amendment rights by ordering him to remove the books altogether and enjoined InterMountain from disciplining him for displaying the books "while the children that he serves are not present in those office spaces." Op. & Order, Doc. 39 at 33. It held that "when displaying the books outside the presence of students, Plaintiff spoke as a private citizen and was therefore protected by the First Amendment." *Id.* at 20. InterMountain "failed to show that they have a legitimate administrative interest outweighing Plaintiff's right to display the books when students are not present." *Id.* Only one employee complained, and the theoretical impact for staff and visitors was an "insufficient basis for this Court to find an actual, material, and substantial disruption, or even a reasonable prediction of such a disruption." *Id.* at 21. InterMountain's assertion that it must comply with Oregon's anti-bias law "d[id]

not change their burden to justify their restrictions on Plaintiff's First Amendment rights." *Id.* at 21–22.

At minimum, Theis is entitled to summary judgment and partial relief on his claim that InterMountain retaliated against him for displaying the books outside the presence of students he served. This Court should make the preliminary injunction permanent.

**A. Theis spoke on a matter of public concern.**

No one disputes that Theis spoke on a matter of public concern when he displayed the books in his office. InterMountain officials viewed Theis's display as a comment on gender identity, a fiercely debated topic in today's culture. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018) ("[S]exual orientation and gender identity" is "undoubtedly [a] matter[ ] of profound 'value and concern to the public.'"); *see also* Op. & Order, Doc. 39 at 15 ("[t]he Parties agree that the display of the books amounted to speech on a matter of public concern[.]")

**B. Theis spoke as a private citizen.**

Government employees "receive First Amendment protection for expressions made at work." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006). While the First Amendment does not protect "statements [made] pursuant to [the employee's] official duties," *id.* at 421, government employees have the right "to speak as a citizen." *Id.* at 417. *Garcetti* identifies five markers of official-duty speech: whether it (1) "owes its existence to a public employee's professional responsibilities"; (2) is "commissioned or created" by the employer; (3) "is part of what [the employee] was employed to do"; (4) is a task the employee "was paid to perform"; and (5) "[has] no

relevant analogue to speech by citizens who are not government employees." *Id.* at 421–24. Under this framework, Theis's display was private speech.

**1. As this Court held, Theis spoke as a private citizen when he displayed the books while the students he served were not present.**

This Court already concluded that "when Plaintiff displayed the books when no children were present and only staff could view them, it constituted private speech." Op. & Order at 16. "Although Plaintiff may have been writing reports or conducting other job-related activities while the books were displayed, it is not enough that the display was in his 'office environment,'" this Court reasoned. *Id.* at 19–20. "When no students were present in Plaintiff's office, the message of the books would not be reasonably attributable to IMESD[.]" *Id.* at 20 (citing *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 778 (9th Cir. 2022)). That same conclusion applies at summary judgment.

**2. Theis spoke as a private citizen when he displayed the books in the presence of students.**

Theis acknowledges the Ninth Circuit's ruling, on the preliminary record, that his display of the books in the presence of students "falls outside the First Amendment's ambit." *Theis*, 182 F.4th at 1098. But "location and audience do not necessarily transform private employee expression into government speech in the school context." *Id.* at 1105 (VanDyke, J., dissenting). "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (citation modified); *see also Dodge*, 56 F.4th at 778.

Here, Theis's decorations "were clearly not 'within the scope' of his duties as an educational specialist. They were not expressed 'pursuant to government policy' and did not 'convey a government-created message.' Theis did not use the books while working with students." *Theis*, 182 F.4th at 1106 (VanDyke, J., dissenting) (quoting *Kennedy v. Bremerton Sch. Dist. (Kennedy III)*, 597 U.S. 507, 530 (2022)). So "[l]ike his colleagues' personal items—pride flags, Black Lives Matter posters, and political endorsements—Theis's placement of three children's books as decorations in his office was his own personal speech, not government speech." *Id.* "[D]isagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school." *Dodge*, 56 F.4th at 786.

**a. The Supreme Court has rejected the Ninth Circuit's "excessively broad" test for official speech.**

In *Kennedy III*, the Supreme Court rejected the Ninth Circuit's "excessively broad" standard from *Johnson v. Poway Unified School District* for a narrower test. *Kennedy III*, 597 U.S. at 530–31. A school employee doesn't speak as an employee just because he bears "the mantle of one who imparts knowledge and wisdom," and that "expression was [his] stock in trade." *Kennedy v. Bremerton Sch. Dist. (Kennedy II)*, 991 F.3d 1004, 1015 (9th Cir. 2021) *(quoting Kennedy v. Bremerton Sch. Dist. (Kennedy I)*, 869 F.3d 813, 827 (9th Cir. 2017)). That conception arose from *Johnson*. *See Kennedy I*, 869 F.3d at 827 (quoting *Johnson*, 658 F.3d 954, 967 (9th Cir. 2011)). The proper question is whether the employee "had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks he was paid to perform." *Dodge*, 56 F.4th at 778 (citation modified). Under that test, Theis's office decorations are private speech.

**i. *Kennedy III* rejected a visibility-based test.**

*Kennedy III* rejected the notion that a school risked violating the Establishment Clause because a "'reasonable observer' could think it 'endorsed [a coach's] religious activity by not stopping the practice.'" 597 U.S. at 533 (quoting *Kennedy II*, 991 F.3d at 1018). The Court held the First Amendment protected Kennedy's prayer at midfield, *in full view* of students and the community. *Id.* at 512. Prayer wasn't part of his job, no policy authorized or encouraged it, and the district told him to stop once it learned of it. This sort of expression—unauthorized, long unknown, and eventually disapproved by the state—cannot be "government speech." Otherwise, schools could "fire teachers for praying quietly over their lunch, for wearing a yarmulke to school, or for offering a midday prayer during a break before practice"—indeed, would be "required to do so." *Id.* at 540. The Court did not allow this.

So too here: a mistaken perception of endorsement cannot turn InterMountain's inaction into its own speech. "The proposition that schools do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990). Where public employers fear misattribution, they should disclaim sponsorship, not silence the speaker. *Hedges v. Wauconda Cmty. Sch. Dist.*, 9 F.3d 1295, 1299–300 (7th Cir. 1993) ("The school's proper response is to educate the audience rather than squelch the speaker"); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) ("[N]ot every message" that is "authorized by a government policy and take[s] place on government property … is the government's own."). Theis's expression doesn't become government speech just because students see it.

#### ii. Treating passive, noncurricular speech as government speech conflicts with decisions elsewhere.

To hold Theis's display as government speech conflicts with decisions of the Fifth and Eighth Circuits.

The Fifth Circuit recently held that "*Kennedy* clearly established that school officials may not impose categorical, *visibility-based* restrictions on an employee's private religious expression or exercise outside official duties." *Barber v. Rounds*, 169 F.4th 577, 584 (5th Cir. 2026) (emphasis added). There, a teacher wanted to pray at the school flagpole before school started, and the principal prohibited her religious expression based solely on the possibility she might be "visible to students." *See id.* at 583. In denying the principal qualified immunity, the court explained that *Kennedy III* "rejected the premise that a school employee's private religious expression becomes constitutionally suspect merely because students might observe it." *Id.* at 584.

The Ninth Circuit read *Barber* to support its ruling. But *Barber* cuts the other way. "The majority's distinction between private and public employee expression boils down to an analysis of *where* Theis spoke (in 'offices where he interacted with students as part of his assigned duties') and *who* observed his expression ('the displays were visible to those students during evaluations and meetings')." *Theis*, 182 F.4th at 1105 (VanDyke, J., dissenting). But decorating his office wasn't part of Theis's official duties. Op. & Order, Doc. 39 at 18; Theis Decl. ¶¶ 14, 17. And InterMountain fired Theis after students whom he neither served nor knew entered his office uninvited and read the books. Theis Decl. ¶¶ 110–15, 157–58, 173, 175. That's a visibility-based restriction.

The Eighth Circuit held that plaintiffs plausibly alleged that Black Lives Matter posters teachers chose to display "are expressions of private persons," and

that rejecting "All Lives Matter" and "Blue Lives Matter" posters was "impermissible viewpoint discrimination." *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1082–83 (8th Cir. 2024). There, the court reasoned that the fact that "[t]he District left to the discretion of individual teachers the decision of whether to post the BLM posters in their classrooms ... support[ed] a finding of private speech" because the district had "relinquished control [of the displays] to private actors." *Id.* at 1080–81. So too here: InterMountain "do[es] not require IMESD employees to ask permission before they present specific views or decorate their workspace." VanNice Decl. ¶ 9, Doc 28.

### C. *Pickering* balancing favors Theis.

#### 1. Displaying the books when no students could see them caused no disruption.

As this Court recognized, "Defendants have failed to show that they have a legitimate administrative interest outweighing Plaintiff's right to display the books when students are not present." Op. & Order, Doc. 39 at 20. Defendants claimed their countervailing interest in regulating speech was to comply with Oregon's anti-bias law and to prevent the potential impact viewing the display would have on staff and visitors. *See id.* at 20–21. This Court rejected both arguments. It concluded that "citing statutory requirements does not change [InterMountain's] burden to justify their restrictions on Plaintiff's First Amendment rights," *id.* at 22, and that citing "potential" impact "is an insufficient basis for this Court to find an actual, material, and substantial disruption, or even a reasonable prediction of such a disruption," *id.* at 21. At summary judgment, Defendants still have no evidence of disruption.

**2. Displaying the books in the presence of students did not disrupt InterMountain's ability to efficiently deliver its services.**

InterMountain does not dispute that the display caused no actual disruption. Nor can it show any reasonable forecast of disruption. In the three school years Theis displayed *Johnny the Walrus*, no one complained about it. *Id.* ¶ 12. No students complained about the other books either. *Id.* ¶¶ 16, 57. InterMountain conceded that the mere display of these book covers didn't "target[ ]" anyone. *Id.* ¶¶ 55, 95, Exs. 16, 27. And students in its schools are exposed to the same binary view of gender in class. *Id.* ¶ 33, Ex. 7.

The complaints about the display came from one teacher: Rachael Oliver. Theis Decl. ¶¶ 39, 70, 137. But even the students she sought to "protect" didn't feel any discomfort. Theis Decl. ¶ 144, Ex. 35. And her complaints were motivated by her admitted animosity towards the views expressed by the books. *Id.* ¶¶ 147, 150; Ex. 35, at 14–15. Disagreement is not disruption. *Dodge*, 56 F.4th at 786.

InterMountain censored Theis because of the viewpoint it read into the display. It admitted that "[t]he conduct at issue here" was "plaintiff's display in his office of two books that advance a binary view of gender[.]" Defs.' Resp. to Plf.'s Mot. Prelim. Inj. at 8. InterMountain permits employees to promote "the validity of non-binary and transgender experiences," including via office décor, but prohibits messages that "diminish[ ]" that "validity." Ex. 16. The books, however, don't even mention transgenderism, much less demean anyone. Theis Decl. ¶¶ 13, 44. As InterMountain conceded, *Johnny the Walrus* "sat alone in Theis' office apparently unnoticed for some long period." Answering Br. of Resp't-Appellee at 30, No. 25-5641 (9th Cir. Dec. 1, 2025).

The schools InterMountain serves, bound by the same Oregon statute, did not find the books hateful. They teach students a "binary view of gender" in science and

English class. Theis Decl. ¶¶ 12, 33, Ex. 7. InterMountain's only response is it "does not, and cannot, control" the schools it serves or their employees[,]" "the library or classroom content in the schools[,]" or "the curriculum." VanNice Decl. ¶ 4, Doc 28. But that shows this isn't about harm to children. InterMountain's real objection was that Theis's celebration of boys and girls "directly contradicts" its preferred view of gender. Theis Decl. ¶ 55, Ex. 16. That doesn't satisfy its burden under *Pickering*.

### D. InterMountain punished and fired Theis because of his views and lawsuit.

#### 1. The parties agree that Theis's speech was a motivating factor for his initial punishment.

The parties agree that Theis's speech motivated the Letter of Directive and that InterMountain wouldn't have issued it absent that speech. *See* Mot. Prelim. Inj. Hearing Tr. 49:21–50:9. With these factors established, Theis has shown a prima facie retaliation case based on InterMountain's censorship of his display outside the presence of students.

#### 2. InterMountain's claim that it didn't fire Theis for his views raises no genuine dispute of material fact.

Defendants now say they fired Theis "not because Plaintiff displayed the books," but "because the school districts that IMESD services refused to allow Plaintiff to work in their districts," and so InterMountain "simply did not have a position within the service district that Plaintiff could fill." Defs.' Mot. for Summ. J. at 4, Doc. 67 (citing Decl. of Aimee VanNice ¶¶ 3–4, Doc. 68). On summary judgment, however, "the alleged factual dispute must be both genuine and material to the nonmoving party's claims." *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021). An issue is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts

that might affect the outcome of the [action] under the governing law will properly preclude the entry of summary judgment." *Id.* InterMountain's claim is neither genuine nor material. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1044 (9th Cir. 2017) (speech needn't be the sole cause, only "a substantial or motivating factor for the adverse employment action." (citation modified))

No reasonable jury could accept it, for five reasons. First, Defendants have repeatedly admitted that the book display was the reason for termination. Their motion opens by asserting that "Defendants were well within their rights to discipline, and later terminate, Plaintiff for the display of those books." Defs.' Mot. for Summ. J. at 2. It then explains that "[a]fter Plaintiff refused to stop displaying the books to students, Defendants initiated termination proceedings." *Id.* at 3.

Defendants told this Court the same thing when it opposed Theis's motion to enforce: because Theis "display[ed] *He Is He* and *She Is She* in his office when a group of eighth grade students were present," InterMountain was "well within their rights to initiate any associated disciplinary action, such as issuing a pre-termination notice." Defs.' Resp. to Mot. to Enforce at 7, Doc. 50. In its own words, this was disciplinary action "associated" with the book display. *Id.*

Second, InterMountain's own termination documents tie the firing to the books. The Pre-Termination Notice, the Investigation Report, the Superintendent's Recommendation, and the Board's Termination Letter each attribute La Grande's refusal to host Theis to his "conduct" on August 25—when the ambassadors read the "books [he] brought to school"—and describe La Grande as the "latest" district to refuse his services "[a]s a consequence of your most recent conduct." Theis Decl. ¶¶ 157–58, 173, 175, Ex. 37, at 2–3; Ex. 40, at 1; Ex. 42. Indeed, the Investigation Report cites *this Court's opinion* and Theis's alleged failure to abide by it. *Id.* ¶¶

133–35, Ex. 35, at 7. The second stated ground—“[i]nability to create a positive work environment”—likewise rests on Theis’s “remarks” to the ambassadors about the books. *Id.* ¶¶ 158, 173, Ex. 37, at 2–3; Ex. 40. The Board adopted those reasons and no others. *Id.* ¶ 175, Ex. 42.

Third, the timeline confirms causation. Theis resumed displaying the books on August 22, 2025. Theis Decl. ¶ 107. The ambassadors entered his office three days later. *Id.* ¶¶ 108–10. Oliver complained the next day. *Id.* ¶ 137. And the day after that, InterMountain opened its investigation and barred Theis from La Grande on August 27, *id.* ¶ 128, Ex. 33. That investigation led to Theis’s termination. *Id.* ¶¶ 155–58, 173–75, Exs. 37, 40, 42. For more than a decade before the book display, InterMountain never sought to terminate him—despite the “professionalism” concerns it later cataloged from as far back as 2015. *Id.* ¶¶ 158, 172, Ex. 37, at 2–3; *see Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 980 (9th Cir. 2002) (Circumstantial evidence showing “(1) proximity in time between the protected speech and the alleged retaliation; (2) the employer's expressed opposition to the speech; and (3) other evidence that the reasons proffered by the employer for the adverse employment action were false and pretextual” demonstrates retaliatory motive (citations omitted)).

The timeline also supports Theis’s claim that InterMountain retaliated against him for suing. It reprimanded Theis because of Oliver’s third complaint, which she coordinated with others right after he sued. InterMountain also gave him his lowest evaluation ever one week after he sued. That document faulted him for insufficient “sensitivity to individual differences (i.e., ... gender).” *Id.* ¶ 60, Exs. 19–21.

Fourth, InterMountain offers no evidence for its "six districts" figure. Theis Decl. ¶¶ 158, 167–70. Theis knows of only two formal non-placement requests, and La Grande's request stemmed from the complaint about his books. *Id.* ¶ 167. He left Umatilla in 2017 for his own safety. *Id.* ¶ 168. InterMountain never produced evidence of the Pendleton and Milton-Freewater requests, and the sixth district was never named. *Id.* ¶¶ 169–70. VanNice's declaration doesn't identify the six districts or when or why each declined his services, or any document showing his position lacked sufficient work. VanNice MSJ Decl. ¶¶ 2–4.

InterMountain also inflated its list of "professionalism" concerns by double-counting the same incidents and counting matters that were resolved, that exonerated him, or that never appeared in his personnel file—while ignoring requests from those same districts that he return. *Id.* ¶ 172. And by Inter-Mountain's own count, Theis could have worked in any of 11 other districts. *Id.* ¶ 171; VanNice MSJ Decl. ¶ 2.

Fifth, the investigation that produced La Grande's refusal grew out of a setup by the same employee whose complaint started this case. Rachael Oliver—who filed the original complaints with La Grande and InterMountain, Theis Decl. ¶ 39, a third complaint two days after Theis sued, *id.* ¶ 70, and the August 26 complaint, *id.* ¶ 137—admitted she was following the case in the news, monitoring his office, and opposed to the display. *Id.* ¶¶ 147–50, Ex. 35 at 14–15. The ambassadors' own statements show they came from and returned to her classroom, entered uninvited, grabbed the books themselves, and felt no discomfort. *Id.* ¶¶ 143–45, Ex. 35, at 10–15. So La Grande's request to bar Theis flowed directly from his display, and Inter-Mountain adopted that as the basis for his termination. *Id.* ¶¶ 157–58, 173, 175, Ex. 37, at 2–3; Ex. 40, at 1; Ex. 42.

Because no genuine dispute exists over whether InterMountain fired Theis at least in part for his display, Theis has met the third element of his retaliation claim. At minimum, InterMountain's motion fails, because the Court must view the record in the light most favorable to the nonmovant and draw all reasonable inferences in Theis's favor. *Clicks Billiards Inc.*, 251 F.3d at 1257.

Lastly, InterMountain has not argued that it would have terminated Theis "even in the absence of [his] protected speech." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (citing *Pinard v. Clatskanie Sch. Dist. 6J, 467 F.3d 755, 770 (9th Cir. 2006)*). Nor could it. The government "must show more than that they '*could have*' punished the plaintiffs in the absence of the protected speech; instead, 'the burden is on the defendants to show' through evidence that they '*would have*' punished the plaintiffs under those circumstances." *Id.* (quoting *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 512 (9th Cir. 2004)). Here, InterMountain's decision to terminate Theis unquestionably stemmed from his display of the books in August 2025.

## II. InterMountain violated Theis's free-exercise rights.

The Free Exercise and Free Speech Clauses "work in tandem." *Kennedy III*, 597 U.S. at 523. "Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities." *Id.* "[T]hese rights spring from a common constitutional principle: that the government may not insist upon our adherence to state-favored orthodoxies, whether of a religious or political variety." *Bates v. Pakseresht*, 146 F.4th 772, 783–84 (9th Cir. 2025) (holding state policy that "suppress[ed] [Bates's] sharing of [her] religious views" burdened her free-speech and free-exercise rights). *Id.* at 790. "When 'the First Amendment protects an

individual's right to speak [her] mind,' it likewise protects her right to speak and live out her conscience, as her religion would direct." *Id.* at 784 (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023)).

Here, Theis believes "God created every person male or female, and that people should accept their God-given sex and not seek to reject or change it." Theis Decl. ¶ 9. That InterMountain's Policy forbids promoting that binary view of gender is "unmistakably normative" and "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Mahmoud v. Taylor*, 606 U.S. 522, 550 (2025).

Theis acknowledges this Court's and the Ninth Circuit's holdings that he "is unlikely to succeed on his Free Exercise claim" because they found InterMountain's Speech Policy was "neutral and generally applicable." Mem. Op. at 3–4. But the Ninth Circuit didn't address Theis's argument that InterMountain treated his religious views with overt hostility. And Theis now has more evidence of hostility. Both courts also ruled on a pre-termination record. *See Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) ("'[B]ecause the fully developed factual record may be materially different from that initially before the district court, our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits.'") (citation omitted)). The full record shows the policy "targets religious expression" and regulates *all* employee conduct, not just conduct "in student-facing professional settings." Mem. Op. at 4.

**A. InterMountain showed hostility to Theis's religious speech.**

InterMountain didn't hide its disdain for Theis's religious views. Before firing him, it cast Theis as a "bigot[ ]," who spread "anti-transgender propaganda" and

"discriminatory rhetoric." Answering Br. 36–37. It even equated his views with racism. *Id.* at 18. During the investigation, InterMountain labeled the books "transphobic" and "a hostile expression of animus." Theis Decl. ¶¶ 52–53, Exs. 12–14. VanNice interrogated Theis about the books' religious views in an "accusatory and leading" manner. *Id.* ¶ 52, Exs. 12–13. Mulvihill determined the display "diminishes the validity of non-binary and transgender experiences" and "contributes to an unwelcoming environment." *Id.* ¶ 55, Ex. 16. So when Oliver complained again on August 26, InterMountain seized on it to fire Theis. *Id.* ¶¶ 128, 137, 155.

Courts have found hostility in similar statements. *E.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 691–92 (9th Cir. 2023), overruled on other grounds (associational standing) by *Ariz. All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (finding hostility where officials described religious views as violating "inclusiveness [and] open-mindedness," "of a discriminatory nature," "bullshit," and without "validity," and "creating a hostile work environment"); *Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 94 (2d Cir. 2025) (religious hostility existed from comments about "blatant discrimination under the guise of religious freedom"). That hostility means this Court should "set aside" InterMountain's censorship "without further inquiry." *Kennedy III*, 597 U.S. at 525 n.1.

### B. InterMountain burdened Theis's religious exercise under a policy that is not neutral or generally applicable.

InterMountain censored and terminated Theis because one employee perceived his speech as "transphobic." Theis Decl. ¶¶ 44, 53. Labeling speech "hostile" is not neutral. And InterMountain doesn't discipline other employees who take the

opposite view. *Id.* ¶¶ 20–28. That's not generally applicable. The Ninth Circuit reached a different conclusion because it read InterMountain's Speech Policy to regulate only "employee conduct in student-facing professional settings." Mem. Op. at 4. But this record shows otherwise.

In assessing neutrality, courts "must carefully examine the totality of the circumstances," including "the effect of [the] law in its real operation,' which 'is strong evidence of its object.'" *Bates*, 146 F.4th at 791 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535, 540 (1993)). In *Bates*, the Ninth Circuit concluded that a policy requiring assent to specific views of sexuality and gender stood "most obviously in opposition to more traditional understandings," which "are often held by persons with religious viewpoints," *id.* at 794, and would therefore "overwhelmingly block those prospective parents who hold traditional religious views on sexuality and gender." *Id.* That policy was not neutral and triggered strict scrutiny. *Id.* at 794–95.

InterMountain's Speech Policy forbids only certain viewpoints. It doesn't just regulate "employee conduct in student-facing professional settings." Mem. Op. at 4. It treats *any* promotion of "a binary view of gender" as a "bias incident" because it "communicates a message of exclusion and diminishes the validity of non-binary and transgender experiences," and "contributes to an unwelcoming environment, which directly contradicts [InterMountain's] commitment to inclusivity and diversity." Theis Decl. ¶ 55, Ex. 16. So InterMountain told Theis his books "cannot go back into [his] office" *at all*. Ex. 14 at 6. InterMountain's reason was that "students *and staff* may interpret that the books send a message of bias and exclusion." *Id.* And according to Mulvihill, even "complying with the directive" to remove the books "does not absolve you from responsibility for the initial display or its

potential impact," hence the initial order for reeducation training. Ex. 16 at 3; Theis Decl. ¶¶ 53, 55.

But a "welcoming" environment "cannot be achieved through hostility toward [ ] religious beliefs[.]" *Mahmoud*, 606 U.S. at 568. Here, the Speech Policy is not generally applicable. It is "welcoming" only to those who affirm the "*validity* of non-binary and transgender experiences," while it labels people of faith who hold a biological view of gender "transphobic" and threatens them with termination. That is not neutrality—especially when InterMountain's schools teach the same view in class. Theis Decl. ¶ 33, Ex. 7.

### C. Strict scrutiny applies to Theis's free-exercise claim.

Strict scrutiny is the right test when government restricts religious speech. *See 303 Creative*, 600 U.S. at 588 (applying per se rule against state action designed to "excise certain ideas or viewpoints from the public dialogue." (citation modified)) *Kennedy III* noted that "[u]nder the Free Exercise Clause, a government entity normally must satisfy at least strict scrutiny," 597 U.S. at 532 (citation modified), and the Court has "never before applied *Pickering* balancing to a claim brought under the Free Exercise Clause," *id.* at 545 (Thomas, J., concurring). Although the Ninth Circuit applied rational basis review because it deemed the Speech Policy neutral and generally applicable, Mem. Op. at 4, it determined this based on the pre-termination record. The full record shows the Policy targets religious expression and regulates *all* employee conduct and InterMountain engaged in overt hostility against Theis's religious views. *Supra* Argument II.A–B. Strict scrutiny fits the burden on Theis's religious speech better than *Pickering* balancing.

### D. InterMountain fails strict scrutiny.

Strict scrutiny requires InterMountain to show its Policy "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021) (quoting *Lukumi*, 508 U.S. at 546). InterMountain cannot meet strict scrutiny's "exacting standard." *Berger v. City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) (en banc). It has no compelling interest in regulating Theis's passive and benign religious speech on a matter of public concern. His display undermined no InterMountain interest or functioning. *Supra* Argument I.C. And investigating, censoring, and terminating Theis are not narrowly tailored to any interest. InterMountain allows its employees to decorate their offices with personal messages. It cannot welcome employees to share their views on a host of issues but then punish one simply because one employee repeatedly objects to his views.

#### 1. Censoring and firing Theis is not narrowly tailored to any interest.

Censoring and firing Theis was not the least restrictive means to further InterMountain's interests. If InterMountain feared observers would mistake Theis's private speech for its own, it could have said office décor does not speak for InterMountain. It didn't need to censor the message—let alone fire the speaker. *Hedges*, 9 F.3d at 1299–300 ("The school's proper response is to educate the audience rather than squelch the speaker.")

InterMountain's only justification for censoring Theis was the "*potential* impact" of the books' display on students and staff who "*may* interpret that the books send a message of bias and exclusion" at some point in the future. Theis Decl. ¶ 55, Ex. 16. Yet InterMountain and its schools allow displays students may consider "bias[ed] and exclus[ory]." *Supra* Background II; Theis Decl. ¶¶ 20–30. A

student who believes “All Lives Matter” may feel a bias against him from the teacher who displays “Black Lives Matter.” *Id.* ¶ 29. A student who believes biological sex dictates gender may feel bias against him from the teacher who displays the progress pride flag. Plus, the schools teach the very same message Theis displayed, with much greater impact on students than a brief encounter with Theis’s passive book covers. *Id.* ¶ 33. This “system of exceptions” undermines InterMountain’s contention that tolerating Theis’s religious views is unworkable. *Fulton*, 593 U.S. at 542.

**2. InterMountain has no compelling interest in censoring Theis’s religious speech.**

InterMountain has no compelling interest in discriminating against Theis for his religious speech. As this Court held, InterMountain cannot “show that [Theis’s] protected First Amendment expression presented an ‘actual, material and substantial disruption,’ or demonstrate ‘reasonable predictions of disruption in the workplace.’” Op. & Order, Doc. 39 at 21 (quoting *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009)).

First, InterMountain argued its “countervailing interest in regulating speech was complying with Oregon’s anti-bias law.” Op. & Order, Doc. 39 at 20–21. This Court rejected that argument in a single line, concluding that simply “citing statutory requirements does not change [InterMountain’s] burden to justify [its] restrictions on [Theis’s] First Amendment rights.” *Id.* at 22.

Second, as this Court noted, there was only “one bias incident complaint about [Theis’s] display in his [La Grande] office.” *Id.* at 21. And the only “disruption” InterMountain identified was that one La Grande employee felt the books were “transphobic”—and that employee later coordinated a setup to have Theis disciplined again. Excluding Theis’s respectful, passive, and protected speech

to "creat[e] a safe place" and ensure "inclusivity and tolerance" for students who disagree, fails. *Dodge*, 56 F.4th at 786. Those are just buzzwords for "avoid[ing] the 'discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Id.* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969).

Educators also have an interest in teaching students and staff to tolerate the religious beliefs of others. *Kennedy III*, 597 U.S. at 538 ("[L]earning how to tolerate speech or prayer of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry." (citation modified)).

Despite offering no evidence to show Theis's speech was likely to undermine InterMountain's functions and hearing no complaints from students, InterMountain still terminated Theis for displaying the books. Theis Decl. ¶¶ 16, 53, 57, Ex. 14. No compelling interest justifies its actions. InterMountain fails strict scrutiny.

## III. InterMountain's policy violates the Constitution both facially and as applied.

The Constitution guarantees public employees "a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S.104, 108 (1972). This doctrine applies with additional force where policies "interfere[ ] with the right of free speech." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). The Due Process Clause protects against punishment for conduct a person "could not have known was" prohibited and "arbitrary and discriminatory enforcement." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (citation modified). InterMountain's Speech Policy causes both.

### A. Intermountain's policy facially violates due process and inflicts a prior restraint on speech.

Intermountain's Speech Policy lacks "explicit standards for those who apply [it]." *Grayned v. City of Rockford*, 408 U.S.104, 108–09 (1972). The Speech Policy

defines "Bias incident" as a "person's hostile expression of animus toward" another "person's perceived … gender identity[.]" Ex. 11. It defines broadly "[p]ersons impacted by a bias incident" as "to include persons directly targeted by an act, as well as the community of students as a whole who are likely to be impacted by the act." In fact, the policy doesn't even require IMESD officials to identify any specific individual who was "impacted" to determine that conduct constitutes a "bias incident."

On its face, the Speech Policy fails to provide any standards restricting InterMountain enforcers. Instead, it expressly gives them unlimited discretion, barring even "language or behavior" the administration determines is "likely to [] impact[]" a group. InterMountain's actions show this is no surplusage: they use this exact leeway to silence speech staff "may interpret" to "send a message of bias and exclusion" at some point in the future. The Speech Policy vests officials with unlimited discretion to restrict speech. This dooms InterMountain's Policy under both the First and Fourteenth Amendments.

InterMountain must shoulder an even "heavier burden" to justify its Policy because it is "an ex ante speech restriction." *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017). It inflicts a prior restraint, "chill[ing] potential speech before it happens." *Id.* The Policy's prohibitions apply anytime and anywhere. Thus, "the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (citation modified). Defendants must show their policy "serve[s] a compelling state interest that cannot be achieved through means significantly less restrictive of

[First Amendment] freedoms." *Janus*, 585 U.S. at 894 (citation modified); *accord Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir. 1996) ("This is indeed an exacting standard.") The Court first asks whether the restriction reaches speech on matters of public concern outside an employee's official duties. *Moonin*, 868 F.3d at 861. The government then must meet its "greater" burden to show an "adequate justification" for the speech restriction. *Barone v. City of Springfield*, 902 F.3d 1091, 1104–05 (9th Cir. 2018). It cannot meet exacting scrutiny's demanding strictures. *Supra* Argument II.D.

**B. Intermountain violated due process as applied.**

The Ninth Circuit preliminarily held only that Theis was unlikely to succeed because he "received adequate notice and an opportunity to be heard" through InterMountain's appeal process. Mem. Op. at 4. The appellate record, however, stopped at InterMountain's censorship. *Ctr. for Biological Diversity*, 706 F.3d at 1090 (Ninth Circuit's "disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." (citation modified)) The record since then shows what the Speech Policy means in practice: whatever InterMountain says it does.

First, Theis had no fair notice. InterMountain punished Theis because he promoted "a binary view of gender,"—even though those words appear nowhere in its Speech Policy or state law. Theis Decl. ¶ 55, Exs. 11, 16. No employee could glean that a ban on "hostile expression[s] of animus" prohibited expressing "more traditional understandings of sexuality and gender." *Bates*, 146 F.4th at 794. Theis could only guess at the policy's meaning. Theis Decl. ¶ 51; Ex. 15 ("I was still left confused as to how the display of the two books could objectively be considered a violation[.]").

It only adds to the vagueness that the schools InterMountain serves read "hostile expression of animus" differently. InterMountain claims its Speech Policy mirrors an Oregon statute that applies to every public education provider. Yet Principal Wagner told Theis he didn't think the books were inappropriate or offensive, and Theis's Elgin building administrator approved of his display of *Johnny the Walrus*. Theis Decl. ¶¶ 12, 35. So school officials charged with enforcing the same statute InterMountain claims requires censorship of Theis's display did not agree that the law prohibits employees from "promot[ing] a binary view of gender." Similarly, another school subject to the same law did "'not sustain'" bias-incident allegations against teachers who publicly advocated that gender is binary, because it was "'not clear'" whether their speech was a "'hostile expression of animus.'" *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1135 (9th Cir. 2025). And schools Theis served teach that DNA dictates sex and that students should use "he" or "she"—not "they"—for a single person. Theis Decl. ¶ 33, Ex. 7. If "he is he" isn't a "hostile statement of animus" in class, it isn't in Theis's office either.

Second, InterMountain enforced its Speech Policy arbitrarily. When it initially disciplined Theis, InterMountain explained the Policy "does not require evidence of direct targeting." Theis Decl. ¶ 55, Ex. 16. But months later, it cleared him of other complaints because his statements "were not directed at any specific student, colleague, or member of the school community." *Id.* ¶¶ 94–95, Ex. 27, at 2. So InterMountain's application of a "bias incident" is a "wholly subjective judgment" unmoored from any "statutory definitions, narrowing context, or settled legal meanings." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010) (citation modified). That renders the Speech Policy unconstitutionally vague.

## IV. Defendants denied Theis equal protection by banning his religious views and firing him.

The Supreme Court has stated that "whenever the government treats any person unequally because of his or her [membership in a protected class], that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229–30 (1995). The Ninth Circuit recognizes "allegations of disparate treatment based on viewpoint give rise to a cognizable equal protection claim." *Damiano*, 140 F.4th at 1150.

Here, the Speech Policy discriminates based on religious viewpoint: it lets Theis's coworkers display messages that gender is fluid but bars Theis from expressing his religious beliefs that gender is binary. Decisions based on "an unjustifiable standard such as race, religion, or other arbitrary classification"—traditional suspect classes—are intolerable under the Equal Protection Clause. *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

Religious and viewpoint discrimination trigger at least strict scrutiny. *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). InterMountain cannot meet that burden. *Supra* Argument II.D.

## V. Theis is entitled to injunctive and declaratory relief and damages.

### A. Theis is entitled to reinstatement, a permanent injunction, and a declaratory judgment.

Because Theis has shown InterMountain's actions and policy are unconstitutional, this Court should grant a permanent injunction and declaratory relief. A permanent injunction requires Theis to show (1) irreparable injury, (2) that other remedies are inadequate; and that (3) the balance of hardships and (4) the public

interest favor an injunction. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023). Theis satisfies each one.

On irreparable harm, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And because Theis has suffered constitutional injuries, legal remedies can't make him whole. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). "[T]he balance of equities favors [the party] whose First Amendment rights are being chilled," *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014), and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). So Theis is entitled to reinstatement and a permanent injunction against Defendants' ongoing censorship.

Theis is entitled to prospective declaratory relief for the same reasons. The Declaratory Judgments Act states: "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The procedural requirements for a declaration under 28 U.S.C. § 2201 are: (1) "the court must inquire whether there is a case of actual controversy within its jurisdiction"; and (2) if so, "the court must decide whether to exercise that jurisdiction." *Am. States. Ins. Co. v. Kearns*, 15 F.3d 142, 143–44 (9th Cir. 1994). The first requirement "is identical to Article III's constitutional case or controversy requirement." *Id.*

This controversy remains live. As the Ninth Circuit ruled, "[e]ven after termination, courts may grant equitable relief, including reinstatement or expungement of adverse employment actions." Mem. Op. at 2 (quoting *Health Freedom Defense Fund v. Carvalho*, 148 F.4th 1020, 1026 (9th Cir. 2025); *Garcia v. Lawn*, 805 F.2d 1400, 1402 (9th Cir. 1986)). "Because Theis seeks prospective relief and the challenged policy remains in force, effective relief remains available," and his claims are therefore not moot. *Id.* So this Court should declare that Defendants' Policy—which bars messages deemed "bias incidents," "hostile expression[s] of animus toward another person" based on "gender identity," or otherwise "contribute[] to an unwelcoming environment"—is unconstitutional.

**B. Theis is entitled to damages.**

Section 1983 gives a damages remedy against anyone who, under color of state law, deprives a person of "rights, privileges, or immunities secured by the Constitution," and § 1988 allows a prevailing plaintiff to recover attorney fees. 42 U.S.C. §§ 1983, 1988. "[L]ocal governing bodies such as school districts may be held liable under § 1983 where a plaintiff shows that 'execution of a government's policy or custom ... inflict[ed] the injury.'" *Damiano*, 140 F.4th at 1154 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978)). That liability may rest on an expressly adopted official policy or the acts of a final policymaker. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Here, InterMountain, through its Board as the final policymaker and its Speech Policy, deprived Theis of his First and Fourteenth Amendment rights and his livelihood when it targeted his religious beliefs, retaliated against him for religious speech, and wielded a vague policy to excise him and his views from the workplace.

As a direct result of InterMountain's actions, Theis lost the remainder of his salary and benefits for the 2025–26 contract year, as well as the salary and benefits he would've received in the 2026–27 contract year. Theis Decl. ¶¶ 176–77. The firing also cut into his Oregon retirement benefits. *Id.* ¶ 178. He suffered other tangible and intangible damages. *Id.* ¶¶ 179–82. The Court should award Theis his damages, attorney fees, and costs, in amounts to be determined by separate motion.

## CONCLUSION

When the government punishes people for expressing views on important political and cultural questions, it threatens everyone's freedom. Defendants violated Theis's constitutional rights when it ended his 17-year career because of his views and one employee's disagreement with them. The Constitution does not let Defendants favor one viewpoint and silence another. Theis asks this Court to grant his summary-judgment motion, deny Defendants', reinstate him, issue a permanent injunction and a declaratory judgment, award damages, and schedule a hearing on any additional remedies.

Respectfully submitted this 23rd day of November, 2026.

Rebekah Schultheiss
OR Bar No. 121199
LAW OFFICES OF REBEKAH MILLARD, LLC
P.O. Box 7582
Springfield, Oregon 97475
(707) 227-2401
rebekah@millardoffices.com

/s/ *Tyson C. Langhofer*
Tyson C. Langhofer*
VA Bar No. 95204
Matthew C. Ray*
GA Bar No. 347985
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
tlanghofer@ADFlegal.org
mray@ADFlegal.org

David A. Cortman*
GA Bar No. 188810
Travis C. Barham*
GA Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org
tbarham@ADFlegal.org

*Counsel for Plaintiff*
**Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains **10,994** words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ *Tyson C. Langhofer*
Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on November 23, 2026, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record for all parties.

s/ *Tyson C. Langhofer*
Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
*Counsel for Plaintiff*